# United States Court of Appeals for the Eleventh Circuit

No. 25-11376

---

Blake Warner

*Plaintiffs-Appellants,*

*v.*

The School Board of
Hillsborough County, Florida

*Defendants-Appelleees.*

Appeal from the United States District Court
for the Middle District of Florida
USDC No. 8:23-CV-181

---

**BRIEF OF APPELLANT**

(i)

**Table of Contents**

I     Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

II    Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . 1

III   Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . 1

IV   Jurisdiction Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

V     Statement of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

VI   Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

VII   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VIII Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . 9

IX   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1.    The Fair Housing Act as an Educational Bill of Rights: Congressional Intent to Address School Segregation . . . . . . . . . . . . . . . . . . . . . 11

2.    FHA § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     A.   The Statutory Text and Purpose Support a Broad Construction . . . . . 15

     B.   The District Court Erred in Narrowly Interpreting § 3604(a) . . . . . . 16

     C.   School Boundaries Directly Affect Housing Availability . . . . . . . . 17

     D.   The Connection Between School Boundaries and Housing Availability Satisfies Proximate Cause . . . . . . . . . . . . . . . . . . . . . 17

     E.   Relevant Circuit Precedent Supports This Interpretation . . . . . . . . 22

     F.   Conclusion on § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . 23

3.    FHA § 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     A.   The Plain Text and Context of § 3604(b) Encompasses School Assignment as a Housing-Connected Service . . . . . . . . . . . . . . . . . 24

     B.   The Direct Connection Between Housing Location and School Assignment Creates a Protected Service Under § 3604(b) . . . . . . . . . 25

     C.   Eleventh Circuit Precedent Establishes That § 3604(b) Covers Services Connected to Housing . . . . . . . . . . . . . . . . . . . . . . 26

D. The Direct Parallels Between Utility Services in LaGrange and School Assignment Policies . . . . . . . . . . . . . . . . . . . . . . . . . . 27

E. Supreme Court Precedent Supports Reading § 3604(b) to Include School Boundaries as Zoning Decisions . . . . . . . . . . . . . . . . . 29

F. The District Court's Narrow Interpretation Contradicts Precedent and Frustrates the FHA's Purpose . . . . . . . . . . . . . . . . . . . . 30

4. The Due Process Clause Protects Parents' Fundamental Right to Direct Their Children's Education, Including the Right to Apply for School Choice Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

A. Supreme Court Precedent Establishes the Fundamental Right of Parents to Direct Their Children's Education . . . . . . . . . . . . . . 32

B. The Right to Direct a Child's Education Necessarily Includes the Right to Apply for School Choice Programs . . . . . . . . . . . . . . . 33

C. Florida's School Choice Laws Create a Protected Property Interest Under the Due Process Clause . . . . . . . . . . . . . . . . . . . . 35

D. Procedural Due Process Violation . . . . . . . . . . . . . . . . . . 37

E. Educational Quality Disparities Heighten the Constitutional Significance of School Choice Applications . . . . . . . . . . . . . . . . . 38

5. The Settlement Agreement Is Unenforceable Under State Law . . . . . . . . 39

A. The Agreement Expressly Preserved Claims Arising After the Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

B. The School Assignment Boundary Challenge was not "Specifically Related" to J.W.'s Education . . . . . . . . . . . . . . . . . . . . 41

C. The Voting Map Challenge Was Not "Specifically Related" to J.W.'s Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

D. Fraudulent Inducement Exception to Parol Evidence Rule . . . . . . . 45

E. Warner Received No Valid Consideration for Releasing His Personal Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

F. The District Court's Consideration Analysis Lacks Supporting Precedent 53

G. Guarantor Law Is Inapplicable to This Tripartite Contractual Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

H. Pure Consideration Analysis in a Tripartite Contract . . . . . . . . . . 54

6.  Federal Law Governs the Validity and Enforceability of Releases of Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    A.  Federal Law's Heightened Standard for Constitutional Waivers . . . . 56

    B.  The Totality of the Circumstances Test . . . . . . . . . . . . . . . . . . 57

    C.  Warner's Settlement Agreement Fails the Knowing and Voluntary Standard Under Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . 58

7.  The Settlement Agreement Violates Public Policy . . . . . . . . . . . . . . . 62

    A.  Conditioning a Child's Special Education Services on The Waiver of The Parent's Personal Constitutional Rights Is Inherently Coercive . . 62

    B.  The Purported Release Undermines Civil Rights Enforcement . . . . . 63

    C.  Civil Rights Cannot Be Prospectively Waived . . . . . . . . . . . . . . 64

8.  The District Court Committed Procedural Errors Requiring Reversal . . . . 68

    A.  The Court Denied Adequate Discovery Before Granting Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    B.  The Court Failed to Provide Proper Notice and Opportunity to Respond 70

    C.  The Court Improperly Relied on Arguments Not Raised by the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

9.  Standing for School Assignment Boundary Challenge . . . . . . . . . . . . . 74

    A.  Personal Racial Discrimination Injury . . . . . . . . . . . . . . . . . . . 74

    B.  Economic Injury via Property Value Diminution . . . . . . . . . . . . . 75

    C.  Rights as Current and Prospective Homeowner . . . . . . . . . . . . . . 76

    D.  Displacement and Loss of Community . . . . . . . . . . . . . . . . . . . 77

    E.  Rights as Parent in School District . . . . . . . . . . . . . . . . . . . . . 79

    F.  Competitor Standing Doctrine . . . . . . . . . . . . . . . . . . . . . . . . 80

10. Standing for Voting Map Challenge . . . . . . . . . . . . . . . . . . . . . . . 81

    A.  Direct Impact on Warner's Voting Districts . . . . . . . . . . . . . . . . 81

    B.  Vote Dilution in Warner's Own Districts . . . . . . . . . . . . . . . . . . 82

(iv)

C.    Proper Application of Gill . . . . . . . . . . . . . . . . . . . . . . . 82

D.    Standing Based on Racial Classification  . . . . . . . . . . . . . . . 83

E.    School Board Voting Districts and Equal Protection  . . . . . . . . . 84

11.  Conclusion on Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

X    Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

XI   Certificate of Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . 87

# I  Table of Authorities

Cases                                                                    Page

*Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*,
   288 So. 3d 1212 (Fla. 3d DCA 2014) . . . . . . . . . . . . . . . . . . . 47, 51

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) . . . . . . . . . . . 80

*Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015) . . . . . . . 83

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) . . . . . . . . 65, 66, 67

*Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) . . . . . . . . . . . 64

*Allen v. Wright*, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . 74

*American Nat. Bank of Jacksonville v. FDIC*,
   710 F.2d 1528 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 73

*Anderson v. Trade Winds Enterprises Corp.*,
   241 So.2d 174 (Fla. 4th DCA 1970) . . . . . . . . . . . . . . . . . . . 54

*Arlington Heights v. Metropolitan Housing Corp.*,
   429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Avenue 6E Investments, LLC v. City of Yuma*,
   818 F.3d 493 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . 23

*Bank of America Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017) . . . . . . . . . . . . . . . . . . . . . 10, 17, 20

*Barnett v. Destiny Owners Ass'n, Inc.*,
   75 So. 3d 766 (Fla. 1st DCA 2011) . . . . . . . . . . . . . . . . . . . 51

*Besett v. Basnett*, 389 So. 2d 995 (Fla. 1980) . . . . . . . . . . . . . 46, 47, 48

*Billington v. Ginn-La Pine Island, Ltd., LLLP*,
   192 So. 3d 77 (Fla. 5th DCA 2016) . . . . . . . . . . . . . . . . . . . 48

*Board of Regents v. Roth*, 408 U.S. 564 (1972) . . . . . . . . . . . . . . . 35

*Brady v. United States*, 397 U.S. 742 (1970) . . . . . . . . . . . . . . . . 56

*Brookhart v. Janis*, 384 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . 56

*Brown v. Board of Education*, 347 U.S. 483 (1954) . . . . . . . . . . . 27, 38, 64

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) . . . . . . . 84

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995) . . . . . . . . . 24

(vi)

Cases—Continued                                                              Page

*City of Homestead v. Johnson*, 760 So. 2d 80 (Fla. 2000) . . . . . . . . . . . . 52

*City of Miami v. Wells Fargo & Co.*,
   923 F.3d 1260 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . 18, 20, 21

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) . . . . . . . . . . . . . . . . . . . 81

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) . . . . . . . . . . . . 75

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
   432 F.3d 286 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 75

*Davies v. Grossmont Union High Sch. Dist.*,
   930 F.2d 1390 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 67

*DeJulio v. Georgia*, 290 F.3d 1291 (11th Cir. 2002) . . . . . . . . . . . . 84

*Duvall v. Sun-Sentinel Co.*, No. 12-62497-CIV-SCOLA (S.D. Fla. July 1,
   2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61

*Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*,
   122 F.3d 895 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 81

*Estate of Todashev by Shibly v. United States*,
   815 F. App'x 446 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . 9

*Excelsior Ins. Co. v. Pomona Park Bar & Package Store*,
   369 So. 2d 938 (Fla. 1979) . . . . . . . . . . . . . . . . . . . . . . . 52, 55

*Ferguson v. Carnes*, 125 So. 3d 841 (Fla. Dist. Ct. App. 2013) . . . . . . . . 50

*First Nat'l Bank of Lake Park v. Gay*,
   694 So. 2d 784 (Fla. 4th DCA 1997) . . . . . . . . . . . . . . . . . . . . 42

*Fruchter v. Florida*, 748 F.3d 1008 (11th Cir. 2014) . . . . . . . . . . . . . 8

*Fuentes v. Shevin*, 407 U.S. 67 (1972) . . . . . . . . . . . . . . . . . . . . 61

*Georgia State Conference of the NAACP v. City of LaGrange*,
   940 F.3d 627 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . *passim*

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) . . . . . . . . . . . . . . 81, 82, 83

*Gladstone Realtors v. Village of Bellwood*,
   441 U.S. 91 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 79

*Gordon v. Corp. Ins. Servs., Inc.*,
   374 So. 2d 603 (Fla. Dist. Ct. App. 1979) . . . . . . . . . . . . . . . . . 54

*Goss v. Lopez*, 419 U.S. 565 (1975) . . . . . . . . . . . . . . . . . . . . . 35

*Gratz v. Bollinger*, 539 U.S. 244 (2003) . . . . . . . . . . . . . . . . . . . 79

Cases—Continued                                                    Page

*Hadley v. Junior College District*, 397 U.S. 50 (1970) . . . . . . . . . . . . 84

*Hallmark Developers, Inc. v. Fulton County*,
466 F.3d 1276 (11th Cir. 2006) . . . . . . . . . . . . . . . . . 22

*Hassan v. U.S. Postal Serv.*, 842 F.2d 260 (11th Cir. 1988) . . . . . . . . . 9, 73

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) . . . . . . . . . . . 85

*Heckler v. Mathews*, 465 U.S. 728 (1984) . . . . . . . . . . . . . . . . . 74

*Herrera v. 7R Charter Ltd.*, No. 21-11766 (11th Cir. Jan. 5, 2022) . . . . . . 8

*Hillcrest Pacific Corp. v. Yamamura*,
727 So. 2d 1053 (Fla. 4th DCA 1999) . . . . . . . . . . . . . . . 48

*Holton v. City of Thomasville Sch. Dist.*,
425 F.3d 1325 (11th Cir. 2005) . . . . . . . . . . . . . . . . 78, 80

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) . . . . . . . . . . . . . . 18

*Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531 (11th Cir. 1994) . . . . . . . 16

*Jackson v. Seaboard Coast Line R.R.*,
678 F.2d 992 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . 66

*Johnson v. Zerbst*, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . 56, 61

*Jones v. Auto. Ins. Co. of Hartford, Conn.*,
917 F.2d 1528 (11th Cir. 1990) . . . . . . . . . . . . . . . . . 9, 71

*Jones v. City of Columbus*, 120 F.3d 248 (11th Cir. 1997) . . . . . . . . . . 68

*Jones v. McConnon & Co., 100 Fla. 1158*, 130 So. 760 (1930) . . . . . . . 54

*Kel Homes, LLC v. Burris*, 933 So. 2d 699 (Fla. 2d DCA 2006) . . . . . . . 50

*Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189 (1973) . . . . . . . 77

*Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969) . . . . . . . 84

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224 (11th Cir. 2010) . . . . . . . . 8

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) . . . . . . . 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118*,
133 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Livingston v. Adirondack Beverage Co.*,
141 F.3d 434 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . 67

*Lou Bachrodt Chevrolet, Inc. v. Savage*,
570 So. 2d 306 (Fla. 4th DCA 1990) . . . . . . . . . . . . . . . 47

Cases—Continued                                                              Page

*Lower Fees, Inc. v. Bankrate, Inc.*,
   74 So. 3d 517 (Fla. 4th DCA 2011) . . . . . . . . . . . . . . . . . . . 48

*MHANY Management, Inc. v. County of Nassau*,
   819 F.3d 581 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . 23

*Marine Coatings of Alabama, Inc. v. United States*,
   792 F.2d 1565 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 71

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) . . . . . . . . . 76

*McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) . . . . . . . . . . . . 34

*Meyer v. Nebraska*, 262 U.S. 390 (1923) . . . . . . . . . . . . . . . . . 32

*Moran v. Burbine*, 475 U.S. 412 (1986) . . . . . . . . . . . . . . . . . 60

*Moton v. Cowart*, 631 F.3d 1337 (11th Cir. 2011) . . . . . . . . . . . . 9

*Myricks v. Fed. Reserve Bank of Atlanta*,
   480 F.3d 1036 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 56

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) . . . . . . . . . 40

*Nationstar Mortg. Co. v. Levine*,
   216 So. 3d 711 (Fla. Dist. Ct. App. 2017) . . . . . . . . . . . . . . . 51

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of
   Jacksonville*, 896 F.2d 1283 (11th Cir. 1990) . . . . . . . . . . . . . . 80

*Northeastern Florida Chapter of the Associated General Contractors of
   America v. City of Jacksonville*, 508 U.S. 656 (1993) . . . . . . . . . . . . . 76

*Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689 (Fla. 1941) . . . . . . . . 46, 48

*Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) . . . . . . . . 64, 65

*Palko v. Connecticut*, 302 U.S. 319 (1937) . . . . . . . . . . . . . . . . 34

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
   551 U.S. 701 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*People's Trust Ins. Co. v. Lamolli*,
   352 So. 3d 890 (Fla. 4th DCA 2022) . . . . . . . . . . . . . . . . . . 41

*Perry v. Sindermann*, 408 U.S. 593 (1972) . . . . . . . . . . . . . . . . 62

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) . . . . . . . . . . . . 32

*Puentes v. United Parcel Serv., Inc.*,
   86 F.3d 196 (11th Cir. 1996) . . . . . . . . . . . . . . . . . 56, 58, 66

Cases—Continued                                                        Page

*Reflectone, Inc. v. Farrand Optical Co.*,
862 F.2d 841 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 50

*Rodriguez v. San Antonio Independent School District*,
411 U.S. 1 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Rosen v. Florida Ins. Guaranty Assn*, 802 So. 2d 291 (Fla. 2001) . . . . . . . 49

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) . . . . . . . . . . 83

*Shaw v. Reno*, 509 U.S. 630 (1993) . . . . . . . . . . . . . . . . . . . 83

*Simmons v. United States*, 390 U.S. 377 (1968) . . . . . . . . . . . . . 63

*Sinkfield v. Kelley*, 531 U.S. 28 (2000) . . . . . . . . . . . . . . . . 84

*Smith v. Henderson*, 944 F. Supp. 2d 89 (D.D.C. 2013) . . . . . . . . . . 76

*Snook v. Trust Co. of Georgia Bank of Savannah, N.A.*,
859 F.2d 865 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . 69

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) . . . . . . . . . . . . . 85

*Stevenson v. Blytheville Sch. Dist. #5*,
800 F.3d 955 (8th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . 36

*Swann v. Charlotte-Mecklenburg Board of Education*,
402 U.S. 1 (1971) . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

*Texas Department of Housing & Community Affairs v. Inclusive
Communities Project, Inc.*,
135 S. Ct. 2507 (2015) . . . . . . . . . . . . . . . . . 16, 29, 30, 31

*Texas v. Lesage*, 528 U.S. 18 (1999) . . . . . . . . . . . . . . . . . . 80

*Thornburg v. Gingles*, 478 U.S. 30 (1986) . . . . . . . . . . . . . . . 82

*Town of Newton v. Rumery*, 480 U.S. 386 (1987) . . . . . . . . . . . 56, 68

*Trafficante v. Metropolitan Life Ins. Co.*,
409 U.S. 205 (1972) . . . . . . . . . . . . . . . . . . . . 15, 24, 79

*Tropical Jewelers, Inc. v. Bank of Am., N.A.*,
260 So. 3d 1105 (Fla. 4th DCA 2019) . . . . . . . . . . . . . . . . 52

*Troxel v. Granville*, 530 U.S. 57 (2000) . . . . . . . . . . . . . . . . 33

*United States v. Hays*, 515 U.S. 737 (1995) . . . . . . . . . . . . . . 83

*United States v. Marengo County Comm'n*,
731 F.2d 1546 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . 22

Cases—Continued                                                    Page

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) . . . . . . . . . . . . . 72

*Vanover v. NCO Financial Services, Inc.*,
  857 F.3d 833 (11th Cir. 2017) . . . . . . . . . . . . . . . . . . . .  9

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . 85

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) . . . . . . . . . . . . . . 33

*Wright v. Sumter Cnty. Bd. of Elections & Registration*,
  979 F.3d 1282 (11th Cir. 2020) . . . . . . . . . . . . . . . . . 82

*Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70 (1998) . . . . . . . . 65

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) . . . . . . . . . . . 34

*Zinermon v. Burch*, 494 U.S. 113 (1990) . . . . . . . . . . . . . . 37


Constitutional Provisions, Statutes and Rules

18 United States Code

  § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

  § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

42 United States Code

  § 1983 . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 56

  § 3601 . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

  § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 10

  § 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fla. Stat. § 1002.31

  (2)(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  (2)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

  (2)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

  (2)(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

  (2)(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

  (2)(k) . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fla. Stat. § 1014.04

Constitutional Provisions, Statutes and Rules—Continued        Page

(1)(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Other Authorities

## II   Certificate of Interested Persons

1. Blake Warner (Appellant)

2. Akerman LLP (Attorneys for Appellee)

3. Fiore, Kristen M. (Attorney for Appellee)

4. Margolin, Jason L. (Attorney for Appellee)

5. Merryday, Steven D., U.S. Dist. Judge (M.D. Fla.)

6. Sneed, Julie S., U.S. Dist. Judge (M.D. Fla.)

7. Griffin, Lindsay S., U.S. Magistrate Judge (M.D. Fla.)

8. The School Board of Hillsborough County, Florida (Appellee)

## III   Statement Regarding Oral Argument

Appellant respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rule 34-3.  This appeal raises multiple novel and substantial questions of first impression in this Circuit that warrant oral presentation, including: (1) whether the Fair Housing Act's prohibitions against making housing "unavailable" under 42 U.S.C. § 3604(a) or discriminating in housing-connected "services or facilities" under § 3604(b)—extend to racially discriminatory school assignment boundaries that perpetuate residential segregation; (2) whether a settlement

1

resolving a child's special education claims under the Individuals with Disabilities Education Act can bar the parent's unrelated personal constitutional claims under *Id.* § 1983; and (3) whether parents possess a protected due process interest in applying for state-created school choice programs as part of their fundamental right to direct their children's education.

These issues implicate complex intersections of federal civil rights statutes, constitutional law, and state contract principles, many without controlling precedent in this Circuit.  For instance, extending this Court's holding in *Georgia State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th Cir. 2019), to school assignment as a housing-connected service presents a novel application that would benefit from clarification through questioning.  Similarly, the enforceability of the settlement agreement turns on fact-intensive inquiries into waiver validity under federal standards, which oral argument would help elucidate beyond the briefs.  And assist the Court's deliberations on matters of significant public importance concerning educational equity and civil rights enforcement.

## IV   Jurisdiction Statement

The district court had original jurisdiction under 28 U.S.C. § 1331 because Appellant's claims arise under the Fair Housing Act, 42 U.S.C. § 3601 et seq., and *Id.* § 1983.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on March 25, 2025. Appellant timely appealed on April 22, 2025.

## V   Statement of Issues

Whether 42 U.S.C. § 3604(a), which bars making housing "unavailable" based on race, applies to discriminatory school assignment practices that price minorities out of neighborhoods through property value manipulation.

Whether Section 3604(b), which prohibits discrimination in services or facilities connected to housing, covers residential school assignments.

Whether the Due Process Clause protects parents' fundamental right to apply for state school choice programs, where Florida law creates a property interest in such applications.

3

Whether the district court erred in enforcing an IDEA settlement to bar unrelated constitutional and statutory claims, where the agreement (1) preserved claims arising after its effective date, (2) covered only matters tied to the child's educational instruction, (3) lacked consideration for waiving constitutional rights, (4) was procured through fraud, (5) fails the "knowing and voluntary" standard, (6) whether civil rights can be prospectively waived, and (7) is unenforceable under Florida contract law.

Whether the district court violated the party presentation rule and due process by raising unbriefed grounds for dismissal, converting a Rule 12(c) motion without allowing discovery, denying a Rule 56(d) motion, and failed to consider extrinsic evidence when evaluating the release.

## VI   Statement of the Case

This is a civil rights action under *Id.* § 1983 for violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as claims under the Fair Housing Act (FHA), *Id.* § 3601 et seq.

The School Board of Hillsborough County, Florida ("HCSB") drew racially discriminatory school assignment boundaries that isolated racial minorities into under-

4

performing schools while isolating white students into higher-performing schools (Third Amended Complaint ("TAC") ¶¶ 84–85). The HCSB intentionally failed to assign white students to majority-minority schools closer to their residences and minority students to majority-white schools closer to their residences (TAC ¶¶ 157–158). These discriminatory school assignment boundaries manipulated property values, causing housing segregation in violation of the FHA (TAC ¶¶ 180–183).

The HCSB also drew racially discriminatory voting district maps that packed Hispanic voters into District 1, African-American voters into District 5, and white voters into Districts 2, 3, and 4 (TAC ¶¶ 94–95). Race predominated over other redistricting criteria in drawing these districts (TAC ¶ 164).

Warner filed an Individuals with Disabilities Education Act ("IDEA") due process complaint on behalf of his minor child J.W. in August 2021 (Doc. 107-1 ¶ 3). Warner reached an oral agreement with Assistant Director Sample in November 2021 to settle the pending Individuals with Disabilities Education Act ("IDEA") due process complaint (Doc. 107-1 ¶ 4). In a December 3, 2021 phone call with HCSB attorney Kinsey-Sallis, they reiterated the agreement to release only the pending IDEA claims (Doc. 107-1 ¶ 5). In a January 28, 2022 email, Kinsey-Sallis sent another draft settlement (Doc. 105 ¶2(b)). In a March 15, 2022 phone call, Kinsey-Sallis

assured Warner the release language covered only special education claims related to J.W. (Doc. 107-1 ¶ 7).  The settlement agreement was executed on March 21, 2022 (Doc. 105 ¶¶ 2(c)–(d)).  Warner believed the release covered only special education claims regarding J.W. through the execution date (Doc. 107-1 ¶ 8).  He was unrepresented by counsel during the settlement negotiations (Doc. 107-1 ¶¶ 4–7) and has only a high school education (Doc. 107-1 ¶ 2).  Warner negotiated changes to the agreement's terms (Doc. 107-1 ¶¶ 4–7).  The release language was modified after Warner's objections to earlier broad drafts (Doc. 107-1 ¶ 6).

Warner relocated to North Tampa in October 2022 where he purchased a home after being priced out of South Tampa (TAC ¶ 88).

The HCSB's school assignment boundary redistricting process began in early 2023.  The HCSB changed Carrollwood Elementary K-5 to K-8 on May 9, 2023 (TAC ¶ 56; Exhibit J).  Warner then sought to enroll J.W. into majority-white Carrollwood for the sixth grade through the school choice program, but was not permitted to *apply* (SAC ¶ 205).  The HCSB adopted new school assignment boundaries on June 20, 2023 (TAC ¶ 72).  Warner sued on January 26, 2023 (Doc. 1).

Warner filed the second amended complaint on June 5, 2024 (Doc. 75).  The Court dismissed the Due Process and Fair Housing Act claims for failure to state a claim,

but sustained the equal protection claims. The third amended complaint was filed on June 10, 2024 and added the district voting map challenge (Doc. 79). The HCSB filed an answer to the third amended complaint on June 24, 2024 (Doc. 82). Warner filed a motion to strike the HCSB's third affirmative defense of release on June 28, 2024, for failure to state a cognizable defense (Doc. 85). The HCSB filed a motion for judgment on the pleadings on August 9, 2024 (Doc. 86). Warner filed a motion to compel discovery on September 11, 2024 (Doc. 93). The HCSB filed a motion to stay discovery on September 25, 2024 (Doc. 96). The court granted the motion to stay discovery and converted the 12(c) motion to summary judgment on November 18, 2024 (Doc. 103). Warner filed a Rule 56(d) motion to stay summary judgment on December 2, 2024 (Doc. 106). The magistrate issued a report and recommendation on January 14, 2025 (Doc. 112), recommending granting the HCSB's converted summary judgment motion based on the settlement agreement without allowing discovery. Warner filed objections on February 9, 2025 (Doc. 117). The district court adopted the entire report on March 24, 2025 (Doc. 120). Judgment was entered on March 25, 2025 (Doc. 121). Warner filed a notice of appeal on April 22, 2025 (Doc. 126).

The HCSB asserts the affirmative defense that Warner released all of his *personal* claims against it in a March 2022 settlement agreement resolving his minor child's

7

(J.W.) IDEA claims (Doc. 82 ¶ 9). The agreement states that in exchange for the HCSB guaranteeing J.W. specific school assignments through the District Choice Options program, Warner released the HCSB from "any and all claims, demands, causes of action, complaints or charges, known or unknown specifically related [to] J.W.'s education, services, and educational program in the District through the date of execution of this Agreement," including "all losses of any kind whatsoever related specifically to J.W.'s education, which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement" (Doc. 82-1 ¶5). The settlement agreement carves out that "this release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement" (Doc. 82-1 ¶5).

## VII   Standard of Review

This Court reviews de novo the district court's grant of summary judgment. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1232 (11th Cir. 2010).

The Court reviews de novo: statutory interpretation, *Fruchter v. Florida*, 748 F.3d 1008, 1010 (11th Cir. 2014); settlement agreement enforceability involving federal law, *Herrera v. 7R Charter Ltd.*, No. 21-11766, *4 (11th Cir. Jan. 5, 2022);

whether constitutional rights waivers were knowing and voluntary, *Estate of Todashev by Shibly v. United States*, 815 F. App'x 446, 452 (11th Cir. 2020); standing determinations, *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011); and subject matter jurisdiction questions.

Procedural rulings are reviewed for abuse of discretion, though underlying legal conclusions receive de novo review. *Vanover v. NCO Financial Services, Inc.*, 857 F.3d 833, 838 (11th Cir. 2017); *Jones v. Auto. Ins. Co. of Hartford, Conn.*, 917 F.2d 1528, 1532 (11th Cir. 1990); *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988). Factual findings regarding constitutional waivers are reviewed for clear error. *Estate of Todashev*, 815 F. App'x at 452.

## VIII    Summary of the Argument

This appeal presents multiple substantial legal questions concerning discriminatory school attendance boundaries, unconstitutional voting maps, and the district court's erroneous enforcement of a settlement agreement. The arguments proceed along five principal avenues.

First, the Fair Housing Act's legislative history demonstrates Congress's specific intent to address the nexus between housing segregation and educational inequality.

The record establishes that lawmakers recognized school assignment policies as critical factors affecting housing patterns—precisely the connection at issue in this case.

Second, the text, purpose, and judicial interpretation of 42 U.S.C. § 3604(a) prohibit school assignment boundaries that "otherwise make unavailable" housing to minorities through racially discriminatory boundary practices. Appellant has demonstrated both disparate treatment and disparate impact in violation of § 3604(a), establishing how discriminatory boundaries inflate property values in white neighborhoods, effectively pricing minorities out of these areas. This causation chain satisfies proximate cause requirements under *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017).

Third, FHA § 3604(b)'s prohibition against discrimination in "services or facilities in connection" with housing encompasses school assignment policies. The Eleventh Circuit's decision in *LaGrange*, 940 F.3d at 627 established that § 3604(b) covers housing-connected services, creating a framework that directly applies to school assignment. The relationship between housing location and school assignment represents an even stronger connection than the utility services protected in *Id*.

Fourth, the settlement agreement does not bar Appellant's claims because: (a) it expressly preserved claims arising after its effective date; (b) constitutional challenges

10

to district-wide boundary practices were not "specifically related to" J.W.'s individual educational program; (c) Appellant received no consideration for any purported waiver of personal constitutional rights; (d) federal law imposes heightened standards for constitutional waivers that were not satisfied; and (e) the district court's procedural errors in converting the motion without proper discovery violated due process.

Fifth, Appellant has standing to challenge both school boundaries and voting maps based on concrete injuries including racial discrimination, property value diminution, community displacement, voting rights dilution, and being forced to compete in a race-based system. These harms are particularized, actual, and redressable through the requested relief.

## IX   Argument

### 1.   The Fair Housing Act as an Educational Bill of Rights:  Congressional Intent to Address School Segregation

The Fair Housing Act of 1968 (FHA) was a landmark civil rights law aimed not only at eliminating housing discrimination but also at remedying its broader consequences—particularly school segregation.

Congress understood the interdependence of housing and school segregation.

Katzenbach made the same point a year earlier: "Segregated housing is the cause – direct and indirect – of many other kinds of segregation... Segregated housing creates segregation in schools and hospitals and most other areas of everyday life" (DOJ Remarks June 15, 1965).

Senator Walter Mondale, the bill's lead sponsor, repeatedly emphasized that school segregation could not be solved without fair housing. During a 1967 floor debate, he declared:

> "With high concentrations of low-income, poorly educated, and unemployed persons in our cities—and without dispersal or balance throughout our communities—our cities will never be able to solve the problems of de facto school segregation, slum housing, crime and violence, disease, blight, and pollution." (90th Cong., 1st sess., Congressional Record 113, August 16, 1967 at 22841)

Other legislators echoed this. Mr. Chase observed that "unequal housing, resulting from discriminatory and closed housing policies" leads to "inherently unequal schools" (at 22844). Senator Tydings added that housing exclusion "unjustly denies many Americans the freedom to gain access on equal terms with other Americans to good housing and good schools for their children" (at 22848).

Congress recognized that the "neighborhood school" model entrenched segregation when paired with discriminatory housing. Senator Mondale explained:

"The typical public grammar school is a neighborhood operation. The composition of the student-body, therefore, is determined by that of the residents. The result can, in effect, be de facto segregation... Negroes simply do not have that kind of mobility... they come home at night to a segregated neighborhood, with its segregated school for their children." (114 Cong. Rec. 24418)

He continued: "the soundest way to attack the segregated neighborhood school is to attack the segregated neighborhood" (114 Cong. Rec. 24418), linking housing policy directly to education reform.

Senator Mondale described the FHA as an educational measure:

"De facto segregation in schools and education is directly traceable to the existing patterns of racially segregated housing. We cannot afford to allow our efforts to provide the best education possible to all Americans to be thwarted by actions of private persons... Fair housing is therefore more than merely housing. It is part of an educational bill of rights for all citizens."

13

(90th Cong., 2nd sess., Congressional Record 114, February 15, 1968, at

3134)

Congress saw housing reform as a more durable solution than busing.  Senator

Mondale observed:

"The stopgap solution for this result of lack of fair housing measures has

been, as for unemployment, to provide transportation.  For education this

has come in the form of busing.  Neither de facto segregation nor busing

would be the case if we could do away with discrimination in housing."

(114 Cong. Rec. 3133-3134)

Two decades later, the housing-education link remained central.  In 1988, Sena-

tor Edward Kennedy declared:  "Residential segregation is the primary obstacle to

meaningful school integration" (134 Cong. Rec. 19711).

The legislative record leaves no doubt:  Congress intended the FHA to address

school segregation by dismantling residential segregation.  Senator Mondale's dec-

laration of the Act as "an educational bill of rights" confirms that education equality

was a core purpose—not a secondary consequence—of the legislation.  Senator Ty-

dings noted, "Segregation in housing compounds the Nation's social and economic

14

problems... educational problems are compounded—because isolation in the central city prevents minority groups from reaching schools" (114 Cong. Rec. 2530 (1968)).

The FHA must therefore be understood not only as housing reform, but as a central pillar of America's commitment to educational equality.

## 2.   FHA § 3604(a)

### A.   The Statutory Text and Purpose Support a Broad Construction

Section 3604(a) of the Fair Housing Act makes it unlawful to "refuse to sell or rent... or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.". The statute's broad language reflects Congress's intent to reach a wide array of discriminatory housing practices beyond merely direct refusals to sell or rent.

The legislative history shows that congress intended the FHA to address educational segregation through housing policy. *supra*. The Supreme Court has consistently held that the FHA should be given a "generous construction" to implement the "policy that Congress considered to be of the highest priority." *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211-12 (1972). The phrase "otherwise

15

make unavailable" demonstrates Congress's intent to reach housing practices that indirectly affect availability. In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2525 (2015), the Court emphasized the Act's "continuing role in moving the Nation toward a more integrated society" and recognized that the FHA must be interpreted to address the complex interplay between housing policy and other governmental actions such as unlawful zoning laws..

## B. The District Court Erred in Narrowly Interpreting § 3604(a)

The District Court's dismissal relied on an impermissibly narrow construction of § 3604(a) that contravenes both Supreme Court and Eleventh Circuit precedent. The court incorrectly concluded that § 3604(a) requires a direct regulation of housing markets, disregarding the "otherwise make unavailable" language that extends the Act's reach beyond direct housing transactions.

In *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1542 (11th Cir. 1994), this Court recognized that actions with "a direct impact on the ability of potential homebuyers or renters to locate in a particular area" can violate the FHA even when those actions indirectly affect housing. School boundary decisions that predictably impact where families can live based on race fall squarely within this understanding.

16

## C.    School Boundaries Directly Affect Housing Availability

School assignment boundaries significantly impact housing markets through a di-
rect and well-documented causal mechanism: they create substantial price differen-
tials between otherwise comparable homes based solely on school assignment. Na-
tional studies consistently demonstrate that homes in areas with high-performing
schools command significant price premiums—often 20% or more—compared to
similar homes assigned to lower-performing schools. This price inflation effec-
tively "makes unavailable" housing in high-performing school zones to many mi-
nority families due to entrenched historical wealth disparities.

## D.    The Connection Between School Boundaries and Housing Availability Satisfies
Proximate Cause

In *Bank of America*, 137 S. Ct. at 1305, the Supreme Court held that proximate
cause under the FHA requires "some direct relation between the injury asserted
and the injurious conduct alleged." The Court explained that proximate cause gen-
erally bars suits for alleged harm that is "too remote" from the defendant's unlaw-
ful conduct, drawing on its earlier analysis in *Lexmark Int'l, Inc. v. Static Control
Components, Inc., 572 U.S. 118*, 133, 133 (2014). Although the Court noted that
proximate cause typically limits liability to the "first step" in the causal chain, it de-

17

clined to adopt a rigid "first-step only" rule, recognizing that the analysis depends on "the nature of the statutory cause of action" and whether "the harm alleged has a sufficiently close connection to the conduct the statute prohibits."

Appellant's case satisfies this "direct relation" standard for three reasons:

**The Appellant Falls Within the "First Step" of Causation**    As established in antitrust jurisprudence, direct buyers are within the "first step" of causation.  In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 720 (1977), the Court held that direct purchasers are within this first step.  Here, Appellant is "undisputably the direct home buyer as he purchased a home in October 2022" (TAC ¶¶ 113, 114) and was "priced out of south tampa regarding that home purchase."  Unlike remote downstream parties, Appellant directly participated in the housing market affected by the Board's discriminatory boundary policies.

**The Causal Chain Is Shorter Than Miami**    The causal chain between discriminatory school boundaries and housing unavailability is remarkably straightforward compared to the chain in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) (where the Eleventh Circuit still found proximate cause on remand):

*Miami's* five-step chain:

18

1. Banks engaged in discriminatory lending practices

2. These practices triggered higher default rates

3. Higher defaults caused increased foreclosures

4. Foreclosures decreased property values

5. Decreased values reduced city tax revenue

By contrast, this case presents a mere three-step chain:

1. The Board engaged in discriminatory school assignment practices (TAC ¶¶ 84-85);

2. These assignments directly altered property values in targeted neighborhoods (TAC ¶ 86);

3. Appellant was priced out of neighborhoods with artificially inflated values (TAC ¶¶ 87-88).

Appellant was directly injured when he was "priced out of south tampa and had to relocate to north tampa where he was assigned to failing schools." TAC ¶ 88.

**The Eleventh Circuit Holmes Factors Support Proximate Cause** First, the damages from the Board's conduct can be readily isolated through statistical analy-

sis of home prices in relation to school assignments. This can be controlled for external factors by studying homes that switch from one school assignment to another, as well as through expert testimony from real estate professionals. The Eleventh Circuit has affirmed that damages related to property values are "entirely practicable and not unduly inconvenient for the courts to handle." *Id.* at 1281.

Second, there is no risk of multiple or duplicative recoveries. The plaintiff seeks both equitable relief and damages for specific harms he personally suffered. The individualized nature of these claims presents no risk of duplicative recoveries. His damages relate to his own real estate transactions, which no other party would have standing to assert.

Third, Appellant is the most directly affected plaintiff possible. As an African-American homebuyer directly affected by the Board's discriminatory boundary practices, the plaintiff represents precisely the type of directly injured party contemplated by the FHA. There are no more directly affected plaintiffs who could better vindicate these rights.

**The FHA's Broad Remedial Purpose Requires Finding Proximate Cause**    The Supreme Court in *Bank of America*, 137 S. Ct. at 1306 emphasized that proximate

cause analysis must consider "the nature of the statutory cause of action" and "the statute's policy goals." The FHA has an exceptionally broad remedial purpose aimed at eliminating housing discrimination and segregation in all its forms.

On remand in *Wells Fargo*, 923 F.3d at 1267, this Court noted "the FHA has a broad remedial purpose, is written in decidedly far-reaching terms, and is perfectly capable of accommodating the type of aggregative causal connection" at issue. Congress designed the FHA to address not just individual acts of discrimination but also broader systemic practices that perpetuate segregation. School assignment practices that manipulate housing markets fall squarely within this broad remedial purpose.

**The Connection Between School Assignments and Housing Discrimination Is Well-Established**    The relationship between school assignments and housing discrimination is neither novel nor attenuated. It is widely recognized that school assignments are among the most significant drivers of housing decisions and property values. The complaint documents this extensively:

First, the Board's own superintendent admitted to manipulating property values: "And what that does is, that increases property values. The more we continue to

21

address our high quality education within everyone of our schools." (TAC ¶ 94)

Second, real estate professionals confirm this relationship: "Tampa realtor Amy Greenfield said home values are higher in neighborhoods assigned to better schools, and people will pay more to be in an area with 'A' rated schools." (TAC ¶ 102)

Third, parents base housing decisions on school assignments: "That's why I bought my house in this area, for the [A-rated] schools." (TAC ¶ 101)

This well-documented connection eliminates any concern about attenuation. The Board assigns schools to properties, and this assignment directly affects property values and housing choices in a way that creates segregation.

**E.   Relevant Circuit Precedent Supports This Interpretation**

While no Eleventh Circuit case has directly addressed school boundary decisions under the FHA, precedent from this Circuit and others supports Appellant's interpretation. In *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1559 (11th Cir. 1984), this Court recognized that practices which make housing "unavailable in practice, though not explicitly" violate § 3604(a). Similarly, in *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276, 1283 (11th Cir. 2006), this Court acknowledged that governmental zoning decisions can violate the FHA when they

22

disproportionately restrict housing opportunities for protected groups.

Other circuits have been more explicit. In *Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016), the Ninth Circuit found that governmental decisions affecting housing affordability can violate the FHA when linked to discriminatory intent or effects. The Second Circuit, in *MHANY Management, Inc. v. County of Nassau*, 819 F.3d 581, 619-20 (2d Cir. 2016), affirmed that governmental actions affecting housing markets can violate the FHA when they perpetuate segregation, emphasizing that the FHA must be construed to address the "ways in which facially neutral policies can perpetuate the exclusion of minorities from certain neighborhoods."

## F.   Conclusion on § 3604(a)

The text, purpose, and judicial interpretation of the FHA all support the conclusion that § 3604(a) prohibits school districts from drawing assignment boundaries that either intentionally or effectively exclude minority neighborhoods from high-performing schools, thereby increasing property values in white neighborhoods and making housing unavailable to minorities through price inflation. Appellant has demonstrated both disparate treatment and disparate impact in violation of § 3604(a), and this Court should reverse the District Court's dismissal.

### 3.   FHA § 3604(b)

### A.   The Plain Text and Context of § 3604(b) Encompasses School Assignment as a Housing-Connected Service

Section 3604(b) of the Fair Housing Act makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

The statutory language contains two crucial elements that support our interpretation:  (1) the phrase "provision of services or facilities in connection therewith" establishes a broad category of covered activities beyond the direct sale or rental transaction; and (2) the text does not limit or enumerate the types of services protected, suggesting Congress intended to prohibit discrimination across all housing-connected services.

This interpretation aligns with the FHA's "broad remedial intent" to eliminate discrimination in housing markets. *Trafficante*, 409 U.S. at 212.  The Supreme Court has consistently held that the Act should be given a "generous construction." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995).  When a family purchases or rents a dwelling in a specific location, school assignment is automati-

24

cally determined through boundary-based policies, creating a direct nexus between housing location and educational services that falls squarely within § 3604(b)'s language.

## B. The Direct Connection Between Housing Location and School Assignment Creates a Protected Service Under § 3604(b)

School assignment policies establish a direct relationship between housing and educational services for three primary reasons:

First, unlike other government services available to all residents regardless of location, school assignment boundaries create a property-specific entitlement to particular educational services. When a family acquires housing, they simultaneously acquire—by operation of law—the right to attend a specific school based solely on that address. This automatic linkage creates a connection between housing and educational services that is qualitatively different from most other government services.

Second, this connection is recognized throughout the real estate market, where school quality significantly impacts housing prices, with homes in well-regarded school zones commanding substantial premiums. Real estate listings routinely highlight school assignments as key property features, acknowledging that the prop-

erty comes with specific educational services attached. This market reality demonstrates that both industry professionals and consumers view school assignment as inherently connected to housing.

Third, the Supreme Court has recognized this connection in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 20-21 (1971), noting that "people gravitate toward school facilities" and "the location of schools may influence the patterns of residential development of a metropolitan area." The Court thus acknowledged the direct relationship between school assignment and housing patterns that § 3604(b) is designed to protect.

## C.   Eleventh Circuit Precedent Establishes That § 3604(b) Covers Services Connected to Housing

The Eleventh Circuit has held that § 3604(b) encompasses post-acquisition services connected to housing. In *LaGrange*, 940 F.3d at 627, this Court ruled that municipal utility services fall within the scope of § 3604(b), establishing a framework that applies to school assignment policies.

The *Id* Court conducted a detailed textual analysis of § 3604(b), concluding that "the most natural reading of 'services' is that it encompasses the provision of municipal utility services" that are "connected to" or "associated with" the dwelling.

26

*Id.* at 632.  Critically, the Court explained that "[t]he use of 'therewith' makes clear that the services or facilities must be connected to 'the sale or rental of a dwelling,' not to the 'selling or renting of a dwelling.'".  This distinction confirms that § 3604(b) covers services tied to the dwelling itself, not merely the transaction.

The Court rejected temporal limitations, holding that "the text of § 3604(b) does not temporally limit the 'provision of services' to the sale or rental of the dwelling." *Id.* at 634.  This interpretation supports treating school assignment as a covered service, as education is provided throughout a family's residence in a dwelling, not merely at the point of purchase or rental.

**D.  The Direct Parallels Between Utility Services in LaGrange and School Assignment Policies**

*LaGrange*'s reasoning resonates with school assignment policies:

**Essential Nature of Both Services**    The Court emphasized that utility services are "essential to habitability" of a dwelling. *Id.* at 632.  Similarly, public education is an essential service for families with school-age children.  The Supreme Court has described education as "perhaps the most important function of state and local governments." *Brown v. Board of Education*, 347 U.S. 483, 493 (1954).  Just

as a dwelling is practically uninhabitable without utilities, housing is effectively unusable for families without access to adequate educational services.

**Automatic Connection to Property**    Both utility services and school assignments are directly "connected to" or "associated with" dwellings themselves.  School assignments automatically attach to residential properties through boundary maps, creating a property-specific entitlement that transfers with the dwelling regardless of occupant.  Both services are permanently tied to the physical location of the property rather than to the initial transaction.

**Impact on Housing Choice**    The *LaGrange*, 940 F.3d 627 Court found that discriminatory utility policies could effectively "make housing unavailable" by rendering it uninhabitable. *Id.* at 639.  School assignment policies similarly affect housing choice—research consistently shows that school quality is among the top factors influencing housing decisions for families with children.  Discriminatory school boundaries create financial barriers to housing in desirable school zones through price inflation, paralleling how discriminatory utility policies can create barriers through financial requirements.

28

**Discriminatory Impacts**    The Court recognized that discriminatory utility poli-
cies could perpetuate segregation by creating barriers in predominantly minority
neighborhoods. *Id.* School assignment boundaries create an even more direct seg-
regative effect when drawn to exclude minority neighborhoods from high-performing
schools, reinforcing residential segregation through diminished educational oppor-
tunities.

These parallels demonstrate that school assignment policies represent an even
clearer example of "services or facilities in connection with" dwellings than the
utility services already protected under § 3604(b).

## E.    Supreme Court Precedent Supports Reading § 3604(b) to Include School Boundaries as Zoning Decisions

In *Inclusive Communities*, 135 S. Ct. at 2521-22, the Supreme Court identified "zon-
ing laws and other housing restrictions" as practices that can "function unfairly
to exclude minorities from certain neighborhoods without sufficient justification."
School assignment boundaries effectively function as zoning decisions that deter-
mine not only educational access but also influence housing patterns, property val-
ues, and neighborhood demographics.

The Court emphasized that the FHA must be construed to recognize "the Na-

29

tion's continuing struggle against racial isolation" and to advance the "historic commitment to creating an integrated society." *Id.* at 2525. This interpretation supports reading § 3604(b) to include school assignment policies that directly connect housing to educational services.

Just as traditional zoning ordinances designate areas for particular uses, school assignment boundaries designate which educational resources are available to residents of particular areas. When these boundaries reinforce residential segregation by linking housing location to educational quality, they create precisely the type of barrier to housing choice and opportunity that the Court recognized the FHA was designed to address.

## F. The District Court's Narrow Interpretation Contradicts Precedent and Frustrates the FHA's Purpose

The district court's ruling that school assignment boundaries are not covered by § 3604(b) creates an artificial separation between housing and education that ignores market realities, statutory text, and binding precedent from this Circuit.

In *LaGrange*, 940 F.3d 627, this Court rejected a narrow interpretation of § 3604(b) as limited to "housing-related services," instead recognizing that the statute applies to services connected to the dwelling itself. 940 F.3d at 634-35. The Court

30

emphasized that courts "do not pick and choose among plausible interpretations of a statute; we choose the best one." Id. at 634. The most sensible reading of § 3604(b) includes school assignment, which establishes an even more direct connection to housing than utility services.

When school assignment is determined exclusively by housing location, drawing a line between housing discrimination and educational discrimination becomes impossible. Such a narrow reading would create a loophole in the FHA, allowing municipalities to perpetuate housing segregation through school assignment policies while evading accountability. This would be particularly troubling given the direct relationship between school assignment and housing patterns acknowledged by the Supreme Court in both *Swann*, 402 U.S. 1 and *Inclusive Communities*, 135 S. Ct. 2507.

The Supreme Court in *Id* warned against interpretations that would undermine the FHA's goal of removing artificial barriers to integration. Excluding school assignment boundaries from § 3604(b)'s protection would create such a barrier, contradicting both the statute's text and purpose.

31

**4.  The Due Process Clause Protects Parents' Fundamental Right to Direct Their Children's Education, Including the Right to Apply for School Choice Programs**

**A.  Supreme Court Precedent Establishes the Fundamental Right of Parents to Direct Their Children's Education**

The Supreme Court has long recognized that parents possess a fundamental liberty interest in directing the education and upbringing of their children.  In *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), the Court held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own."  Two years later in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925), the Court struck down an Oregon law requiring all children to attend public schools, holding that the law "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control."

The Court expressly recognized that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535.  This fundamental right was further affirmed in *Wisconsin v. Yoder*, 406 U.S. 205, 232

(1972), where the Court held that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."

More recently, in *Troxel v. Granville*, 530 U.S. 57 (2000), the Court reaffirmed that the "liberty interest of parents in the care, custody, and control of their children— is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Id.* at 65. These cases demonstrate that parents' rights to direct their children's education is a deeply rooted fundamental liberty interest protected by the Due Process Clause.

## B.   The Right to Direct a Child's Education Necessarily Includes the Right to Apply for School Choice Programs

The parental right to direct a child's education is not merely theoretical but must include practical methods of exercising that right. When a state creates educational alternatives through school choice programs, parents must be permitted to access these alternatives to meaningfully exercise their fundamental right to direct their children's education.

Florida's legislature has explicitly recognized this principle in its Parental Bill of Rights, which states that parents have "[t]he right, pursuant to s. 1002.20(2)(b) and

(6), to apply to enroll his or her minor child in a public school or, as an alternative to public education, a private school, including a religious school, a home education program, or other available options, as authorized by law." Fla. Stat. § 1014.04 (1)(c).

This Court has recognized substantive due process protections extend not just to enumerated rights but also to those rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). The right to access state-created educational alternatives falls squarely within the scope of a parent's fundamental right to direct their child's education.

The Supreme Court implicitly recognized the constitutional significance of school choice in *Zelman v. Simmons-Harris*, 536 U.S. 639, 639 (2002), where it upheld Ohio's school voucher program against an Establishment Clause challenge. While *Id* focused on religious establishment concerns, the Court's reasoning acknowledged the important role that school choice programs play in enabling parents to exercise their constitutional rights.

**C.    Florida's School Choice Laws Create a Protected Property Interest Under the Due Process Clause**

**State Law Creates Legitimate Entitlements That Qualify as Protected Property Interests**    The Supreme Court has held that property interests protected by due process "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). To have a property interest, "a person clearly must have more than an abstract need or desire for it... He must, instead, have a legitimate claim of entitlement to it." *Id.*

State-created educational benefits can constitute protected property interests. In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause." *Id.* at 574. The Court further noted that "as long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Id.* at 576.

35

**Florida's Non-Discretionary School Choice Laws Create a Protected Property Interest**    Florida's open enrollment statute creates a legitimate entitlement to apply for school choice.  The statute provides that "each district school board or charter school shall allow a parent from any school district in the state whose child is not subject to a current expulsion or suspension to enroll his or her child in and transport his or her child to any public school, including charter schools, that has not reached capacity in the district." Fla. Stat. § 1002.31 (2)(a) (emphasis added).

The mandatory language of the statute—using "shall" rather than discretionary terms like "may"—creates a legitimate expectation and entitlement.  This statutory scheme is distinguishable from discretionary programs that do not create protected interests. *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 955 (8th Cir. 2015) (finding that Arkansas's discretionary school choice law did not create a protected property interest).

Unlike the discretionary law at issue in *Id*, Florida's law contains multiple non-discretionary provisions that create enforceable rights, including requirements that school districts:

• "Allow parents to declare school preferences" (Fla. Stat. § 1002.31 (2)(b))

• "Provide a lottery procedure to determine student assignment and establish an

36

appeals process for hardship cases" (*Id.* (2)(c))

- "Maintain socioeconomic, demographic, and racial balance" (*Id.* (2)(e))

- "Require school districts to maintain a wait list of students who are denied access due to capacity and notify parents when space becomes available" (*Id.* (2)(j))

- "Require schools to accept students throughout the school year as capacity becomes available" (*Id.* (2)(k))

These provisions create a legitimate expectation that eligible parents will, at minimum, be permitted to apply for school choice, be placed on a waitlist if capacity is reached, and receive notice when space becomes available. The denial of these procedural rights constitutes a deprivation of a protected property interest.

## D.    Procedural Due Process Violation

"Procedural due process requires notice and an opportunity to be heard before any governmental deprivation of a property interest." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Appellant received neither notice nor an opportunity to be heard regarding the denial of his application for school choice.

Florida's school choice law explicitly requires procedural protections, including an "appeals process for hardship cases" (Fla. Stat. § 1002.31 (2)(c)). Appellees'

37

failure to provide these statutorily mandated procedures constitutes a violation of procedural due process.

### E.    Educational Quality Disparities Heighten the Constitutional Significance of School Choice Applications

The denial of school choice applications takes on greater constitutional significance when there are substantial disparities in educational quality between schools. The record indicates that Appellant's child was assigned to a lower-performing school, while being denied the opportunity to apply for a higher-performing school.

The Supreme Court has recognized that education is "perhaps the most important function of state and local governments." *Brown*, 347 U.S. at 493. When significant educational quality disparities exist between schools, denying parents the right to apply for better-performing schools effectively denies children "the opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Rodriguez v. San Antonio Independent School District*, 411 U.S. 1, 37 (1973).

While the Supreme Court has held that education itself is not a fundamental right under the federal Constitution, it has never suggested that state-created rights to educational choice are unprotected by the Due Process Clause. When a state creates

mechanisms for parents to access better educational opportunities, as Florida has done, due process protections attach to those state-created rights.

### 5. The Settlement Agreement Is Unenforceable Under State Law

### A. The Agreement Expressly Preserved Claims Arising After the Effective Date

The district court erred in finding that the settlement agreement barred Appellant's claims regarding school boundary changes that occurred after the agreement was executed. This finding directly contradicts the express language of the agreement and misapplies basic principles of contract interpretation.

The settlement agreement contained two key provisions limiting its temporal scope. First, the release in paragraph 5 covered claims "through the date of execution of this Agreement." Second, and more importantly, the agreement expressly stated: "The Parties further agree that this release shall not cover... any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement." This carve-out unambiguously preserves claims based on conduct occurring after March 15, 2022.

Appellant's claims in Count One challenged school boundary changes made in

2023—changes that indisputably occurred after the settlement agreement's March 15, 2022 effective date.  TAC ¶ 72.  These 2023 boundary changes affected Appellant's North Tampa residence, where he moved seven months after the date of release.  TAC ¶ 88.  The magistrate acknowledged these post-settlement facts but erroneously concluded that "these claims existed as of March 15, 2022" because similar boundary practices had existed previously.  But the question is not whether *similar* claims predated the settlement agreement, but whether these exact claims existed as of the settlement.

This reasoning fundamentally misunderstands the nature of Section 1983 claims.  Each discrete discriminatory act gives rise to a new claim.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Each discrete discriminatory act starts a new clock for filing charges alleging that act."); *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 628 (2007).  The Board's 2023 boundary changes were new, discrete acts that could not have been released in 2022 because they had not yet occurred.

Even under state contract law, this interpretation violates the fundamental principle that "no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given

40

to it." *People's Trust Ins. Co. v. Lamolli*, 352 So. 3d 890, 895 (Fla. 4th DCA 2022). The district court's interpretation renders the express carve-out for "any new claim that may arise by reason of an act or omission occurring after the Effective Date" entirely meaningless.

**B.    The School Assignment Boundary Challenge was not "Specifically Related" to J.W.'s Education**

The district court erred in concluding that Warner's equal protection claims challenging discriminatory school boundaries were "specifically related" to J.W.'s education, services, or educational program. The plain language of the release was limited to claims "specifically related [to] J.W.'s education, services, and educational program in the District through the date of execution." This language does not encompass Warner's personal constitutional claims concerning systemic countywide racial discrimination.

The Agreement's enumeration of specific types of released claims explicitly limits the scope to educational services matters. Paragraph 5 of the Agreement states that it includes "claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorneys' fees, and all losses of any kind whatsoever related specifically

41

to J.W.'s education." Doc. 105-3 at 5-6.

Under the well-established canon of construction *ejusdem generis*, general words following an enumeration of specific terms are construed to embrace only objects similar in nature to those objects specifically enumerated. *First Nat'l Bank of Lake Park v. Gay*, 694 So. 2d 784, 787 (Fla. 4th DCA 1997) (applying this principle under Florida law). Every example listed in the release provision relates specifically to educational services that could be provided to a student under IDEA—services, supports, therapies, evaluations, tutoring, training, and compensatory education. None of these examples even remotely suggests constitutional challenges to school district boundaries or voting districts.

The specific nature of these examples demonstrates that the parties intended to release only claims related to J.W.'s educational services—precisely the subject matter of the original IDEA dispute. Constitutional claims challenging systemic racial discrimination in boundary drawing are fundamentally different in kind from claims for special education services. These constitutional claims represent Warner's personal rights as a citizen, not educational service claims for his child.

This limited scope of the release is further confirmed by the negotiation history documented in the emails between Warner and the Board's attorney. On December

10, 2021, Kinsey-Sallis wrote to Warner expressly confirming that "this settlement agreement carves out and does not cover the public records case." Doc. 105-1 at 1. This shows that both parties understood the agreement to be limited in scope and not intended to waive all possible claims Warner might have against the Board in any capacity.

Warner's challenge to school assignment boundaries is based on countywide racial segregation patterns affecting all students, not merely his child J.W. The complaint alleges widespread racial gerrymandering of school boundaries throughout Hillsborough County, including schools that J.W. has never attended and will never attend. TAC ¶¶ 19-42 (describing discriminatory boundaries for high schools, middle schools, and elementary schools across the county). These claims are not derivative of or dependent upon J.W.'s educational experience, but instead represent Warner's personal rights as an African-American citizen and property owner.

A proper interpretation of the release language must acknowledge that claims "specifically related [to] J.W.'s education" cannot reasonably encompass Warner's personal constitutional claims challenging systemic racial discrimination that affects every student in the district. Warner's claims are quintessentially public-interest constitutional claims asserting his personal rights to equal protection, not

43

claims about the quality or nature of J.W.'s individual special educational program—the subject of the original IDEA dispute.

This conclusion is reinforced by the structure of the operative complaint, which pleads two distinct equal protection claims: Count I challenges the school assignment maps on racial discrimination grounds, and Count II challenges the voting district maps that elect School Board members. TAC ¶¶ 152-168. Both claims assert Warner's own constitutional rights to equal protection—rights that belong to him personally and could not be waived through a settlement concerning his child's special education services.

## C. The Voting Map Challenge Was Not "Specifically Related" to J.W.'s Education

The district court erred by finding that Appellant's challenge to School Board voting district maps (Count Two) fell within the scope of the settlement agreement's limited release of claims "specifically related [to] J.W.'s education, services, and educational program." This conclusion contradicts the plain language of the release provision and ignores the fundamental distinction between voting rights and educational services.

The voting district challenge in Count Two concerns the boundaries used for electing Board members—a matter fundamentally different from the educational

services and programming at issue in the IDEA settlement. TAC ¶¶ 94-130. These claims involve different legal rights, different subject matter, different beneficiaries, and different remedies.

The IDEA due process complaint that led to the settlement concerned only J.W.'s right to receive a Free Appropriate Public Education (FAPE) during COVID-related remote learning and mask mandates. The administrative process under IDEA lacks jurisdiction over voting rights claims or challenges to district voting boundaries.

No reasonable person in Appellant's position would understand that, by settling an IDEA due process complaint regarding his child's educational services, he was also waiving his constitutional right to challenge racially gerrymandered voting districts. Such a reading strains the settlement agreement beyond its reasonable limits and imputes to Appellant an intent to waive constitutional rights that were never contemplated during negotiations.

## D.   Fraudulent Inducement Exception to Parol Evidence Rule

The district court erred by disregarding extrinsic evidence of the Board's fraudulent inducement under the guise of the parol evidence rule. As the Florida Supreme Court has long held with unwavering clarity, the parol evidence rule yields to allegations of fraud in the inducement, permitting the admission of extrinsic evidence

45

to unveil the deceit that procured the agreement. This venerable exception, rooted in equity and justice, ensures that no party may cloak perfidy behind the sanctity of written words.

In *Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689, 690 (Fla. 1941), the Florida Supreme Court affirmed this principle, declaring that if a contract "was procured by fraud and misrepresentation as to a material fact... then such fraudulent misrepresentation vitiated every part of the... contract." The Court emphasized that "a party can not contract against liability for his own fraud," and to hold otherwise "would be against the fundamental principles of law, equity, good morals, public policy and fair dealing." *Id.*

The Supreme Court reinforced this doctrine in *Besett v. Basnett*, 389 So. 2d 995, 998 (Fla. 1980), where it upheld a fraud claim despite the buyer's opportunity to investigate, reasoning that "when the choice is between the two—fraud and negligence—negligence is less objectionable than fraud." Quoting with approval from precedent, the Court admonished: "[I]f I have made that statement for the fraudulent purpose of inducing you to purchase, and you have in good faith made the purchase in reliance upon its truth... it does not lie with me to say to you, 'It is true that I lied to you... but you were guilty of negligence... in believing that I

46

told you the truth."' *Id* (quoting Bristol v. Braidwood, 28 Mich. 191, 196 (1873)). This admonition resonates profoundly in the instant case, where the Board's attorney assured Warner that "the release language only covered special education claims related specifically to J.W.," inducing his execution of the agreement. Doc. 107-1 ¶ 7. To bar this evidence would exalt form over substance, contravening the Supreme Court's directive.

Subsequent appellate decisions have consistently applied the exception. In *Lou Bachrodt Chevrolet, Inc. v. Savage*, 570 So. 2d 306, 308 (Fla. 4th DCA 1990), the Fourth District Court of Appeal reiterated that "while, under normal circumstances, a party is responsible for the terms of the contract he signed and final agreements may not be contradicted by parol or extrinsic evidence, an exception is made in an action alleging fraudulent inducement. In such a case, the parol evidence rule does not preclude admission of extrinsic evidence." Similarly, the First District in *Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 3d 1212, 547-48 (Fla. 3d DCA 2014), admitted parol evidence to resolve contractual ambiguities, underscoring that extrinsic evidence is admissible to explain latent ambiguities and effectuate the parties' intent.

The presence of a non-reliance clause in the settlement agreement does not alter

this analysis or preclude invalidation for fraud.  While Florida's district courts of appeal are divided on whether non-reliance clauses bar later claims of fraudulent inducement, the Florida Supreme Court's precedent in *Oceanic Villas*, 4 So. 2d at 690 compels the conclusion that such clauses cannot immunize a party from liability for its own fraud, particularly in settlement agreements resolving educational disputes. This division is captured in the confusion surrounding justifiable reliance, as exemplified in *Besett*, 389 So. 2d at 998, where the Supreme Court prioritized combating fraud over enforcing contractual provisions that might excuse negligent reliance.

On one side of the split, the Fifth District in *Billington v. Ginn-La Pine Island, Ltd., LLLP*, 192 So. 3d 77, 84 (Fla. 5th DCA 2016) enforced a non-reliance clause to negate a fraud claim, emphasizing contractual predictability.  Similarly, the Fourth District in *Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999) affirmed dismissal of fraud claims where the agreement disclaimed reliance on prior statements.  On the other side, the Fourth District in *Lower Fees, Inc. v. Bankrate, Inc.*, 74 So. 3d 517, 519 (Fla. 4th DCA 2011) refused to enforce a non-reliance clause, holding that fraudulent inducement claims cannot be defeated unless the contract explicitly states fraud is not a ground for rescission, faithfully applying *Oceanic Villas*, 4 So. 2d at 690.

48

This Court should adopt the Supreme Court's unequivocal stance: non-reliance clauses cannot bar settlement agreements from being invalidated for fraud, as to hold otherwise would contravene public policy and equity.

Here, Warner's uncontroverted declaration establishes a prima facie case of fraudulent inducement: the Board's counsel misrepresented the release's scope to encompass only J.W.'s special education claims, inducing Warner's assent while concealing its purported breadth. Doc. 107-1 ¶ 7. The district court's refusal to consider this evidence under the parol evidence rule defies Florida Supreme Court precedent and demands reversal. Equity abhors fraud, and no written instrument may shield it from scrutiny.

### E.    Warner Received No Valid Consideration for Releasing His Personal Claims

The district court erred by treating Mr. Warner and J.W. as a single unified entity for purposes of consideration analysis. This fundamental misunderstanding of contract formation principles undermines the court's entire holding regarding the enforceability of the settlement agreement against Mr. Warner in his personal capacity.

Contract law requires that each party to an agreement receive valid, separate consideration to form a binding contract. *Rosen v. Florida Ins. Guaranty Assn*, 802 So. 2d 291, 294 (Fla. 2001) (holding each party to a contract must receive

valid consideration); *Kel Homes, LLC v. Burris*, 933 So. 2d 699, 703 (Fla. 2d DCA 2006) (confirming that "mutual promises constitute consideration only when there is a binding obligation on each promisor"). The Agreement explicitly designates "Blake Warner" in two legally distinct capacities: (1) Mr. Warner personally, and (2) Mr. Warner on behalf of J.W. See Settlement Agreement at 1 ("by and between Blake Warner (hereinafter 'Parent'), individually, and on behalf of his minor child (J.W.)"). These distinct legal capacities create separate rights and obligations that require separate consideration flowing to each.

The consideration problem creates an irreconcilable paradox: If the Board was already legally obligated to provide educational services to J.W. due to their agreement with J.W. (through Mr. Warner as representative), then that same promise cannot simultaneously serve as fresh consideration to Mr. Warner in his individual capacity. *Ferguson v. Carnes*, 125 So. 3d 841, 842 (Fla. Dist. Ct. App. 2013); *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843-44 (11th Cir. 1989) (holding that promises to perform acts a party is already legally obligated to perform cannot constitute valid consideration).

This paradox is amplified by a patent ambiguity in the Agreement regarding the capacity in which "the Parent" received consideration and released claims. A patent

ambiguity appears on the face of a document and creates uncertainty that cannot be resolved by reading the contract as a whole. *Ace Electric*, 288 So. 3d at 450 (Fla. 3d DCA 2014) (describing patent ambiguity as one that is "apparent on the face of the document"); *Barnett v. Destiny Owners Ass'n, Inc.*, 75 So. 3d 766, 856 (Fla. 1st DCA 2011) (Fla. 1st DCA 2011). The Agreement consistently refers to "the Parent" without distinguishing when Warner is acting for himself versus on behalf of his child, particularly in paragraph 5's release provision.

Florida courts permit extrinsic evidence to clarify the capacity in which a party executed an agreement when the document itself is unclear. *Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711 (Fla. Dist. Ct. App. 2017).

Warner's declaration provides direct evidence of capacity clarification during negotiations. He states that Attorney Kinsey-Sallis "assured [him] that the release language only covered special education claims related specifically to J.W., and that [he] was only included because he possessed certain I.D.E.A.-related rights as a parent that needed to be released to fully end the litigation." Doc. 107-1 ¶ 7. This crucial context explains why Warner is named "individually" in the Agreement – not to release his personal constitutional claims, but solely to release any derivative rights he possessed under I.D.E.A. as J.W.'s parent (which is also the most logical

reading of the agreement).

The nature of the consideration itself and the examples of released claims confirms the capacity distinction. The sole consideration provided was educational services for J.W. Doc. 105-3 at 4-5. No consideration whatsoever flowed to Warner personally. Furthermore, the agreement states that "the Parent" is releasing "all claims for services, supports, therapies, evaluations, tutoring, training". But these are not claims the parent can bring in his individual capacity since he is not a student. Confirming that he was releasing claims only in his representative capacity.

Florida law resolves such ambiguities against the drafter of the agreement. *City of Homestead v. Johnson*, 760 So. 2d 80, 645 (Fla. 2000) (holding that "any ambiguity in a written contract is to be construed against the drafter"); *Tropical Jewelers, Inc. v. Bank of Am., N.A.*, 260 So. 3d 1105, 580–81 (Fla. 4th DCA 2019) (Fla. 4th DCA 2019). This rule of *contra proferentem* applies with particular force when parties have unequal bargaining power. *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 63 (Fla. 1979). The HCSB, through its attorney, drafted this Agreement, as evidenced by the emails between Warner and a school board attorney. Doc. 105-2, 105-3. Warner explicitly objected to overly broad language in these exchanges, stating: "Let me be perfectly frank, based on your

correspondence, I am not agreeing to any additional clauses or terms that were not agreed upon by Suzette Sample and myself." Doc. 105-2 at 2.

### F.    The District Court's Consideration Analysis Lacks Supporting Precedent

The District Court summarily concluded that "Warner signed the agreement in both his personal capacity and on behalf of J.W., and Warner promised to release the School Board in exchange for the benefits promised to J.W. . . .  This is valid consideration and binds Warner, both individually and as the parent of J.W." (Doc. 112 at 20).

Notably, the District Court cited no Florida caselaw whatsoever to support this critical conclusion regarding consideration.  The absence of supporting precedent suggests that this is an unsettled area of Florida law.

### G.    Guarantor Law Is Inapplicable to This Tripartite Contractual Relationship

The closest Florida law comes to addressing this issue is in guarantor/cosigning contexts.  In Florida, "[w]here ...  the guaranty is entered into at the time of the creation of the principal obligation and becomes an essential ground of the credit given to the principal debtor, the same consideration for the principal debt suffices for the contract of guaranty." *Gordon v. Corp. Ins. Servs., Inc.*, 374 So. 2d 603, 604

(Fla. Dist. Ct. App. 1979) (citing *Jones v. McConnon & Co., 100 Fla. 1158*, 130 So. 760, 760 (1930); *Anderson v. Trade Winds Enterprises Corp.*, 241 So.2d 174, 178 (Fla. 4th DCA 1970)).

This principle is inapplicable here for two reasons. First, Warner's individual capacity is not analogous to that of a guarantor; he was not guaranteeing J.W.'s performance but purportedly releasing his own independent claims. Second, Warner's release of his individual claims was not "an essential ground" for the School Board's promises to J.W. The Agreement's primary purpose was to resolve J.W.'s educational claims under the Individuals with Disabilities Education Act. The School Board could have (and should have) provided the same consideration to J.W. regardless of whether Warner also released his individual claims, to remedy the board's failure to provide a FAPE to J.W.

## H.   Pure Consideration Analysis in a Tripartite Contract

Treating Warner and J.W. as distinct contracting parties, as Florida law requires, this case presents a straightforward consideration analysis in a tripartite contractual relationship. *see Jones v. McConnon & Co.*, 130 So. at 760 ("... ordinarily a contract of guaranty is separable from the debt of the person whose debt is guaranteed"). The legal issue turns on the fundamental contract principle that each party must

54

receive consideration. When viewed as three distinct contracting entities (School Board, J.W., and Warner individually), the analysis reveals that one party (Warner individually) received no consideration for his gratuitous promises.

This creates a logical impossibility: For the contract to be enforceable against Mr. Warner personally, the court must accept the absurd result that J.W. was not a valid party to the settlement of his own IDEA litigation and received no consideration for releasing his claims. Conversely, if J.W. was a valid party (as clearly intended), then Mr. Warner personally received no consideration and cannot be bound by the release in his individual capacity. The only reasonable interpretation is that there exists a binding agreement between the School Board and J.W. (through Mr. Warner as representative), but no enforceable agreement between the School Board and Mr. Warner in his personal capacity. *Excelsior*, 369 So. 2d at 941 ("A reasonable interpretation of a contract is preferred to an unreasonable one").

## 6.    Federal Law Governs the Validity and Enforceability of Releases of Constitutional Rights

The district court's fundamental error was applying Florida contract law rather than federal law to determine whether Appellant had validly released his federal

constitutional claims under 42 U.S.C. § 1983.

## A.    Federal Law's Heightened Standard for Constitutional Waivers

The Supreme Court has stated "the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law." *Brookhart v. Janis*, 384 U.S. 1, 4 (1966). This principle is particularly significant when evaluating waivers of civil rights under Section 1983. *Town of Newton v. Rumery*, 480 U.S. 386, 392 (1987) (applying federal standards to determine if a release of Section 1983 claims was enforceable).

Federal law imposes a heightened standard for constitutional waivers, requiring they be "voluntary, knowing, and intelligently made." *Brady v. United States*, 397 U.S. 742, 748 (1970). Courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). This rigorous standard reflects the unique importance of constitutional protections in our legal system.

This Court has repeatedly affirmed this principle, holding that "the validity of a release of federal civil rights is governed by federal rather than state law." *Puentes v. United Parcel Serv., Inc.*, 86 F.3d 196, 198 (11th Cir. 1996). In *Myricks v. Fed. Reserve Bank of Atlanta*, 480 F.3d 1036, 1040 (11th Cir. 2007), the court emphasized

56

that "waivers of federal remedial rights are subject to a more stringent evaluation than are commercial contracts negotiated at arm's length."

## B.   The Totality of the Circumstances Test

Federal courts apply a "totality of the circumstances" test to evaluate whether a waiver of constitutional rights was knowing and voluntary.  The Eleventh Circuit has established seven specific factors for this analysis:

1. The clarity and specificity of the release language;

2. The plaintiff's education and business experience;

3. The amount of time plaintiff had for deliberation about the release before signing it;

4. Whether plaintiff knew or should have known his rights upon execution of the release;

5. Whether plaintiff was encouraged to seek, or in fact received, benefit of counsel;

6. Whether there was opportunity for negotiation of the terms; and

7. Whether the consideration given in exchange for the waiver exceeds the benefits to which the executive was already entitled by contract or law.

*Puentes*, 86 F.3d at 198.

This multi-factor test requires courts to conduct a thorough, fact-intensive examination that considers both objective and subjective elements. No single factor is dispositive. In *Duvall v. Sun-Sentinel Co.*, No. 12-62497-CIV-SCOLA, *2-3 (S.D. Fla. July 1, 2013), the court explicitly stated that even with broad release language, "the Court cannot dismiss on the basis of those documents alone... [but] must make fact-intensive inquiries to determine whether, under 'the totality of the circumstances,'" the release was knowing and voluntary.

## C.    Warner's Settlement Agreement Fails the Knowing and Voluntary Standard Under Federal Law

Applying the Eleventh Circuit's totality of the circumstances test to Warner's case reveals numerous undisputed material facts that preclude summary judgment:

**Release Language Limited to Educational Services**    The Agreement's enumeration of released claims strongly indicates Warner did not knowingly waive constitutional rights. As discussed above, Paragraph 5 specifically lists "claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorneys' fees" as

58

the types of claims released. Doc. 105-3 at 5-6. Every example relates exclusively to educational services typically provided under IDEA—not constitutional claims challenging systemic racial discrimination. This specific enumeration would naturally shape Warner's understanding of what he was releasing.

**Warner's Limited Education Background**    Warner's declaration explicitly states: "High school is the highest level of education Affiant has achieved." Doc. 107-1 ¶ 2. This limited educational background weighs against finding he knowingly waived complex constitutional rights.

**Misrepresentations and Warner's Objections**    Warner presented evidence that School Board representatives misrepresented the scope of the release, with a school board attorney assuring him "that the release language only covered special education claims related specifically to J.W." Doc. 107-1 ¶ 7. Warner consistently objected to overly broad language, writing: "Let me be perfectly frank, based on your correspondence, I am not agreeing to any additional clauses or terms that were not agreed upon by Suzette Sample and myself." Doc. 105-2 at 2. In another email, Warner explicitly stated: "A waiver of all claims is a non-starter," and clarified he was only willing to waive "FAPE claims prior to the execution date." Doc. 105-2 at

59

3-4. Waivers of constitutional rights must be free of precisely this type of deception and coercion. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

**Narrowing of Agreement Language**    The executed agreement's language was substantially narrowed from the original draft, demonstrating intent to limit its scope. The "Purpose" section was changed from resolving "any and all claims that pertaining specifically to the Parent may have against the School Board" to settling only "claims pertaining specifically to the education of J.W." Doc. 107-3 at 1. The release provision was modified from covering claims "in any way connected with" J.W.'s education to those "specifically related [to] J.W.'s education, services, and educational program." Doc. 107-3 at 2. The final agreement added explicit limiting language stating "this release shall not cover any claim that is not regarding J.W.'s education." Doc. 107-3 at 3.

**Lack of Valid Consideration**    As discussed above, Warner did not receive *any* consideration for the release. Additionally, the consideration provided flowed entirely to J.W., not to Warner personally. The agreement provided for educational services for J.W. and guaranteed J.W.'s admission to certain schools. Doc. 105-3 at 4-5. This consideration structure reinforces that Warner was not knowingly

60

waiving his own constitutional claims.

**No Explicit Discussion of Constitutional Rights**    Nowhere in the agreement or related communications did the School Board explicitly inform Warner he was waiving personal constitutional rights to challenge racial discrimination in school boundaries or voting districts.  Under federal standards, waivers of constitutional rights must be explicit and unambiguous.  *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972) (requiring clear and unmistakable waiver of constitutional rights).

Consideration of these undisputed facts is required in the kind of "fact-intensive inquiries" that are necessary before dismissing a case based on a release.  *Sun-Sentinel*, No. at *2-3.  The district court's cursory analysis consisting of a single paragraph that relied exclusively on boilerplate language in the agreement itself fails to satisfy the federal standard for evaluating constitutional waivers.

The totality of circumstances establishes that Warner's purported waiver was not knowing and voluntary.  The Supreme Court has emphasized that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights."  *Zerbst*, 304 U.S. at 464.  The facts here do not overcome that presumption but affirmatively demonstrate Warner did not knowingly waive his constitutional

rights.

## 7.   The Settlement Agreement Violates Public Policy

### A.   Conditioning a Child's Special Education Services on The Waiver of The Parent's Personal Constitutional Rights Is Inherently Coercive

Any interpretation of the settlement agreement requiring Warner to waive his own constitutional rights as a condition for securing remedies for his child's educational needs would render the agreement unenforceable as a matter of public policy.  Such conditional waivers create an inherently coercive dynamic that undermines both the voluntariness requirement for constitutional waivers and the broader public interest in safeguarding civil rights enforcement.

The unconstitutional conditions doctrine applies when fundamental rights are at stake. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests").

In the context of special education, the coercive dynamics are especially pronounced.  A parent of a child with disabilities faces extraordinary pressure to secure appropriate educational services for their child, often after prolonged disputes with

school authorities. Forcing parents to choose between vindicating their child's educational rights and preserving their own constitutional rights creates precisely the type of "Hobson's choice" that the Supreme Court has found inherently coercive. *Simmons v. United States*, 390 U.S. 377, 394 (1968) (finding it "intolerable that one constitutional right should have to be surrendered in order to assert another").

Congress enacted IDEA to ensure that children with disabilities receive appropriate educational services, not to create a mechanism through which school districts could immunize themselves from constitutional accountability. 20 U.S.C. § 1400(d)(1)(A) (stating that IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education"). Interpreting IDEA settlements to extinguish parents' constitutional rights would undermine this legislative purpose.

## B.   The Purported Release Undermines Civil Rights Enforcement

The district court's interpretation would undermine our nation's primary civil rights enforcement statute § 1983 in the educational context by creating a mechanism for public school districts to immunize themselves from constitutional accountability.

Particularly troubling is the potential for conditional waivers to shield systemic discrimination from judicial scrutiny. If school districts could routinely require

parents to waive constitutional challenges to discriminatory policies as a condition

for receiving IDEA services, patterns of institutional discrimination could persist

unchecked behind a wall of private settlements.

The Supreme Court has consistently recognized the vital public interest in ensur-

ing judicial review of discriminatory practices. *Allen v. State Bd. of Elections*, 393

U.S. 544, 556 (1969) (emphasizing the importance of private enforcement actions

in addressing discrimination). This interest is particularly acute in the educational

context, where the Court has recognized the profound harm caused by segregation

and discrimination. *Brown*, 347 U.S. at 493.

Courts have regularly refused to enforce waivers obtained through similarly co-

ercive means in other contexts. In *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422,

426-27 (1998), the Supreme Court refused to enforce a waiver of age discrimina-

tion claims, emphasizing the need to protect employees from pressure to waive their

rights.

## C.   Civil Rights Cannot Be Prospectively Waived

The district court erred in finding that Warner prospectively waived his civil rights

("a party may contract to relinquish a prospective Section 1983 claim" Doc. 120),

effectively ruling that Warner can never sue the school board, for anything ever

again—no matter what the school board does in the future. The Supreme Court has long held that such prospective waivers of fundamental civil rights are unenforceable, as they undermine the very purpose of these protections and create perverse incentives for continued misconduct.

In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51-52 (1974), the Supreme Court declared that "there can be no prospective waiver of an employee's rights under Title VII," emphasizing that civil rights statutes embody "a congressional command that each employee be free from discriminatory practices" and that allowing advance waivers would "defeat the paramount congressional purpose behind Title VII." This principle extends beyond Title VII to other civil rights protections, as the Court has consistently guarded against arrangements that would immunize future violations of federal rights. *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 75-76 (1998) (refusing to enforce a collective bargaining agreement's arbitration clause as a prospective waiver of statutory rights under the ADA, noting that unions may not prospectively waive employees' right to a judicial forum for statutory claims of employment discrimination unless the waiver is "clear and unmistakable"); *Oubre*, 522 U.S. at 427 (invalidating a waiver of ADEA claims that did not comply with statutory requirements, underscoring the Court's reluctance to permit releases that could shield future discrimination).

The rationale is clear: prospective waivers "would nullify the purposes of the [civil rights] laws" by allowing parties to contract around protections designed to vindicate public interests, not merely private ones. *Alexander*, 415 U.S. at 51. Here, the district court's reading of the settlement agreement as barring future challenges to discriminatory boundary practices—conduct occurring after the agreement's execution—constitutes such an impermissible prospective waiver. Appellant's claims arise from the School Board's 2023 boundary changes and ongoing maintenance of racially gerrymandered maps, acts postdating the March 2022 settlement. Enforcing the agreement to bar these claims would prospectively immunize the Board from accountability for future equal protection violations and FHA breaches, directly contravening Supreme Court precedent.

This Circuit has applied these principles to Section 1983 claims, recognizing that prospective waivers of constitutional rights are particularly suspect. In *Jackson v. Seaboard Coast Line R.R.*, 678 F.2d 992, 1005 (11th Cir. 1982), the Eleventh Circuit held that a release purporting to waive future civil rights claims was unenforceable, citing *Alexander*, 415 U.S. 36 for the proposition that "there can be no prospective waiver of an employee's rights under Title VII." *Puentes*, 86 F.3d at 198 (applying heightened scrutiny to waivers of federal remedial rights).

66

Other circuits reinforces this prohibition.  The Second Circuit, for instance, has held that "a stipulation that purports to assume, prospectively, the absence of discrimination will not be enforced," as it would allow employers—or here, public entities—to "purchase an exemption from Title VII and other civil rights statutes." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) (citing *Alexander*, 415 U.S. 36).  Similarly, the Ninth Circuit in *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1399 (9th Cir. 1991) invalidated a settlement agreement's prospective waiver of a plaintiff's right to run for public office, reasoning that "constitutional rights, because they are guarantees against abuse of governmental authority, cannot be subordinated to that authority through waiver or agreement."  These decisions underscore a uniform judicial consensus:  prospective waivers of civil rights serve no legitimate purpose and instead enable the very discrimination that federal law seeks to eradicate.

In this case, the settlement arose from an IDEA dispute concerning J.W.'s individual educational services during COVID-19—not systemic racial discrimination.  Interpreting it to prospectively bar Appellant's personal challenges to future boundary gerrymandering would not only exceed the agreement's intended scope but also violate public policy by shielding the School Board from accountability for ongoing constitutional violations.  The Supreme Court admonished in *Rumery*,

480 U.S. at 394, even retrospective releases must be carefully scrutinized to ensure they do not "tempt[] the prosecutor to trump up charges" or, by analogy, tempt public officials to perpetuate discrimination knowing future challenges are barred. Prospective waivers pose an even graver threat, meriting outright invalidation.

## 8.  The District Court Committed Procedural Errors Requiring Reversal

### A.  The Court Denied Adequate Discovery Before Granting Summary Judgment

The district court abused its discretion by denying Appellant's Rule 56(d) motion and refusing to allow discovery before ruling on summary judgment.  Discovery was essential to resolving the very issues on which summary judgment was granted.

Rule 56(d) provides that if a non-movant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may:  "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

This Court has emphasized that "summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery." *Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997); *Snook v. Trust Co. of*

68

*Georgia Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988) ("[T]he party opposing a motion for summary judgment has a right to challenge the affidavits and other factual materials submitted in support of the motion by conducting sufficient discovery so as to enable him to determine whether he can furnish opposing affidavits.").

In this case, Appellant filed a proper Rule 56(d) motion supported by a detailed declaration specifying exactly what discovery was needed and why. Appellant specifically sought:

1. Documents related to the School Board's understanding and intent regarding the settlement agreement. Rule 56(d) Decl. ¶ 6.

2. The depositions of key individuals involved in negotiating the agreement, including Suzette Sample who signed on behalf of the School Board. Rule 56(d) Decl. ¶ 8.

3. Discovery regarding whether the agreement was "knowingly and voluntarily" made. Rule 56(d) Decl. ¶ 6.

4. Evidence regarding what types of claims the parties intended to release. Rule 56(d) Decl. ¶ 6.

These discovery requests directly addressed the central issues on which summary judgment was granted: whether the settlement agreement unambiguously covered Appellant's claims and whether Appellant knowingly and voluntarily waived his constitutional rights.

Discovery had only recently resumed after a stay had been lifted on June 7, 2024, and Appellant had filed a motion to compel discovery on September 11, 2024. Rule 56(d) Decl. ¶¶ 2-4. Before the court could rule on the motion to compel, it converted the motion to summary judgment on November 18, 2024, and stayed all discovery. Rule 56(d) Decl. ¶ 5.

The district court's premature conversion of the motion to summary judgment and denial of all discovery was particularly prejudicial because the School Board had asserted that the settlement agreement barred Appellant's claims as an affirmative defense. When a defendant relies on an affirmative defense, courts routinely permit discovery into the facts underlying that defense before granting summary judgment.

**B.    The Court Failed to Provide Proper Notice and Opportunity to Respond**

Warner was denied an opportunity to fully oppose summary judgment after converting Defendant's Rule 12(c) motion into a Rule 56 motion. This Court has held that

70

before a Rule 12(c) motion may be converted into a summary judgment motion, the court must: 1) Notify the parties of the conversion; and 2) Provide the parties an opportunity to submit evidence and legal arguments. *Marine Coatings of Alabama, Inc. v. United States*, 792 F.2d 1565, 1568 (11th Cir. 1986); *Jones v. Auto. Ins. Co. of Hartford, Conn.*, 917 F.2d at 1532.

The lower court gave only a limited opportunity to submit evidence but did not invite or permit full summary judgment briefing. On November 18, 2024, the magistrate judge issued an order (Doc. 103) stating that "the parties must provide the Court all material pertinent to the motion for judgment on the pleadings." This directive was understood by both parties to call for evidentiary submissions, not full summary judgment arguments.

Without a proper briefing schedule, Warner was unable to properly address the summary judgment standard, marshal legal arguments regarding genuine issues of material fact, or present his arguments within the framework of Rule 56 jurisprudence. This procedural defect is significant because summary judgment arguments fundamentally differ from arguments opposing judgment on the pleadings.

Warner was prejudiced by this error because he was denied his constitutional right to be heard, including the right to assert material facts, the right to be put on

notice of factual contentions the board makes, and then an opportunity to dispute

them in accordance with Rule 56 procedures.

## C.    The Court Improperly Relied on Arguments Not Raised by the Defendant

The district court violated the party presentation rule by granting summary judg-

ment on grounds not raised by the School Board in its motion or pleadings.  Specifi-

cally, the court relied on (1) the "agreement not to sue" provision in paragraph 6 of

the settlement agreement and (2) Appellant's alleged lack of standing to challenge

boundaries outside his own district.  Neither of these arguments was raised by the

School Board.

The Supreme Court has emphasized that our adversarial system follows the "prin-

ciple of party presentation," meaning "we rely on the parties to frame the issues

for decision and assign to courts the role of neutral arbiter of matters the parties

present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (internal

quotation marks omitted).  While Rule 56(f) allows a court to grant summary judg-

ment on grounds not raised by a party, it requires the court to "giv[e] notice and a

reasonable time to respond." Fed. R. Civ. P. 56(f).

The district court's reliance on the "agreement not to sue" provision in paragraph

6 of the settlement agreement was improper because the School Board never pled

this provision as an affirmative defense in its answer to the complaint. Under Rule 8(c), Federal Rules of Civil Procedure, failure to plead an affirmative defense in the responsive pleading constitutes a waiver of that defense. *Hassan*, 842 F.2d at 263; *American Nat. Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1537 (11th Cir. 1983).

The answer's third affirmative defense (Doc. 82 at 33-35) stated only that Warner's "claims are barred by release, discharge, and waiver" and specifically quoted only the language from paragraph 5 of the settlement agreement, not paragraph 6. The School Board's motion for judgment on the pleadings (Doc. 86) similarly relied exclusively on the release provision in paragraph 5.

By resurrecting and relying on a waived affirmative defense, the district court improperly acted as advocate rather than arbiter, disrupting the adversarial balance that is fundamental to our judicial system.

Similarly, the district court improperly ruled sua sponte on standing, holding that "Warner lacks standing to sue for racial gerrymandering of boundaries other than those where he lives." The School Board never raised this argument, and the court's sua sponte ruling without notice violated Rule 56(f) and deprived Appellant of the opportunity to present relevant evidence and argument.

## 9.    Standing for School Assignment Boundary Challenge

Warner has established standing to challenge school attendance boundaries through-out Hillsborough County through multiple, independent avenues:

### A.    Personal Racial Discrimination Injury

Warner plead standing based on his status as an African-American who has "been the subject of discrimination throughout his life" and who is "particularly sensitive to discriminatory practices." TAC ¶ 80. The complaint details his personal emo-tional distress from knowing "students in his community were being discriminated against because of their race." TAC ¶ 80. This injury is personal to Warner, not derivative of J.W.'s educational interests.

The Supreme Court has consistently recognized that stigmatic harm from racial discrimination constitutes an injury-in-fact sufficient to establish Article III stand-ing. *Allen v. Wright*, 468 U.S. 737, 755 (1984) (acknowledging that stigmatic harm can constitute injury-in-fact when plaintiffs are "personally denied equal treatment" by the challenged discriminatory conduct); *Heckler v. Mathews*, 465 U.S. 728, 740 (1984) (holding that discrimination itself, apart from any tangible effects, can cause serious non-economic injuries to those persons who are personally denied equal

treatment).

## B.   Economic Injury via Property Value Diminution

Warner asserts standing based on concrete economic injury through diminished property values caused by the discriminatory boundaries.  He alleges that "the value of Mr. Warner's house is depressed due to the gerrymandered schools assigned to his residence."  TAC ¶ 87.  This property-based injury affects Warner's financial interests entirely separate from any educational considerations.

Economic injury is a paradigmatic basis for Article III standing. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) ("Economic injury is one of the paradigmatic forms of injury-in-fact."); *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) (confirming that financial losses constitute "a classic form of injury in fact").  Courts have specifically recognized standing based on diminished property values resulting from discriminatory school assignment policies. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 92 (1979) (holding diminished property values constituted sufficient injury-in-fact for standing);

The TAC also alleges that Warner was personally "priced out of south tampa" due to the School Board's "manipulation of property values" through its boundary drawing practices.  TAC ¶ 88.  This economic displacement represents a concrete

financial injury directly traceable to the challenged policies and redressable by judicial relief. *Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) (recognizing standing based on diminished property values and economic displacement).

## C.    Rights as Current and Prospective Homeowner

Warner pleaded that as a current and prospective homeowner not tied to any one area of Hillsborough County, the discriminatory school assignment boundaries affect property values of his current and prospective homes. TAC ¶¶ 86-88. This gives him standing to challenge boundaries throughout the county, not merely those affecting his current residence. *Smith v. Henderson*, 944 F. Supp. 2d 89, 99 (D.D.C. 2013) (finding Plaintiff has standing to challenge not just the closure of their assigned school, but all schools in the district when the process was discriminatory).

The Supreme Court has recognized that prospective interests can establish standing. In *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993), the Court held that "a party challenging the government's use of a criterion on equal protection grounds need not show that but for the use of [the criterion], that party would have obtained the benefit. The 'injury in fact' is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Simi-

larly, Warner need not demonstrate that he would purchase a home in each affected area; the injury is the racially discriminatory barrier affecting his housing choices throughout the county.

In *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 262-64 (1977) (1977), the Court found standing for a plaintiff who alleged that discriminatory zoning practices prevented him from moving into the community. Warner's allegation that discriminatory school boundaries affect his housing options as a prospective homeowner presents a comparable injury.

## D.    Displacement and Loss of Community

Warner claims that the Board's discriminatory boundary policies resulted in "a loss of community for Mr. Warner" and forced relocation from his established neighborhood. TAC ¶¶ 91-92. This displacement and community disruption constitutes a concrete injury-in-fact sufficient to confer Article III standing.

The Supreme Court has long recognized that forced displacement and community disruption represent cognizable injuries under the Equal Protection Clause. In *Keyes v. School Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 223-25 (1973), the Court acknowledged the profound impact of school segregation on residential patterns and community cohesion. This recognition reflects the understanding that discrim-

inatory educational boundaries don't merely affect school assignments—they fundamentally reshape communities and force families to make difficult choices about where to live.

The Eleventh Circuit has recognized community displacement as a concrete injury conferring standing in cases challenging discriminatory educational policies. In *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1248 (11th Cir. 2005), the court affirmed that racial segregation causing "community isolation" establishes a redressable injury. This reflects judicial recognition that community ties and neighborhood stability are legally protected interests that can be injured by discriminatory boundary-drawing practices.

Warner's complaint details his personal displacement from South Tampa, where he had deep community ties, to North Tampa due to the Board's manipulation of school boundaries that artificially inflated housing prices in predominantly white school zones. TAC ¶¶ 87-92. This forced relocation separated Warner from his established community networks, where he had "spent much of his childhood" and "attended Tinker Elementary, Monroe Middle School, and Robinson High School." TAC ¶ 92. The loss of these community connections represents a distinct and concrete injury to Warner's personal interests, separate from any educational interests

of his child.

Numerous federal courts have recognized that community displacement caused by discriminatory housing and education policies creates standing for affected individuals. *Trafficante*, 409 U.S. at 211 (recognizing standing based on "loss of important benefits from interracial associations"); *Gladstone Realtors*, 441 U.S. at 109-11 (finding standing based on community displacement caused by discriminatory housing practices).

### E.   Rights as Parent in School District

The Supreme Court has conferred standing to parents challenging race-based assignment systems when they are "being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 718–19 (2007). In *Id*, the Court recognized that parents have standing to challenge discriminatory school assignment policies even when their children have not yet been denied admission to any school, because "the fact that it is unknown whether these children will be denied admission to a school based on their race ... does not eliminate the injury claimed." *Id.* at 719.

This standing doctrine has been extended to all race-conscious admissions or assignment policies. *Gratz v. Bollinger*, 539 U.S. 244, 268 (2003) (finding stand-

ing to challenge university admissions policies even where the plaintiff had not reapplied); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1499 (11th Cir. 1990) (holding that "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract").

Unlike voter districts where a person votes in exactly one district, parents can potentially enroll their children in any public school, and boundaries directly impact school capacity and enrollment options. The Eleventh Circuit has recognized this distinction in *Holton*, 425 F.3d at 1253–54, acknowledging that parents have standing to challenge district-wide policies affecting school assignment and composition.

## F.   Competitor Standing Doctrine

Warner's allegations that he must "compete in a race-based school enrollment system" (TAC ¶ 81) trigger the "competitor standing" doctrine, which confers standing when a plaintiff is forced to compete in an allegedly unlawful system. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 2105 (1995) (recognizing standing based on the inability to compete on an equal footing); *Texas v. Lesage*, 528 U.S. 18, 20–21 (1999) (holding that a person has standing to challenge a race-conscious policy

80

even if they would have been rejected under a race-neutral policy).

This Court has applied this doctrine in the educational context, recognizing that "a governmental barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group" establishes injury-in-fact. *Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 1334 (11th Cir. 1997).

## 10.    Standing for Voting Map Challenge

The district court's reliance on *Gill v. Whitford*, 138 S. Ct. 1916 (2018) to dismiss Warner's standing for the voting map challenge represents a misapplication of that precedent:

### A.    Direct Impact on Warner's Voting Districts

While Warner has never resided in District 1, he has resided in both District 2 and District 3, which directly border the challenged District 1. TAC ¶¶ 94-130. Any manipulation of District 1's boundaries necessarily affects the boundaries of adjacent districts, including those where Warner resided. The Supreme Court recognized this principle in *Cooper v. Harris*, 137 S. Ct. 1455, 1458 (2017) (acknowledging that manipulation of one district's boundaries necessarily affects surrounding dis-

tricts and voters in those districts have standing).

## B.    Vote Dilution in Warner's Own Districts

Warner plead that the Board was "sucking large amounts of minority voters out of his district and packing them into District 1," which directly dilutes his minority vote in his voting districts.  TAC ¶¶ 112-115.  This alleges a concrete, particularized injury to Warner's personal voting rights.

The Supreme Court has recognized vote dilution as an injury-in-fact in *Thornburg v. Gingles*, 478 U.S. 30, 42 (1986) (establishing that vote dilution constitutes injury when minority voters have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice").  The Eleventh Circuit has confirmed that individual voters have standing to bring vote dilution claims.  *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1317–18 (11th Cir. 2020) (finding standing for individual African American voters challenging county electoral system for school board).

## C.    Proper Application of Gill

*Gill*, 138 S. Ct. 1916 actually supports Warner's standing, as it holds that "voters who allege facts showing disadvantage to themselves as individuals have standing

82

to sue." *Id.* at 1929 (quoting Baker, 369 U.S., at 206). Warner has demonstrated precisely this type of individualized disadvantage in his own voting districts through the gerrymandering of District 1's boundaries.

Post-*Id* decisions have clarified that voters have standing to challenge district lines when they allege concrete, personalized harms to their voting power. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2492, 2495 (2019) (distinguishing between partisan gerrymandering claims affecting all voters of a party and individualized vote dilution claims); *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 1267 (2015) (finding standing for racial gerrymandering claims where plaintiffs resided in affected districts or districts whose boundaries were affected by the challenged redistricting).

### D.   Standing Based on Racial Classification

The Supreme Court has consistently recognized that "[r]acial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions." *Shaw v. Reno*, 509 U.S. 630, 657 (1993). These racial classifications cause unique harms that confer standing on affected voters. *United States v. Hays*, 515 U.S. 737, 744 (1995) (finding that residence in a district where boundaries were allegedly drawn on racial

grounds confers standing); *Sinkfield v. Kelley*, 531 U.S. 28, 8 (2000) (per curiam) (explaining that voters residing in districts adjacent to allegedly gerrymandered districts have standing when boundaries of their districts were affected by racial gerrymandering).

### E.   School Board Voting Districts and Equal Protection

This Court has recognized standing for challenges to school board electoral systems under the Equal Protection Clause.  In *Burton v. City of Belle Glade*, 178 F.3d 1175, 1211–12 (11th Cir. 1999), the court found that African American residents had standing to challenge an electoral system that allegedly diluted their voting strength in school board elections.  Similarly, in *DeJulio v. Georgia*, 290 F.3d 1291, 700 (11th Cir. 2002), the Eleventh Circuit recognized that voters have standing to challenge electoral systems when they allege that their votes are devalued compared to voters in other districts.

The Supreme Court has also recognized that school board electoral systems must comply with the Equal Protection Clause.  *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 632 (1969) (finding that restrictions on voting in school district elections must be subjected to strict scrutiny under the Equal Protection Clause); *Hadley v. Junior College District*, 397 U.S. 50, 183 (1970) (extending one-person,

one-vote principle to school board elections).

## 11.    Conclusion on Standing

The trial court's sua sponte dismissal of Warner's standing—without notice or opportunity to be heard—was procedurally improper and substantively incorrect. Warner has articulated multiple independent bases for standing that satisfy Article III requirements for both challenged practices.  The Supreme Court reaffirmed in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), the injury-in-fact requirement is satisfied when an injury is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  Warner's allegations satisfy these requirements through his personal experiences of racial discrimination, economic harm, and vote dilution.

At minimum, these factual allegations of standing create genuine issues of material fact that preclude summary judgment, particularly without discovery into the impact of the challenged policies on Warner's interests.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372–73 (1982) (recognizing that factual disputes concerning standing should be resolved through the ordinary processes of discovery and trial); *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975) (noting that standing determi-

nations often require development of the factual record).

## X    Conclusion

Appellant respectfully requests that this Court reverse the judgment below and grant the relief requested in this brief, together with any further relief the Court deems just and proper.

## XI   Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 32-4 because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 12,929 words as counted by https://charactercounter.com/pdf-word-counter

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using LaTeX in 14-point Times New Roman font.

August 6, 2025
_____

Date

/s/blake warner
_____

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

87