# United States Court of Appeals for the Eleventh Circuit

No. 25-11376

---

Blake Warner

*Plaintiffs-Appellants,*

*v.*

The School Board of
Hillsborough County, Florida

*Defendants-Appelleees.*

Appeal from the United States District Court
for the Middle District of Florida
USDC No. 8:23-CV-181

---

**APPENDIX VOLUME 1**

# APPENDIX INDEX

## VOLUME 1

**U.S. District Court Middle District of Florida (Tampa)**

    **Civil Docket for Case No. 8:23-cv-181-SDM-LSG** . . . . . . . . . . . . . . . . . . . . **DKT**

**Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**Answer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**Second Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

    Exhibit A south tampa race map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-A

    Exhibit B white map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-B

    Exhibit C hispanic map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-C

    Exhibit D black map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-D

    Exhibit E south tampa elementary map . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-E

    Exhibit F wfla addison davis property values . . . . . . . . . . . . . . . . . . . . . . Vol 3-F

    Exhibit G HOLC ads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-G

    Exhibit H HOLC map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-H

Exhibit J carrollwood proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-J

Exhibit K wtsp property value concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-K

Exhibit R district map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-R

Exhibit X gerrymander graphs elementary . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-X

Exhibit Y gerrymander graphs middle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Y

Exhibit Z gerrymander graphs high . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Z

**Motion To Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **45**

**Response To Motion To Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **49**

**Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **72**

**Objection To Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . .    **76**

**Order Adopting Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . .    **78**

## VOLUME 2

**Third Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **79**

Exhibit A south tampa race map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-A

Exhibit B white map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-B

Exhibit C hispanic map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-C

Exhibit D black map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-D

Exhibit E south tampa elementary map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-E

Exhibit F wfla addison davis property values . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-F

Exhibit G HOLC ads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-G

Exhibit H HOLC map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-H

Exhibit J carrollwood proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-J

Exhibit K wtsp property value concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-K

Exhibit R district map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-R

Exhibit X gerrymander graphs elementary . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-X

Exhibit Y gerrymander graphs middle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Y

Exhibit Z gerrymander graphs high . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Z

**Answer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **82**

Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82-1

**Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **85**

**Motion For Judgment On The Pleadings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **86**

**Opposition Motion For Judgment On The Pleadings** . . . . . . . . . . . . . . . . . . . . .    **87**

**Response Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **91**

## VOLUME 3

**Motion To Stay Discovery** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **96**

**Reply Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **97**

**Response In Opposition To Stay Discovery** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **99**

**Order Staying Discovery and 12(c) Conversion to Summary Judgment** . . .    **103**

**Joint Statement Of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **105**

Draft Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .105-1

Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .105-2

Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .105-3

Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .105-4

**Motion To Stay Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **106**

Blake Warner Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .106-1

**Notice Submitting Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **107**

Blake Warner Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .107-1

Agreement Redline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .107-2

**Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **112**

**Objection To Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **117**

**Response To Objections** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **118**

**Order Adopting Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **120**

**Notice of Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **126**

## VOLUME 4

**Exhibit A south tampa race map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **A**

**Exhibit B white map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **B**

**Exhibit C hispanic map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **C**

**Exhibit D black map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **D**

**Exhibit E south tampa elementary map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **E**

**Exhibit F wfla addison davis property values** . . . . . . . . . . . . . . . . . . . . . . . . . . **F**

**Exhibit G HOLC ads** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **G**

**Exhibit H HOLC map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **H**

**Exhibit J carrollwood proposal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **J**

**Exhibit K wtsp property value concerns** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **K**

**Exhibit R district map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **R**

**Exhibit X gerrymander graphs elementary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **X**

**Exhibit Y gerrymander graphs middle** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Y**

**Exhibit Z gerrymander graphs high** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Z**

## VOLUME 5

**114 Cong. Rec. at 2530 (1968)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-1**

**114 Cong. Rec. at 24418** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-2**

**134 Cong. Rec. (1988) at 19711** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-3**

**90th Cong., 1st sess., Congressional Record 113, August 16, 1967 at 22841 -
22848** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-4**

**90th Cong., 2nd sess., Congressional Record 114, February 15, 1968 at 3133
- 3134** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-5**

**DOJ Remarks June 15, 1965** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-6**

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TAB DKT

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:23-cv-00181-SDM-LSG

Warner v. School Board of Hillsborough County, Florida | Date Filed: 01/26/2023
Assigned to: Judge Steven D. Merryday | Date Terminated: 03/25/2025
Referred to: Magistrate Judge Lindsay S. Griffin | Jury Demand: None
Case in other court: 11th Circuit, 23-12408-E | Nature of Suit: 448 Civil Rights: Education

Eleventh Circuit, 25-11376-J | Jurisdiction: Federal Question

Cause: 42:1983 Civil Rights Act

**Plaintiff**

**Blake Andrew Warner**                                represented by   **Blake Andrew Warner**
2211 S Village Ave
Tampa, FL 33612
212-542-0055
Email: blake@null3d.com
PRO SE

V.

**Defendant**

**School Board of Hillsborough County,**              represented by   **Jason L. Margolin**
**Florida**                                                             Akerman LLP - Tampa
401 E Jackson St Ste 1700
Tampa, FL 33602-5250
813.209.5009
Fax: 813.223.2837
Email: jason.margolin@akerman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin Robinson**
Akerman LLP
401 E. Jackson St.
Suite 1700
Tampa, FL 33602
813-223-7333
Fax: 813-223-2837
Email: benjamin.robinson@akerman.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2023 | 1 | COMPLAINT against School Board of Hillsborough County, Florida Filing fee $402.00, receipt number TPA 67976 filed by Blake A. Warner. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(AM) (Entered: 01/26/2023) |
| 01/26/2023 | 2 | ***STRICKEN PURSUANT TO ORDER 22*** MOTION for Preliminary Injunction by Blake A. Warner. (AM) Modified on 2/14/2023 (CTR). (Entered: 01/26/2023) |
| 01/26/2023 | 3 | MEMORANDUM of Law in support re 2 Motion for Preliminary Injunction filed by Blake A. Warner. (AM) (Entered: 01/26/2023) |
| 01/26/2023 | 4 | SUMMONS issued as to School Board of Hillsborough County, Florida. (AM) (Entered: 01/26/2023) |
| 01/27/2023 | 5 | NOTICE of Local Rule 1.07(c) and Local Rule 3.02(a)(2) <br><br>-**Local Rule 1.07(c)** requires lead counsel to *promptly* file a **Notice of a Related Action** that identifies and describes any related action pending in the Middle District or elsewhere. <br><br>-**Local Rule 3.02(a)(2)** requires the parties in every civil proceeding, except those described in subsection (d), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies or employees. Judges may have a special CMR form for certain types of cases. These forms can be found at www.flmd.uscourts.gov under the Forms tab for each judge. |

| | | (DAY) (Entered: 01/27/2023) |
|---|---|---|
| 01/27/2023 | 6 | **ORDER** *sua sponte* for a preliminary injunction hearing; directing Warner to effect proper service no later than 2/10/2023; directing the school board to respond within seven days after receiving service of process and notice of the motion. Signed by Judge Steven D. Merryday on 1/27/2023. (WBW) (Entered: 01/27/2023) |
| 01/27/2023 | 7 | RETURN of service executed on 01/26/23 by Blake A. Warner as to School Board of Hillsborough County, Florida. (AG) Modified text on 1/30/2023 (AG). (Entered: 01/30/2023) |
| 01/27/2023 | 8 | RETURN of service executed on 01/26/23 by Blake A. Warner as to School Board of Hillsborough County, Florida. (AG) (Entered: 01/30/2023) |
| 01/30/2023 | 9 | NOTICE of Corrected Filing and RESPONSE to Court's 6 Order, by Blake A. Warner. (Attachments: # 1 Revised Timeline Email)(AG) (Entered: 01/30/2023) |
| 01/30/2023 | 10 | NOTICE of a related action per Local Rule 1.07(c) by Blake A. Warner. Related case(s): No. (AG) (Entered: 01/30/2023) |
| 02/02/2023 | 11 | NOTICE of Appearance by Jason L. Margolin on behalf of School Board of Hillsborough County, Florida (Margolin, Jason) (Entered: 02/02/2023) |
| 02/02/2023 | 12 | MOTION for Extension of Time to File Response/Reply as to 2 MOTION for Preliminary Injunction by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 02/02/2023) |
| 02/02/2023 | 13 | **ENDORSED ORDER: The defendant's unopposed motion (Doc. 12) to extend the time within which to respond to the motion for a preliminary injunction is GRANTED. No later than FEBRUARY 6, 2023, the defendant must respond. Signed by Judge Steven D. Merryday on 2/2/2023. (WBW)** (Entered: 02/02/2023) |
| 02/06/2023 | 14 | MOTION to Dismiss Complaint or, in the Alternative, MOTION for a More Definite Statement by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit A-Email Regarding Lawsuit Scope)(Margolin, Jason) . Added MOTION for More Definite Statement on 2/6/2023 (MCB). (Entered: 02/06/2023) |
| 02/06/2023 | 15 | RESPONSE in Opposition re 2 MOTION for Preliminary Injunction filed by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit A-Email Regarding Lawsuit Scope) (Margolin, Jason) (Entered: 02/06/2023) |
| 02/06/2023 | 16 | RESPONSE to Motion re 14 MOTION to Dismiss Complaint *or, in the Alternative, for a More Definite Statement* MOTION for More Definite Statement filed by Blake A. Warner. (Attachments: # 1 Exhibit)(AG) (Entered: 02/07/2023) |
| 02/06/2023 | 17 | MOTION for Miscellaneous Relief, specifically for leave to file documents in the Middle District of Florida using the docketing system by Blake A. Warner. (AG) (Entered: 02/07/2023) |
| 02/07/2023 | 18 | MOTION to Amend 2 MOTION for Preliminary Injunction, or in the alternative, MOTION for Leave to File Reply to Defendant's Response in Opposition to Plaintiff's Motion for Prelimianry Injunction by Blake A. Warner. (AG) Modified text on 2/8/2023 (AG). (Entered: 02/08/2023) |
| 02/09/2023 | 19 | **ORDER granting 17--motion to file documents using electronic filing system; permitting Warner to register for CM/ECF not later than 2/17/2023; directing Warner to read and comply with all applicable rules. Signed by Judge Steven D. Merryday on 2/9/2023. (WBW)** (Entered: 02/09/2023) |
| 02/09/2023 | 20 | MOTION to Withdraw 2 MOTION for Preliminary Injunction by Blake A. Warner. (Attachments: # 1 Exhibit)(AG) (Entered: 02/10/2023) |
| 02/11/2023 | 21 | NOTICE by Blake Andrew Warner re 20 MOTION to Withdraw 2 MOTION for Preliminary Injunction *Defendant is UNOPPOSED* (Attachments: # 1 Exhibit Boundary Plan, Davis recommends (phases)) (Warner, Blake) (Entered: 02/11/2023) |
| 02/13/2023 | 22 | **ORDER granting 20--motion to withdraw motion for preliminary injunction; striking and directing the clerk to terminate 2--motion for a preliminary injunction; denying as moot 18--motion to amend. Signed by Judge Steven D. Merryday on 2/13/2023. (WBW)** (Entered: 02/13/2023) |
| 04/07/2023 | 23 | **ENDORSED ORDER: A hearing on the motion (Doc. 14) to dismiss is SCHEDULED for APRIL 28, 2023, at 10:00 A.M. in Courtroom 15A, United States Courthouse, 801 North Florida Avenue, Tampa, Florida. Blake Warner, who proceeds pro se, and lead counsel for the defendant must appear in person. Signed by Judge Steven D. Merryday on 4/7/2023. (WBW)** (Entered: 04/07/2023) |
| 04/28/2023 | 24 | Minute Entry. In Person Proceedings held before Judge Steven D. Merryday: MOTION HEARING held on 4/28/2023 re 14 MOTION to Dismiss Complaint *or, in the Alternative, for a More Definite Statement* MOTION for More Definite Statement filed by School Board of Hillsborough County, Florida. Court Reporter: David Collier (DAY) (Entered: 04/28/2023) |
| 04/28/2023 | 25 | **ORDER denying 14--motion to dismiss; denying 14--motion for more definite statement; directing the School Board to answer the complaint no later than MAY 19, 2023. Signed by Judge Steven D. Merryday on 4/28/2023. (WBW)** (Entered: 04/28/2023) |

| 05/10/2023 | 26 | NOTICE of a related action per Local Rule 1.07(c) by Blake Andrew Warner. Related case(s): Yes (Attachments: # 1 Exhibit Related Complaint)(Warner, Blake) (Entered: 05/10/2023) |
| 05/17/2023 | 27 | MOTION to Consolidate Cases by Blake Andrew Warner. (Attachments: # 1 Exhibit email requesting conference)(Warner, Blake) (Entered: 05/17/2023) |
| 05/18/2023 | 28 | NOTICE by Blake Andrew Warner re 1 Complaint, *of Abandonment of Claims I and II* (Warner, Blake) (Entered: 05/18/2023) |
| 05/18/2023 | 29 | AMENDED COMPLAINT against School Board of Hillsborough County, Florida filed by Blake Andrew Warner. (Attachments: # 1 Exhibit south tampa race map, # 2 Exhibit white map, # 3 Exhibit hispanic map, # 4 Exhibit black map, # 5 Exhibit south tampa elementary map, # 6 Exhibit email consent amend)(Warner, Blake) (Entered: 05/18/2023) |
| 05/30/2023 | 30 | ANSWER and affirmative defenses to 29 Amended Complaint, by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Margolin, Jason) (Entered: 05/30/2023) |
| 05/31/2023 | 31 | NOTICE informing the parties that they may consent to the jurisdiction of a United States magistrate judge by filing Form AO 85 Notice, Consent, and Reference of a Civil Action to a Magistrate Judge using the event **Consent to Jurisdiction of US Magistrate Judge**. (Signed by Deputy Clerk). (DAY) (Entered: 05/31/2023) |
| 06/13/2023 | 32 | MOTION to Strike 30 Answer to amended complaint by Blake Andrew Warner. (Attachments: # 1 Exhibit United States Statement of Interest)(Warner, Blake) (Entered: 06/13/2023) |
| 06/23/2023 | 33 | RESPONSE re Motion re 32 MOTION to Strike 30 Answer to amended complaint filed by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 06/23/2023) |
| 06/23/2023 | 34 | MOTION for Judgment on the Pleadings by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 06/23/2023) |
| 06/27/2023 | 35 | RESPONSE in Opposition re 34 MOTION for Judgment on the Pleadings filed by Blake Andrew Warner. (Warner, Blake) (Entered: 06/27/2023) |
| 06/29/2023 | 36 | CASE MANAGEMENT REPORT. (Margolin, Jason) (Entered: 06/29/2023) |
| 07/06/2023 | 37 | **COPY OF ORDER dismissing complaint in case 8:23-cv-01029-SDM-SPF, allowing plaintiff to amend. Signed by Judge Steven D. Merryday on 7/6/2023. (LAB)** (Entered: 07/06/2023) |
| 07/10/2023 | 38 | SECOND AMENDED COMPLAINT against School Board of Hillsborough County, Florida filed by Blake Andrew Warner. (Attachments: # 1 Exhibit A south tampa race map, # 2 Exhibit B white map, # 3 Exhibit C hispanic map, # 4 Exhibit D black map, # 5 Exhibit E south tampa elementary map, # 6 Exhibit F wfla addison davis property values, # 7 Exhibit G HOLC ads, # 8 Exhibit H HOLC map, # 9 Exhibit J carrollwood proposal, # 10 Exhibit K wtsp property value concerns, # 11 Exhibit R district map, # 12 Exhibit X gerrymander graphs elementary, # 13 Exhibit Y gerrymander graphs middle, # 14 Exhibit Z gerrymander graphs high)(Warner, Blake) Modified text on 7/11/2023 (LNR). (Entered: 07/10/2023) |
| 07/11/2023 | 39 | **ORDER denying as moot 32--motion to strike; denying as moot 34--motion for judgment on the pleadings; denying as moot 27--motion to consolidate actions; directing the clerk to remove from the case caption "On behalf of himself and his minor child J.W." Signed by Judge Steven D. Merryday on 7/11/2023. (WBW)** (Entered: 07/11/2023) |
| 07/13/2023 | 40 | MOTION for Preliminary Injunction by Blake Andrew Warner. (Attachments: # 1 Text of Proposed Order proposed order, # 2 Exhibit A - Distance Carrollwood K-8, # 3 Exhibit B - Distance Adams MS, # 4 Exhibit E - Carrollwood proposal, # 5 Exhibit F - School Race demographics, # 6 Exhibit G - State school grades, # 7 Exhibit M - WFLA addison davis property values, # 8 Exhibit N - Distant assigned students, # 9 Exhibit K - Assignment, # 10 Exhibit Q - Race Map)(Warner, Blake) (Entered: 07/13/2023) |
| 07/20/2023 | 41 | RESPONSE in Opposition re 40 MOTION for Preliminary Injunction filed by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 07/20/2023) |
| 07/21/2023 | 42 | NOTICE OF INTERLOCUTORY APPEAL as to 37 Order by Blake Andrew Warner. (Warner, Blake) (Entered: 07/21/2023) |
| 07/21/2023 | 43 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 42 Notice of Interlocutory Appeal. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (LD) (Entered: 07/21/2023) |
| 07/23/2023 | 44 | Unopposed MOTION for Leave to File Other Document :Reply to Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction by Blake Andrew Warner. (Warner, Blake) (Entered: 07/23/2023) |
| 07/24/2023 | 45 | MOTION to Dismiss Plaintiff's Second Amended Complaint by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 07/24/2023) |
| 07/26/2023 | 46 | Unopposed MOTION to File Excess Pages by Blake Andrew Warner. (Warner, Blake) (Entered: 07/26/2023) |
| 07/27/2023 | 47 | **ORDER granting 44--motion to reply in support of the motion for a preliminary injunction;** |

| | | |
|---|---|---|
| | | **permitting Warner to reply in a paper not exceeding SEVEN pages; granting-in-part 46--motion to file excess pages in the response to the motion to dismiss; permitting Warner to respond in a paper not exceeding THIRTY pages. Signed by Judge Steven D. Merryday on 7/27/2023. (WBW)** (Entered: 07/27/2023) |
| 07/28/2023 | 48 | Joint MOTION for leave to file DOCUMENT under seal by School Board of Hillsborough County, Florida (Margolin, Jason).Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 07/28/2023) |
| 07/31/2023 | 49 | RESPONSE in Opposition re 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by Blake Andrew Warner. (Warner, Blake) (Entered: 07/31/2023) |
| 07/31/2023 | 50 | REPLY to Response to Motion re 40 MOTION for Preliminary Injunction filed by Blake Andrew Warner. (Warner, Blake) (Entered: 07/31/2023) |
| 08/15/2023 | 51 | USCA ORDER: Pursuant to the 11th Cir. R. 42-1(b), this appeal is DISMISSED for want of prosecution because the appellant Blake Andrew Warner failed to pay the filing and docketing fees to the district court, or alternatively, file a motion to proceed in forma pauperis in district court and file a Transcript Order Form within the time fixed by the rules as to 42 Notice of Interlocutory Appeal. EOD: 08/15/2023; USCA number: 23-12408-E. (AG) (Entered: 08/16/2023) |
| 08/16/2023 | | USCA appeal fees received $505.00, receipt number TPA69027 re 42 Notice of Interlocutory Appeal filed by Blake Andrew Warner. (AA) (Entered: 08/16/2023) |
| 08/16/2023 | 52 | TRANSCRIPT information form filed by Blake Andrew Warner for proceedings held on April 28, 2023 before Judge Merryday re 42 Notice of Interlocutory Appeal. USCA number: 23-12408. Electronic notification sent to Court Reporter David Collier (Warner, Blake) (Entered: 08/16/2023) |
| 08/17/2023 | 53 | USCA ORDER: Motion to reinstate appeal filed by Appellant Blake Warner is GRANTED by clerk as to 42 Notice of Interlocutory Appeal. EOD: 08/17/2023; USCA number: 23-12408-E. (AG) (Entered: 08/17/2023) |
| 08/25/2023 | 54 | **ORDER granting 48--motion for leave to file under seal. Signed by Judge Steven D. Merryday on 8/25/2023. (WBW)** (Entered: 08/25/2023) |
| 08/31/2023 | 55 | **ENDORSED ORDER: The motion (Doc. 40) for a preliminary injunction and the motion (Doc. 45) to dismiss are REFERRED to the magistrate judge to conduct any necessary hearing and to submit a report and recommendation. Signed by Judge Steven D. Merryday on 8/31/2023. (WBW) Motions referred to Magistrate Judge Julie S. Sneed.** (Entered: 08/31/2023) |
| 08/31/2023 | 56 | NOTICE of hearing: re: 40 MOTION for Preliminary Injunction , 45 MOTION to Dismiss Plaintiff's Second Amended Complaint EVIDENTIARY Hearing set for 9/19/2023 at 02:00 PM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. MOTION Hearing set for 9/19/2023 at 02:00 PM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. (SET) (Entered: 08/31/2023) |
| 09/01/2023 | 57 | NOTICE OF RESCHEDULING HEARING: The EVIDENTIARY Hearing and Motion Hearing previously scheduled for 9/19/2023 is rescheduled. New scheduling date and time: Evidentiary Hearing set for 10/26/2023 at 10:00 AM before Magistrate Judge Julie S. Sneed. Motion Hearing set for 10/26/2023 at 10:00 AM before Magistrate Judge Julie S. Sneed. (SET) (Entered: 09/01/2023) |
| 09/06/2023 | 58 | COURT REPORTER ACKNOWLEDGMENT by David J. Collier re 42 Notice of Interlocutory Appeal. Estimated transcript filing date: 9-1-2023. USCA number: 23-12408-E. (DJC) (Entered: 09/06/2023) |
| 09/06/2023 | 59 | TRANSCRIPT of motion hearing held on April 28, 2023 before District Judge Steven D. Merryday re 42 Notice of Interlocutory Appeal. Court Reporter: David J. Collier. Email address: david_collier@flmd.uscourts.gov. Telephone number: (813) 301-5575.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter Redaction Request due 9/27/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/5/2023. (DJC) (Entered: 09/06/2023) |
| 09/06/2023 | 60 | NOTIFICATION that transcript has been filed by David J. Collier re: 42 Notice of Interlocutory Appeal. USCA number: 23-12408-E. (DJC) (Entered: 09/06/2023) |
| 09/15/2023 | 61 | MOTION for Issuance of Subpoena *Addison Davis* by Blake Andrew Warner. (Warner, Blake) Motions referred to Magistrate Judge Julie S. Sneed. Modified on 9/25/2023 to terminate as pending motion. Incorrect event used. Counsel notified. (AG) (Entered: 09/15/2023) |
| 09/26/2023 | 62 | Joint MOTION to Bifurcate *Hearing* by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 09/26/2023) |
| 09/27/2023 | 63 | **ENDORSED ORDER granting the parties' 62 Joint Motion to Bifurcate Hearing. The evidentiary hearing scheduled for October 26, 2023 is continued and the Clerk is directed to re-notice the hearing as a motion hearing on Defendant's 45 Motion to Dismiss only. The evidentiary hearing on Plaintiff's 40 Motion for a Preliminary Injunction will be reset by separate notice. Signed by Magistrate Judge Julie S. Sneed on September 27, 2023. (DD)** |

| | | (Entered: 09/27/2023) |
|---|---|---|
| 09/28/2023 | 64 | NOTICE of Continued Evidentiary Hearing. The Motion Hearing on Defendant's 45 Motion to Dismiss will proceed as previously scheduled on 10/26/2023 at 10:00 AM in Tampa Courtroom 11 A before Magistrate Judge Julie S. Sneed. (SET) (Entered: 09/28/2023) |
| 10/16/2023 | 65 | NOTICE of supplemental authority re 49 Response in Opposition to Motion *Ga. State Conference of NAACP v. City of Lagrange (11th Cir. 2019)* by Blake Andrew Warner. (Warner, Blake) (Entered: 10/16/2023) |
| 10/26/2023 | 66 | Minute Entry. In Person Proceedings held before Magistrate Judge Julie S. Sneed: MOTION HEARING held on 10/26/2023 re 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by School Board of Hillsborough County, Florida. (Digital) (SET) (Entered: 10/26/2023) |
| 11/30/2023 | | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Middle District of Florida certifies that the record is complete for the purposes of this appeal re: 42 Notice of Interlocutory Appeal. All documents are imaged and available for the USCA to retrieve electronically. USCA number: 23-12408-E (MCB) (Entered: 11/30/2023) |
| 12/11/2023 | 68 | Unopposed MOTION to Stay Discovery by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Margolin, Jason) Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 12/11/2023) |
| 01/02/2024 | 69 | MOTION for Extension of Time to Complete Discovery *pending ruling on motion to stay discovery and motion to dismiss second amended complaint* by School Board of Hillsborough County, Florida. (Margolin, Jason) Motions referred to Magistrate Judge Julie S. Sneed. (Entered: 01/02/2024) |
| 01/03/2024 | 70 | RESPONSE in Opposition re 69 MOTION for Extension of Time to Complete Discovery *pending ruling on motion to stay discovery and motion to dismiss second amended complaint and Cross MOTION to Compel* filed by Blake Andrew Warner. (Attachments: # 1 Exhibit A - Email Chain)(Warner, Blake) Modified on 1/4/2024 to edit docket text (AJS). (Entered: 01/03/2024) |
| 02/21/2024 | 71 | **ENDORSED ORDER granting Defendant's Unopposed Motion to Stay Discovery 68 and Defendant's Motion for Enlargement of Time to Respond to Discovery 69. Signed by Magistrate Judge Julie S. Sneed on February 21, 2024. (PNT)** (Entered: 02/21/2024) |
| 02/29/2024 | 72 | **REPORT AND RECOMMENDATIONS re 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by School Board of Hillsborough County, Florida; 38 Amended Complaint filed by Blake Andrew Warner; 40 MOTION for Preliminary Injunction filed by Blake Andrew Warner. Signed by Magistrate Judge Julie S. Sneed on February 29, 2024. (PNT)** (Entered: 02/29/2024) |
| 03/01/2024 | 73 | Unopposed MOTION for Extension of Time to File Response/Reply as to 72 REPORT AND RECOMMENDATIONS re 40 MOTION for Preliminary Injunction filed by Blake Andrew Warner, 45 MOTION to Dismiss Plaintiff's Second Amended Complaint filed by School Board of Hillsborough County, Florida, 38 Ame by Blake Andrew Warner. (Warner, Blake) (Entered: 03/01/2024) |
| 03/01/2024 | 74 | **ENDORSED ORDER: The plaintiff's unopposed motion (Doc. 73) to extend the time within which to object to the report and recommendation is GRANTED. No later than APRIL 15, 2024, the plaintiff must object. Signed by Judge Steven D. Merryday on 3/1/2024. (WBW)** (Entered: 03/01/2024) |
| 03/05/2024 | 75 | Case Reassigned to Magistrate Judge Unassigned Magistrate. New case number: 8:23-cv-181-SDM-UAM. Magistrate Judge Julie S. Sneed no longer assigned to the case. (SET) (Entered: 03/05/2024) |
| 04/08/2024 | 76 | OBJECTION to 72 Report and Recommendations by Blake Andrew Warner. (Warner, Blake) (Entered: 04/08/2024) |
| 05/16/2024 | 77 | OPINION of USCA as to 42 Notice of Interlocutory Appeal filed by Blake Andrew Warner. EOD: 5/8/2024; Mandate to issue at a later date. USCA number: 23-12408-JJ. (SET) (Entered: 05/16/2024) |
| 06/07/2024 | 78 | **ORDER adopting 72--report and recommendations; granting-in-part 45--motion to dismiss; denying without prejudice 40--motion for preliminary injunction. Signed by Judge Steven D. Merryday on 6/7/2024. (WBW)** (Entered: 06/07/2024) |
| 06/10/2024 | 79 | Third AMENDED COMPLAINT against School Board of Hillsborough County, Florida filed by Blake Andrew Warner. (Attachments: # 1 Exhibit A south tampa race map, # 2 Exhibit B white map, # 3 Exhibit C hispanic map, # 4 Exhibit D black map, # 5 Exhibit E south tampa elementary map, # 6 Exhibit F wfla addison davis property values, # 7 Exhibit G HOLC ads, # 8 Exhibit H HOLC map, # 9 Exhibit J carrollwood proposal, # 10 Exhibit K wtsp property value concerns, # 11 Exhibit R district map, # 12 Exhibit X gerrymander graphs elementary, # 13 Exhibit Y gerrymander graphs middle, # 14 Exhibit Z gerrymander graphs high)(Warner, Blake) Modified text on 6/11/2024 (HAI). (Entered: 06/10/2024) |
| 06/21/2024 | 80 | Unopposed MOTION for Extension of Time to File Answer *to Third Amended Complaint* by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 06/21/2024) |
| 06/24/2024 | 81 | **ENDORSED ORDER: The defendant's unopposed motion (Doc. 80) to extend the time within which to respond to the third amended complaint is GRANTED. No later than JULY 24, 2024, the defendant must respond. Signed by Judge Steven D. Merryday on 6/24/2024.** |

| | | (WBW) (Entered: 06/24/2024) |
|---|---|---|
| 07/24/2024 | 82 | ANSWER to Amended Complaint of School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1)(Margolin, Jason) (Entered: 07/24/2024) |
| 07/29/2024 | 83 | MOTION for Issuance of Subpoena *LaKisha Kinsey-Sallis* by Blake Andrew Warner. (Warner, Blake) Motions referred to Magistrate Judge Unassigned Magistrate. (Entered: 07/29/2024) |
| 07/30/2024 | 84 | **ENDORSED ORDER granting 83 Motion to Issue Subpoena, to the extent the Clerk is DIRECTED to issue the subpoena. See Rule 45(a)(3). Nonetheless, Plaintiff is advised that pro se litigants are not exempt from complying with the requirements imposed by the law and rules of procedure. See Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). Plaintiff is not permitted to discover privileged information, including materials protected by the work-product privilege or by the attorney-client privilege. Fed. R. Civ. P. 26(b)(1). Signed by Magistrate Judge Natalie Hirt Adams on 7/30/2024. (CJF)** (Entered: 07/30/2024) |
| 08/09/2024 | 85 | MOTION to Strike 82 Answer to amended complaint *third affirmative defense* by Blake Andrew Warner. (Warner, Blake) (Entered: 08/09/2024) |
| 08/09/2024 | 86 | MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 08/09/2024) |
| 08/10/2024 | 87 | RESPONSE in Opposition re 86 MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* filed by Blake Andrew Warner. (Attachments: # **STRICKEN PER ORDER 89, REFILED AT 90** (1) Exhibit settlement redline redacted, # 2 Exhibit settlement email wrt release scope)(Warner, Blake) Modified text and removed exhibit 1 on 8/14/2024 (GL). (Entered: 08/10/2024) |
| 08/12/2024 | 88 | MOTION to Strike *Improperly Redacted Document* by Blake Andrew Warner. (Attachments: # 1 Exhibit settlement redline redacted)(Warner, Blake) (Entered: 08/12/2024) |
| 08/13/2024 | 89 | **ORDER granting 88--motion to strike. Signed by Judge Steven D. Merryday on 8/13/2024. (WBW)** (Entered: 08/13/2024) |
| 08/13/2024 | 90 | NOTICE of Filing Exhibit settlement redline redacted by Blake Andrew Warner re 87 Response in Opposition to Motion. (GL) (Entered: 08/14/2024) |
| 08/23/2024 | 91 | RESPONSE to Motion re 85 MOTION to Strike 82 Answer to amended complaint *third affirmative defense* filed by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1)(Margolin, Jason) (Entered: 08/23/2024) |
| 08/23/2024 | 92 | Unopposed MOTION for Leave to File Other Document :Reply to Defendant's Response to Plaintiff's Motion to Strike by Blake Andrew Warner. (Warner, Blake) (Entered: 08/23/2024) |
| 09/11/2024 | 93 | MOTION to Compel Response to RFI and RFP by Blake Andrew Warner. (Attachments: # 1 Exhibit A - Email Chain, # 2 Exhibit B - Confer Email Chain, # 3 Exhibit C - Response RFP, # 4 Exhibit D - Response RFI, # 5 Exhibit E - Boundary Recommendation, # 6 Exhibit F - Casetext Receipts)(Warner, Blake) Motions referred to Magistrate Judge Unassigned Magistrate. (Entered: 09/11/2024) |
| 09/12/2024 | 94 | **ENDORSED ORDER: Appearing pro se, Blake Warner moves (Doc. 92) to reply to the defendant's response (Doc. 91) to the motion (Doc. 85) to strike an affirmative defense. The motion is GRANTED. Warner may file a reply, not to exceed five pages, no later than SEPTEMBER 17, 2024. Signed by Judge Steven D. Merryday on 9/12/2024. (DJL)** (Entered: 09/12/2024) |
| 09/12/2024 | 95 | MANDATE of USCA: It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court as to 42 Notice of Interlocutory Appeal filed by Blake Andrew Warner. Issued as Mandate: 9/12/2024. USCA number: 23-12408-JJ. (SET) (Entered: 09/13/2024) |
| 09/13/2024 | 96 | MOTION to Stay Discovery by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Margolin, Jason) Motions referred to Magistrate Judge Unassigned Magistrate. (Entered: 09/13/2024) |
| 09/14/2024 | 97 | REPLY to Response to Motion re 85 MOTION to Strike 82 Answer to amended complaint third affirmative defense filed by Blake Andrew Warner. (Warner, Blake) (Entered: 09/14/2024) |
| 09/25/2024 | 98 | RESPONSE to Motion re 93 MOTION to Compel Response to RFI and RFP filed by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Margolin, Jason) (Entered: 09/25/2024) |
| 09/25/2024 | 99 | RESPONSE in Opposition re 96 MOTION to Stay Discovery filed by Blake Andrew Warner. (Warner, Blake) (Entered: 09/25/2024) |
| 10/04/2024 | 100 | Case Reassigned to Magistrate Judge Lindsay S. Griffin. New case number: 8:23-cv-00181-SDM-LSG. Magistrate Judge Unassigned Magistrate no longer assigned to the case. Motion(s) REFERRED: 96 MOTION to Stay Discovery , 93 MOTION to Compel Response to RFI and RFP . Motion(s) referred to Magistrate Judge Lindsay S. Griffin. (AJS) (Entered: 10/04/2024) |
| 11/08/2024 | 101 | **ENDORSED ORDER referring motion for report and recommendation: 86 MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* filed by School** |

| | | |
|---|---|---|
| | | **Board of Hillsborough County, Florida, 85 MOTION to Strike 82 Answer to amended complaint *third affirmative defense* filed by Blake Andrew Warner. Signed by Judge Steven D. Merryday on 11/8/2024. (JTM) Motions referred to Magistrate Judge Lindsay S. Griffin.** (Entered: 11/08/2024) |
| 11/08/2024 | 102 | **ENDORSED ORDER REFERRING MOTION: 96 MOTION to Stay Discovery filed by School Board of Hillsborough County, Florida, 93 MOTION to Compel Response to RFI and RFP filed by Blake Andrew Warner. Signed by Judge Steven D. Merryday on 11/8/2024. (JTM) Motions referred to Magistrate Judge Lindsay S. Griffin.** (Entered: 11/08/2024) |
| 11/18/2024 | 103 | **ORDER granting 96 Motion to Stay Discovery. Signed by US Magistrate Judge Lindsay S. Griffin on 11/18/2024. (ABC)** (Entered: 11/18/2024) |
| 11/19/2024 | 104 | DECLARATION of Blake Warner re 103 Order on Motion to Stay Discovery by Blake Andrew Warner. (Warner, Blake) (Entered: 11/19/2024) |
| 12/02/2024 | 105 | STIPULATION re 103 Order on Motion to Stay Discovery *Joint Stipulation of Facts and Exhibits* by School Board of Hillsborough County, Florida. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Margolin, Jason) (Entered: 12/02/2024) |
| 12/02/2024 | 106 | MOTION to Stay Summary Judgment under Rule 56(d) by Blake Andrew Warner. (Attachments: # 1 Affidavit Blake Warner)(Warner, Blake) Modified event on 12/3/2024 (ABM). (Entered: 12/02/2024) |
| 12/02/2024 | 107 | NOTICE by Blake Andrew Warner re 103 Order on Motion to Stay Discovery (Attachments: # 1 Affidavit Blake Warner, # 2 Exhibit Draft and Final Settlement Redline)(Warner, Blake) (Entered: 12/02/2024) |
| 12/10/2024 | 108 | **ENDORSED ORDER directing the plaintiff to provide for in camera review an unredacted copy of the settlement agreement, Doc. 82-1, to facilitate my evaluation of the plaintiff's claim that the agreement lacks consideration and is otherwise unenforceable. The plaintiff may send the document by e-mail to chambers_flmd_griffin@flmd.uscourts.gov, with a copy to defense counsel. Signed by Magistrate Judge Lindsay S. Griffin on 12/10/2024. (Griffin, Lindsay)** (Entered: 12/10/2024) |
| 12/16/2024 | 109 | RESPONSE to Motion re 106 Motion to Stay Summary Judgment under Rule 56(d) filed by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 12/16/2024) |
| 12/29/2024 | 110 | NOTICE of supplemental authority re 109 Response to motion *Myricks v. Federal Reserve (11th Cir. 2007)* by Blake Andrew Warner. (Warner, Blake) (Entered: 12/29/2024) |
| 01/14/2025 | 112 | **REPORT AND RECOMMENDATIONS re 106 Motion to Stay Summary Judgment under Rule 56(d) filed by Blake Andrew Warner, 86 MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* filed by School Board of Hillsborough County, Florida, 85 MOTION to Strike 82 Answer to amended complaint *third affirmative defense* filed by Blake Andrew Warner, 93 MOTION to Compel Response to RFI and RFP filed by Blake Andrew Warner. Signed by Magistrate Judge Lindsay S. Griffin on 1/14/2025. (ABC)** (Entered: 01/14/2025) |
| 01/16/2025 | 113 | Unopposed MOTION for Extension of Time to File Response/Reply as to 112 REPORT AND RECOMMENDATIONS re 106 Motion to Stay Summary Judgment under Rule 56(d) filed by Blake Andrew Warner, 86 MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* filed by School Board of Hillsborou by Blake Andrew Warner. (Warner, Blake) (Entered: 01/16/2025) |
| 01/16/2025 | 114 | **ENDORSED ORDER: The plaintiff moves (Doc. 113) to extend the time within which to object to the magistrate judge's report and recommendation (Doc. 112). The motion is GRANTED. No later than FEBRUARY 11, 2025, the plaintiff may object to the report and recommendation. Signed by Judge Steven D. Merryday on 1/16/2025. (DJL)** (Entered: 01/16/2025) |
| 01/23/2025 | 115 | Unopposed MOTION to File Excess Pages *Objection to Report and Recommendation* by Blake Andrew Warner. (Warner, Blake) (Entered: 01/23/2025) |
| 01/24/2025 | 116 | **ENDORSED ORDER: Appearing pro se, Blake Warner moves (Doc. 115) to enlarge the page limit for his objection to the magistrate judge's report and recommendation (Doc. 112). Citing the need to "perfect the record" and his lack of legal training, Warner asks for leave to file a forty-page objection. The motion (Doc. 115) is GRANTED-IN-PART. In no more than twenty-five pages, Warner may object to the report and recommendation. Signed by Judge Steven D. Merryday on 1/24/2025. (DJL)** (Entered: 01/24/2025) |
| 02/09/2025 | 117 | OBJECTION re 112 REPORT AND RECOMMENDATIONS re 106 Motion to Stay Summary Judgment under Rule 56(d) filed by Blake Andrew Warner, 86 MOTION for Judgment on the Pleadings *as to Plaintiff's Third Amended Complaint* filed by School Board of Hillsborou . (Warner, Blake) (Entered: 02/09/2025) |
| 02/18/2025 | 118 | RESPONSE to objections to 112 Report and Recommendations by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 02/18/2025) |
| 02/25/2025 | 119 | NOTICE to the Courts to take judicial notice regarding *community criticism of NAACP ineffectiveness due to conflict of interest with school board* by Blake Andrew Warner. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Exhibit Website describing Feb 11, 2025 school board meeting, # 2 Exhibit Meeting minutes, # 3 Exhibit Email from school board attorney to NAACP Feb 10, 2025)(Warner, Blake) (Entered: 02/25/2025) |
| 03/24/2025 | 120 | **ORDER adopting 112--report and recommendation; denying 106--motion to stay summary judgment; granting 86--motion for summary judgment; denying as moot 93--motion to compel; denying as moot 85--motion to strike; directing the clerk to enter judgment for the school board and against Blake Warner; directing the clerk to close the case. Signed by Judge Steven D. Merryday on 3/24/2025. (DJL)** (Entered: 03/24/2025) |
| 03/25/2025 | 121 | JUDGMENT is entered for the school board and against Warner ( Signed by Deputy Clerk) (ARL) (Entered: 03/25/2025) |
| 03/25/2025 | 122 | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (ARL) (Entered: 03/25/2025) |
| 04/07/2025 | 123 | MOTION for Attorney Fees *and costs, ruling on entitlement* by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 04/07/2025) |
| 04/08/2025 | 124 | PROPOSED BILL OF COSTS by School Board of Hillsborough County, Florida. (Margolin, Jason) (Entered: 04/08/2025) |
| 04/10/2025 | 125 | RESPONSE in Opposition re 123 MOTION for Attorney Fees *and costs; ruling on entitlement* filed by Blake Andrew Warner. (Attachments: # 1 Exhibit 90th Cong., 2nd sess., Congressional Record 114, February 15, 1968, # 2 Exhibit Supreme Court Docket No. 24-718)(Warner, Blake) (Entered: 04/10/2025) |
| 04/22/2025 | 126 | NOTICE OF APPEAL as to 120 Order on Motion to Strike Order on Motion for Judgment on the Pleadings Order on Motion to Compel Order on Motion to Stay Order on Report and Recommendations by Blake Andrew Warner. Filing fee $ 605, receipt number AFLMDC-23274165. (Warner, Blake) (Entered: 04/22/2025) |
| 04/23/2025 | 127 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 126 Notice of Appeal,. Eleventh Circuit Transcript information form forwarded to pro se litigants and available to counsel at www.flmd.uscourts.gov under Forms and Publications/General. (Attachments: # 1 Copy of Docket Sheet, # 2 Copy of Order, # 3 Copy of Judgment, # 4 Copy of Notice of Appeal)(JDR) (Entered: 04/23/2025) |
| 04/24/2025 | 128 | TRANSCRIPT information form filed by Blake Andrew Warner for proceedings held on 10/26/2023 before Judge Sneed re 126 Notice of Appeal USCA number: 25-11376. Electronic notification sent to Court Reporter Sharon Miller (Warner, Blake) (Entered: 04/24/2025) |
| 05/15/2025 | 129 | COURT REPORTER ACKNOWLEDGMENT by SHARON A. MILLER re 126 Notice of Appeal,. Estimated transcript filing date: May 26 2025. USCA number: 25-11376. (SAM) (Entered: 05/15/2025) |
| 05/27/2025 | 130 | TRANSCRIPT of MOTION HEARING (digitally recorded and transcribed) held on OCTOBER 26, 2023 before Judge JULIE S. SNEED re 42 Notice of Interlocutory Appeal, 126 Notice of Appeal,. Court Reporter/Transcriber: SHARON A. MILLER. Email address: sharon_miller@flmd.uscourts.gov. Telephone number: 8133015041.<br><br>NOTICE TO THE PARTIES - The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such notice is filed, the transcript may be made remotely available to the public without redaction after ninety (90) calendar days. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter Redaction Request due 6/17/2025. Redacted Transcript Deadline set for 6/27/2025. Release of Transcript Restriction set for 8/25/2025. (SAM) (Entered: 05/27/2025) |
| 05/27/2025 | 131 | NOTIFICATION that transcript has been filed by SHARON A. MILLER re: 42 Notice of Interlocutory Appeal, 126 Notice of Appeal,. USCA number: 25-11376. (SAM) (Entered: 05/27/2025) |
| 07/01/2025 | 132 | **ORDER denying 123--motion for an attorney's fee. Signed by Judge Steven D. Merryday on 7/1/2025. (DJL)** (Entered: 07/01/2025) |

# TAB 1

FILED

# United States District Court
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CLERK, US DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

BLAKE WARNER, J.W.

v.

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY FLORIDA

Case Number  8: 23 cv 181 SDM - JSS

## VERIFIED COMPLAINT

## INTRODUCTION

*Plaintiff*, Blake Warner, *pro se*, hereby brings this action, on behalf of himself and his minor child J.W., against The School Board of Hillsborough County, Florida ("HCSB") for violations of 20 U.S. Code § 1706 ("Equal Educational Opportunities Act") or ("EEOA"), 42 U.S. Code § 3601 et seq ("Fair Housing Act"), and 42 U.S. Code § 1983, for intentionally operating a segregated school system.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then used these racial boundaries as a pretext for discrimination through redlining and steering.



An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## Plaintiffs

1. *Plaintiff* Blake Warner is African-American and the parent of a minor child ( J.W.) who currently attends a public school operated by the HCSB.

2. Blake Warner and J.W. have continuously resided in Hillsborough County since 2016.

3. At all times relevant to this lawsuit, J.W. was assigned to the following schools operated by the HCSB: Plant High School, Chamberlain High School, Wilson Middle School, Coleman Middle School, Adams Middle School, Mitchell Elementary, and Lake Magdalene Elementary.

4. J.W. currently attends Mitchell Elementary, and intends to attend Coleman Middle School and Plant High School thereafter.

## Defendant HCSB

5. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

6. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## Jurisdiction and Venue

7. This court has jurisdiction pursuant 20 U.S. Code § 1706, 42 U.S. Code § 3613, and 42 U.S. Code § 1983.

8. Venue is proper pursuant 28 U.S.C. § 1391 with respect to all defendants, because all Defendants reside in the Middle District of Florida, and all events giving rise to *Plaintiff*'s claims occurred in the Middle District of Florida.

## EEOA

9. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

10. When J.W. lived at 502 S. Fremont Avenue during the 2019 school year, he was assigned to Mitchell Elementary despite being closer to Gorrie Elementary, and he was assigned to Plant High School despite being closer to Blake High School. This assignment resulted in more segregation than would have normally occurred had he been assigned to the closest schools.

11. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation, in violation of the EEOA.

### Tampa Regions

12. For the purposes of this complaint, the following regions are defined as follows:

13. *South of Gandy* ("SOG") is defined as the area between Mac Dill Air Force Base and Gandy Boulevard.

14. *South Tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

15. *West Tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

16. *North Tampa* is defined as the area between Busch Boulevard/Linebaugh Avenue and Lutz, Forida, and west of I-275.

17. *East Tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

## Regions

18. *South Tampa*'s population is predominantly White. *see* Exhibits A and B.

19. *West Tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

20. *East Tampa*'s population is predominantly African-American. *see* Exhibits A and D.

21. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## Elementary Schools

22. The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.

23. The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.

24. The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.

25. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.

26. Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.

27. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## Plant, Jefferson, and Blake High School

28. The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):



29. Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominently African-American school.

30. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

31. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the

following image:



32. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.

33. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

34. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-

American population to their north, despite them being significantly closer to Coleman than Pierce.

35. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools to the north.

36. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## District Boundaries

37. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.

38. This image shows the racial map overlaid with the district boundaries shown in blue lines:



39. The racial segregation in the district map was intentional.

40. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded"[1].

41. The HCSB stated "The black population percentage for district five .. is 41.1%"[2].

42. The black population percentage for Hillsborough County is approximately 18%.

43. The school board intentionally drew their district map to concentrate their black population in District 5.

44. By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.

## FAIR HOUSING ACT

45. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

46. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

47. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

---

[1] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png
[2] *see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png

48. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

49. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

50. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

51. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

52. The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

53. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

54. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.

## Injury

55. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

11

aged students in his community–including his child–were being discriminated against because of their race... in the year 2023.

56. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

57. Defendant's unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.

58. Due to HCSB's manipulation of property values, Mr. Warner and J.W. were priced out *South Tampa* and had to relocate to more diverse *North Tampa*, further increasing segregation in *South Tampa* and resulting in a loss of community for both Mr. Warner and J.W.

59. Mr. Warner grew up in *South Tampa* and *SOG*. He attended elementary, middle, and high school there. J.W. had lived half of his life there.

60. J.W. is injured by currently attending schools which are unlawfully segregated, depriving him of both an equal educational opportunity and the opportunity to attend racially integrated schools.

## Intent

61. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

62. The fact that the school board explicitly used race to draw the district maps to segregate.

63. The fact that the HCSB has a history of refusing to desegregate.

64. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that

assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

65. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

66. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

67. The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

68. Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

69. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:



**Tim McGaughey**  Author  Group expert
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d                                                                          👍❤ 3

70. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *South Tampa* residents:



71. School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

72. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## Dr. Hahn's Statements

73. On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA[3].

74. This interview was broadcast on public television as well as printed on WFLA's website.

75. Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

76. During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

77. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

78. "District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2"'s population is predominantly white.

79. District 1's population is predominantly minority and borders District 2 to the north.

80. Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

81. Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[3] *see* https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

## DISPARATE IMPACT

82. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

83. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

84. The disparity is immense, every single one of the *South Tampa* white schools near the border are A-Rated, and every single one of the minority schools near the *South Tampa* border are C rated or below. The minority schools are so underfunded, that they cannot even afford to bus all of their students to extra circular activities such as football games. Meanwhile the white schools are swimming in cash.

85. While on paper both white schools and minority schools receive the same funding, in practice the white schools leverage the wealth of the affluent white parents to raise side-money for the school.

86. They raise hundreds of thousands of dollars per year in additional funding through fundraisers such as art galleries and other special events throughout the year.

87. The parents in the minority schools cannot afford to spend thousands of extra money out of pocket to self-fund their schools.

88. The end result is the white schools getting significant more funding than minority schools, leading to better student outcomes for white students.

89. The school boundaries are then directly used both to keep minority students out of the A-rated white schools so that they cannot benefit from this increased revenue and educational opportunity, and to avoid sending affluent white students to minority schools thus depriving those schools of an additional revenue stream and improving the ratings and educational opportunities at those schools.

90. This further harms the minority communities, because their property values are decreased, while the property values increase in the white neighborhoods.

## Counts

### Count I

*20 U.S. Code § 1703(a): Deliberate Segregation*
*J.W. Against* Defendant *HCSB*

91. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90 *Defendant* intentionally segregated students by race by assigning them to farther away schools to increase segregation.

### Count II

*20 U.S. Code § 1703(c): Closest School*
*J.W. Against* Defendant *HCSB*

92. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90 *Defendant* segregated students by race by assigning them to farther away schools which resulted in an increase in segregation.

### Count III

*42 U.S. Code § 1983: Equal Protections - Race*
*Blake Warner and J.W. Against* Defendant *HCSB*

93. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

94. *Defendant* intentionally treated white students differently than minority students, to segregate them.

## Count IV

*42 U.S. Code § 3604(b): Intentional Discrimination School Services*
*Blake Warner and J.W. Against* Defendant *HCSB*

95. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

96. *Defendant* intended to segregate students by race and/or color through school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith.

## Count V

*42 U.S. Code § 3604(b): Disparate Impact School Services*
*Blake Warner and J.W. Against* Defendant *HCSB*

97. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 90

98. *Defendant*'s school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and/or color.

# Nature of Relief

Wherefore, *Plaintiffs* respectfully requests that this court:

(a) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the Fair Housing Act; and

(b) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the EEOA; and

(c) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the equal protections clause; and

(d) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps that unlawfully segregate students by race; and

(e) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps without prior approval of the Court; and

(f) enter an order directing Defendant HCSB to submit a proposed desegregated school assignment boundary map for approval; and

(g) award to the *Plaintiff* costs of suit and reasonable attorney fees; and

(h) grant whatever additional relief this Court deems appropriate and just under the circumstances.

# DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

# UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

| | |
|---|---|
| 1-26-2023 | |

Date

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

# TAB 29

# United States District Court
## For The Middle District of Florida
## Tampa Division

| | |
|---|---|
| Blake Warner | Case Number 8:23-CV-181-SDM-JSS |
| v. | |
| The School Board of Hillsborough County Florida | |

# Amended Verified Complaint

## Introduction

*Plaintiff*, Blake Warner, *pro se*, hereby amends his complaint, pursuant Rule 15(a)(2) with written consent of *Defendant*[1], against The School Board of Hillsborough County, Florida ("HCSB") for violations of 42 U.S. Code § 3601 et seq ("Fair Housing Act") for unlawful manipulation of housing values in *south tampa* by intentionally operating a segregated school system.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then used these racial boundaries as a pretext for discrimination through redlining and steering.

---

[1] *see* exhibit h. Though *Defendant* requests *Plaintiff* file a Rule 41 notice of dismissal for the individual counts, the eleventh circuit held that Rule 15 amendment is the proper procedure to do this, not Rule 41. *see* Perry v. Schumacher Group of Louisiana, 2018 WL 2473721 (11th Cir. June 4, 2018). *Plaintiff* construes this as written consent to amend.

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## Plaintiff

1. *Plaintiff* is African-American.

2. *Plaintiff* has continuously resided in Hillsborough County since 2016.

## Defendant HCSB

3. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

4. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## Jurisdiction and Venue

5. This court has jurisdiction pursuant 42 U.S. Code § 3613.

6. Venue is proper pursuant 28 U.S.C. § 1391 because *Defendant* reside in the Middle District of Florida, and all events giving rise to *Plaintiff*'s claims occurred in the Middle District of Florida.

## EEOA

7. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within

the school district of such agency providing the appropriate grade level and type of education for such student".

8. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation.

## Tampa Regions

9. For the purposes of this complaint, the following regions are defined as follows:

10. *South Tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

11. *West Tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

12. *East Tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

## Regions

13. *South Tampa*'s population is predominantly White. *see* Exhibits A and B.

14. *West Tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

15. *East Tampa*'s population is predominantly African-American. *see* Exhibits A and D.

16. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## Elementary Schools

17. The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.

18. The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.

19. The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.

20. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.

21. Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.

22. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## Plant, Jefferson, and Blake High School

23. The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):



24. Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominantly African-American school.

25. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

26. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the

following image:



27. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.

28. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

29. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-

American population directly to their north, despite them being significantly closer to Coleman than Pierce.

30. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools directly to the north.

31. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## District Boundaries

32. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.

33. This image shows the racial map overlaid with the district boundaries shown in blue lines:



34. The racial segregation in the district map was intentional.

35. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded"[2].

36. The HCSB stated "The black population percentage for district five .. is 41.1%"[3].

37. The black population percentage for Hillsborough County is approximately 18%.

38. The school board intentionally drew their district map to concentrate their black population in District 5.

39. By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.

## FAIR HOUSING ACT

40. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

41. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

42. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

---

[2]*see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png
[3]*see* https://www.hillsboroughschools.org/cms/lib/FL50000635/Centricity/Domain/282/Map%20F.png

43. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

44. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

45. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

46. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

47. The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

48. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

49. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.

## Injury

50. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community were being discriminated against because of their race... in the year 2023.

51. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

52. *Defendant*'s unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race dis-crimination in housing and the school system.

53. Due to HCSB's manipulation of property values, *Plaintiff* was priced out of *South Tampa* and had to relocate to relocate outside of *South Tampa*, further in-creasing segregation in *South Tampa* and resulting in a loss of community for *Plaintiff*.

54. Mr. Warner spent much of his childhood in *South Tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.

## INTENT

55. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

56. The fact that the school board explicitly used race to draw the district maps to segregate.

57. The fact that the HCSB has a history of refusing to desegregate.

58. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

59. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

60. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

61. The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

62. Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

63. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:



> **Tim McGaughey**  Author  Group expert
> There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.
>
> Note: I assume this referenced scenario 2 and WBA, WSP.
>
> 1d                                                  ❤️👍 3

64. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, be-

cause they lack the political courage to overcome that political pressure from *South Tampa* residents:



65. School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

66. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## Dr. Hahn's Statements

67. On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA[4].

68. This interview was broadcast on public television as well as printed on WFLA's website.

69. Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

70. During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

71. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

72. "District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2"'s population is predominantly white.

73. District 1's population is predominantly minority and borders District 2 to the north.

74. Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

75. Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[4]*see* https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

# DISPARATE IMPACT

76. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

77. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

78. This further harms the minority communities in *east tampa* and *west tampa*, because their property values are decreased, while the property values increase in the white neighborhoods.

# COUNTS

## COUNT I
### 42 U.S. Code § 3604: Intentional Discrimination

79. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 78

80. *Defendant* intended to unlawfully segregate students by race and/or color through *south tampa* school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of *south tampa* due to unlawful pricing manipulation.

## COUNT II
### 42 U.S. Code § 3604: Disparate Impact

81. *Plaintiffs* re-alleges and incorporates by reference ¶ 1 - 78

82. *Defendant*'s school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of *south tampa* services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of *south tampa* due to unlawful pricing manipulation.

## NATURE OF RELIEF

**WHEREFORE**, *Plaintiffs* respectfully requests that this court:

(a) declare the actions, omissions, policies, and procedures of Defendant HCSB, complained of herein to be in violation of the Fair Housing Act; and

(b) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps complained of herein that unlawfully segregate students by race; and

(c) enter a permanent injunction enjoining Defendant HCSB from promulgating any school assignment boundary maps complained of herein without prior approval of the Court; and

(d) enter an order directing Defendant HCSB to submit a proposed desegregated school assignment boundary map complained of herein for approval; and

(e) award to the *Plaintiff* costs of suit and reasonable attorney fees; and

(f) grant whatever additional relief this Court deems appropriate and just under the circumstances.

## DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

## UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct.  Executed on:

5-18-2023
_____

Date

_____

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

# TAB 30

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BLAKE WARNER and J.W.,

     Plaintiffs,

v.                         Case No. 8:23-cv-00181-SDM-JSS

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY
FLORIDA,

     Defendant.

_____/

## ANSWER AND AFFIRMATIVE DEFENSES
## TO AMENDED VERIFIED COMPLAINT

Defendant School Board of Hillsborough County, Florida ("School Board"), answers the numbered paragraphs of the Amended Verified Complaint (Dkt. 29) (the "Amended Complaint") by Plaintiff Blake Warner ("Plaintiff")[1] and states:

The School Board denies any wrongdoing. The School Board denies all allegations by Plaintiff, except as specifically set forth below. Further, legal conclusions do not require a response; to the extent a response is required,

---

[1] In the original Complaint, Plaintiff included his minor child (J.W.) as a co-plaintiff. In light of the Amended Verified Complaint, the School Board understands that J.W. is no longer a party to this action. To the extent J.W. raises any allegations or claims in this action, they are denied.

70614833;1

Plaintiff's legal conclusions are denied. The School Board denies any allegations either express or implied in the headings, subheadings, and defined terms in this Answer. The use of certain headings, subheadings, and defined terms from the Amended Complaint, is for ease of reference only and is not to be construed as an admission by the School Board.

Additionally, the School Board denies in its entirety the "Introduction" section preceding the numbered allegations in Plaintiff's complaint, including the website referenced therein, and further denies that Plaintiff is entitled to any relief.

## Responses to Individual Paragraphs

1.    *Plaintiff* **is African-American.**

Response:   Without knowledge, therefore denied.

2.    *Plaintiff* **has continuously resided in Hillsborough County since 2016.**

Response:   Without knowledge, therefore denied.

3.    **Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.**

Response:  Admitted that the School Board operates, controls, and supervises the free public schools in Hillsborough County. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves.

4.     **The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.**

Response:   Admitted that the School Board accepts federal funding. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves.

5.     **This court has jurisdiction pursuant 42 U.S. Code § 3613.**

Response:   Admitted only that the School Board does not contest the Court's jurisdiction. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

6.     **Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Plaintiff's claims occurred in the Middle District of Florida.**

Response:   Admitted only that the School Board does not contest venue in this matter. Denied that Plaintiffs experienced any "events" that entitle them to claimed relief. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

7.     **The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

8.     **As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation, in violation of the EEOA.**

Response:   Denied.

9.     **For the purposes of this complaint, the following regions are defined as follows:**

Response:   This paragraph does not set forth any allegations, but rather appears to be a general introduction for the following paragraphs. To the extent this paragraph is deemed to set forth an allegation, denied.

10.     ***South Tampa*** **is defined as the area between Gandy Boulevard and Kennedy Boulevard.**

Response:   Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

11.     ***West Tampa*** **is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.**

Response:   Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

12.     ***East Tampa*** **is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.**

Response:   Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

13.     ***South Tampa*****'s population is predominantly White.** ***see*** **Exhibits A and B.**

Response:   Without knowledge, therefore denied. [2]

14.     **West Tampa's population is predominantly Hispanic.** **see Exhibits A and C.**

Response:   Without knowledge, therefore denied.

---

[2] First, Plaintiff does not authenticate or explain the origin or modification of his exhibits. Second, the School Board does not dispute any official census data, but does not have any independent knowledge to admit or deny Plaintiff's allegations. All remaining paragraphs involving purported exhibits and/or population data are further denied for those same reasons.

15. **East Tampa's population is predominantly African-American. see Exhibits A and D.**

Response:   Without knowledge, therefore denied.

16. **The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.**

Response:   Without knowledge, therefore denied.

17. **The three *South Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.**

Response:   Denied.

18. **The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.**

Response:   Denied.

19. **The bordering *South Tampa* schools are extremely over utilized, while the bordering *West Tampa* are extremely underutilized.**

Response:   Denied.

20. **The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *South Tampa* to underutilized–majority minority–*West Tampa* to balance out the utilization.**

Response:   Denied.

21. **Rather than do this, the HCSB has proposals to close a minority school and leave the bordering *South Tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range.**

Response:   Denied.

22.   **The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.**

Response:   Denied.

23.   **The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Therefore, denied.

24.   **Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominantly African-American school.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

25.   **Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

26.   **The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

27.   **The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.**

Response:   Denied.

28.   **The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

29.   **The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

30.   **Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the District is proposing plans to just close Madison or Monroe, to avoid sending white students to minority schools directly to the north.**

Response:   The School Board admits the school boundary lines and proposals are public record and speak for themselves. Otherwise denied.

31.   **The following image shows the locations of Coleman, Pierce, and Madison, over-layed over a map of race. The black lines represent the border for the closest school:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

32.   **Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population in district 2.**

Response:   Denied.

33.   **This image shows the racial map overlaid with the district boundaries shown in blue lines:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

34.   **The racial segregation in the district map was intentional.**

Response:   Denied.

35.   **The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded".**

Response:   The document cited by Plaintiffs in footnote 2 to paragraph 35 speaks for itself. Otherwise denied.

36.   **The HCSB stated "The black population percentage for district five. is 41.1%".**

Response:   The document cited by Plaintiffs in footnote 3 to paragraph 36 speaks for itself. Otherwise denied.

37.   **The black population percentage for Hillsborough County is approximately 18%.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

38.   **The school board intentionally drew their district map to concentrate their black population in District 5.**

Response:   Denied.

39.   **By concentrating the black population in District 5, they remove the black population from the other districts causing other races to be segregated as well. The end result was a map where Hispanic (District 1), black (District 5), and white (District 2, 3, and 4) populations were segregated into their own respective districts.**

Response:   Denied.

40.   **Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.**

Response:   Without knowledge, therefore denied.

41.   **The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.**

Response:   Denied.

42.   **The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.**

Response:   The School Board admits it is the entity that determines the boundary maps for public school assignments. Otherwise denied.

43.   **Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

44.   **At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.**

Response:   Denied to the extent Plaintiff alleges the School Board had had "at least one residential real estate property for sale in each of the affected neighborhoods." Otherwise without knowledge, therefore denied.

45. **"Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.**

Response:   This paragraph is a legal characterization that requires no factual response, as the applicable laws speak for themselves. Otherwise denied.

46. **"Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.**

Response:   This paragraph is a legal characterization that requires no factual response, as the applicable laws speak for themselves. Otherwise denied.

47. **The HCSB artificially inflated the property values in *South Tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.**

Response:   Denied.

48. **On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.**

Response:   Denied.

49. **This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.**

Response:   Denied.

50. **As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school aged students in**

70614833;1

his community–including his child–were being discriminated against because of their race... in the year 2023.

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

51.   **Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.**

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

52.   **Defendant's unlawful conduct proximately caused Mr. Warner to suffer the aforementioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.**

Response:   Denied.

53.   **Due to HCSB's manipulation of property values, Plaintiff was priced out of *South Tampa* and had to relocate to relocate outside of *South Tampa* and resulting in a loss of community for Plaintiff.**

Response:   Denied.

54.   **Mr. Warner spent much of his childhood in South Tampa. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.**

Response:   Without knowledge, therefore denied.

55.   **The fact that the school boundaries correlate nearly 1-to-1 directly to race.**

Response:   Denied.

56.   **The fact that the school board explicitly used race to draw the district maps to segregate.**

Response:   Denied.

70614833;1

57.    **The fact that the HCSB has a history of refusing to desegregate.**

Response:   Denied.

58.    **The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.**

Response:   Denied.

59.    **The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.**

Response:   Denied.

60.    **The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.**

Response:   Denied.

61.    **The affluent white residents of *South Tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.**

Response:   Without knowledge, therefore denied.

62.    **Those affluent white *South Tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.**

Response:   Without knowledge, therefore denied.

63.    **Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school**

**board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:**

Response: This paragraph purports to include and rely upon a picture, likely a social media screenshot, which Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

64. **The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *South Tampa* residents:**

Response: This paragraph purports to include and rely upon a picture, likely a social media screenshot, which Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

65. **School Board Member Dr. Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).**

Response:   Denied.

66. **A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.**

Response:   Denied.

67. **On or about January 11, 2023, Dr. Stacy Hahn gave a news interview with New Channel 8 WFLA.**

Response:   Admitted.

68. **This interview was broadcast on public television as well as printed on WFLA's website.**

Response:   Admitted.

69.   **Dr. Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.**

Response:   Without knowledge, therefore denied.

70.   **During this interview, Dr. Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".**

Response:   This paragraph purports to describe a written article Plaintiffs linked. As that document is the best evidence of its own contents and speaks for itself, denied. Further denied to the extent this paragraph implies unlawful discrimination by the School Board.

71.   **There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.**

Response:   This paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. To the extent this paragraph is deemed to suggest the School Board engages in unlawful discrimination, denied.

72.   **"District 2" is the racially gerrymandered Caucasian district that Dr. Hahn represents. "District 2" 's population is predominantly white.**

Response:   Denied.

73.   **District 1's population is predominantly minority and borders District 2 to the north.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

74.   **Dr. Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.**

Response:   Denied.

75.    **Dr. Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.**

Response:    Denied.

76.    **The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.**

Response:    Denied.

77.    **The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.**

Response:    Denied.

78.    **This further harms the minority communities in east Tampa and west Tampa, because their property values are decreased, while the property values increase in the white neighborhoods.**

Response:    Denied.

### Count I: 42 U.S. Code § 3604: Intentional Discrimination[3]

79.    *Plaintiffs* **re-alleges and incorporates by reference ¶ 1 – 78**

Response:    The School Board restates its responses to paragraphs 1–78 above.

80.    **Defendant intended to unlawfully segregate students by race and/or color through South Tampa school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of south tampa due to unlawful pricing manipulation.**

Response:    Denied.

---

[3] The School Board reiterates that the headings are included solely for convenience, and it affirmatively denies all allegations that might be deemed to exist within them.

## Count II: 42 U.S. Code § 3604: Disparate Impact

81.    *Plaintiffs* re-alleges and incorporates by reference ¶ 1 – 78

Response: The School Board restates its responses to paragraphs 1–78 above.

82.    **Defendant's school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of south tampa services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of south tampa due to unlawful pricing manipulation.**

Response:   Denied.

::::

**The School Board further denies all allegations contained in the "Wherefore" paragraph at the end of Plaintiff's complaint, and further denies that Plaintiff is entitled to any claimed relief.**

## AFFIRMATIVE DEFENSES

Without conceding that the School Board bears the burden of proof as to any issue, and without conceding liability, the School Board asserts the following defenses to Plaintiff's complaint:

### FIRST DEFENSE

The Eleventh Circuit previously declared the Hillsborough County school system unitary, ceasing federal judicial supervision of the Hillsborough County school system. *See Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 947 (11th Cir. 2001). Plaintiff's claims fail to the extent they seek relieve inconsistent with *Manning* and to the extent Plaintiff

challenges school boundary lines in place or demographic shifts that began to occur, prior to the *Manning* opinion.

## SECOND DEFENSE

The Plaintiff has not suffered any harm because he received his preferred and requested school assignment.

## THIRD DEFENSE

Plaintiff's claims are barred by release, discharge, and waiver. Plaintiff previously executed a Settlement Agreement with the School Board. Because the Settlement Agreement is confidential, the School Board attached a mostly-redacted version as **Exhibit 1**.[4] Pursuant to the Settlement Agreement, Plaintiff received a specific school assignment for his minor child. Additionally, the Settlement Agreement includes a broad release where Plaintiff agreed as follows:

> **5. <u>Release of the School Board and District</u>:** For and in consideration of the required acts and promises set forth in this Agreement, the **Parent hereby knowingly and voluntarily releases and discharges the School Board and District from any and all claims, demands, causes of action, complaints or charges, known or unknown** specifically related J.W.'s education, services, and educational program in the District **through the date of the execution of this Agreement**.

---

[4] Because the Settlement Agreement is confidential, the School Board attaches a mostly-redacted version as Exhibit 1. Prior to this filing, the parties conferred and agreed to the redactions made.

This shall include, but not be limited to, all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorneys' fees, **and all losses of any kind whatsoever related specifically to J.W.'s education**, **which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement**.

The Parent understands that this **release shall also cover any claims, if any, that may belong independently to J.W. related to his educational services and program**. The claims described in this paragraph shall be collectively referred to as "Released Claims" herein. The Parties jointly agree that the release in this paragraph shall not act to impair the enforceability of this Agreement or a waiver of the Parties' respective rights to take action to enforce this Agreement. The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement. To that end, the School Board and District acknowledge that no provision in this Agreement may be construed as relieving them of any obligation they may have under federal or state law to provide J.W. a FAPE for any time after the execution of this Agreement.

*See* Settlement Agreement, ¶ 5 (emphasis added).

Moreover, Plaintiff admits his claims are premised on the contractual assignment (*i.e.*, his choice) under the settlement agreement. *See* Plaintiffs' email dated May 17, 2023, attached as **Exhibit 2**, admitting his "EEOA counts are premised on the contractual assignment of J.W. to Coleman Middle School and Plant High School."

70614833;1

Because Plaintiff voluntary chose to have his child attend the assigned school and because of the release he executed, Plaintiff's claims fail as a matter of law.

## FOURTH DEFENSE

Any purported imbalances are naturally attributable to the intervening acts of third parties, specifically the natural flow of people within a community (particularly one growing as quickly as Tampa) and are not attributable to any purported actions by the School Board.

## FIFTH DEFENSE

By affirmatively requesting and receiving their preferred school placements, the Plaintiff waived any ability to sue based on the purported placements.

## SIXTH DEFENSE

The School Board at all relevant times has acted reasonably, properly, lawfully, and in good faith.

## SEVENTH DEFENSE

The relief sought by Plaintiff is unreasonable and constitutes an undue hardship on the School Board.

70614833;1

## EIGHTH DEFENSE

The School Board is not in business of selling or renting dwelling units, and accordingly, cannot be held liable under 42 U.S.C. § 3604. *See* 42 U.S.C § 3603(c).

## NINTH DEFENSE

Plaintiff's claims are barred by the Eleventh Amendment, which bars suits brought by private citizens against a state or arm of the state in federal court without consent. *See McCardell v. U.S. Dept. of Housing and Urban Development*, 794 F.3d 510, 521-22 (5th Cir. 2015) (holding state defendants, which were arms of the state of Texas, had not consented to suit brough under the Fair Housing Act).

## TENTH DEFENSE

Plaintiff lacks standing to sue.

## ELEVENTH DEFENSE

Plaintiff's claims are barred to the extent they are premised upon Plaintiff J.W.'s assignment, using his prior 502 S. Fremont Avenue address as outlined in paragraph 10 of the Complaint, in light of Plaintiffs' email dated May 17, 2023, attached as **Exhibit 2**, withdrawing any such allegation.

Similarly, Plaintiffs' claims within Counts I (28 U.S. Code § 1703(a)), II (28 U.S. Code § 1703(c)), and III (28 U.S. Code § 1983) of the original complaint are barred by Plaintiffs' Notice of Abandonment of Counts I and II, filed on

May 18, 2023, *see* Dkt. 28, and by virtue of Plaintiff's filing of the Amended

Verified Complaint omitting those claims.

## RESERVATION OF RIGHTS

The School Board reserves the right to assert additional affirmative

defenses and to supplement its current affirmative defenses as discovery

warrants.

:::

Having fully answered the Plaintiff's complaint, the School Board

requests the court enter an order:

(a)    Dismissing the complaint against the School Board with prejudice;

(b)    Ordering that the Plaintiff take nothing by this action;

(c)    Awarding the School Board its costs and attorney's fees associated
       with this litigation, pursuant to 42 U.S.C. § 1988(b), 42 U.S.C.
       § 3613(c)(2), or otherwise; and

(d)    Awarding the School Board such other and further relief as the
       Court deems just and proper.

70614833;1

Respectfully submitted,

/s/ *Jason L. Margolin*

**Jason L. Margolin, Esq.**
Florida Bar No. 69881
jason.margolin@akerman.com
judy.mcarthur@akerman.com
**Gregg M. Moran, Esq.**
Florida Bar No. 1011060
gregg.moran@akerman.com
ava.hill@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
(813) 223-7333 / Fax: (813) 223-2837
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May 2023, I filed the foregoing using

the Court's e-portal and served an additional copy on Blake Warner at

blake@null3d.com.

/s/ *Jason L. Margolin*
Counsel for Defendant

70614833;1

# TAB 38

# United States District Court
## For The Middle District of Florida
## Tampa Division

| | |
|---|---|
| Blake Warner<br><br>v.<br><br>The School Board of<br>Hillsborough County Florida | Case Number 8:23-CV-181-SDM-JSS |

# Second Amended Verified Complaint

# Introduction

Plaintiff, Blake Warner, *pro se*, hereby amends his complaint, pursuant the Court's order Doc. 37, against The School Board of Hillsborough County, Florida ("HCSB") for violations of Title VI of 42 U.S.C. § 2000d et seq ("1964 Civil Rights Act"), 20 U.S.C. 1703 ("Equal Educational Opportunities Act"), 42 U.S. Code § 3601 et seq ("Fair Housing Act"), and Art. IX, § 1, Fla. Const. for unlawful manipulation of housing values in Hillsborough County through operating a segregated school system, and 42 U.S.C. § 1983 for denying him due process with the school choice application process.

   The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then

used these racial boundaries as a pretext for discrimination through redlining and steering.

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## PLAINTIFF

1. Mr. Warner is African-American.

2. Mr. Warner has continuously resided in Hillsborough County since 2016.

## DEFENDANT

3. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

4. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## JURISDICTION AND VENUE

5. This court has jurisdiction pursuant 28 U.S. Code § 1331, 1367, 1343, 2201, and 2202, and 42 U.S. Code § 3613 and 1983.

6. Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Mr. Warner's claims occurred in the Middle District of Florida.

## PARENTAL RIGHTS

7. Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of J.W. *see* Troxel v. Granville (2000).

8. The educational welfare/placement of J.W. is closely tied to the Mr. Warner's Fourteenth Amendment fundamental rights and his ability to advocate for J.W.'s rights.

9. The state of Florida has additionally given Mr. Warner the following rights:

   (a) The right to direct the education and care of J.W.[1]; and

   (b) The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll J.W. in a public school[2].

## EEOA

10. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

11. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation.

## TAMPA REGIONS

12. For the purposes of this complaint, the following regions are defined as follows:

13. *south tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

---

[1] *see* Fla. Stat. § 1014.04(a)
[2] *see* Fla. Stat. § 1014.04(c)

14. *west tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

15. *east tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

16. *south tampa*'s population is predominantly White. *see* Exhibits A and B.

17. *west tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

18. *east tampa*'s population is predominantly African-American. *see* Exhibits A and D.

19. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## Map Compactness

20. Compactness is a quantitative measure of a boundary's shape and how tightly packed, or compact, the boundary is.

21. The compactness of a boundary is a critical measure when evaluating if a boundary is discriminatory. A map that is not compact may be considered gerrymandered.

22. All of the compactness measures and boundaries provided here are approximate, and are subject to change as more data becomes available before trial.

## I   Schools

### School Boundary Compactness

23. All of the Hillsborough County school statistics cited here and attached are approximate and based on imperfect data, such as some schools missing and non-exact boundary definitions. These statistics and graphs will change slightly and improve as more data becomes available through discovery.

24. The School Board only has three high schools which have compact bound-
aries:



25. The two of the top three *least* compact high schools are negro schools:



26. Nearly all of the School Board's school boundaries are gerrymandered. *see* Exhibits X, Y, and Z.

There is only one compact Middle School: Shields Middle School. The rest are gerrymandered.

27. The top three *least* compact middle schools are: Randall Middle School, Memorial Middle School, and Barrington Middle School:



| RANDALL MIDDLE SCHOOL | | MEMORIAL MIDDLE SCHOOL | | BARRINGTON MIDDLE SCHOOL | |
|---|---|---|---|---|---|
| Accuracy: 7% | Grade: A | Accuracy: 25% | Grade: C | Accuracy: 23% | Grade: B |
| Minorities: 32.5% | Utilization: 98% | Minorities: 90.5% | Utilization: 57% | Minorities: 51.4% | Utilization: 97% |
| LS Exclusion: 92% | FS Inclusion: 28% | LS Exclusion: 52% | FS Inclusion: 64% | LS Exclusion: 28% | FS Inclusion: 73% |
| Displacement: 30.71:1 | R: gerrymandered | Displacement: 0.60:1 | R: gerrymandered | Displacement: 0.14:1 | R: gerrymandered |

## A. NUMBERS DEFINED

28. A "Local Student" is a student who resides closest to that school. A "Foreign Student" is a student who is resides closer to a different school. In a perfectly compact map, a foreign student would never be assigned because they would always be assigned to their closest school where they are a local student.

29. The Local Student Exclusion Ratio ("LS Exclusion") represents the percent of local students who are not assigned to that school. A LS Exclusion

ratio of 0.2 means that 20% of the local students are assigned to a different more geographically distant school.

30. The green area represents the area of local students are actually assigned to that school.

31. The red area in the graphs represents local students who are excluded from that school. The LS Exclusion ratio is calculated as:

$$LER = \frac{area(red)}{area(green) + area(red)} \tag{1}$$

32. The Foreign Student Inclusion Ratio ("FS Inclusion") represents the percent of assigned students who are foreign students. A FS Exclusion ratio of 0.4 means that 40% of the assigned student population are foreign students.

33. The yellow area represents the foreign students. The FS Inclusion ratio is calculated as:

$$FIR = \frac{area(yellow)}{area(green) + area(yellow)} \tag{2}$$

34. The displacement ratio represents that ratio between excluded local students and included foreign students. For example, a displacement ratio of 12:1 indicates that 12 local students lost their seat at that school for every 1 foreign student that was assigned. A high displacement ratio indicates that a school is trying hard not to assign local students and still fill capacity. A great example of this is A-rated Fishkawk Elementary which borders C-rated Pinecrest Elementary:



FISHHAWK CREEK ELEMENTARY SCHOOL

PINECREST ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 13% | Grade: | A |
| Minorities: | 33.7% | Utilization: | 100% |
| LS Exclusion: | 86% | FS Inclusion: | 1% |
| Displacement: | 593.94:1 | R: | gerrymandered |

| | | | |
|---|---|---|---|
| Accuracy: | 65% | Grade: | C |
| Minorities: | 34.5% | Utilization: | 67% |
| LS Exclusion: | 1% | FS Inclusion: | 33% |
| Displacement: | 0.03:1 | R: | gerrymandered |

35. The Displacement ratio is calculated as:

$$D = \frac{area(red)}{area(red) + area(yellow)} \tag{3}$$

36. Accuracy is a percent of how close the assigned boundary is to a perfectly compact boundary (closest school boundary).  With 1.0 being perfectly accurate and 0.0 not being accurate at all.  This is the closest single number to a measure of compactness used in this document.

37. Accuracy is calculated as:

$$A = \frac{area(green)}{area(red) + area(yellow) + area(green)} \tag{4}$$

38. Utilization is the school utilization percent, and is from the School Board's last published 40-day enrollment numbers.

39. Minorities represents the percent of the school's student that are minorities.

## B.   ANALYSIS

40. Coincidentally, all of the compact school boundaries beset on two or more sides by natural borders or the county line.  They are not compact due to the diligent efforts of the school board, they are compact only because the board did not have much discretion to screw it up.

41. Significant amounts of red and yellow areas are strong indicators of gerrymandering.

42. Blake and Middleton are the two negro high schools in Tampa; the high degree of non-compactness in these boundaries, combined with the nearby white neighborhoods that are not assigned to these schools suggests that race was the predominant factor when drawing these boundaries.

## SOUTH TAMPA

### ELEMENTARY SCHOOLS

43. All of the *south tampa* school boundaries correspond nearly perfectly to the Home Owners' Loan Corporation ("HOLC") maps which was created by the federal government in 1933 which racially segregated housing. *see* Exhibit G and H.

44. The three *south tampa* elementary schools which border *west tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.



GRADY ELEMENTARY SCHOOL

MITCHELL ELEMENTARY SCHOOL

GORRIE ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 44% | Grade: | A |
| Minorities: | 41.4% | Utilization: | 104% |
| LS Exclusion: | 41% | FS Inclusion: | 36% |
| Displacement: 1.24:1 | | R: gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 55% | Grade: | A |
| Minorities: | 36.4% | Utilization: | 96% |
| LS Exclusion: | 23% | FS Inclusion: | 32% |
| Displacement: 0.61:1 | | R: gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 60% | Grade: | A |
| Minorities: | 28.2% | Utilization: | 92% |
| LS Exclusion: | 39% | FS Inclusion: | 1% |
| Displacement:40.25:1 | | R: gerrymandered | |

45. The three *west tampa* elementary schools which border *south tampa*–Tampa Bay Boulevard, West Tampa, and Just (until it closed)–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.



TAMPA BAY BOULEVARD ELEMENTARY SCHOOL

WEST TAMPA ELEMENTARY SCHOOL

JUST ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 24% | Grade: | C |
| Minorities: | 95% | Utilization: | 55% |
| LS Exclusion: | 49% | FS Inclusion: | 68% |
| Displacement: 0.45:1 | | R: gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 41% | Grade: | C |
| Minorities: | 95.6% | Utilization: | 68% |
| LS Exclusion: | 49% | FS Inclusion: | 30% |
| Displacement: 2.18:1 | | R: gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 30% | Grade: | F |
| Minorities: | 97.8% | Utilization: | 47% |
| LS Exclusion: | 33% | FS Inclusion: | 63% |
| Displacement: 0.29:1 | | R: gerrymandered | |

46. The bordering *south tampa* schools are extremely over utilized, while the bordering *west tampa* are extremely underutilized. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *south tampa* to underutilized–majority minority–*west tampa* to balance out the utilization. Rather than do this, the HCSB closed a minority school and left the bordering *south tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

### Plant, Jefferson, and Blake High School

47. Plant is over capacity, yet 44% percent of it's students should not even be assigned there. The 44% are distant predominantly white students who would otherwise be assigned to minority schools Jefferson and Blake. It makes no sense why the school board would go out of its way to assign distant students to a school that is over capacity.

PLANT HIGH SCHOOL                JEFFERSON HIGH SCHOOL                BLAKE HIGH SCHOOL



| Accuracy: | 51% | Grade: | A |
|---|---|---|---|
| Minorities: | 31.1% | Utilization: | 101% |
| LS Exclusion: | 10% | FS Inclusion: | 44% |
| Displacement: | 0.14:1 | R: | gerrymandered |

| Accuracy: | 52% | Grade: | C |
|---|---|---|---|
| Minorities: | 91.2% | Utilization: | 63% |
| LS Exclusion: | 27% | FS Inclusion: | 34% |
| Displacement: | 0.74:1 | R: | gerrymandered |

| Accuracy: | 26% | Grade: | C |
|---|---|---|---|
| Minorities: | 76.4% | Utilization: | 90% |
| LS Exclusion: | 49% | FS Inclusion: | 63% |
| Displacement: | 0.55:1 | R: | gerrymandered |

48. The following map shows the locations and boundaries for Plant High
    School (orange), Jefferson High School (yellow), and Blake High School
    (purple):



49. Plant High School is nearly *twice* as far from Davis Island as Blake High
    School is by ground transportation, yet students in that affluent white en-
    clave are not assigned to Blake, a predominantly African-American school.

50. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach
    Park, and Oakford Park are at least twice as close to Jefferson High School
    than Plant, and in some cases literally across the street from Jefferson, yet

those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

51. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:



52. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School.  The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools.  The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

53. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.



COLEMAN MIDDLE SCHOOL          PIERCE MIDDLE SCHOOL          MADISON MIDDLE SCHOOL

| | | | | | |
|---|---|---|---|---|---|
| Accuracy: | 45% | Grade: | A | | |
| Minorities: | 28.3% | Utilization: | 104% | | |
| LS Exclusion: | 42% | FS Inclusion: | 31% | | |
| Displacement: 1.59:1 | | R:  gerrymandered | | | |

| | | | |
|---|---|---|---|
| Accuracy: | 55% | Grade: | C |
| Minorities: | 93.3% | Utilization: | 69% |
| LS Exclusion: | 11% | FS Inclusion: | 40% |
| Displacement: 0.19:1 | | R:  gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 64% | Grade: | C |
| Minorities: | 72.2% | Utilization: | 58% |
| LS Exclusion: | 19% | FS Inclusion: | 23% |
| Displacement: 0.79:1 | | R:  gerrymandered | |

54. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the School Board closed Monroe, to avoid sending white students to minority schools directly to the north.

55. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## North Tampa

### Carrollwood K-8

56. On May 9, 2023, Defendant promulgated a format change for Carrroll-wood Elementary, converting it from kindergarten through fifth grade ("K-5") to kindergarten through eighth grade ("K-8") effective August 2023 with the 2023-2024 school year for the sixth grade. *see* Exhibit J.

57. J.W. is starting the sixth grade for the 2023-2024 school year.

58. Defendant assigned Plaintiff's child J.W. to Adams Middle School–located at 10201 N Blvd, Tampa, FL 33612.

59. Carrollwood K-8 is located at 3516 McFarland Rd, Tampa, FL 33618.

60. Both Adams Middle School and Carrollwood K-8 are operated by Defendant.

61. Carrollwood K-8 has a non-compact boundary:

CARROLLWOOD ELEMENTARY SCHOOL



| | | | | |
|---|---|---|---|---|
| Accuracy: | 33% | Grade: | | A |
| Minorities: | 57.6% | Utilization: | | 73% |
| LS Exclusion: | 63% | FS Inclusion: | | 21% |
| Displacement: | 6.12:1 | R: | gerrymandered | |

62. The children it includes in the yellow and green areas are significantly more White than the excluded red areas.

63. The children it excludes to the south of Gunn Highway and Busch Boulevard are predominantly Latino and African-American.

64. The children it excludes to the east are significantly more likely to be African-American or Latino than the children it included in the green and yellow areas.

**Hill Middle School**

65. Hill has a non-compact boundary:

HILL MIDDLE SCHOOL



| | | | | |
|---|---|---|---|---|
| Accuracy: | 37% | Grade: | | B |
| Minorities: | 68.6% | Utilization: | 83% | |
| LS Exclusion: | 46% | FS Inclusion: | 43% | |
| Displacement: | 1.11:1 | R: | gerrymandered | |

66. Hill's assignment boundary is being manipulated to protect two border-
ing white schools: A-rated Carrollwood K-8 and A-rated Martinez Mid-
dle School. Nearby affluent white students who should be assigned to Hill,
are instead assigned to Martinez and Carrollwood. To fill those student
seats back up, they gerrymandered the boundary to pull in distant minor-
ity neighborhoods that the A-rated schools do not want. The result is a
significantly higher concentration of minorities at Hill, and a decrease of
minority enrollment at Martinez and Carrollwood.

## Lake Magdalene Elementary

Lake Magdalene's boundary was just changed for the 2024-2025 school year. They reassigned a large swath of white students from Miles Elementary to Lake Magdalene, despite those students being significantly closer to Miles. Miles is a low performing minority school, and the reassignment of these white students only further concentrated minorities there. The school board gerrymandered the Miles boundary so hard, that it now resembles a penis and testicles:

MILES ELEMENTARY SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 28% | Grade: | C |
| Minorities: | 90.9% | Utilization: | 81% |
| LS Exclusion: | 56% | FS Inclusion: | 54% |
| Displacement: | 1.08:1 | R: | gerrymandered |

### Miles Elementary

67. The School Board juiced the numbers it told the public on it's boundary website to try to justify changing Miles' boundary. The website indicates that Miles' utilization is around 109% to justify relocating a large portion of it's white students to Lake Magdalene away from predominantly minority Miles. Yet the numbers the School Board reports to the state indicates that Miles' utilization is 81%. Miles is not over capacity, the School Board lied to segregate it:

| Miles Elementary | | | Remove |
|---|---|---|---|
| School level | | | ES |
| Enrollment (school year 2021-22) | | | 794 |
| Capacity | | | 726 |
| Utilization (school year 2019-20) | | | 117% |
| Utilization (school year 2020-21) | | | 108% |
| Utilization (school year 2021-22) | | | 109% |

| Metric | Existing | S4 | S5 |
|---|---|---|---|
| Anticipated utilization | 113% | 87% | 87% |
| Assigned pupils rezoned | 0 | 228 | 228 |
| Anticipated utilization (with temporary classrooms) | 109% | 84% | 84% |
| Capacity (with temporary classrooms) | 754 | 772 | 772 |
| Capacity | 726 | 747 | 747 |
| Anticipated enrollment | 821 | 652 | 652 |
| Total assigned pupils | 1,259 | 986 | 986 |

### Gaither High School

68. Gaither has a non-compact boundary:

GAITHER HIGH SCHOOL



| Accuracy: | 30% | Grade: | B |
| Minorities: | 62.9% | Utilization: | 98% |
| LS Exclusion: | 65% | FS Inclusion: | 29% |
| Displacement: | 4.49:1 | R: | gerrymandered |

69. Mr. Warner resides on the edge of the Gaither red area, yet his home is
    assigned to Chamberlain High School. In 2022, Gaither's enrollment was
    62.9% minority, in contrast to Chamberlain's 88.1%.

## Chamberlain High School

70. Gaither has a non-compact boundary:

CHAMBERLAIN HIGH SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 38% | Grade: | C |
| Minorities: | 88.1% | Utilization: | 63% |
| LS Exclusion: | 52% | FS Inclusion: | 34% |
| Displacement: | 2.10:1 | R: | gerrymandered |

71. Mr. Warner resides on the edge of the green and yellow area that borders Gaither's boundary. There was a huge red area of students that were much closer than Mr. Warner, yet they excluded them and assigned him there instead to dilute minority enrollment at Gaither.

## 1.   BOUNDARY CHANGES

72. The School Board promulgated controversial district wide boundary changes for the 2024-2025 school year on June 20, 2023 with a 4-3 vote, over the objections of minority members who were opposed to the disproportionate nega-

tive impact that the changes would have have African-American and Hispanic communities.

73. The white board members (along with a Moroccan), with an additional seat obtained through illegal gerrymandering, overrode the minority members to cram through the changes in a sharply divided 4-3 vote.

## 2.   Assignment Shenanigans

74. Everytime the School Board creates a K-8, they always make the 6-8 boundary the exact same as the PK-5.

75. This is done because elementary boundaries are significantly smaller than middle school, so its easy to segregate.

76. Each and every time the school board creates a K-8, it is due to community pressure to segregate: either to pack white kids in, or to pack black kids in.

77. Sulphur Springs K-8 packs poor performing minorities into a small school.

SULPHUR SPRINGS K-8 SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 16% | Grade: | C |
| Minorities: | 95% | Utilization: | |
| LS Exclusion: | 83% | FS Inclusion: | 12% |
| Displacement: | 34.94:1 | R: | gerrymandered |

78. Carrollwood K-8, Maniscalo K-8, and Lutz K-8 were all designed to segregate and isolate affluent white families from having their children assigned to nearby minority middle schools.



CARROLLWOOD ELEMENTARY SCHOOL          MANISCALCO K-8 SCHOOL          LUTZ K-8 SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 33% | Grade: | A |
| Minorities: | 57.6% | Utilization: | 73% |
| LS Exclusion: | 63% | FS Inclusion: | 21% |
| Displacement: 6.12:1 | | R:   gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 54% | Grade: | A |
| Minorities: | 59.7% | Utilization: | 79% |
| LS Exclusion: | 31% | FS Inclusion: | 27% |
| Displacement: 1.22:1 | | R:   gerrymandered | |

| | | | |
|---|---|---|---|
| Accuracy: | 56% | Grade: | A |
| Minorities: | 37.4% | Utilization: | 86% |
| LS Exclusion: | 9% | FS Inclusion: | 40% |
| Displacement: 0.15:1 | | R:   gerrymandered | |

79.   The school board also play games by not assigning children to certain schools, even if those children live across the street. Walker Middle School is a great example of this. The School Board does not assign students to Walker, because they know under-performing minorities attend the school they are assigned the vast majority of the time, and they wanted that school to have a good grade. So they made it 100% lottery based to discourage minorities from attending.

## FAIR HOUSING ACT

80.   Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

81.   The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

24

82. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

83. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

84. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

85. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

86. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

87. The HCSB artificially inflated the property values in *south tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

88. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

89. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation. Effectively redlining along the HCSB's segregated school boundaries.

# II   Disparate Treatment

90. diminution in property values "Any discrimination in housing that is based on un-
supported stereotypes, prejudices, fear stemming from ignorance or generaliza-
tions, or aversion toward the handicapped is illegal.".  Epicenter of Steubenville
v. City of Steubenville, 924 F. Supp. 845, 851 (S.D. Ohio 1996).

91. A plaintiff need not prove that discrimination was the sole motivating factor in
the challenged action; it is sufficient that he show that discrimination was a moti-
vating factor. Community Services, Inc. v. Wind Gap Municipal Authority, 421
F.3d 170, 177 (3d Cir. 2005); Regional Economic Community Action Program,
Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir.), cert. denied, 537 U.S.
813 (2002); Community Housing Trust v. Dep't of Consumer and Regulatory
Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003); Sunrise Dev., Inc. v. Town of
Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

92. A municipality may be liable for actions that deny housing opportunities because
of discriminatory animus by its constituents, i.e., "for effectuating the discrimi-
natory wishes of the body politic," even though the local officials did not them-
selves inflame, direct, or encourage such discriminatory sentiments. United States
v. City of Chicago Heights, No. 99 C 4461, 1999 WL 1068477 at *5 (N.D. Ill.
Nov. 19, 1999).

93. The School Board acquiesced to their constituents pressured adopt known racially
discriminatory school assignment boundaries.

## Property Values

94. The Superintendent freely admits to manipulating property values through as-
signed schools in a news interview[3]:

---

[3]*see* Exhibit F, https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-
present-re-zoning-recommendation-to-school-board/

"We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values. The more we continue to address our high quality education within within everyone of our schools."

-Addison Davis

95. On June 21, 2023, WTSP 10 Tampa Bay published an article titled "Hillsborough County Schools redistricting plan sparks concerns over property values"[4]

96. In that article, The President of Greater Tampa Realtors stated that the redistricting will change Hillsborough County Property values.

97. They also quoted parents who stated that they made housing purchasing decisions based on the assigned schools:

"Concerned parents are now speaking out about how the changes could impact their children's education and their property value."

"'That's why I bought my house in this area, for the schools,' said Elena Ivani, the mother of two young boys."

"Ivani said when she and her husband were house hunting eight years ago, they were only looking at A-rated public school districts."

"If I wanted them to go to private school, we would have stayed in the house we were in and put that money towards private education,"

"'I'm hoping my home's value at least stays level, but in all honesty, would you pay a premium for a C-rated school?' Ivani asked. "

---

[4] *see* Exhibit K. https://www.wtsp.com/article/news/local/hillsboroughcounty/hillsborough-county-schools-redistricting-plan-property-values/67-979bab7e-012f-437e-8530-26a69ae58958

"'I'm most likely moving in three years,' said Ivani."

98. About 88 percent of Hillsborough County students are educated at public schools, and 12 percent at private schools.

99. Public education has traditionally been tied directly to housing through residential assignment policies that assign homes to schools via school attendance zones.

100. Housing is the traditional gateway to public education.

101. School zones are typically designed so that students attend schools near home, and despite growing opportunities to opt out or choose another school via charters, magnets, and public school open enrollment policies, 71 percent of students attend their assigned public school.

102. Families with children predictably take housing selection seriously, as housing often determines children's access to educational opportunities.

103. At least half of households with children consider school district quality when selecting a neighborhood during home buying.

104. Homes assigned to poor performing schools will have less demand from those households, therefore that home's value will decrease.

105. Homes that are assigned to well performing schools will have more demand from those households, therefore that home's will increase.

106. This chart shows the national values of homes vs the quality of the elementary school it is assigned:



107. The United States Census Bureau reports that the median household income for <u>black</u> households is $30,772 per year in Tampa, while the <u>white</u> households make nearly double at $59,390.

108. Any increase in property values will disproportionately price out more minorities from those neighborhoods.

109. Race is directly tied to property values: neighborhoods become more gentrified with higher concentrations of white residents the higher their property values are.

## INJURY

110. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community were being discriminated against because of their race... in the year 2023.

111. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

112. Defendant's unlawful conduct proximately caused Mr. Warner to suffer the aforementioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.

113. Between August 2017 and October 2022, Mr. Warner continuously resided in *south tampa* at residences assigned to A-rated schools Plant High School, Wilson Middle School, and Mitchell Elementary.

114. Due to HCSB's manipulation of property values, Mr. Warner was priced out of *south tampa* and had to relocate to relocate to *nouth tampa* where he was assigned to failing schools.

115. This increased segregation in both *south tampa* and *nouth tampa*.

116. Had The School Board assigned all students to their closest school, property values in area of *south tampa* that Mr. Warner resided would have decreased, and he would have purchased a home there.

117. This move resulted in a loss of community for Mr. Warner.

118. Mr. Warner spent much of his childhood in *south tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.

## REDISTRICTING

119. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic

population is packed into district 1, the African-American population into district 5, and white population into districts 2, 3, and 4.

120. 46% of Hillsborough County's population is non-Hispanic white, yet the board managed to gerrymander the districts to give white constituents mote voting power by giving them more board seats.

121. The School Board then used this slim white majority to cram through unpopular rebundary decisions that disproportionally harmed minority communities in District 5, such as the controversial closing of Just Elementary along a slim 4-3 vote.

122. This image shows the racial map overlaid with the district boundaries shown in blue lines:



123. The School Board has seven (7) board members, five of which are elected by constituents in their respective geographically defined voting districts, two (2) at-large county wide districts.

124. The School Board promulgates their own voting district maps.

125. A new district map was promulgated on December 16, 2021. *see* Exhibit R.

### 1.   School Board meeting

126. The School Board held a special called meeting on Dec 10, 2021, to discuss redistricting.  At that meeting, the board members made the following statements:

### Stacy Hahn

127.   "SO WHEN THE OPPORTUNITY TO REDISTRICT CAME UPON ALL OF US THIS YEAR, I THOUGHT THAT IT WAS THE PERFECT OPPORTUNITY TO CREATE AN HISPANIC SEAT ON THE SCHOOL BOARD TO REPRESENT OUR HISPANIC COMMUNITY"

"IT'S THE OPPORTUNITY TO CREATE THE SEAT, AND THEN IN 2024, HAVE HISPANIC REPRESENTATION FOR THAT COMMUNITY. SO THAT'S HOW I APPROACHED THIS TASK."

"BUT THE MAP DOES, BY FAR, PROVIDE THE HIGHEST HISPANIC POPU-LATION OF 46.6%, WHICH WOULD ENABLE HISPANIC MINORITIES THE OPPORTUNITY TO ELECT THEIR CANDIDATE OF CHOICE AND GUAR-ANTEE A SCHOOL BOARD MEMBER SEAT"

"NOW LET ME JUST DISCUSS MAP E SPECIFICALLY AND SOME OF THE HIGHLIGHTS OF MAP E. FIRST OF ALL, ANOTHER THING THAT MS. GRAY SAID THAT I'M GOING TO PUSH BACK ON HERE IS THAT SHE MEN-TIONED THAT MAP F HAD THE HIGHEST HISPANIC COMMUNITY. AC-

TUALLY, MAP E DOES AT 46.6%. MAP F IS AT 44.9%. 1.7% MAY NOT SEEM
LIKE A BIG DIFFERENCE, BUT IT'S CLOSE TO 10,000 VOTES THAT YOU
WOULD BE TAKING AWAY FROM THE HISPANIC COMMUNITY WITH
MAP F. I DON'T THINK – I WOULD THINK IF YOU TOOK 10,000 VOTES
AWAY FROM YOUR DISTRICT, MEMBER SHAKE TODAY, YOU AND YOUR
CONSTITUENTS WOULD BE UPSET. I'M SAYING THAT BECAUSE 10,000
VOTES IS A LOT OF VOTES AND A LOT OF PEOPLE"

"WITH MAP E, NOT ONLY IS IT ONE OF THE HIGHEST AT 40.6, BUT IT
ALSO CREATES AND GUARANTEES A HISPANIC SEAT"

"SO I UNDERSTAND WHEN YOU SAY, OKAY, CERTAIN PEOPLE WHO VOTED
FOR YOU ARE NOW GOING TO BE TAKEN OUT OF THAT DISTRICT, YOU
GET TO CONTINUE TO SERVE IN YOUR SEAT, BUT IT'S NOT – IT'S ABOUT
THE ADVOCACY. IT'S ABOUT HAVING A PERMANENT ADVOCATE FOR
THE HISPANIC COMMUNITY THAT PERSONALLY UNDERSTANDS THEIR
NEEDS AND CHALLENGES. SO, YOU KNOW, THAT'S REALLY A CON-
CERN FOR ME."

## A. Karen Perez

128. "THE MAP THAT I SUBMITTED HAS ONE OF THE HIGHEST HISPANIC
POPULATIONS IN DISTRICT ONE. AND IT'S PROJECTED TO GROW AN-
OTHER 5.4 OVER THE NEXT DECADE. SO MAP F ACTUALLY UNITES
HILLSBOROUGH COUNTY'S HISPANIC COMMUNITY EVEN BETTER THAN
THE CURRENT MAP."

"MAP F HAS BY FAR THE LARGEST AFRICAN AMERICAN POPULATION
IN DISTRICT 5 OUT OF 41.1% OF THE POPULATION BEING BLACK. THE
LARGEST INCREASE IN HILLSBOROUGH COUNTY IN HISTORY. NONE
OF THE HISTORICALLY BLACK DISTRICTS IN HILLSBOROUGH COUNTY,
TAMPA CITY COUNCIL, THE COUNTY COMMISSION OR THE SCHOOL
BOARD HAVE EVER HAD A MAP THAT INCREASED THE BLACK POPU-
LATION IN THAT DISTRICT. THIS ENORMOUSLY."

### B.   Henry Washington

129.  "WHAT I'M LOOKING AT IS INCREASING THE LARGEST BLACK POPULATION. AND I DON'T EVER WANT TO DECREASE THAT IN DISTRICT 5."

"ALSO, FOR EXAMPLE, PROGRESS VILLAGE, I CAN NEVER UNDERSTAND WHY WE DIVIDE PROGRESS VILLAGE. THAT'S PRETTY MUCH PREDOMINANTLY A BLACK AREA. HALF OF THE AREA GOES TO ANOTHER DISTRICT, THE OTHER HALF GOES TO DISTRICT FIVE. SO I WANT THE DISTRICTS TO UNDERSTAND THAT I WANT MY PEOPLE TO BE TOGETHER IN THOSE AREAS"

"AND I'M HERE TO REPRESENT DISTRICT 5 HISPANICS. I HAVE HISPANICS IN MY AREA. I REALLY DO, BUT I'M HERE TO REPRESENT DISTRICT 5. AND TO ME, MAP F GIVES ME THE BEST OPPORTUNITY TO REPRESENT DISTRICT 5.".

### C.   Nadia Combs

130.  "SO THAT'S WHY I PERSONALLY VOTED FOR THAT AS NUMBER SIX. AND I WANT TO KEEP THE HISPANIC COMMUNITY TOGETHER. OBVIOUSLY. I AM OUT THERE. I AM VERY ACTIVE. AND I THINK YOU DON'T HAVE TO BE HISPANIC TO REPRESENT AND FIGHT FOR HISPANICS IN THIS DISTRICT. SO FOR ME, THAT IS WHY I WOULD CHOOSE MAP F BASED ON THE WAY I BASICALLY CATEGORIZE MINE. SO THANK YOU SO MUCH."

### D.   Melissa Snively

131.  "IT CREATES HISPANIC DISTRICT. MAYBE WE NEED TO TWEAK IT IF MEMBER COMBS IS NOT LIVING IN IT."

### E.  Lynn Gray

132. "AND LAST, DISTRICT 5, WE DID ENSURE THAT IT HAS THE HIGHEST BLACK POPULATION."

## 2.  Promulgated Map

133. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected.  When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded". *see* Exhibit R.

134. The HCSB stated "The black population percentage for district five .. is 41.1%". *see* Exhibit R.

135. The black population percentage for Hillsborough County is approximately 18%.

## 3.  Predominant Factor

136. The school board used race as the predominant factor when drawing the map to concentrate African-American voters into District 5, and Hispanic voters into District 1.

137. This artificially created high concentrations of White voters in Districts 2, 3, and 4.

138. Districts 2, 3, and 4 all elected White representatives.

139. Some board members were motivated to maximize their chances of re-election.

140. Specifically, Henry Washington desired to pack a high concentration of African-American voters into District 5 to maximize his chances of re-election.

141. Stacy Hahn and Melissa Snively were all too happy to accommodate Henry Washington's desire, to keep African-Americans out of their district to maximize their own chances of re-election.

142. The push to pack Hispanics into District 1 kept them out of White districts 2, 3, and 4.

143. Race-based considerations were not simply a factor when redrawing district lines, they were the predominant factor.

144. The board members were actually bragging about whose map could pack the most minorities into isolated districts.

145. When they weren't referencing voters explicitly by race, they did so through pretextual phrases such as "keeping the community together".

146. The United States Census reports the following racial demographics for Hillsborough County: 18.5% African American, 30.5% Hispanic, 46% White non-Hispanic.

147. The county is majority African-American and Hispanic, yet the majority of the School Board seats went to White candidates.

148. The School Board achieved this result by diminishing the influence of African-American and Hispanic voters by packing them into their own respective districts.

149. Racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.". Shaw v. Reno, 509 U.S. 630, 650 (1993).

150. At the time of the last election, Mr. Warner resided in White District 2 and had his vote diluted. He currently resides in District 3, and again has his voted diluted.

151. The School Board ensured that a Hispanic board member was not even elected to the Hispanic district they just packed, by rejecting any maps that placed Member Combs' home outside of District 1 so that she would continue to be eligible to run for the District 1 seat. Member Combs is not Hispanic.

### 4.   COMPACTNESS

#### A.   POLSY-POPPER MEASURE

152. The Polsy-Popper score is a commonly used measure of compactness for voting maps that compares the boundary shape to a square that has the same perimeter as the boundary by calculating the area ratio between the two. It quantifies how contorted the boundary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$PPM = \frac{4 * area(B)}{perimiter(B)^2} \tag{5}$$

153. None of the five districts are compact as measured by the approximate polsy-popper scores:

District 1: 0.74

District 2: 0.57

District 3: 0.53

District 4: 0.38

District 5: 0.41

#### B.   REOCK MEASURE

154. The Reock score is another commonly used measure of compactness for voting maps that compares a boundary shape to the minimum-bounding square by calculating the ratio of the boundaries occupied space within that minimum-bound square. It quantifies how stretched out the bound-

ary is.  It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$RM = \frac{area(B)}{max(width(B), height(B))^2} \qquad (6)$$

155. None of the five districts are compact as measured by the approximate Reock scores:

District 1: 0.64

District 2: 0.69

District 3: 0.67

District 4: 0.47

District 5: 0.50

## INTENT

156. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

157. The fact that the school board explicitly used race to draw the district maps to segregate.

158. The fact that the HCSB has a history of refusing to desegregate.

159. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

160. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

161. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

162. The affluent white residents of *south tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

163. Those affluent white *south tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

164. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:



**Tim McGaughey** <span>Author</span> <span>Group expert</span>
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d                                                     3

165. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *south tampa* residents:



166. School Board Member Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

167. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## STACY HAHN'S STATEMENTS

168. On or about January 11, 2023, Stacy Hahn gave a news interview with New Channel 8 WFLA[5].

169. This interview was broadcast on public television as well as printed on WFLA's website.

170. Stacy Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

171. During this interview, Stacy Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

172. There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

173. "District 2" is the racially gerrymandered Caucasian district that Stacy Hahn represents. "District 2"'s population is predominantly white.

174. District 1's population is predominantly minority and borders District 2 to the north.

175. Stacy Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

176. Stacy Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[5] *see* https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

# Disparate Impact

177. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

178. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

179. This further harms the minority communities throughout Hillsborough County because their property values are decreased, while the property values increase in the segregated white neighborhoods.

# Counts

## Count I

### 42 U.S. Code § 3601 et seq: Disparate Treatment

180. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

181. Defendant intended to unlawfully segregate students by race and/or color through *south tampa* school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## Count II

### 42 U.S. Code § 3601 et seq: Disparate Impact

182. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

183. Defendant's school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## COUNT III
### *20 U.S. Code § 1703(c): Closest School*

184. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

185. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

186. Mr. Warner's home is 1.6 miles from Carrollwood K-8.

187. Mr. Warner's home is 2.3 miles from Adams Middle School.

188. Adams Middle School is a failing school with a D-rating from the Florida Department of Education ("FDOE").

189. Adams Middle School's student demographics are 29.65% black, 55.13% hispanic, and 7.05% white according to the FDOE.

190.  Carrollwood K-8 is a good school with an A-rating from the FDOE.

191.  Carrollwood K-8's student demographics are 7.56% black, 39.56% hispanic, and 41.78% white according to the FDOE.

192.  Defendant created a greater degree of segregation when they assigned the African-American Plaintiff to further away minority school (Adams) despite there being a closer white school (Carrollwood K-8).

193.  The School Board Denied Mr.  Warner an educational opportunity by assigning his sixth grade child J.W. to Adams Middle School for the 2023-2024 school year, instead of Carrollwood K-8.

## COUNT IV

### *42 U.S.C. § 2000d et seq: Disparate Treatment*

194.  Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

195.  42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

196.  Defendant receives federal financial assistance to fund it's school programs.

197.  Defendant intentionally discriminates on the basis of race and/or color in it's school assignment boundaries.

## COUNT V

*42 U.S.C. § 2000d et seq: Disparate Impact*

198. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

199. 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

200. Defendant receives federal financial assistance to fund it's school programs.

201. Defendant's school assignment boundaries have a discriminatory effect on the basis of race or color.

# Count VI
### *42 U.S.C. § 1983: Due Process*

202. Plaintiff re-alleges and incorporates by reference ¶ 1 - 9

203. The School Board opened a school choice application window on July 10, 2023.

204. That same day, Mr. Warner logged into the School Board's school choice application website to apply for School Choice for his child J.W. to get into Carrollwood K-8 and another school.

205. The website presented a list of schools to Mr. Warner to choose from, however Carrollwood K-8 was not on the list so he was unable to apply for that school.

206. However, the other school was available so Mr. Warner applied to it.

207. Mr. Warner then tried to apply for "Hardship" to get into Carrollwood K-8, however he was prevented from doing so unless he withdrew his application to the other school.

208. While Mr. Warner might assume the School Board believe the school is over capacity and decided not to list it, Mr. Warner still has a right under Florida law to apply to a) get a response that the school is over capacity and b) be put on a waiting list to be notified if capacity becomes available throughout the year.

209. Additionally, even if Mr. Warner was able to apply for Hardship, the criteria for being accepted is arbitrary and capricious. There are no requirements or procedures for being accepted to hardship, the School Board just wants you to submit a 2000 character essay explaining "a compelling reason for this hardship request".

210. Florida is a controlled open enrollment state: School Boards have a non-discretionary ministerial duty to "allow a parent from any school district in the state ... to enroll his or her child in ... any public school ... that has not reached capacity in the district ... The school district ... shall accept the student, pursuant to that school district's or charter school's controlled open enrollment process"[6].

211. Mr. Warner have a clearly established right to enroll in any public school that is below capacity. *see* Fla. Stat. § 1014.04, Fla. Stat. § 1002.20, Fla. Stat. § 1002.31, and the fundamental right of parents to direct the care, upbringing, and education of their children under Fourteenth Amendment of the United States Constitution.

212. Defendant has deprived Mr. Warner of those clearly established rights and liberties through their actions complained of herein.

---

[6] *see* Fla. Stat. § 1002.31(2)(a)

213. The school board has no "open enrollment process" for Carrollwood K-8.

214. The school board has implemented a written policy[7] of blanket refusing all general choice applications for Carrollwood K-8 in violation of Fla. Stat. § 1002.31.

215. Mr. Warner is not eligible to apply for choice hardship because Carrollwood K-8 is not capped / at-capacity. *see* Exhibit J.

216. Mr. Warner has no procedural way to apply for general choice admission into Carrollwood K-8 for the 2023-2024 school year.

217. The expanded Carrollwood K-8 has available capacity for the 2023-2024 school year. *see* Exhibit J pp. 2 - 3.

218. Mr. Warner has exhausted all administrative remedies, though that is not required to bring a 1983 due process claim. *see* Monroe v. Pape.


# COUNT VII

### *42 U.S.C. § 1983: Equal Protections - District Map Gerrymandering*

219. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

220. Plaintiff re-alleges and incorporates by reference ¶ 20 - 22

221. Plaintiff re-alleges and incorporates by reference ¶ 119 - 155

222. The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

---

[7]"General school choice options will be closed for Carrollwood PK-8". *see* Exhibit J pp. 3

223. Under the Fourteenth Amendment's Equal Protection Clause, a racial classi-
fication is prohibited unless it is narrowly tailored to serve a compelling state
interest.

224. As alleged in detail above, race was the predominant factor in the design of
all five Miami City Commission districts. Race predominated over all other
redistricting criteria when each of these districts was drawn.

225. Thee use of race as the predominant factor in creating the districts was not
narrowly tailored to advance any compelling state interests, including compli-
ance with the Voting Rights Act.

226. Map-drawing in which race predominates, subordinating traditional, race-neutral
redistricting considerations to racial decision-making, is presumptively in-
valid under the Equal Protection Clause.

227. Consequently, the districts do not survive strict scrutiny.

228. Therefore, the districts violate Mr. Warner's rights under the Equal Protec-
tion Clause and 42 U.S.C. § 1983.


# Count VIII

*Art. IX, § 1(a), Fla. Const.: Free Public Education*

229. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

230. Art. IX, § 1(a), Fla. Const. states:

   "Adequate provision shall be made by law for a ... high quality system of free public
   schools"

231. The School Board's manipulation of housing property values results in an
additional fee that parents must pay to attend certain public schools in the

form of higher rents or higher home sales prices. The fee that must be paid is the difference between the manipulated housing prices minus the price that housing would be but-for the School Board's pricing manipulation.

# Count IX

### *Art. IX, § 1(a), Fla. Const.: Uniform Public Schools*

232. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

233. Plaintiff re-alleges and incorporates by reference ¶ 20 - 79

234. Art. IX, § 1(a), Fla. Const. states:

> "Adequate provision shall be made by law for a uniform, [and] efficient ... system of free public schools"

235. School attendance boundaries are promulgated via administrative law.

236. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence is neither uniform nor efficient regardless if such assignments have a racially discriminatory effect.

237. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence that exacerbates racial segregation is neither uniform nor efficient.

# III   RELIEF

Plaintiff respectfully requests that this court:

## SCHOOL ASSIGNMENT MAP CHALLENGES

1. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Fair Housing Act; and

2. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Title VI of the Civil Rights Act; and

3. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Art. IX, § 1 of the Florida Constitution ; and

4. enter a permanent injunction enjoining Defendant from promulgating any school assignment boundary maps complained of herein that violate the previous declarations; and

5. enter an order directing Defendant to redraw it's school assignment boundaries that complies with all federal, state laws, and this court's orders; and

6. award Plaintiff compensatory damages and punitive damages; and

7. award Plaintiff costs of suit and reasonable attorney fees; and

8. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## EEOA CHALLENGES

9. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the EEOA; and

10. enter an order directing Defendant to redraw the Carrollwood K-8 assignment boundary map to be in compliance with the EEOA; and

11. enter an order directing Defendant to admit J.W. to Carrollwood K-8 for the 2023-2024 school year in compliance with the EEOA; and

12. award to the Plaintiff costs of suit and reasonable attorney fees; and

13. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## Due Process

14. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Due Process Clause; and

15. enter an order directing Defendant to admit J.W. to Carrollwood K-8; and

16. award to the Plaintiff costs of suit and reasonable attorney fees; and

17. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## District Map Challenges

18. declare the actions, omissions, policies, and procedures of the School Board, complained of herein to be in violation of the Equal Protections Clause; and

19. declare the 2022 school board election invalid with regards to Districts 2 and 4 seats; and

20. enter an order directing Defendant to hold a special election; and

21. award Plaintiff nominal damages; and

22. award Plaintiff costs of suit and reasonable attorney fees; and

23. grant whatever additional relief this Court deems appropriate and just under the circumstances.

# DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

# UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

7-10-2023

Date

Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

# TAB 45

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BLAKE WARNER,

     Plaintiffs,

v.                            Case No. 8:23-cv-00181-SDM-JSS

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY
FLORIDA,

     Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendant, The School Board of Hillsborough County, Florida (the "School Board"), moves to dismiss Plaintiff Blake Warner's Second Amended Verified Complaint (Doc. 38) (the "SAC" or "Second Amended Complaint").

## I.    INTRODUCTION

This Court should dismiss Plaintiff's Second Amended Complaint because it (1) is barred by the parties' prior settlement agreement; (2) fails to state a claim for relief; and (3) violates this Court's prior Order. *See* Doc. 37 (the "Order") (explaining Plaintiff Mr. Warner could not appear *pro se* for claims brough on behalf of his minor child) (citing *FuQua v. Massey*, 615 F. App'x 611, 612 (11th Cir. 215)).

Plaintiff's Second Amended Complaint, Plaintiff's third iteration of these claims—not including the related case Plaintiff filed, assigned Case No. 8:23-cv-01029 (the "Second Case")—alleges "unlawful manipulation of housing values . . . through operating a segregated school system" and the denial of "due process with the school choice application process." SAC, p.1.

Although the crux of Plaintiff's allegations have not changed, Plaintiff's Second Amended Complaint now includes nine counts: Counts I and II under 42 U.S.C § 3601, *et seq.* (the "Fair Housing Act Claims"); Count III under 20 U.S.C. § 1703(c) (the "EEOA Claim"); Counts IV and V under 42 U.S.C. § 2000d *et seq.* (the "§ 2000d Claims"); Counts VI and VII under 42 U.S.C. § 1983 (the "§ 1983 Claims") and Counts VIII and IX under Art. IX, § 1(a) Fla. Const. (the "FL Constitution Claims"). The School Board requests dismissal of this repeatedly amended pleading with prejudice. *See Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) (explaining district courts do not have to give more than one opportunity to amend a complaint, and "dismissal with prejudice" is the "default" under Rule 12(b)(6)).

## II.   STANDARD FOR DETERMINATION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Boyd v. Warden, Holman*

*Correctional Facility*, 856 F.3d 853, 864 (11th Cir. 2017). Although the complaint does not need to contain "detailed factual allegations," it must contain enough facts to show the complainant is entitled to relief on more than a "speculative level." *Twombly*, 550 U.S. at 555; *see* Fed. R. Civ. P. 8(a)(2).

Applying these principles requires a two-step approach. *Iqbal*, 556 U.S. at 678–79. First, any threadbare legal conclusions are not entitled to any assumptions of truth, but instead should be eliminated from the complaint. *Id.* Second, any well-pleaded factual allegations should be tested for whether they "plausibly" show an entitlement to relief. *Id.* at 679–80. Courts also recognize that where an exhibit attached to a complaint contradicts the allegations of the complaint, the exhibit controls. *Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023) (citing *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016)).

## III.   MEMORANDUM OF LAW

### A.   Plaintiff's settlement with the School Board bars the claims in the Second Amended Complaint.

Plaintiff previously entered into a settlement agreement with the School Board, in which Plaintiff (and his minor child, J.W.) released all claims relating to J.W.'s education. Doc. 30-1, Ex. 1 (the "Settlement Agreement"), at 2 ¶ 5.[1]

---

[1]   Plaintiff agrees this Court may consider the Settlement Agreement. This Court may consider the Settlement Agreement without converting this motion to dismiss into one for summary judgment because the Settlement Agreement is (1) central to the plaintiff's claim and (2) undisputed. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (affirming order

Under the terms of this Settlement Agreement, Plaintiff "knowingly and voluntarily release[d] and discharge[d] the School Board and District from any and all claims, demands, causes of actions, complaints or charges, known or unknown, specifically related to [his child's] education, services, and educational program in the District through [March 15, 2022]." *Id.*

Although Plaintiff's Second Amended Complaint now spans over fifty pages and 237 paragraphs, *see generally* Doc. 38, he has never rebutted the release defense arising from his Settlement Agreement. Specifically, he has never asserted the boundaries relating to his home and to his child (J.W.) have changed since he signed the Settlement Agreement. *See generally id.*; Doc. 34, at 4. And Plaintiff has never explained how his Fair Housing Act claims are anything but an indirect effort to circumvent the Settlement Agreement. *E.g.*, Doc. 38 ¶¶ 8-9. In short, each of Plaintiff's claims relates to his child's education—he complains about the district boundaries, and those district boundaries directly relate to his child's schooling and services. As a result, the School Board requests dismissal of the Second Amended Complaint.

## B.   Plaintiff's Second Amended Complaint does not cure the deficiencies cited in the Court's prior Order.

This Court dismissed Plaintiff's Second Case, holding Plaintiff Warner could not proceed *pro se* on claims belonging to his minor child. *See* Order at 3–

---

granting motion to dismiss, where motion attached contract between the parties) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).

4 (quoting *FuQua v. Massey*, 615 Fed. App'x 611, 612 (11th Cir. 2015)) ("[P]arents are not attorneys may not bring a *pro se* action on their child's behalf."). The Court recognized there is a limited exception to this general rule under the Individuals with Disabilities Education Act (IDEA). *See* Order (citing *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 526 (2007)). But that exception does not apply to any of Plaintiff's claims, because it flows directly from the statutory scheme under IDEA.

In the Second Case, Plaintiff attempted to sue the School Board on behalf of his child, asserting claims under the Equal Educational Opportunities Act (like Count III here), 42 U.S.C. § 1983 (like Counts VI and VII here), and "mandamus." *Compare* Second Case Doc. 19, ¶¶ 25-26, *with* Doc. 38 (Counts III, VI and VII in this case). Plaintiff's Count III is functionally identical to his Equal Educational Opportunities Act claim the Court already dismissed as being an improper attempt to act as an unlicensed attorney for his child. Order at 3–4; Doc. 38 ¶¶ 184–93; Second Case, Doc. 19 ¶¶ 22–30. Similarly, Plaintiff's Count IV (42 U.S.C. § 2000d) is an allegation on his child's behalf, identical in all substantive respects to his Equal Educational Opportunities Act claim. *Compare* Doc. 38 ¶ 192 (claiming the school boundaries are discriminatory for purposes of the Equal Educational Opportunities Act), *with*

Doc. 38 ¶ 197 (claiming the school boundaries are discriminatory for purposes of 42 U.S.C. § 2000d).[2]

Plaintiff's § 1983 Claims (Counts VI and VIII, ¶¶ 202–28) should be dismissed for this same reason. Each arises from allegations related to his child's education, not the education of Mr. Warner. *See* Doc. 38 ¶ 211 (asserting the claim based on the alleged "fundamental right of parents to direct the care, upbringing, and education of their children under the Fourteenth Amendment of the United States Constitution"); *see also*, *id.* at ¶¶ 119–21, 220–21 (claiming the school boundaries are discriminatory, just like under the Equal Educational Opportunities Act claim, and explicitly adopting those allegations into the second § 1983 claim).

Plaintiff's FL Constitution Claims (Counts VIII and IX, ¶¶ 229–37) should also be dismissed for this same reason. *Id.* ¶¶ 72–79, 229, 233 (incorporating allegations relating to his child's education and purported discrimination, similar to the previously dismissed EEOA claim).

To be clear, the School Board maintains that there are additional reasons to dismiss these claims, as outlined below. But the failure to comply with the prior order itself and underlying reasoning of that order warrants dismissal.

---

[2]   During the conferral process, Plaintiff agreed to dismiss Count V of the Second Amended Complaint, which was a disparate impact theory under 42 U.S.C. § 2000d.

71757728;3

**C.     The Fair Housing Act does not apply to the School Board's alleged actions.**

This Court should dismiss Counts I (disparate treatment) and II (disparate impact) under the Fair Housing Act because the act does not apply to the School Board. *See* Doc. 34, at 5–15 (explaining the Fair housing Act does not apply to the School Board's purported activities in this situation). The School Board is a constitutional entity in Florida tasked with "operat[ing], control[ling], and supervis[ing] all free public schools within the school district." Fla. Const. art. IX, § 4. In contrast, the Fair Housing Act applies to (1) sales of homes; (2) rentals of homes; (3) advertisements regarding homes for sale or rent; (4) the terms, conditions, or privileges of home sales or rentals; or (5) making a home unavailable. 42 U.S.C. § 3604. Plaintiff's entire theory of supposed liability is his assertion that the School Board assigns schools to "pric[e] minorities out of certain neighborhoods . . . ." Doc. 38 ¶¶ 181, 183.

But by Plaintiff's logic, nearly every action by every party could be swept into the Fair Housing Act, and courts have uniformly rejected that approach. For example, if a company builds a new office building in a suburb, the availability of those jobs is likely going to affect housing prices in the area. Similarly, improving a park or other community space in the area might *affect* housing prices, thereby creating Fair Housing Act liability under Plaintiff's theory. Such an expansive reading of the Fair Housing Act is unsupported.

Rather, courts emphasize that the Fair Housing Act is concerned with activities directly relating to the sale or rental of dwellings. *See, e.g.*, *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1233 (M.D. Fla. 2003)[3] (emphasis added) ("This Court need not reach the question of whether Plaintiffs needed to be evicted to violate Section 3604(b), because this Court concludes that Section 3604(b) only prohibits the discriminatory provision of services and facilities *in connection with a sale of a dwelling*."); *see also Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 329 (7th Cir. 2004) (dismissing complaint involving services from a homeowners association); *Clifton Terrace Associates, Ltd. V. United Technologies Corp.*, 929 F. 2d 714, 719–20 (D.C. Cir. 1991) (affirming dismissal of Fair Housing Act claims against a company that merely repaired elevators at a residential building); *Roy v. Board of County Com'rs Walton County, Fla.*, No. 3:06-cv-00095, 2007 WL 3345352 (N.D. Fla. Nov. 9, 2007) (quoting *Edwards v. Media Borough Council*, 430 F. Supp. 2d 445, 452 n.14 (E.D. Pa. 2006)) (noting that where the Fair Housing Act discusses "services,"

---

[3]   "After the *Gourlay* decision was issued, the parties settled and the court withdrew the opinion. [*See* 2003 WL 22149660 (M.D. Fla. Sept. 16, 2003).] The order's reasoning and analysis, however, remain instructive and persuasive." *Schwarz v. Villages Charter Sch., Inc.*, No. 5:12-cv-00177, 2014 WL 12623013, at *6 (M.D. Fla. May 23, 2014) (recommending dismissal of Fair Housing Act claim for handicap discrimination).

71757728;3

those services "must relate to the sale of a dwelling, and not just ownership of the dwelling").

Additionally, the language from the *Clifton Terrace* decision is instructive regarding the limits of the Fair Housing Act: "The fact that . . . a discriminatory practice could have an impact on the use and enjoyment of residential property rights, however, does not necessarily mean that it will also be redressable under Title VIII." 929 F.2d at 720; *see also Edwards*, 430 F. Supp. 2d at 451 ("The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing."). There is no allegation here that the School Board took any direct actions with respect to housing; at most, its actions are alleged only to have had an indirect effect just as might be the case with a transportation agency widening a road.

Contrast Plaintiff's allegations with the types of situations that *might* lead to a governmental entity being liable under the Fair Housing Act. For example, 24 C.F.R. § 100.70(d)(5) (with emphasis added) prohibits "[e]nacting or implementing *land-use* rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or *deny housing opportunities* or otherwise make *unavailable or deny dwellings* to persons because of race, color, religion, sex, handicap, familial status, or national origin." And other decisions have likewise rejected efforts to say that simply *affecting* house prices creates liability.

9

For example, the Eastern District of Michigan faced a situation in which a group of people living in a community opposed a proposed group home and "began to engage in activities designed to prevent the institution of the group home," such as picketing, arranging for media coverage, and threatening boycotts. *Michigan Protection and Advocacy Service, Inc. v. Babin*, 799 F. Supp. 695, 701 (E.D. Mich. 1992). The complaint asserted several different claims, *id.* at 703-04, including a theory of expanding the Fair Housing Act claims to enclose those who "*indirectly* deprive a protected individual of housing." *Id.* 711-12 (emphasis added). The court rejected this theory, stating:

> The second part of § 3604(f)(1) applies to those who "otherwise make unavailable" a dwelling. Although this phrase has been referred to as a "catchall," Schwemm § 13.4(1), its scope is not limitless. By its terms, it is limited to those individuals who are in a position to make a dwelling unavailable. *To be in this position, a person must be able to exercise influence over or control the disposition of the dwelling.* Without this power, the person might be able to annoy a prospective tenant, but would be unable to make a dwelling unavailable.
>
> . . . .
>
> This Court agrees with the reasoning and conclusions of the *Devereux* and *Steptoe* courts. *Section 3604(f)(1) covers only those actors who are in a position directly to make a dwelling unavailable—that is, a seller, his agent, or another person or entity integrally involved in the sale or financing of real estate. An expansion of the statute beyond this limit would contravene the language of § 3604(f)(1) as well as common sense.* Because the Neighbors had no control over the Home,

> they could not and did not directly deprive Plaintiffs of
> housing. Therefore, they are not covered by
> § 3604(f)(1). The Court rejects all § 3604(f)(1) claims
> against the Neighbors.

*Id.* at 711–14 (emphasis added).

This case represents the same type of unwarranted invitation for the Court to dramatically expand the Fair Housing Act well beyond its language, Congress's intent, and common sense. *Id.* at 714. The Court should decline that invitation. Plaintiff's efforts to stretch the Fair Housing Act through his first and second counts are unpersuasive, and the School Board requests the Court dismiss those counts in their entirety.

## D. Plaintiff fails to plead a claim under the EEOA.

In his prior effort to bring his Equal Educational Opportunities Act claim, Plaintiff acknowledged the School Board assigned his home not based on race or any other protected classes, but rather by his neutral "home address." Second Case, Doc. 1 ¶ 8. Recognizing this admission is fatal to his claim, Plaintiff omits it in this action despite including it in a judicial admission previously. *Cf., e.g., Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 718–19 (11th Cir. 2011) (internal citations omitted) (noting admissions in pleadings are "proof possessing the highest possible probative value"). In other words, Plaintiff acknowledged there was *no* decision based on the protected classes listed in the Equal Educational Opportunities Act.

11

The case law interpreting Section 1703(c) of the Equal Educational Opportunities Act supports this conclusion. In *U.S. v. Hinds County School Board*, the Fifth Circuit (which later split into the Eleventh Circuit) noted the definition of "segregation" in 20 U.S.C. § 1720(c) as being the operation of schools "in which students are wholly or substantially separated . . . on the basis of race, color, sex, or national origin . . . ." 560 F.2d 619, 624 (5th Cir. 1977).[4] The court then elaborated: "Thus, among the schools within a system, Congress intended to prohibit the *assignment of students on the basis of race, color, sex, or national origin.*" *Id.* The School Board does *not* do so, and Plaintiffs' allegations are insufficient to state a claim. Again, Plaintiff voluntarily chose to buy his house despite knowing it was assigned to Adams Middle School and despite having previously released all claims against the School Board as of May 2022, at which time his home had the same assignment as it does now. *Supra* Section III.A.

Moreover, Plaintiff does *not* allege the boundaries are materially different than those previously approved when the district was declared unified. *See Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927 (11th Cir. 2001); *infra* Section III.A. And even if the boundaries

---

[4]   *See, e.g.*, *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (adopting pre-1981 decisions of the Fifth Circuit as binding for precedential purposes in the Eleventh Circuit).

have been modified, Plaintiff does *not* allege there have been material changes to the assignment for his residence, which is the predicate for his claim. Moreover, Plaintiff still cannot overcome the Court's order dismissing the EEOA Claim in the related case. *See generally* Order (dismissing Plaintiff's claims and recognizing he cannot act as an unlicensed attorney); *supra* Section III.B. As a result, the School Board requests dismissal.

**E.    During the conferral process, Plaintiff agreed to dismiss Count V because no private right of action is available for purported disparate impact under 42 U.S.C. § 2000d.**

Private rights of action are unavailable for disparate impact theories under 42 U.S.C. § 2000d, as the statute prohibits only *intentional* discrimination, and the disparate impact prohibitions flow from regulations that do not carry a private right of action. *Alexander v. Sandoval*, 532 U.S. 275, 284, 291, 293 (2001). During the parties' conferral, Plaintiff agreed to abandon this claim. As a result, the School Board requests dismissal of Count V.

**F.    Plaintiff cannot use § 1983 to sue under Florida law. Regardless, the School Board's choice processes comply any Due Process requirements.**

Plaintiff's Section 1983 due process claim is an attempt to enforce what he claims is Florida law, challenging a hardship application requirement he deems "arbitrary and capricious." Doc. 38 ¶ 209 (recognizing Plaintiff could submit a hardship application even to an over-capacity school as part of the school choice process, requiring a written submission explaining the basis for

his claimed hardship, which he feels is "arbitrary and capricious"). Section 1983 applies to violations of "the Constitution and laws," and that language refers to the Constitution and laws of the *United States*.[5] *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) (emphasis added) ("Section 1983 does <u>not</u> create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a *federal right*.") (emphasis added). As the Northern District of Florida explained in *Dean v. Escambia County*, "[i]t is well settled that § 1983 imposes liability only for violations of rights protected by the Constitution and laws of the United States. . . . Therefore, mere allegations of state law infractions are insufficient to support a § 1983 claim." No. 3:05-cv-00029, 2005 WL 927387, at *8 (N.D. Fla. Apr. 20, 2005) (citing numerous cases from around the country for the proposition, including *Knight* from the Eleventh Circuit).

Moreover, Florida law has been careful *not* to make education a "fundamental right," given concerns over this exact type of litigation. As the Florida Supreme Court explained in *Bush v. Holmes*:

> The "fundamental **value**" language, new to the constitution, was codified from the language taken from the Florida Supreme Court decision in *Coalition for Adequacy and Fairness in School Funding, Inc. v.*

---

[5]   Section 1983 further confirms this interpretation by noting in its final sentence that "any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." In other words, Section 1983 is not concerned with local laws.

71757728;3

> *Chiles*, 680 So.2d 400 (Fla.1996). Early proposals presented before the Constitution Revision Commission framed education in terms of being a "fundamental **right**." In response to concerns of commissioners that the state might become liable for every individual's dissatisfaction with the education system, the term "fundamental **value**" was substituted.

919 So. 2d 392, 403–04 (Fla. 2006) (emphasis added).

Similarly, the three statutory sections on which Plaintiff attempts to rely in paragraph 211 of the Second Amended Complaint—Sections 1014.04, 1002.20, and 1002.31—do not create a fundamental right to school choice. Section 1014.04 outlines general parental rights (including rights unrelated to education) and does *not* state anything about school choice. Rather, it merely notes parents have rights to do activities such as enroll their children in public schools, make health care decisions for their children, and the right to receive notification of any criminal offenses for which their children might be suspects. Fla. Stat. § 1014.04(1).

Likewise, Section 1002.20 does not create any legitimate right as opposed to a mere expectancy. Its language about school choice is in Subsection (6), which states: "Parents of public school students *may* seek any public educational school choice options that are applicable and available to students throughout the state." Fla. Stat. § 1002.20(6) (emphasis added). In

71757728;3

other words, parents *may* seek school choice, but there is nothing under that statute obligating schools to accept those children to a specific school.

Finally, Section 1002.31 is the most on-point statute for purposes of school choice. But even its language notes there is no guaranteed right to school choice. For example, Subsection (1) notes that "parents' indicated preferential educational choice" is merely "a significant factor." And even the language in paragraph (2)(a) that Plaintiffs cite about schools accepting applications is still subject to the school's capacity, including its long-term plans and projections. Fla. Stat. § 1002.31(2)(b). The statute further notes that merely applying for school choice is not a guaranteed result, given that schools must also give preferential treatment to classes of children such as children of military personnel. Fla. Stat. § 1002.31(2)(c). In other words, there is still a process to which the School Board must adhere, and Plaintiff cannot use Section 1983 to claim some unhindered right to force his child into a specific school.

Regardless, Plaintiff's own filings note that the general processes have remained open to him. His preliminary injunction motion admits he submitted a school choice application to a preferred school. Doc. 40, at 8 n.8. His primary complaint appears to be with the requirement that he submit a hardship application to have his child admitted into a school with capacity concerns, which he describes as "arbitrary and capricious." Doc. 38 ¶ 209; *see also* Doc. 38-9, at 3 (noting the projected growth for Carrollwood and potential

16

capacity concerns); *Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023) (citing *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016)) (recognizing exhibits attached to a complaint control over contradictory allegations). Plaintiff's judicial admissions demonstrate the School Board is acting in an entirely rational manner, asking for applicants to explain the bases of their claimed hardships so it can evaluate them. *Id.* at ¶¶ 208–09. Plaintiff did not pursue a hardship application but applied to another school. *Id.* 205-206. Accordingly, this Court should dismiss Count VI.

## G. Plaintiff mistakes the applicable standard for Equal Protection review.

Plaintiff's equal protection claim under 42 U.S.C. § 1983 is founded on his mistaken belief that "strict scrutiny" is the applicable standard. Doc. 38 ¶ 227. *But see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (noting legal conclusions in complaints are not entitled to deference on a motion to dismiss). Strict scrutiny applies in two possible situations: (1) a law has a substantial impact on a fundamental right or (2) a law draws explicitly racial classifications. *F.C.C. v. Beach Comms., Inc.*, 508 U.S. 307, 314 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the

classification."). If strict scrutiny does not apply, and the rational basis test applies, the Supreme Court has articulated several important principles:

1. Governmental acts come "bearing a strong presumption of validity";

2. Plaintiffs attacking the rationality of a legislative classification have the burden of negating every conceivable basis that might support it; and

3. It is irrelevant whether the conceived reason for a challenged law in fact motivated the governmental body.

*See id.* at 314–15 (citing numerous cases for these principles).

As explained above in Section III.F of this motion, the Florida public and legislature has already taken steps to eliminate "fundamental right" language with respect to educational decisions, given concerns over these very types of lawsuits being used to circumvent the political processes. *See, e.g.*, *Bush v. Holmes*, 919 So. 2d 392, 403–04 (Fla. 2006) ("In response to concerns of commissioners that the state might become liable for every individual's dissatisfaction with the education system, the term "fundamental value" was substituted."). And likewise, the U.S. Supreme Court has cautioned against stretching any perceived federal rights regarding education too far:

> In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, the Court held that the liberty protected by the Due Process Clause of the Fourteenth Amendment includes the right "to . . . *bring up children,*" . . . and, concomitantly, the *right to send one's children to a private school* that offers specialized training in that case, instruction in the German language. In *Pierce v. Society of Sisters*, 268 U.S. 510,

> 45 S.Ct. 571, 69 L.Ed. 1070, the Court applied "the doctrine of *Meyer v. Nebraska*," *Id.*, at 534, 45 S.Ct., at 573, to hold unconstitutional an Oregon law requiring the parent, guardian, or other person having custody of a child between 8 and 16 years of age to send that child to public school on pain of criminal liability. . . . In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, the Court stressed the limited scope of Pierce, pointing out that it lent *"no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society" but rather "held simply that while a State may posit (educational) standards, it may not pre-empt the educational process by requiring children to attend public schools." Id.*, at 239, 92 S.Ct., at 1545 (White, J., concurring). And in *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723, *the Court once again stressed the "limited scope of Pierce," Id., at 461, 93 S.Ct., at 2809, which simply "affirmed the right of private schools to exist and to operate . . . ." Id.*, at 462, 93 S.Ct., at 2809.

*Runyon v. McCrary*, 427 U.S. 160, 176–77 (1976) (emphasis added).

In other words, the federal constitutional cases regarding children's educations deal with the right to send children to *private* school rather than *public* school. And *Runyon* itself simply held that federal anti-discrimination laws do not violate the constitution's freedom of association or any amorphous right to control education just because they do not allow segregated schools. *Id.*

The circuit courts have reached the same conclusion. For example, in *Stevenson v. Blytheville School District #5*, the Eighth Circuit offered a lengthy opinion noting that "neither [of the Supreme Court's decisions in] *Meyer*,

71757728;3

*Pierce*, nor any other relevant precedent support the proposition that a parent's ability to choose where his or her child is educated *within the public school system* is a fundamental right or liberty." 800 F.3d 955, 967 (8th Cir. 2015) (emphasis in original, internal quotes omitted).

Likewise, the *Stevenson* court rejected the proposition that a general state school choice law created a property interest enforceable through the constitution: "Therefore, under [the Supreme Court's] *Goss* [decision], the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." *Id.* at 968 (quoting *Mazevski v. Horseheads Cent. Sch. Dist.*, 950 F. Supp. 69, 72 (W.D.N.Y. 1997); *see also Anderson v. Hillsborough Cty. Sch. Bd.*, 390 F. App'x 902, 903 (11th Cir. 2010) ("Florida law does not, however, create a right to attend a high school of your choice, and this court has never decided that a Florida student has a property or liberty interest in attending a particular high school."). It further noted that laws only create property interests where they create "a legitimate claim to entitlement as opposed to a mere subjective expectancy." *Stevenson*, 800 F.3d at 968 (quoting *Snaza v. City of Saint Paul*, 548 F.3d 1178, 1182–83 (8th Cir. 1997)). As noted above, Florida law does not go that far.

Turning then to the second option for applying strict scrutiny under an Equal Protection challenge, Plaintiff does not cite to any lines drawn using

explicit racial distinctions or other protected classes. Rather, he offers only his own conclusory theories that race was "the predominant factor," but then in the very same complaint notes that the states reasons for drawing boundaries were "keeping the community together" (*i.e.*, ensuring continuity of friend groups and education. Doc. 38 ¶¶ 145, 221, 224. While the School Board maintains that drawing boundaries is a highly complex endeavor requiring multiple considerations, the point is that Plaintiff's own complaint notes the absence of any explicit racial classifications, and in fact legitimate, non-racial reasons for the boundaries.

Accordingly, strict scrutiny does not apply. Rather, the far more deferential rational basis test applies, and by the terms of Plaintiff's own complaint, there is at least one legitimate reason for the lines. Doc. 38 ¶¶ 145, 221; *see also Beach Comms.*, 508 U.S. at 314–15 (outlining the rational basis test and noting when it applies). As a result, the School Board requests dismissal of Count VII.

### H.    Plaintiff fails to state a claim under the Florida Constitution.

This Court should dismiss Counts VIII and IX because Plaintiff cannot state a claim for violation of the Florida Constitution, specifically Article IX, Section 1(a). Doc. 38 ¶¶ 230, 234. The challenged section states:

> Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to

21

> obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.

FLA. CONST. art. IX, § 1(a).

Plaintiff has not stated a claim for violation of this section against himself, but improperly pursues relief, *pro se*, allegedly due to his minor child. Accordingly, both claims fail.

Independently, Plaintiff cannot state a private right of action against the School Board under this section. *See Kunz v. Sch. Bd. of Palm Beach Cty.*, 237 So. 3d 1026, 1027 (Fla. Dist. Ct. App. 2018) (recognizing Article IX, Section 1 does not contain "a method of enforcement" and thus "it does not provide a private right of action to enforce any specific procedure"); *Simon v. Celebration Co.*, 883 So. 2d 826, 831 (Fla. Dist. Ct. App. 2004) (holding that Article IX, Section 1 does not create a private right of action against school boards). As a result, the School Board requests dismissal of Counts VIII and IX.

## IV.   GOOD FAITH CONFERRAL CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for the School Board conferred with Plaintiff. Plaintiff agreed to dismiss Count V (regarding disparate impact under 42 U.S.C. § 2000d). Plaintiff agreed the Court could consider the Settlement Agreement and requested the School Board file an unredacted copy

71757728;3

under seal (which motion to seal will be forthcoming). Otherwise, the parties do not agree on the relief sought.

## V.   CONCLUSION

Plaintiff's latest amended complaint violates the Court's order of dismissal, and independently fails to state a claim on which relief can be granted. Accordingly, the School Board requests the Court grant dismissal under Federal Rule of Civil Procedure 12(b)(6). And given Plaintiff's numerous past amendments, combined with dismissal with prejudice being the "default" under Rule 12(b)(6), the School Board requests the dismissal be with prejudice. *See Eiber Radiology, Inc.*, 673 F. App'x at 929.

Respectfully submitted,

*/s/ Jason L. Margolin*
**Jason L. Margolin, Esq.**
Florida Bar No. 69881
jason.margolin@akerman.com
judy.mcarthur@akerman.com
**Gregg M. Moran, Esq.**
Florida Bar No. 1011060
gregg.moran@akerman.com
ava.hill@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
(813) 223-7333 / Fax: (813) 223-2837
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July 2023, I filed the foregoing using the Court's CM/ECF and served an additional copy on Blake Warner at blake@null3d.com.


/s/ *Jason L. Margolin*
Counsel for Defendant

24

71757728;3

# TAB 49

# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-JSS

# Plaintiff's Response to
# Defendant's Motion to Dismiss

Defendant moved to dismiss Plaintiff's Second Amended Complaint ("SAC") presumably pursuant Rule 12(b)(6). Defendant argues that the court should dismiss the SAC with prejudice because Plaintiff should not be given more than one opportunity and cites unpublished *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) with the summary "explaining district courts do not have to give more than one opportunity to amend a complaint, and "dismissal with prejudice" is the "default" under Rule 12(b)(6)". However this is a gross misrepresentation of the cited case, what *Eiber* really held was:

> "We have never required district courts to grant *counseled plaintiffs* more than one opportunity to amend a deficient complaint, nor have we concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has

failed to cure a deficient pleading after having been offered ample opportunity to do so." *Id* at \*11 (11th Cir. Dec. 20, 2016) (emphasis mine)

In any event, the claims presented in the SAC have never been dismissed on the merits, each amendment was done either as a matter of right, consent of the parties, or by the court for the practical purpose of consolidating actions. In *Eiber*, the Plaintiff's attorney was given an opportunity to cure a procedural defect and they failed to do so. There are no allegations that Mr. Warner failed to cure any defects when given an opportunity to do so by the Court, and even if there were, *pro se* Plaintiffs are given more leniency in this regard than counseled Plaintiffs.

*Pro se* complaints are to be liberally construed. *see* Alba v. Montford, 517 F.3d 1249, 1252 (11th Cir. 2008).

# I   Standards

## 1.   Plaintiff Need Only Plead a Prima Facie Case at the Pleading Stage

"'The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.' *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000)." *Gibson v. JetBlue Airways Corp., No. 20-10943*, at \*8 (11th Cir. Nov. 18, 2021).

"The plaintiff can establish a claim of ... race discrimination through direct evidence or circumstantial evidence. Alvarez, 610 F.3d at 1264. Where a plaintiff supports her § 1981 discrimination claim using circumstantial evidence, we generally apply the McDonnell Douglas burden-shifting framework. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174, 1181 (11th Cir. 2010)." *Id.*

"To evaluate a claim of discrimination under the FHA, we use the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)" *Molina v. Aurora Loan Services, LLC, 635 F. App'x 618*, 13 (11th Cir. 2015).

"To withstand a motion to dismiss, a plaintiff asserting discrimination under the FHA need not allege specific facts establishing a prima facie case. *see* *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Still, in order to avoid

dismissal, a plaintiff's complaint 'must provide enough factual matter (taken as true) to suggest intentional . . . discrimination.' *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (quoting Twombly, 550 U.S. at 556)." *id*

## II   Settlement Release does not Apply

Defendant misrepresents the release as "broad" and "extremely broad", when the plain language only releases claims "specifically related J.W.'s education, services, and educational program" (emphasis mine). The conjunctive "and" means all three must be present which the School Board did not and can not allege.

The release only covers claims that accrued on or before March 15, 2022.

### Count I, II: Fair Housing

These counts are *generally* challenging the assignment of *all* students in *south tampa*, and is thus not "specifically related J.W.'s education, services, and educational program". J.W. is not referenced at all in these counts.

Mr. Warner could bring the exact same claims even if J.W. did not exist, because the claim is not predicated on J.W. at all, but rather the assignment of *all* students in *south tampa* and how those assignments affected property values. Even a childless person could bring the *exact* same claims.

Additionally, the claim did not accrue until Mr. Warner purchased a home in October 2022, well after the date of release.

### Count III, VI: EEOA and School Choice

Defendant raises the nonsensical argument that nothing has changed between the settlement release date and present with regards to the schools assigned to his home, therefore it is released. This argument fails because Mr. Warner and J.W. never resided in *north tampa* during any time periods covered by the release, so it is impossible for the release to cover claims related to J.W.'s assignment to *north*

*tampa* schools.  SAC ¶ 113, 114.  Additionally, the challenged Carrollwood K-8 school boundary was created on May 9, 2023—more than a year after the release date. SAC ¶ 56.

## Count IV: 2000d: Disparate Treatment

This claim alleges that Mr. Warner was denied the benefits of and/or be subjected to discrimination under any program.  To the extent that the release might apply specifically to (or derrived from) J.W., many of the events occurred after the date of release.  For example the Carrollwood K-8 assignment and school choice application accrued after the date of release.

## Count VII: District Voting Map Gerrymandering

The equal protections clause challenge to the District Map is not "specifically related to J.W.'s education".  Every voter in Hillsborough County can vote for School Board members, regardless if they have children attending public school or not, and the claim is derived from Mr. Warner's right to vote, not J.W.'s.  In any event, voting is not related to education *at all*.

## Count VIII, IX

The release does not apply to these counts for the same reasons Counts I - IV do not apply.

## 1.   Release is Unenforceable

In addition to being knowingly and voluntarily signed, a valid agreement also must: (1) offer some sort of consideration in exchange for the waiver of the right to sue; (2) not require the party to waive future rights; and (3) comply with applicable state and federal laws.

## A.   Civil Rights Waiver was not knowingly, voluntarily, and intelligently made

Waiver of civil rights claims are closely scrutinized. *Morey v. McDonald*, CASE NO.: 8:16-cv-3232-T-23AEP, at *6 (M.D. Fla. June 29, 2017) ("The waiver of a Title VII claim is closely scrutinized, and in determining whether a waiver is "knowingly" and "voluntarily" signed, the "totality of the circumstances" are examined. *Puentes v. United Parcel Service, Inc.*, 86 F.3d 196, 198 (11th Cir. 1996)."). Federal Employment discrimination, housing discrimination, and educational discrimination law are all like Clay County kissing cousins[1].

"In determining whether a release was knowingly and voluntarily entered, the factors that guide a court include: the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled." Beadle v. City of Tampa, 42 F.3d 633, 635 (11th Cir. 1995)

The *Beadle* factors challenged here are the lack of consideration given to Mr. Warner in exchange for the release, and the lack of clarity of the agreement with regard to the scope of the release.

## B.   The release lacks clarity of the scope

To the extent that the Court finds that the claims are covered by the release, the release is unenforceable because the scope of the release was not clear and unambiguous to Mr. Warner. The words "specifically related to J.W.'s education..." would be superfluous and meaningless if the court extends that to practically any claim against the School Board by virtue that they always have some connection to J.W.'s education.

---

[1]The Supreme Court and several lower courts have relied on Title VII precedents to interpret Title VIII. *see DiCenso v. H.U.D.*, 96 F.2d 1004, 1008-09 (7th Cir. 1996); *Huntington Branch of the N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), aff'd per curiam, 488 U.S. 15 (1988); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 128889 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978);

The release itself gives examples of the types of claims that the parties expected to be released: "all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services". These are all claims or relief associated with I.D.E.A. and Section 504 litigation which is what the underlying litigation was about. Nothing in the agreement either expresses or implies that the release went beyond I.D.E.A. and Section 504 claims, much less to housing discrimination claims, voting map challenges, and racial discrimination challenges to school assignment maps.

The nonsensical interpretation of the release that Defendant is asking this court to adopt would also preclude Mr. Warner from bringing a premise liability claim against the school board if he had a slip-and-fall at J.W.'s school. It would render the words "specifically related to J.W.'s education" meaningless.

The original draft release prepared by the School Board did contain a broad release for both Mr. Warner and J.W., however Mr. Warner refused to sign it and indicated to the School Board that he was unwilling to release any of his claims, and was only willing to release disability claims related specifically to J.W.'s education. In response, the School Board amended the release to include the phrase "specifically related J.W.'s education, services, and educational program" and then specifically listed out a series of educational disability related claims that the parties intended to release. Discovery is required to flush out the facts related to this, as such release cannot be applied at the 12(b) stage, however the Court is free to rule it does *not apply* based on other arguments presented.

## C.   NO CONSIDERATION GIVEN TO MR. WARNER

All consideration in the agreement was given to Mr. Warner's child, J.W., therefore the release is only enforceable on J.W., *not* Mr. Warner as there is no valid contract with Mr. Warner.

# III   Plaintiff's Second Amended Complaint does not violate the Court's Order

Mr. Warner interprets the Court's order to forbid him from doing the following *pro se*: a) directly representing the child; b) asserting *jus tertii* standing; and c) bringing any of the child's claims as a natural or plenary guardian.

Mr. Warner does not interpret the order from preventing him from raising any claims that are independently his own, regardless if they implicate the rights of his child. To that end, Fla. Stat. § 1014.04 "The Parental Bill of Rights" gives Mr. Warner the independent right to direct the education of his minor child, and the right to apply to enroll his minor child in a public school. Additionally, Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of his child. *see Troxel v. Granville* (2000).

## 1.   Count VI: Due Process

The due process school choice claim (SAC Count VI) fits squarely within these rights given to Mr. Warner.

## 2.   Count III: EEOA

The relevant EEOA provisions read together (emphasis mine):

"An *individual* denied an equal educational opportunity, as defined by this subchapter may institute a civil action" § 1706

"No State shall deny equal educational opportunity to an *individual* on account of his or her race ... by—" § 1703

"the assignment ... of a *student* to a school, other than the one closest to his or her place of residence ..." § 1703(c)

The *individual* is not the same person as *student*. The articles *an* and *a* are indefinite articles which indicates that the identities are not known to the reader. When indefinite articles are used in repetition, they do not refer to the same person.

If the legislature intended for both nouns ("individual" and "student") to refer to the same purpose, they would have omitted the second article:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... to a school, other than the one closest to his or her place of residence ..."

or added the definite article *the*:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... of *the* student to a school, other than the one closest to his or her place of residence ..."

To the extent that there is any ambiguity here, it has long been a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Liberally construing statutory standing here would clearly effectuate the purpose of the EEOA: to eliminate segregation in the public school system.

What practically limits who can bring a 1703(c) claim is Article III standing. Mr. Warner suffered a particularized injury by this assignment in the form diminution of property values, increased transportation costs, and loss of community.

With regards to the "educational opportunity" that Mr. Warner was denied, as argued below, Mr. Warner has a clearly established right under federal and state law to enroll his child in a public school. Unlawfully assigning his child to a different school denies him that educational opportunity.

# IV   THE FAIR HOUSING ACT APPLIES TO THE SCHOOL BOARD'S ALLEGED ACTIONS.

## 1.   PROXIMATE CAUSE

"The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so. *see Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838-839, 116 S. Ct. 1813, 135 L. Ed. 2d 113 (1996); *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207,

224-225, 132 S. Ct. 680, 181 L. Ed. 2d 675, 691 (2012) (Scalia, J., concurring in part and concurring in judgment). Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.

Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118*, 133 (2014)

## 2. History

### *City of Miami v. Bank of Am. Corp.*, No. 1:13-cv-24506-WPD (S.D. Fla. 2013)

On December 13, 2013, the City of Miami brought a complex Fair Housing Act action against Bank of America alleging violations of 42 U.S.C. § 3604(b) and § 3605(a) by engaging in discriminatory mortgage lending practices that resulted in a disproportionate and excessive number of foreclosures in minority neighborhoods, causing the city—inter alia—to suffer financial loss in the form of decreased tax revenue from depreciated property values.

The trial court dismissed the action stating that the City had failed to demonstrate proximate cause between the Bank's unlawful conduct and the injuries suffered by the City.

### *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262 (11th Cir. 2015)

The City appealed, and the Eleventh Circuit reversed holding that proximate cause had been met with the foreseeability test.

### *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)

The Bank appealed to the Supreme Court, which then reversed the Eleventh Circuit holding that foreseeability alone does not satisfy the proximate cause element of a FHA claim. and imposed the more stringent "direct relation standard" which necessitates a direct relationship between the injurious conduct and alleged harm. While the Court declined to outline the precise boundaries

of that standard, it did offer some guidance:

1. foreseeability *alone* will not satisfy the proximate cause element;

2. the proximate cause theory does not generally find liability "beyond the first step" of a causal chain;

3. the two considerations for expanding proximate causation beyond the first step are:

   (a) the nature of the statutory action; and

   (b) the statute's policy goals; and

   (c) the consideration of what is "administratively possible and convenient."

4. that proximate cause turns on "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits".

5. the Court cited three cases in emphasizing the principle of "directness" over "foreseeability": *Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 112 S. Ct. 1311*, 117 L. Ed. 2d 532 (1992)., *Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 126 S. Ct. 1991*, 164 L. Ed. 2d 720 (2006). and *Hemi Group, LLC v. City of New York, NY, 559 U.S. 1, 130 S. Ct. 983*, 175 L. Ed. 2d 943 (2010). abc.

### *City of Miami v. Wells Fargo & Co.*, 923 F.3ᴅ 1260 (11ᴛʜ Cɪʀ. 2019)

On remand from the Supreme Court, the Eleventh Circuit *again* found proximate-cause for the city by going beyond the "first step" (opinion vacated as moot after the parties settled).

"It is clear, though, that proximate cause does not always cut off at the first step after a violative act. A general tendency is not the same as a hard and fast rule that dictates the outcome in every case ..." *Id*

"If, in fact, there were a hard and fast 'only the first step' rule limiting liability, a plaintiff homeowner who was forced into foreclosure on account of a predatory bank loan that violated the Fair Housing Act would never be able to plausibly allege that the foreclosure was proximately caused by the bank's predation" *Id*

"the FHA has a broad remedial purpose, is written in decidedly far-reaching terms, and is perfectly capable of accommodating the type of aggregative causal connection that the City has identified between the Banks' alleged misconduct and financial harm to Miami." *Id*

"Most obviously, the '[t]he language of the [FHA] is broad and inclusive.' Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). It provides for suit by "an aggrieved person," 42 U.S.C. § 3613(a)(1)(A), (c)(1), expansively defined as 'any person who claims to have been injured by a discriminatory housing practice,' § 3602(i)" *Id*

### 3.   THE FIRST STEP

It is well established in the antitrust context that the "first step" are the direct buyers. *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Plaintiff is undisputably the direct home buyer as he purchased a home in October 2022, and he alleges that he was priced out of *south tampa* regarding that home purchase. SAC ¶ 113, 114.

Even if this court finds that the causal chain goes beyond the first step, the Eleventh Circuit on remand from *Miami* none-the-less went beyond the first step again in *City of Miami v. Wells Fargo*, 923 F.3d 1260 (opinion was vacated as moot after the parties settled) as argued above.

The causal chain in *Miami* looked like this:

1. the bank engaged in discriminatory lending practices;

2. the lending practices triggered higher default rates;

3. the default rates caused higher foreclosure rates;

4. the foreclosure rates led to a decrease in property values; and

5. this harmed the City because it ultimately led to less property tax revenue.

The causal chain in the instant action is significantly shorter:

1. the School Board engaged in discriminatory school assignment practices;

2. the assignments lead to an increase in property values in white neighborhoods;

11

3. Plaintiff was harmed by being priced out of those white neighborhoods.

The causal chain in *Miami* was longer and more attenuated than the instant case, and the Eleventh Circuit *still* found proximate cause, therefore it is almost certain they would find proximate-cause in this instant action.

## 4.  HOLMES FACTORS

The *Holmes Factors*[2] weigh heavily in favor of Plaintiff:

### A.  THE ABILITY TO DISTINGUISH THE DAMAGES ATTRIBUTABLE TO THE VIOLATION, AS DISTINCT FROM OTHER, INDEPENDENT, FACTORS

This action is seeking both equitable relief and damages. To the extent that we need to quantify the degree of pricing manipulation, that is possible using statistical analysis of the sales prices of homes and the schools they are assigned to. The results can be controlled to exclude external factors affecting property values by closely studying the sales prices of homes that flip from one school to another, as well as expert testimony from property appraisers and other real estate professionals.

The Eleventh Circuit has held that damages relates related to property values are able to be handled by the courts. City of Miami v. Wells Fargo & Co., 923 F.3d 1260, 1281 (11th Cir. 2019) ("In no small part, we conclude that the City has adequately—that is to say, plausibly—pled proximate cause because we find it entirely practicable and not unduly inconvenient for the courts to handle damages like the City's tax revenue injury.")

### B.  THE RISK OF MULTIPLE RECOVERIES; AND

To the extent that this action seeks equitable relief, multiple recoveries are not possible. The damages sought are in relation to harms suffered directly to Mr.

---

[2] *see Holmes v. Securities Investor Protection Corporation*, 117 L. Ed. 2d 532

Warner regarding his real-estate transactions, no one else would have standing to assert those exact injuries.

### C.   WHETHER MORE DIRECT PLAINTIFFS COULD BE COUNTED ON TO VINDICATE THE LAW AS PRIVATE ATTORNEYS GENERAL.

Plaintiff was an African-American prospective home-buyer who did in-fact purchase a Home in October 2022.  As far as the FHA goes, you cannot get more direct than that.

## 5.   FORESEEABILITY

It is common knowledge by prospective home-buyers and renters alike that the value of a property is significantly linked to the schools that are assigned to it because people are willing to pay a significant premium to get into elite public schools. SAC ¶ 94-109. And people without children pay the premium because the higher property values that the young families pay, increases the price of nearby properties through comps which creates barriers to minorities to enter that neighborhood.  In sum, young families pay the price premium to get their children into elite schools and people without children pay the premium to live in a segregated neighborhood: one hand jerks off the other.

The Hillsborough County Public Schools superintendent proudly admits to knowing that they are manipulating property values in these affluent areas:

> "We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district.  The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools.  And what that does is, that increases property values.  The more we continue to address our high quality education within within every-one of our schools" [3]

Multiple news reports link school assignments to property values:

[3] *see*   SAC   Exhibit   F   https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

"That's why I bought my house in this area, for the [A-rated] schools," Elena Ivani said, a parent whose sons will now attend a C-rated high school under the plan ... Ivani said when she and her husband were house hunting eight years ago, they were only looking at A-rated public school districts ... I'm hoping my home's value at least stays level, but in all honesty, would you pay a premium for a C-rated school?" [4]

"Tampa realtor Amy Greenfield said home values are higher in neighborhoods assigned to better schools, and people will pay more to be in an area with 'A' rated schools." [5]

"Parents have started multiple petitions against the redistricting plan, citing concerns over the school choices, emotional impact on children and property value." [6]

## 6.   RELAXED PROXIMATE CAUSE

The Supreme Court imposed a more stringent *direct relation* standard in *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 for FHA proximate cause pleadings only for *damages*. All of their language around the matter surrounded *damages*. Nothing in the opinion expressed or implied that actions for equitable relief should be held to the higher standard. Concerns about multiple recoveries and calculating damages simply are not applicable to equitable claims. And jettisoning these more stringent requirements for equitable relief would further the statutory intent of the FHA to desegregate housing.

Thus this instant action should be held to the less stringent Foreseeability standard that the Eleventh Circuit originally applied to FHA actions.

## 7.   MAKING HOUSING UNAVAILABLE § 3604(A)

The Eleventh Circuit has affirmed liability under § 3604(a) for merely "affecting the availability" of housing. The manipulation of property values clearly af-

---

[4] *see* SAC Exhibit K https://www.wtsp.com/article/news/local/hillsboroughcounty/hillsborough-county-schools-redistricting-plan-property-values/67-979bab7e-012f-437e-8530-26a69ae58958
[5] https://www.baynews9.com/fl/tampa/news/2023/01/06/hillsborough-proposed-school-boundary-changes-impact-on-property-value
[6] https://www.fox13news.com/news/hillsborough-county-parents-start-petitions-against-proposed-new-school-boundaries

fects the availability of housing when it causes housing segregation:

"The complaint in this case adequately states a cause of action under § 3604(a), since this suit alleges race-based discrimination affecting the "availability" of housing within Hillsborough County. The Fair Housing Act is concerned with both the furtherance of equal housing opportunity and the elimination of segregated housing." *Jackson v. Okaloosa County, 21 F.3d 1531*, 1542 (11th Cir. 1994)

## 8. THE "PROVISION OF SERVICES" PRONG OF § 3604(B) APPLIES TO THE SCHOOL BOARD

As outlined below in section § 100.65(a) "Discrimination in Terms, Conditions, Privileges, Services, and Facilities", HUD's interpretation of § 3604(b) does not require that the tortfeasor be directly involved in the real-estate transaction. HUD gives several examples of liability that do not involve direct involvement in the real-estate transaction: § 100.65(b)(2), (4), (5), (6), and (7). All of those examples, given their plain meaning, could apply to post-sale conduct as well.

## 9. 24 C.F.R. § 100 IMPARTS LIABILITY TO THE SCHOOL BOARD

### A. CHEVRON'S DEFERENCE

The applicable U.S. Department of Housing and Urban Development ("HUD") rules and interpretations of 42 U.S.C. 3601 et seq—codified in 24 C.F.R. § 100—are binding on this court through a *Chevron*'s deference. *see Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). If the statute is ambiguous or silent on an issue, then a federal court must defer to an agency's interpretation of a statute so long as it is "permissible".

### § 100.7(A)(1) "LIABILITY"

§ 100.7(a)(1)(i) imparts direct liability under the FHA for a "person's own conduct that results in a discriminatory housing practice". It does not state

that the person must be directly involved in a real-estate transaction, only that their conduct resulted in a discriminatory housing practice. As a practical matter, the *proximate cause* element limits how far the ripple can flow from the alleged conduct and the discriminatory housing practice.

§ 100.7(a)(1)(ii) imparts direct liability under the FHA for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party". At the very least, Defendant is aware that it's school boundary assignment maps are used by third parties (such as white home buyers) to perpetuate housing segregation. Defendant has, and always had, the power to fix their school boundary maps to fix this issue, yet has refused to do so.

### § 100.65(a) "Discrimination in Terms, Conditions, Privileges, Services, and Facilities"

Section A of this rule states:

"It shall be unlawful, because of race ... to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65(a)

Defendant misrepresents Plaintiff's position and the rule by focusing on "in connection with the sale or rental of a dwelling". The rule is actually two disjunctive clauses:

1. to impose different terms, conditions or privileges relating to the sale or rental of a dwelling; or

2. to deny or limit services or facilities in connection with the sale or rental of a dwelling.

The first clause applies because the school assigned to a property is a "term, condition, or privilege" related to the sale or rental of a dwelling. As the SAC alleges, the assigned school is one of the most important factors a prospective buyer considers when making real-estate purchasing decisions.

Likewise, second applies because the assigned schools are services or facilities connected to the sale or rental of a dwelling.

HUD gives the following example of what falls under this rule:

"Limiting the use of privileges, services or facilities associated with a dwelling because of race ... of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4)

*All* public schools in Hillsborough County are associated with a dwelling because the property taxes levied directly upon that dwelling are used to directly fund the schools, and are often paid at the closing of the real-estate transaction and through escrow accounts associated with those same transactions. The School Board unlawfully denies minority neighborhoods access to closer white schools through the promulgated school boundary assignment maps that prevent children in those minority neighborhoods from enrolling at the white schools.

### § 100.70(a) "Restrict Housing"

Section A of this rule states:

"It shall be unlawful, because of race ... to **restrict or attempt to restrict the choices of a person** by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as **to perpetuate, or tend to perpetuate, segregated housing patterns**, or to discourage or obstruct choices in a community, neighborhood or development." (emphasis mine)" 24 C.F.R. § 100.70(a)

This binding HUD interpretation is unambiguous: you do not have to be directly involved in real-estate transactions—as Defendant would like this Court to believe—to be liable under the FHA.

This section is on-point because the SAC accuses the School Board of perpetuating segregated housing patterns through it's exercise of discretion in promulgating school boundary assignment maps.

The examples HUD gives remove any doubt that § 100.70(a) applies to the School Board:

"Discouraging any person from ... purchasing or renting a dwelling because of race ... or because of the race ... of persons in a community, neighborhood or development." § 100.70(c)(1)

The SAC alleges that Defendant prices out minorities from white neighborhoods by unlawfully raising the property values in those neighborhoods. Raising the cost of specific homes would tend to discourage minorities from purchasing homes in those areas.

"Assigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race." § 100.70(c)(4)

Individual schools are a section of the community, and the SAC alleges that Defendant assigns students to them based on race.

### § 100.70(b) "Discriminate in Services"

Section B of this rule states:

"It shall be unlawful, because of race ... to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b)

The examples HUD gives remove any doubt that § 100.70(b) applies to the School Board:

"Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race ..." § 100.70(d)(4)

Schools are municipal services. By segregating students in minority neighborhoods, the school board is denying them access to municipal services that are provided to students in white neighborhoods.

"Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race ..." § 100.70(d)(5)

Defendant's School boundary assignment maps are ordinances, procedures, policies, and/or implementations of address requirements that restrict or deny housing opportunities (or otherwise make unavailable) to minorities by unlawfully manipulating the property values in white neighborhoods to the point where significantly fewer minorities can afford to purchase or lease property in those neighborhoods.

## 10.  DISTINGUISH

### A.  GOURLAY V. FOREST LAKE ESTATES CIVIC ASSOCIATION, NO. 8:02-CV-1955-T-30TGW (M.D. FLA. 2003)

This case arose from a dispute between a homeowner and their Home Owners Association ("HOA") alleging adverse discriminatory actions taken by the HOA against the homeowner because they had taken in foster children *after* the sale of the house.  The instant action alleges discriminatory actions that occur and affect housing transactions *before* the sale.

There are generally two ways to be priced out of a neighborhood: a) through the initial cost of the home and b) through the manipulation of post-sale non-fixed costs such as property taxes and insurance.  The first part, the initial cost of the home, implicates the actual sale of dwellings which places it outside of the purview of *Gourlay*.  In addition, *Gourlay* was only concerned with one small provision of the FHA, whereas the instant action invokes parts of the FHA that *Gourlay* did not decide.

### B.  ROY V. BOARD OF COUNTY COM'RS WALTON COUNTY, FLA., NO. 3:06-CV-95, 2007 WL 3345352 (N.D. FLA. NOV. 9, 2007)

This case arose from a dispute where a property owner alleged that the government denied his zoning permit to construct a wall for discriminatory reasons. The property owners' tenuous FHA theory was couched on their intention "to market their properties substantially, but not exclusively, to African-

Americans and thus the defendants' obstruction has a harsher impact on African-Americans than whites." and he was trying to shoe horn his permit denial into a FHA claim. Defendant cited this case in support of it's proposition that "provision of services" ... "must relate to the sale of a dwelling, and **NOT JUST OWNERSHIP OF THE DWELLING.**" (emphasis mine). This is distinguished from the instant action because the SAC does not allege that prices were manipulated on owned properties by existing property owners, rather it alleges the price manipulation of properties that are for sale creating barriers to entry for minorities to purchase homes in white neighborhoods. In any event, the allegations in the SAC do relate to the sale of dwellings. Plaintiff also plead "tester" standing which falls outside of the scope of *Roy*.

## V   PLAINTIFF PLEAD A CLAIM UNDER THE EEOA

Defendant argues that the EEOA claim must fail because "Plaintiffs' own complaint admits they would not be sorted based on race ... but rather by 'home address' and by the existing boundaries."[7], however the complaint pleads that assigning by address is pretext for racial discrimination. It is a moot point in any event, as intent is not required to be plead under § 1703(c) as it is a disparate impact cause of action. Put simply, Plaintiff does not need to allege or prove de-jure segregation or intent to sustain a § 1703(c) claim, only that he was assigned to a further away school that resulted in a greater degree of racial segregation which the SAC pleads.

The School Board maintains that 1704(c) is only actionable if students are "wholly or substantially separated . . . on the basis of race, color, sex, or national origin". *U.S. v. Hinds County School Board* 560 F.2d 619 (5th Cir. 1977). Assuming this is true, the SAC plead that Carrollwood K-8 is 41.78% white, and bordering Adams Middle School is 7.05% white. SAC ¶ 189, 191. A 592% increase in black assignment to bordering Adams Middle School is "substantial" by any measure. The further SAC further

---

[7]unsurprisingly without citation.

plead that this disparity was caused by gerrymandering the assignment boundary by assigning students to further away schools.

### PLAINTIFF DOES NOT NEED TO ALLEGE THAT HIS ASSIGNED SCHOOL WAS CHANGED

Defendant asserts (without citation) that "Plaintiffs do not allege there have been material changes to the assignment for their residence, which is the predicate for their claim". The EEOA does not state that a student must be *re-assigned* to a further away school, only *the assignment of a student to a school other than the one closest to his or her place of residence*. The claim is that once Carrollwood K-8 was created, Plaintiff was no longer assigned to the closest school. Accepting Defendant's completely unsupported position would lead to the absurd result of school boards being allowed to open new schools and then only assign students in predominantly white neighborhoods to them[8].

Defendant cites no authority for the notion that the School Board is immune from EEOA claims once the school system has been declared unitary in an unrelated action (*Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927 (11th Cir. 2001)) if the school assignment boundaries are not materially changed. Assuming the School Board is trying to invoke § 1707, that is an affirmative defense that they must plead and prove, not an element of a § 1703(c) claim. Such an argument would be frivolous given the breadth of the boundary changes the School Board promulgated this year (let alone the last twenty years).

## VI  PLAINTIFF CAN USE § 1983 TO ENFORCE STATE-CREATED AND FEDERAL RIGHTS

As a preliminary matter, Defendant's arguments fail to distinguish the difference between a procedural due process challenges and substantive. And they misstate the

---

[8]Which is funny enough, what they are doing with Carrollwood K-8.

entire purpose of the claim by focusing excessively on the hardship process, and ignoring the main point of the claim: That Mr. Warner has a federal and state-created right to *apply* for J.W. to attend Carrollwood K-8, not that he has a right to attend that school (at least at this juncture in the litigation). Whether the school is over-capacity (projected or otherwise) is immaterial, Mr. Warner has the right to apply, be denied, and then placed on a waiting list.

## 1. Due Process Standards

"The Due Process Clause offers two different kinds of constitutional protection: procedural due process and substantive due process, and a violation of either may form the basis for a suit under § 1983. McKinney v. Pate, 20 F.3d 1550, 1555-56 (11th Cir. 1994) ( en banc)." Slakman v. Buckner, 434 F. App'x 872, 875 (11th Cir. 2011)

"'[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression.' County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998) (internal quotations and citations omitted)." *Davis v. Carter, 555 F.3d 979*, 981 (11th Cir. 2009)

### A. Substantive

"The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them."' Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986))." Davis v. Carter, 555 F.3d 979, 981-82 (11th Cir. 2009)

### B. Procedural

"''A § 1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process.' Zisser v. Fla. Bar, 747 F.Supp.2d 1303, 1317 (M.D. Fla. 2010) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994))." *Anthony v. City of Naples, & 7-Eleven, Inc., Case No: 2:16-cv-543-FtM-99MRM*, at *10 (M.D. Fla. Dec. 1, 2016)

## C. Rights

The *Amended Complaint* alleges the existence of both a federal and state-created educational rights:

## D. Federal Rights

"'The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.'" *Troxel v. Granville, 530 U.S. 57,* 65 (2000)

## E. State Rights

"Rights created by state law (e.g., tort and employment law) are protected by procedural ... due process" *DeKalb Stone, Inc. v. County of DeKalb, 106 F.3d 956,* 960 (11th Cir. 1997) (quoting McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994)

"We recently reiterated this logic in the context of state education rights. C.B. ex rel. Breeding v. Driscoll, 82 F.3d 383 (11th Cir. 1996). In accordance with school board policy and procedures, several students were suspended after telephone conferences with parents. Id. at 385-87. The Court held that because the decision to suspend a student is an executive act, any deprivation of the state-created right to attend school is protected only by the guarantee of procedural due process. Id." *Id*

## 2. Argument

To be clear, the procedural and substantive due process claim in the SAC alleges that Defendant denied Plaintiff the right to *apply* for school choice by making the application process unavailable. SAC ¶ 203 - 218. The mere act of applying for a school fits squarely within the federally protected "right to direct the ... education of children". *see supra* 1. C. D..

Additionally, the state-created rights cited in the SAC are protect-able by procedural due process. *see supra* 1. C. E..

### 3. MISREPRESENTATIONS AND DISTINGUISHMENTS

### A. SECTION 1014.04

Defendant misrepresented Fla. Stat. 1014.04(1)(c) by stating "Section 1014.04 outlines general parental rights (including rights unrelated to education), and does not state anything about school choice." yet the statute states that parents have "The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll his or her minor child in a public school", yet the referenced Fla. Stat. 1002.20(6) is explicitly about school choice. *Plaintiff* explicitly referenced it in the *Amended Complaint* ¶ 16(b), 33, and 45. Yet Defendant intentionally misrepresented the statute to this Court when it omitted references to 1002.20 in it's summary then stated that the statute did "not state anything about school choice" when it clearly does by reference.

Defendant then states that "parents may seek school choice, but there is nothing under [Fla. Stat. § 1002.20(6)] obligating schools to accept those children." but this contention misses the point of the procedural due process claim: that Defendant made the application process unavailable to *Plaintiff*, and that he has the *right* to *apply*. To whatever extent that the school is at capacity is purely academic at this point because Defendant has not actually denied *Plaintiff* citing overcapacity. Even if the school is over capacity, *Plaintiff* still has the right to apply and to be put on a waiting list. *see* Fla. Stat. 1002.31(3)(j).

Again, academic until Defendant actually accepts an application from *Plaintiff* and then denies him citing over-capacity, however Defendant argues that the *Amended Complaint* concedes that the school has a capacity issue citing ¶ 18. However Defendant omits ¶ 19 - 21 which a) clarify that the numbers cited are for the 2025-2026 school year and that there is capacity available for the 2023-2024 and 2024-2025 school years. Furthermore, the attached Exhibit E (which is more recent and what the school board actually approved) states that

the proposed utilization rate for 2025-2026 school year is 99% indicating that there is capacity available.

## B.   *Stevenson v. Blytheville Sch. Dist. #5, 800 F.3d 955*, 969 (8ᴛʜ Cɪʀ. 2015)

Defendant misrepresented the holding in *Id* by stating "the Stevenson court rejected the proposition that a general state school choice law created a property interest enforceable through the constitution". What *Id* really held was that an *Arkansas* state school choice law that gave school boards discretion to exempt themselves from the school choice law did not convey a protect-able property interest to the parents, which is correct: it is not a right if the government has discretion to deny it to you.

The *Florida* law at issue is a *non-discretionary* open enrollment statute and the "Parental Bill of rights", both of which create enforceable rights.

"In summary, although the 2013 Act prohibited nonresident school districts from considering certain characteristics of an applicant, it still invested the nonresident school district with the discretion to decide whether to accept a student seeking transfer. Cf. Horton v. City of Smithville, 117 Fed.Appx. 345, 347–48 (5th Cir.2004) ('[D]iscretionary statutes do not give rise to constitutionally-protected property interests.' (footnote omitted))" *Id*

"'In reviewing whether the appellants have a protected property interest, we must examine what the 2013 Act provides to the appellants. And, by its plain language, what it provides to them is the possibility of transfer to another district, not a guarantee or absolute right to transfer.'" *Id*

## C.   *Anderson v. Hillsborough Cty. Sch. Bd., 390 F. App'x 902*, 903 (11ᴛʜ Cɪʀ. 2010)

Defendant misrepresented to this Court that "this court has never decided that a Florida student has a property or liberty interest in attending a particular high school." by quoting a 2010 Eleventh Circuit opinion which was written eleven years before the "Parental Bill of Rights" was enacted, and six years before Fla. Stat. 1002.31 was amended to switch Florida from a discretionary

open-enrollment school choice state to a non-discretionary open-enrollment school choice state[9].

In any event, the opinion explicitly stated that it was not deciding the issue that Defendant cited it for:

"But this is not a case where we need decide this question ... assume arguendo, therefore, that the due process clause of the Fourteenth Amendment applies to both Anderson's temporary suspension and the Boards's decision to place her in an alternative school" *id*

### D.   *Mazevski v. Horseheads Central School Dist.*, 950 F. Supp. 69 (W.D.N.Y. 1997).

This *New York* case is not about enforcing state-created rights or school choice through the due process clause at all, rather *Id* held that there is no *federal* right to participate in a high school marching band without any underlying state-law right.

### E.   *United States Knight v. Jacobson, 300 F.3d 1272,* 1276 (11th Cir. 2002)

Defendant asserts that "Section 1983 applies to violations of 'the Constitution and laws,' and that language refers to the Constitution and laws of the United States Knight v. Jacobson, 300 F.3d 1272, 1276 (11th Cir. 2002) (emphasis added) ('Section 1983 does not create a remedy for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right.').

The cited portion of *Knight* was a narrow Fourth Amendmentment false arrest case which held that federal law, not state law, governs the validity of arrests under the Fourth Amendment. The instant claim is Fourteenth Amendment Procedural Due Process claim, not a Fourth Amendment False Arrest claim. The elements and relevant case law between the two types of claims

---

[9] *see* https://www.tampabay.com/news/politics/stateroundup/gov-rick-scott-signs-school-choice-education-bill-19-others-into-law/2273265/

are wholly distinct: Fourth Amendment case law is completely inapplicable to Procedural Due Process claims.

### F. *Dean v. Escambia County Commissioners*, 3:05-cv-00029-LC (N.D. Fla. April 20, 2005)

Defendant additionally cites a *Northern* District Court opinion, *Id*, in which a *pro se* plaintiff collaterally challenged an unfavorable state court judgment regarding the height of his residential fence, by suing–inter alia–the special master acting in a judicial capacity who presided over the case and the neighbor who reported the city code violation at issue, in federal court. Unsurprisingly, the magistrate judge recommended dismissal under the Rooker-Feldman Doctrine. However only one of the cases cited in the quoted excerpt deal with *procedural due process* with regards to state-created rights (and it was denied on standing grounds):

1. Baker v. McCollan held state tort of negligence is not actionable through § 1983.

2. Knight v. Jacobson was about Fourth Mmendment false arrest.

3. J.H. ex rel. Higgin v. Johnson was a substantive due process claim based on the theory that the state failed to prevent the sexual assault of a child in their custody.

4. White v. Olig was another Fourth Amendment false arrest case.

5. Barry v. Fowler another Fourth Amendment false arrest case.

6. Street v. Surdyka another Fourth Amendment false arrest case.

7. Ouzts v. Maryland National Insurance Co appears to be another Fourth Amendment false arrest case.

8. Moore v. The Marketplace Restaurant, Inc false arrest/false imprisonment case.

9. Moore v. Kusper due process case, but court held plaintiff lacked standing due to lack of harm.

10. Clark v. Link was another Fourth Amendment false arrest case.

Not withstanding Knight v. Jacobson, none of these cases are binding on this court. And none of them were on-point. It appears to be a magistrate judge being a bit sloppy in throwing a bat-shit-crazy *pro se* plaintiff out of court.

## VII   Strict Scrutiny applies to the Equal Protections claim

Defendant appears to be confused about the scope of the Equal Protections claim. The SAC Equal Protections Count VII is styled "42 U.S.C. § 1983: Equal Protections - District Map Gerrymandering", which specifies it is a challenge to the "District Voting Map" under the federal constitution because race was the predominant factor or motivation when drawing the map, *not* the "School Boundary Assignment Map", school choice, or any invocation of state law.

Defendant asserts that strict scrutiny does not apply because "Plaintiff does not cite to any lines drawn using explicit racial distinctions", however the SAC is replete with such citations to support that race was the predominant factor: *see* SAC ¶ 127 - 133. Then, out of all of those citations, Defendant proffers that the *real* predominant reason was to "keep[] the community togoether". But as the SAC alleges, this is simply pretext for race because as the board members state, these "commuities" they are trying to keep together are racially homogeneous: *see* SAC ¶ 128[10], 130[11]

## VIII   Plaintiff States a claim under the Florida Constitution

Defendant argues that Mr. Warner cannot state a claim under FLA. CONST. art. IX, § 1 because a) the claim is his child's and he cannot represent his child *pro se*; and b) does not it does not provide for a private cause of action.

---

[10]"SO MAP F ACTUALLY UNITES HILLSBOROUGH COUNTY'S HISPANIC COMMUNITY EVEN BETTER THAN THE CURRENT MAP"

[11]"I WANT TO KEEP THE HISPANIC COMMUNITY TOGETHER".

It is ironic that Defendant cites *Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006) for the proposition that a private party cannot challenge the constitutionality of a state law under FLA. CONST. art. IX, § 1, because that exact case was about private party parents successfully challenging the constitutionality of a state law under FLA. CONST. art. IX, § 1:

> "Various parents of children in Florida elementary and secondary schools and several organizations (hereinafter collectively referred to as the plaintiffs) filed complaints in the circuit court challenging the constitutionality of the OSP under article I, section 3, article IX, section 1, and article IX, section 6 of the Florida Constitution" *Id*

> "Article IX, section 1(a) is a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." *Id*

> "Because we conclude that section 1002.38 violates article IX, section 1(a) of the Florida Constitution, we disapprove the First District's decision in Holmes I. We affirm the First District's decision finding section 1002.38 unconstitutional in Holmes II" *Id*

To accept Defendant's argument, this court would have to believe that the Florida Supreme Court issued an opinion on a matter of which it did not have jurisdiction.

## IX   CONCLUSION

While Defendant presents this action as "novel", represents that the sky would fall down if the Court finds liability, and generally airs grievances about the scope of the FHA, at it's core this case is really just another government discriminatory zoning case which is bread and butter for the FHA. This court need not try to limit the scope of the FHA, because the Supreme Court has already done that several times (most recently in *Miami*). That Court painstakingly deliberated on the guard rails for the FHA (as recently as *Miami*) and it is not for the Defendant or this court to second guess their judgment.

The fact is Plaintiff plead a prima facie case that Defendant is engaging in discriminatory zoning practices that are causing and/or perpetuating housing segregation in

Hillsborough County, and Plaintiff has standing to sue them for that. No amount of Defendant's bufuddling arguments will change that.

And this case is clearly one of public importance that invokes important civil rights which should be adjudicated on the merits, not dismissed on trivial procedural grounds or though the application of an ambiguous, unenforceable release that goes against public policy.

And lastly, it is apparent that Defendant's brief (and previous briefs) is raising multiple arguments that are completely unsupported in fact or law including misrepresenting cited case law. Such behavior are improper litigation tactics that frustrate the efficient administration of justice. Rule 11 is not an effective deterrent in this regard because the sanction—the awarding of attorney fees—is not available when the opposing party is *pro se*. It is my hope that the court puts the kibosh on this abusive litigation behavior or grants Plaintiff leave to add an eighth amendment claim.

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.

7-31-2023
_____

Date

_____

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

# TAB 72

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


BLAKE ANDREW WARNER,

     Plaintiff,

v.                              Case No: 8:23-cv-181-SDM-JSS

SCHOOL BOARD OF
HILLSBOROUGH COUNTY,
FLORIDA,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     Defendant moves to dismiss Plaintiff's Second Amended Verified Complaint. (Motion, Dkt. 45.)  The court held a hearing on the Motion on October 26, 2023.  (Dkt. 66.)  For the reasons that follow, the court recommends that Defendant's Motion be granted in part and denied in part.  Additionally, the undersigned further recommends that Plaintiff's Motion for Preliminary Injunctive Relief (Dkt. 40) be denied.

## BACKGROUND

     Plaintiff lived in the South Tampa area of Hillsborough County until 2022, when he alleges he was forced to relocate due to rising housing costs.  (Dkt. 38, Compl. ¶¶ 113–14.)  As a result, Plaintiff was unable to enroll his minor child, J.W., in a public school in South Tampa.  (*Id.*)  Plaintiff attributes increased housing prices in South Tampa to racially motivated school boundary assignments made by Defendant, the School Board of Hillsborough County, Florida.  (*Id.*)  According to Plaintiff,

Defendant segregated school boundary assignments for public schools in Hillsborough County by race or color, which caused racially segregated neighborhoods and increased home values in South Tampa.  *See*  (*id.* ¶¶ 110–18.)  Plaintiff alleges Defendant's intentional and unlawful segregation of the school assignment boundaries on the basis of race or color resulted in the violation of Plaintiff's constitutional rights. *See generally* (*id.*)

Plaintiff filed his initial verified complaint in this matter on behalf of himself and his minor son, J.W., on January 26, 2023.  (Dkt. 1.)  On May 18, 2023, Plaintiff amended his complaint, asserting claims on behalf of himself only and dropping any claims asserted on behalf of J.W.  (Dkt. 29.)  Defendant answered the Amended Complaint and asserted affirmative defenses noting that Plaintiff's claims were barred by a prior settlement agreement with Defendant. (Dkt. 30.)  On May 10, 2023, Plaintiff filed a separate action against Defendant on behalf of himself and J.W. based on facts similar to those alleged in this matter.  *See Warner v. Sch. Bd. of Hillsborough Cnty.*, Fla., No. 8:23-cv-01029-SDM-SPF (M.D. Fla. 2003); *see also* (Dkt. 26.)  On July 5, 2023, the court dismissed Plaintiff's complaint in the separate action for improper claim splitting, among other reasons, and directed Plaintiff to assert all of his claims against Defendant in a second amended complaint in this matter.  *See* (Dkts. 37, 39.)  The court further cautioned Plaintiff that, as a non-attorney, he may not bring a pro se

action on his child's behalf.  (Dkt. 37 (citing *FuQua v. Massey*, 615 F. App'x 611, 612 (11th Cir. 2015).)[1]

Plaintiff filed his Second Amended Verified Complaint in this matter, asserting nine counts against Defendant.  (Dkt. 38, Compl.)  In Counts I and II, Plaintiff seeks relief under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, alleging Defendant's school boundary assignments affect minority rights to housing.  *See* (Compl. ¶¶ 180–83.)  In Count III, Plaintiff seeks relief under the Equal Educational Opportunities Act, 20 U.S.C. § 1703(c), alleging Defendant denied Plaintiff an educational opportunity by assigning his minor child, J.W. to Adams Middle School instead of Carrollwood K-8, Plaintiff's school of choice.  (Compl. ¶¶ 184–93.)  In Counts IV and V, Plaintiff seeks relief under Title VI, 42 U.S.C. § 2000d *et seq.*, alleging that Defendant discriminates on the basis of race or color in its school assignment boundaries.  (Compl. ¶¶ 194–201.)  In Counts VI and VII, Plaintiff seeks relief under 42 U.S.C. § 1983 for violations of his rights to due process and under the Equal Protection Clause of Fourteenth Amendment.  (Compl. ¶¶ 202–28.)  In Counts VIII and IX, Plaintiff alleges

---

[1] Plaintiff filed an interlocutory appeal on the issue of whether he can represent his son pro se (Dkt. 42), but neither party has moved to stay the case pending the appeal.  "The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *see also Dayton Indep. Sch. Dist. v. U.S. Mineral Prods. Co.*, 906 F.2d 1059, 1063 (5th Cir. 1990) ("When one aspect of a case is before the appellate court on interlocutory review, the district court is divested of jurisdiction over that aspect of the case.").  As discussed herein, Plaintiff's Second Amended Verified Complaint does not purport to assert claims "on behalf of J.W." and the court therefore finds that the issues raised in Defendant's Motion to Dismiss and for Preliminary Injunctive relief are not related to the issue on interlocutory appeal.  *See* (Dkt. 49 at 7 (arguing that Plaintiff is asserting claims that are "independently his own, regardless if they implicate the rights of his child").)

Defendant's actions violated article IX, section 1(a) of the Florida Constitution and denied access to his guaranteed rights to education.  (Compl. ¶¶ 229–37.)

Defendant moves to dismiss Plaintiff's Second Amended Verified Complaint. (Dkt. 45.)  Defendant argues that Plaintiff's claims are precluded by a prior settlement agreement between Plaintiff and Defendant, that Plaintiff improperly asserts claims pro se on behalf of his minor child and lacks standing to sue on his own behalf for each count, and that Plaintiff otherwise fails to state claims upon which relief may be granted.  (*Id.*)  Plaintiff opposes the Motion in part, and has agreed to dismiss Count V.  (Dkt. 49.)  Plaintiff also argues that he has individualized standing to assert each claim and that he sufficiently stated a claim on each count.  (*Id.*)  The Honorable Steven D. Merryday referred the Motion to the undersigned for a hearing and report and recommendation.  (Dkt. 55.)

## APPLICABLE STANDARDS

When ruling on a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all well-plead factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002).  To survive a motion to dismiss, a pleading must allege facts that reasonably demonstrate evidence exists to support the plaintiff's claims.  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).  A litigant cannot solely put forth "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft,* 556 U.S. at 678.  "To avoid dismissal, the 'complaint

must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *petition for cert. denied*, 139 S. Ct. 807 (Jan. 7, 2019). "A complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). Additionally, although pleadings drafted by pro se litigants are liberally construed, they must still "conform to procedural rules." *Loren v. Sasser*, 309 F.3d 1296, 1304 (11th Cir. 2002).

The party invoking federal jurisdiction also bears the burden of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, a plaintiff must plead sufficient facts to establish each element of standing in that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Warth v. Seldin,* 422 U.S. 490, 498–99 (1975)); *see also Lujan*, 504 U.S. at 560–61. If a plaintiff's injury is one which is "stigmatic" in nature, or generally "suffered by all members of a racial group" when the alleged discrimination is racial, the litigant must assert a "judicially cognizable injury" to survive dismissal. *Allen v. Wright*, 468 U.S. 737, 754 (1984). Absent standing, a claim is due to be dismissed. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964,

974 (11th Cir. 2005). A motion to dismiss for lack of standing "has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (citing *Cone Corp. v. Fla. Dep't of Transp.,* 921 F.2d 1190, 1203 n. 42 (11th Cir. 1991)).

## ANALYSIS

### A.   Plaintiff's Settlement Agreement with the School Board

Defendant contends that Plaintiff's Second Amended Verified Complaint must be dismissed because Plaintiff released all claims related to J.W.'s education in a previous settlement agreement with Defendant. (Dkt. 45 at 3–4.) Defendant attached the settlement agreement to its answer to Plaintiff's first amended complaint (Dkt. 30-1), and although the settlement agreement was neither referenced in the Second Amended Verified Complaint nor attached thereto, Defendant seeks its consideration in support of Defendant's Motion.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see also Roberts v. Carnival Corp.*, 824 F. App'x 825, 826 (11th Cir. 2020) (citing *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005)). "[A] document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2)

undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *see also Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018) ("Under the doctrine of incorporation by reference, we may also consider documents attached to the motion to dismiss if they are referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity."). "A document is central to a complaint when it is a 'necessary part of [the plaintiff's] effort to make out a claim." *Madura v. Bank of Am., N.A.*, 767 F. App'x 868, 870 (11th Cir. 2019) (citing *Day*, 400 F.3d at 1276). Courts consider documents outside of the four corners of the complaint when the documents relate to the substance of the allegations in the complaint itself. *Roberts*, 824 F. App'x at 827 (holding that district court erred in considering ticket contract containing one-year limitations period without converting motion to summary judgment in plaintiff's negligence action against cruise-ship operator).

According to Defendant, the parties previously entered into a settlement agreement concerning all claims related to Plaintiff's child's education in the Hillsborough County School District through March 15, 2022. (Dkt. 45.) Plaintiff maintains that the settlement agreement was not supported by consideration, he did not agree to waive all of his claims against Defendant, and the agreement is illegal. (Dkt. 49.) As noted, the settlement agreement was not referenced in the 53-page, 237 paragraph Second Amended Verified Complaint, nor do Plaintiff's claims rely on the settlement agreement in any way. Thus, the settlement agreement appears to be neither undisputed, nor central to Plaintiff's claims. *See Horsley*, 304 F.3d at 1134. As

such, the undersigned does not recommend dismissing the Second Amended Verified Complaint based on the parties' settlement agreement at this early stage. *See Quiller v. Barclays Am./Credit, Inc.,* 727 F.2d 1067, 1069 (11th Cir. 1984) ("Generally, the existence of an affirmative defense will not support a motion to dismiss."), *aff'd and reinstated on reh'g,* 764 F.2d 1400 (11th Cir. 1985).

### B.     Plaintiff's Standing and Compliance with the Court's Prior Order

Defendant next argues that Plaintiff's Second Amended Verified Complaint does not comply with the court's prior order dismissing the separate action and specifically providing that Plaintiff cannot proceed pro se on behalf of his minor child. (Dkt. 45 at 4–6.) Defendant challenges Plaintiff's standing to bring Counts III, IV, VI, VII, VIII, and IX and maintains Plaintiff lacks standing to bring those claims. (*Id.*)

To establish standing, Plaintiff must plead sufficient facts to establish that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. at 338. If a plaintiff's injury is one which is "stigmatic" in nature, or generally "suffered by all members of a racial group" when the alleged discrimination is racial, the litigant must assert a "judicially cognizable injury" to survive dismissal. *Allen*, 468 U.S. at 754; *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1113 (11th Cir. 2021) ("In order to sufficiently allege stigmatic injury, a plaintiff still must meet the constitutional standing requirements."). "An individual who suffers an intangible injury from discrimination can establish standing if he

personally experienced the discrimination." *Sierra*, 996 F.3d at 1113 (citing *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019) (finding that an organizational plaintiff that alleged stigmatic injury did not have standing because it did not adequately allege "it [was] among the class of persons whose concrete interests [were] affected by discriminatory treatment")).   In the context of alleged discriminatory school practices, the Supreme Court has recognized that "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff," and that parents "can validly claim [such an injury] on behalf of their children" to establish standing.   *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007); *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) ("Parents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children.").   The Supreme Court has also recognized that "a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered."   *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (citing *United States v. Hays*, 515 U.S. 737, 744–745 (1995)).

Here, Plaintiff's Second Amended Verified Complaint does not assert claims on behalf of J.W. but rather asserts claims on Plaintiff's own behalf.   *See* (Dkt. 38, Compl.) As the parent of J.W., Plaintiff generally asserts injuries arising from the effects of Defendant's alleged discriminatory conduct, denial of an educational opportunity, and

the infringement of his rights from Defendant's conduct, including those under the Equal Protection Clause of the Fourteenth Amendment. *See* (Compl. ¶¶ 110–18.) Plaintiff also alleges that as a resident of Tampa, he has been adversely affected by the impermissible gerrymandering of the school district boundaries on the basis of race. (*Id.* ¶¶ 119–76.) Plaintiff alleges that he "is particularly sensitive to discriminatory practices" and that he was "insulted and emotionally distressed by the knowledge that school aged students in his community were being discriminated against because of their race . . . in the year 2023." (*Id.* ¶ 110.) Plaintiff further alleges that he "was and is saddened, angered, and insulted by the fact that [Defendant] continues to operate a segregated school system" and that "Defendant's unlawful conduct proximately caused [Plaintiff] to suffer the aforementioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system." (*Id.* ¶¶ 111–12.) With respect to his housing claims, Plaintiff alleges that due to Defendant's "manipulation of property values, [Plaintiff] was priced out of [S]outh [T]ampa and had to relocate [] to [North] [T]ampa where he was assigned to failing schools." (*Id.* ¶ 114.) Plaintiff further alleges that had Defendant "assigned all students to their closest school, property values in area of [S]outh [T]ampa that Mr. Warner resided would have decreased, and he would have purchased a home there." (*Id.* ¶ 116.)

   At this early state in the litigation, the court finds that Plaintiff has sufficiently alleged that he either personally experienced discrimination or that he is within the

class of individuals targeted by that discrimination to establish standing for his claims. *See Sierra*, 996 F.3d at 1113 ("An individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination."); *see also Common Cause Fla. v. Desantis,* No. 4:22-cv-109-AW-MAF, 2022 WL 19978293, at *1 (N.D. Fla. Nov. 8, 2022) (finding that plaintiffs "have standing under the district-specific injury analysis of *Gill v. Whitford*, 138 S.Ct. 1916, 1929–30 (2018)").  To the extent Plaintiff claims an injury to J.W. in the form of competing in a race-based school system under the Equal Protection Clause, the court further finds that Plaintiff has established constitutional standing to pursue his claims as J.W.'s parent.  *See Parents Involved in Cmty. Sch.*, 551 U.S. at 718–19.  Accordingly, the court finds that Plaintiff's Second Amended Verified Complaint complies with the court's prior order to bring pro se claims on behalf of Plaintiff only and that Plaintiff has sufficiently alleged facts to establish his personal standing to assert those claims except where specifically discussed herein.  The court therefore recommends denying Defendant's Motion to Dismiss as to Plaintiff's standing.

## C.    Failure to State a Claim

Defendant asserts that Plaintiff has either failed to state a claim on each count or that Plaintiff's alleged injury is not redressable pursuant to the statute under which he brings his causes of action.  *See* (Dkt. 45.)  Plaintiff has agreed to dismiss Count V, but otherwise asserts that he has sufficiently stated a redressable claim on each count. (Dkt. 49.)  Upon consideration, the court agrees with Defendant in part, and finds that

Plaintiff has failed to state a claim on Counts I, II, III, IV, V[2], VI, VIII, and XI.  The court therefore recommends that those counts be dismissed.  However, the court finds that Plaintiff has sufficiently stated a claim on Count VII, and recommends that Defendant's Motion be denied as to that count.

### i.    Fair Housing Act (Counts I and II)

In Counts I and II, Plaintiff generally asserts claims under the Fair Housing Act (FHA), 42 U.S.C. § 3601 *et seq.*, for disparate treatment (Count I) and disparate impact (Count II).  (Compl. ¶¶ 180–83.)  The Fair Housing Act requires the government to provide access to fair housing throughout the country and provides a cause of action for denial of that right.  42 U.S.C. §§ 3601, 3613.  Race is a protected class under the statute and "[t]he FHA prohibits the 'refus[al] to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.'"  *Hallmark Devs., Inc. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1283 (11th Cir. 2006); *see* 42 U.S.C. § 3604.  "Claims of discrimination under the FHA may be brought under theories of (1) disparate treatment, (2) disparate impact, or (3) failure to accommodate."  *Root v. Salazar*, 406 F. Supp. 3d 1322, 1325 (M.D. Fla. 2019) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216–18 (11th Cir. 2008)).

According to Plaintiff, Defendant's intentional segregation of students by race or color resulted in increased pricing for homes within the South Tampa neighborhood and had a discriminatory effect on minorities in violation of the Fair Housing Act.

---

[2] Plaintiff agreed to dismiss Count V.

(Compl. ¶¶ 80–89, 180–81, 231.)  Plaintiff's Second Amended Verified Complaint does not identify a specific provision of the Fair Housing Act under which he is suing, but in his opposition to the Motion, Plaintiff argues that Defendant's actions violate 42 U.S.C. §§ 3604(a) and (b) and the interpreting regulations.   (Dkt. 49 at 8–20.) Defendant moves to dismiss Counts I and II and argues that the Fair Housing Act does not apply to Defendant's alleged actions. (Dkt. 45 at 7–11.)  Upon consideration, the court recommends that Counts I and II be dismissed with prejudice because Plaintiff cannot maintain causes of action against Defendant under either § 3604(a) or § 3604(b) of the Fair Housing Act.

### 1.  42 U.S.C § 3604(a)

Pursuant to 42 U.S.C. § 3604(a) of the Fair Housing Act, it is unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  In addition to actions directly involving the sale or rental of a dwelling, courts have applied § 3604(a) "as covering activities such as zoning, sale of (or refusal to sell) homeowners' insurance, racial steering, eviction, and other conduct occurring after acquisition of housing." *United States v. Advoc. L. Groups of Fla., P.A.*, 413 F. Supp. 3d 1225, 1231 (M.D. Fla. 2019) (collecting cases); *see also* 24 C.F.R. § 100.60 (providing several examples of prohibited actions).  "[I]n order to state a claim under § 3604(a), the plaintiffs must

allege unequal treatment on the basis of race that affects the availability of housing."

*Jackson v. Okaloosa County*, 21 F.3d 1531, 1542 (11th Cir. 1994).

Plaintiff argues that Defendant's actions "otherwise make unavailable or deny" housing to minorities in areas that Defendant has zoned for certain schools.  (Dkt. 49 at 14–15.)  Plaintiff has not cited a case in which § 3604(a) has been applied in similar circumstances and instead relies on *Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994) to argue that Defendant's "manipulation of property values clearly affects the availability of housing when it causes housing segregation[.]"  (Dkt. 49 at 14–15.)  In *Jackson*, the plaintiff sued a county and its commissioners and a local housing authority and its members under § 3604(a) alleging "race-based discrimination affecting the 'availability' of public housing" stemming from the site selection process for a new public housing project.  21 F.3d at 1542.  The Eleventh Circuit held that the plaintiff sufficiently stated a claim under § 3604(a) explaining "the phrase 'otherwise make unavailable or deny' in subsection (a) … encompass[es] actions by individuals or government units that affected the availability of housing to minorities."  *Id.* at 1542 n.17.  The court reasoned that plaintiff had sufficiently alleged that the county's policy, "which was intended to exclude public housing from areas that are predominantly white and to ensure that housing will be placed in areas that contain the greatest concentration of African-Americans" would "affect the availability of public housing in a substantial portion of the [Housing] Authority's territory and [] exacerbate segregation" in violation of the FHA.  *Id.* at 1542.  In so holding, the court applied the

FHA's "otherwise make unavailable" language "beyond providers of housing [to] include officials with authority on housing and zoning decisions." *Joubert v. Hussain*, No. CV 118-147, 2020 WL 12676384, at *4 (S.D. Ga. Sept. 8, 2020) (citing *Jackson*, 21 F.3d at 1542–43).

In contrast here, Plaintiff does not allege that Defendant has any authority over the availability or denial of housing or that Defendant directly manipulated any pricing or denied housing to any minority on the basis of their race or color. Rather, Plaintiff alleges only that Defendant's determination of school attendance zones resulted in higher home prices that affected the availability of housing in certain areas. Given the absence of authority to affect the availability of housing, Defendant's actions do not fall within the scope of § 3604(a) of the Fair Housing Act. *See, e.g.*, *Advoc. L. Groups of Fla., P.A.*, 413 F. Supp. 3d at 1231–32 (granting motion to dismiss FHA claims where "Defendants in the case at hand could not, on their own, 'make housing unavailable to the Intervenors or others on the facts alleged"); *Joubert*, 2020 WL 12676384, at *5 (granting motion to dismiss Fair Housing Act claims against individual neighbors who, "as residents objecting to the rezoning at a public hearing – even if done for discriminatory purposes – possessed no authority or power to make the dwelling unavailable"); *Sampson v. All Am. Home Assistance Servs., Inc.*, No. 1:13-cv-495-WSD, 2013 WL 12322089, at *8 (N.D. Ga. Mar. 7, 2013) ("Actions that do not affect the availability of housing are not proper under Section 3604(a), to include refusals of a bank to grant a second mortgage to improve or repair property, and claims against

- 15 -

third-parties for actions that impact a plaintiff's finances and ability to remain in their home."). Defendant does not allegedly control the availability of housing, nor can Defendant make housing more or less available. Defendant's alleged actions in determining school attendance zones are neither akin to the conduct prohibited in the interpreting regulations nor similar to the conduct courts have found to be covered by the FHA. *See* 24 C.F.R. § 100.60. The conduct Plaintiff challenges is too remote to support § 3604(a) liability. *See, e.g.*, *Anthony v. City of Naples*, No. 2:16-cv-543-FtM-99MRM, 2016 WL 7010949, at *3 (M.D. Fla. Dec. 1, 2016) ("In order to allege a claim under the Fair Housing Act there must be a closer causal connection between the act and the effect on the availability of housing."); *Paulk v. Ga. Dep't of Transp.*, No. CV 516-19, 2016 WL 3023318, at *8 (S.D. Ga. May 24, 2016) ("Because the roadway-planning process is not related to housing and could only remotely and indirectly impact Plaintiffs' housing rights under the FHA, it is not the type of conduct that Section 3604(a) is intended to prevent."). Plaintiff thus fails to state a claim in Counts I or II that falls within the purview of § 3604(a) of the Fair Housing Act. *See, e.g.*, *Advoc. L. Groups of Fla., P.A.*, 413 F. Supp. 3d at 1232 ("In sum, although the FHA is a remedial statute that is to be construed broadly,[] Plaintiffs are attempting to stretch § 3604(a) too far here.") (internal citation omitted).

### 2. 42 U.S.C. § 3604(b)

Pursuant to 42 U.S.C. § 3604(b) of the Fair Housing Act, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental

of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." *See also* 24 C.F.R. § 100.65 (providing examples of prohibited actions). Plaintiff argues that Defendant's actions constitute "the provision of services" in connection with the sale of a dwelling and thus fall under § 3604(b). (Dkt. 49 at 8–20.) Defendant argues that § 3604(b) does not govern the conduct Plaintiff seeks to challenge in this action. (Dkt. 45 at 7–11.) The court agrees with Defendant.

The Eleventh Circuit has rejected an "expansive view of services covered by § 3604(b)" and instead holds that "a service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling." *Ga. State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627, 633–34 (11th Cir. 2019) In *City of LaGrange, Ga.*, the Eleventh Circuit found that basic utility services, such as water, gas, and electricity were services "in connection with" the sale or rental of a dwelling because "(1) they are services closely tied to the sale or rental of a dwelling, and (2) they are essential to the habitability of the dwelling." *Id.* at 634. In contrast, the court stated that "[l]aw enforcement services are not provided in connection with the 'sale or rental of a dwelling[]' [because] those services are provided regardless of whether an individual has housing and are not required in order to obtain housing." *Id.* at 633. The Eleventh Circuit further cautioned that "to extend the Fair Housing Act to any and every municipal policy or service that touches the lives of residents 'would be to expand that Act into a civil rights statute of general applicability

- 17 -

rather than one dealing with the specific problems of fair housing opportunities.'" *Id.* at 633 (quoting *Clifton Terrace Assocs., Ltd. v. United Tech. Corp.*, 929 F.2d 714, 720 (D.C. Cir. 1991)).

Upon consideration, the court finds that Defendant's provision of education services, including determining school attendance zones in Hillsborough County, is not a "housing-related service that is directly connected to the sale or rental of a dwelling" under § 3604(b). *See City of LaGrange, Ga.*, 940 F.3d at 633–34. Plaintiff has not cited any cases in which courts have interpreted the Fair Housing Act so expansively. Rather, the provision of education, like the law enforcement services noted by the Eleventh Circuit in *City of LaGrange, Ga.*, is a service "provided regardless of whether an individual has housing and [is] not required in order to obtain housing." *City of LaGrange, Ga.*, 940 F.3d at 633; *see also Cox v. City of Dallas, Tex.*, 430 F.3d 734, 745 (5th Cir. 2005) (holding that § 3604(b) did not apply to claims that city discriminated in enforcing zoning laws to prevent unlawful dumping near plaintiffs' residences "because the service was not 'connected' to the sale or rental of a dwelling as the statute requires"). Plaintiff does not allege that Defendant directly controlled his ability to live in a specific school boundary area due to his race, or that Defendant treated minority home buyers differently because of their race. Although Plaintiff argues that race may have been a consideration in determining school board members seats and divisions, Plaintiff has not provided a causal link evidencing racial discrimination in connection with the provision of any services related to housing or

the denial of housing rights, which is needed to bring Defendant's actions under the purview of § 3604(b) of the Fair Housing Act. *See, e.g.*, *Hallmark Devs., Inc. v. Fulton Cnty.*, Ga., 466 F.3d 1276, 1283 (11th Cir. 2006) (finding that evidence that a rezoning decision had a disparate impact on minorities and that certain landowners and developers met with community groups expressing racial bias did not show proposed development was denied on a basis of race and thus redressable under the Fair Housing Act); *Anthony*, 2016 WL 7010949, at *3 (finding that site plan approval is "far too remotely related to the housing interests that are protected by the Fair Housing Act" to establish Fair Housing Act claims); *Price v. Howard*, No. 1:22-cv-02056-SDG, 2023 WL 2767770, at *3 (N.D. Ga. Mar. 31, 2023) (finding Plaintiff failed to state a claim for relief under the FHA because although she was a member of a class protected under the FHA as a black woman, she did not allege facts suggesting she was treated differently than white prospective home applicants or the victim of any additional discriminatory actions giving rise to a violation under the Act).

While a discriminatory practice may affect the housing market, without overt or direct action, redress is not available under the Fair Housing Act. *See City of LaGrange, Ga.*, 940 F.3d at 633 (citing *Clifton Terrace Assocs., Ltd.*, 929 F.2d at 720). "Numerous actions, private and official, may affect housing in some remote manner, but the Fair Housing Act requires a closer causal link between the availability of housing and the disputed action[.]" *Anthony*, 2016 WL 7010949, at *3 (citing J*ersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180 (4th Cir. 1999) (finding decision

- 19 -

for placement of highway too remotely related to the availability of housing to support a claim under the FHA)).  Accordingly, Defendant's challenged actions in determining school boundaries do not fall under the purview of either § 3604(a) or (b) of the Fair Housing Act.  The court therefore recommends that Counts I and II be dismissed with prejudice.

### ii.    Equal Educational Opportunities Act (Count III)

In Count III, Plaintiff alleges that Defendant violated the Equal Educational Opportunities Act (EEOA), 20 U.S.C. § 1703, by denying an educational opportunity because J.W. was assigned to Adams Middle School instead of Carrollwood K-8 for the 2023-2024 school year.  (Compl. ¶¶ 184–93.)   Defendant argues that the EEOA does not create a private right of action for parents to sue on their own behalf.  Upon consideration, the court agrees with Defendant and recommends that Count III be dismissed without prejudice.

The Equal Educational Opportunities Act was enacted to enforce the Congressional policy that "all children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin; and the neighborhood is the appropriate basis for determining public school assignments."  20 U.S.C. § 1701.  In Count III, Plaintiff seeks redress under 20 U.S.C. § 1703(c), which provides:

> No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by –

> (c) the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student.

20 U.S.C. § 1703(c).  "An individual denied an equal educational opportunity, as defined by this subchapter may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate." 20 U.S.C. § 1706.  According to Plaintiff, Congress's use of the term "an individual" indicates that the statute sweeps broader than "students," and that he, as the parent of J.W., may bring suit to vindicate the denial of J.W.'s educational opportunity.  (Dkt. 49 at 7–8.)

Upon consideration, the plain language of 20 U.S.C. § 1703(c) does not encompass a cause of action for parents to sue for the loss of an equal educational opportunity of a child.  *See Coggin Auto. Corp. v. Comm'r*, 292 F.3d 1326, 1332 (11th Cir. 2002) ("The general rule is that unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language.").  Rather, § 1703 specifically defines several prohibited activities, including the assignment of a student to a school other the one closest to his residence, that results in a greater degree of segregation.  *See* 20 U.S.C. § 1703(c).  Further, § 1706 provides a private right of action to the "individual denied an equal educational opportunity," in other words, the student.  20 U.S.C. § 1706.  Plaintiff, as a parent of J.W., may not state a claim

- 21 -

under the EEOA to vindicate the denial of an equal educational opportunity to J.W. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (the doctrine of prudential standing encompasses three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.") (internal quotation marks omitted); *see also FuQua*, 615 F. App'x at 612 ("The right to appear pro se, however is limited to parties conducting 'their own cases,' and does not extend to non-attorney parties representing the interests of others. Consequently, [] 'parents who are not attorneys may not bring a pro se action on their child's behalf.'").

Courts considering a third party's right to sue under § 1703 have concluded that parents do not have a right to sue on behalf of their minor children. *See, e.g.*, *Collins v. City of N.Y.*, 156 F. Supp. 3d 448, 456–57 (S.D.N.Y. 2016) ("Collins is claiming neither that she has been denied an equal education opportunity nor that she is bringing this cause of action on behalf of students who have been denied an equal education opportunity; under the plain language of the EEOA, therefore, she does not have a cause of action."); *Neil Through Cyprian v. Modesto City Sch. Dist.*, No. 1:17-cv-0256-LJO-SKO, 2017 WL 2911578, at *7 (E.D. Cal. July 7, 2017) ("Plaintiff Cyprian does not allege that she individually was denied an equal education opportunity, only that her daughter was.  Thus, Plaintiff does not have a cause of action as an individual

under the plain language of the EEOA."); *Bradford v. Morehouse Par. Sch. Bd.*, No. CV 18-1536, 2019 WL 572981, at *5 (W.D. La. Jan. 28, 2019), *report and recommendation adopted,* 2019 WL 576007 (W.D. La. Feb. 12, 2019) (dismissing complaint asserting EEOA violations where plaintiff alleged only that his grandchildren were denied an educational opportunity by the closure of their elementary school).   Accordingly, Plaintiff has failed to state a claim for violation of the EEOA, and the court recommends that Count III be dismissed.  Although Plaintiff may not bring an EEOA claim on his own behalf, J.W. may pursue his own claim through an attorney.  *See FuQua*, 615 F. App'x at 612.  The undersigned therefore recommends that Count III be dismissed without prejudice.

### iii.    Title VI – Disparate Treatment (Count IV)

In Count IV, Plaintiff asserts a claim for disparate treatment under Title VI, 42 U.S.C. § 2000d, and alleges that "Defendant intentionally discriminates on the basis of race and/or color in [its] school assignment boundaries."  (Compl. ¶¶ 194–97.) Defendant moves to dismiss Count IV contending that Plaintiff lacks standing to bring this claim on his own behalf and that it is "identical in all substantive respects to his Equal Educational Opportunities Act claim."  (Dkt. 45 at 5.)  Upon consideration, the court agrees with Defendant and recommends that Count IV be dismissed without prejudice.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  A private plaintiff may bring a suit under Title VI when they are intentionally discriminated against by a recipient of federal funds because of their race, color, or national origin.  *Alexander v. Sandoval*, 532 U.S. 275, 279–80 (2001); *see also Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("Although Title VI does not mention a private right of action, our prior decisions have found an implied right of action[.]").  "Title VI's protection extends no further than that already afforded under the Equal Protection Clause of the Fourteenth Amendment."  *Arrington v. Miami Dade Cnty. Pub. Sch. Dist.*, 835 F. App'x 418, 420 (11th Cir. 2020) (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir. 1999)).

Upon consideration, Plaintiff's claim in Count IV fails because he, as the parent of J.W., does not have standing to sue under Title VI.  The doctrine of prudential or statutory standing incorporates "at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Lexmark Int'l, Inc.*, 572 U.S. at 126 (quoting *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (internal quotations omitted)).[3]  "The question is whether the statute grants the plaintiff the cause of action that he

---

[3] The Eleventh Circuit instructs that prudential standing is not jurisdictional because "the question is whether Plaintiffs have a valid cause of action, and 'the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction.'"  *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1274 n.6 (11th Cir. 2018) (citing *Lexmark Int'l, Inc.*, 572 U.S. at 128 n.4).

- 24 -

asserts," with the presumption being "that a statute ordinarily provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 197 (2017) (quoting *Lexmark Int'l, Inc.*, 572 U.S. at 128 n.4). In considering suits brought under Title VI, courts have consistently held that parents lack standing to assert causes of action on their own behalf "because they are not beneficiaries of federally-funded school programs." *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 CS, 2012 WL 4477552, at *18 (S.D.N.Y. Sept. 27, 2012) (citing *Rodriguez v. Boursiquot*, No. 09–CV–802, 2010 WL 985187, at *4 (S.D.N.Y. Mar. 17, 2010) (finding that plaintiff lacked standing to bring Title VI claim because claim was not brought on behalf of child or operator of after-school program and noting that "[t]he intended beneficiaries of a federally funded public school program are school children, not their parents")); *I.G. by & through Grunspan v. Jefferson Cnty. Sch. Dist. through Bd. of Educ. for Jefferson Cnty. Sch. Dist.*, 452 F. Supp. 3d 989, 998 (D. Colo. 2020) ("Courts have consistently held that parents are not the intended beneficiaries of school programs and, therefore, may not assert Title VI claims on their own behalf.") (collecting cases); *R.W. ex rel. Williams v. Del. Dep't of Educ.*, No. CIV.A.05-662GMS/MPT, 2008 WL 4330461, at *3 (D. Del. Sept. 22, 2008) ("This court recommends that Counts I, II, and III be dismissed because Williams does not have standing to pursue Title VI, due process, and equal protection claims which belong to her child."), *report and recommendation adopted,* 2008 WL 4547192 (D. Del. Oct. 9, 2008); *Schuler v. Bd. of Educ. of Cent. Islip*

*Union Free Sch. Dist.*, No. 96-CV-4702 (JG), 2000 WL 134346, at \*10 (E.D.N.Y. Feb. 1, 2000) ("Thus, while parents (through counsel) may bring a Title VI action on behalf of a child who is the intended beneficiary of a funding program, parents may not bring the action on their own behalf.").

Plaintiff, as the parent of J.W., is not a beneficiary of a federally-funded school program, and may therefore not assert a cause of action under Title VI on his own behalf.  Instead, like his EEOA claim, Plaintiff may only assert this claim on behalf of J.W and through counsel. *See FuQua*, 615 F. App'x at 612; *Grappell v. Carvalho*, 847 F. App'x 698, 701 (11th Cir. 2021) ("[T]o the extent Grappell, a non-attorney, sought to represent the legal interests of her son, the district court should have dismissed those claims without prejudice.").  Accordingly, the court recommends that Count IV be dismissed without prejudice.

### iv.    Title VI - Disparate Impact (Count V)

Plaintiff has agreed to dismiss Count V and the court therefore recommends that Defendant's Motion as to Count V be granted.  *See* (Dkt. 45.)

### v.    42 U.S.C. § 1983 Claims (Count VI and VII)

Plaintiff brings Counts VI and VII under 42 U.S.C. § 1983.  In Count VI, Plaintiff appears to allege a procedural due process claim contending that his parental rights were violated when his minor child was unable to enroll in Carrollwood K-8, and when Carrollwood K-8's hardship application process required him to withdraw other pending applications.  (Compl. ¶¶ 202–18.)  Defendant argues Plaintiff lacks

standing to assert claims on behalf of his minor child in Count VI and that Plaintiff fails to adequately state a claim for a due process violation. (Dkt. 45.) Additionally, in Count VII, Plaintiff argues race was the predominant factor in creating Defendant's school boundaries, and the regulation violates his rights under the Equal Protection Clause and 42 U.S.C. § 1983. (Compl. ¶¶ 219–28.) Defendant disagrees with Plaintiff's contentions and maintains that Plaintiff lacks standing to bring this claim. (Dkt. 49 at 10.)

### 1.   Due Process Claim (Count VI)

Section 1983 of Title 42 of the United States Code provides a remedy for the deprivation of certain rights afforded by federal statutory and constitutional law. *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979); *Almand v. DeKalb Cnty., Ga.*, 103 F.3d 1510, 1512 (11th Cir. 1997); *R.W. v. Charter Schools USA, Inc.*, No. 18-14405-CIV-MARRA (S.D. Fla. May 23, 2019). "To prove a violation under 42 U.S.C. § 1983, a plaintiff must show that an entity, acting under the color of state law, deprived [him] of a right under the United States Constitution or federal law." *Porter v. Duval Cnty. Sch. Bd.*, 406 F. App'x 460, 462 (11th Cir. 2010); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). School boards may be treated as a municipality and subject to liability under § 1983 if a plaintiff establishes that a municipal policy or custom has caused him injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 689 (1978); *Fernandez v. Sch. Bd. of Miami-Dade Cty.,* 201 F. Supp. 3d 1353, 1365 (S.D. Fla. 2016). Additionally, in the Eleventh Circuit, "a § 1983 claim alleging a denial of procedural

due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Phodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

Plaintiff contends that he was unable to submit a school choice application for his child to attend Carrollwood K-8 during the school choice application period in July 2023. (Compl. ¶¶ 202–05.) As a result, Plaintiff submitted a school choice application to a different school.   (*Id.* ¶ 206).   Plaintiff also attempted to submit a hardship application for J.W. to attend Carrollwood K-8, but he was unable to do so without withdrawing his school choice application. (*Id.* ¶ 207.)   According to Plaintiff, under Florida law, his son has a right to enroll in any public school that is below capacity, his school of choice is below capacity, and Plaintiff has "no procedural way to apply for general choice admission" into the school of his choice.  (*Id.* ¶¶ 209–18.)

Plaintiff alleges Defendant's violations of Florida law give rise to his § 1983 due process claim.   Specifically, Plaintiff argues that § 1014.04 of the Florida Statutes provides that parents can "direct the education and care" of their minor children, and choose "to apply to enroll his or her minor child in a public school."   According to Plaintiff, § 1002.20 of the Florida Statutes also requires schools to provide accurate and timely information to parents regarding their child's academic progress. Additionally, Plaintiff notes that § 1002.31 of the Florida Statutes defines policies and procedures related to Florida public school's "controlled open enrollment" process, which requires each district school board to identify schools that have not reached

capacity online, maintain a wait list of students who are denied access due to capacity, and notify parents when space becomes available.  It is unclear whether Plaintiff contends that these statutes establish a constitutionally-protected liberty or property interest guaranteed under the United States Constitution.  "An alleged violation of a state statute does not give rise to a corresponding § 1983 violation, unless the right encompassed in the state statute is guaranteed under the United States Constitution." *Dean v. Escambia Cnty.*, No. 3:05-cv-29-LAC/MD, 2005 WL 927387, at *8 (N.D. Fla. Apr. 20, 2005).

The "Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). The Supreme Court has recognized that parents have a  fundamental right to make decisions concerning the care, custody, and control of their children – including matters pertaining to their education.  *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

The allegations in Plaintiff's Second Amended Verified Complaint do not sufficiently allege the deprivation of a constitutionally-protected liberty interest. Although Plaintiff identifies Florida Statutes he maintains were violated by Defendant's school choice and hardship procedures, those alleged violations do not relate to rights guaranteed under the United States Constitution.  Courts have upheld

limitations concerning parents' rights with respect to students' education in public schools. *See Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1223 (11th Cir. 2023) ("This Court has issued its own series of decisions outlining the contours of parents' liberty interest to control the upbringing of their children[.]") (collecting cases); *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1281–86 (11th Cir. 2008) (holding that Florida's Pledge of Allegiance statute, which requires students to recite the Pledge in the absence of a written request to the contrary by a parent, is constitutional despite restricting the students' freedom of speech because it advances the fundamental rights of parents to direct the upbringing of their children); *Arnold v. Bd. of Educ. of Escambia Cnty. Ala.*, 880 F.2d 305, 313 (11th Cir. 1989) ("[W]hen parents enroll their children in public schools they cannot demand that the educational program be tailored to their individual preferences."); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395–96 (6th Cir. 2005) ("[w]hether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or [] a dress code, these issues of public education are generally 'committed to the control of state and local authorities.'"); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 291 (5th Cir. 2001) ("While [p]arents may have a fundamental right in the upbringing and education of their children, this right does not cover the [p]arent's objection to a public school Uniform Policy."). Plaintiff has not identified caselaw and the court has not located binding precedent holding that school choice and hardship policies provide rights

protected by the United States Constitution.  As a result, Plaintiff has failed to state a claim in Count VI for a § 1983 due process violation and the court recommends that Count VI be dismissed.

### 2.    Equal Protection Claim (Count VII)

In Count VII, Plaintiff alleges that Defendant impermissibly gerrymandered its school assignment boundaries on the basis of race and thereby violated Plaintiff's rights under the Equal Protection Clause.  (Compl. ¶¶ 219–28.)  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.   "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'"  *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).   The Supreme Court has held that a plaintiff challenging the apportionment of voting districts under the Equal Protection Clause "may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification."  *Shaw v. Reno*, 509 U.S. 630, 649 (1993); *see also Bethune-Hill*, 580 U.S. at 187 ("[A] plaintiff alleging racial gerrymandering bears the burden 'to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating

the legislature's decision to place a significant number of voters within or without a particular district.'") (citing *Miller*, 515 U.S. at 916).

Plaintiff sued Defendant contending that "race was the predominant factor" in the design of Defendant's school boundaries and school board districts. (Compl. ¶¶ 1-6, 20–22, 119–55, 224–26.) According to Plaintiff's detailed allegations in the Second Amended Verified Complaint, Defendant's school boundaries and school board district boundaries were designed with the intent to discriminate based on race. (*Id.* ¶¶ 119–76.) Plaintiff supports his allegations with maps purporting to show the overlay of the school district zones with the racial makeup of Tampa, purported irregularities in school assignments based on race, and statements from School Board members and the superintendent indicating that race was a consideration in determining the school attendance zones. *See generally* (*Id.*); *see also* (Dkts. 38-1, 38-11.) Plaintiff has sufficiently alleged that Defendant made school boundary and school board district boundary decisions based on race, failed to assign white students to predominately African-American schools that were closer to their residence, assigned minority students to predominately African-American schools that were further from their residences, drew district map boundaries that directly correspond to race, and that the decisions were discriminatory and intentional. (Compl. ¶¶ 1–6, 20–22, 119–55, 224–26.) These allegations are sufficient to state a claim for a violation of the Equal Protection Clause. *See Shaw*, 509 U.S. at 649 ("We hold only that, on the facts of this case, appellants have stated a claim sufficient to defeat the state appellees' motion to

dismiss."); *Bethune-Hill*, 580 U.S. 178, 189 ("The Equal Protection Clause does not prohibit misshapen districts.  It prohibits unjustified racial classifications."); *see also Methelus v. Sch. Bd. of Collier Cnty., Fla.*, 243 F. Supp. 3d 1266, 1280 (M.D. Fla. 2017) (finding allegations sufficient to state equal protection claim where alleged "policy forced [students] to seek out and pay for unequal education programs because of their national origin and status as foreign-born ELL students"); *Barnett v. Baldwin Cnty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1231 (S.D. Ala. 2014) (denying motion for judgment on the pleadings on parents' § 1983 claim alleging equal protection violations against students).  Accordingly, the court recommends that Defendant's Motion be denied as to Count VII.

### vi.   Florida Constitutional Claims (Counts VIII and IX)

In Counts VIII and IX, Plaintiff asserts causes of action for alleged violations of Article IX, section 1(a) of the Florida Constitution.  (Compl. ¶¶ 229–37.)  Article IX, section 1(a) states in relevant part:

> The education of children is a fundamental value of the people of the State of Florida.  It is, therefore, a paramount duty of the state to make adequate provision for the education of all children residing within its borders.  Adequate provision shall be made by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of institutions of higher learning and other public education programs that the needs of the people may require.

Fla. Const. art. IX, § 1(a).[4]  "Article IX, section 1(a) is a limitation on the [Florida] Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." *Bush v. Holmes*, 919 So. 2d 392, 406 (Fla. 2006).  Specifically, "[t]he third sentence of article IX, section 1(a) provides a restriction on the exercise of this mandate by specifying that the adequate provision required in the second sentence 'shall be made by law for a uniform, efficient, safe, secure and high quality system of free public schools.'"  *Id.* at 407 (emphasis removed); *see also Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 262 So. 3d 127, 140 (Fla. 2019).

Defendant moves to dismiss Counts VIII and IX and argues that Plaintiff has not stated a claim on behalf of himself for violations of Article IX, section 1(a) and that Plaintiff otherwise cannot assert a private right of action under that section.  (Dkt. 45 at 21–22.)  Plaintiff responds that Counts VIII and IX properly challenge the constitutionality of state law.  (Dkt. 49 at 28–29.)  Upon consideration, the court finds that Plaintiff has failed to state a cause of action under Article IX, section 1(a) of the Florida Constitution and therefore recommends that Counts VIII and IX must be dismissed.

The Florida Supreme Court has recognized that a parent may have standing to challenge the constitutional validity of a legislative act alleged to be harming the

---

[4] Section 1(a) goes on to state that "[t]o assure that children attending public schools obtain a high quality education, the legislature shall make adequate provision to ensure that, by the beginning of the 2010 school year, there are sufficient number of classrooms so that" certain maximum number of students per classroom are met.  Fla. Const. art. IX, § 1(a).

educational interests of their children.  *See Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 403, 403 n.5 (Fla. 1996) (noting the difference in Florida and federal standing requirements and discussing citizen and taxpayer standing to challenge constitutional validity of Florida legislative acts).  However, Florida courts have found that article IX, section 1(a) of the Florida Constitution is not "self-executing" and thus does not create a private cause of action "without the aid of legislative enactment."  *Simon v. Celebration Co.*, 883 So. 2d 826, 831 (Fla. 5th DCA 2004) (quoting *Gray v. Bryant,* 125 So. 2d 846 (Fla. 1960)).  Article IX, section 1(a) further does not create a private right of action against individual school boards because it "specifically states that the provision of an adequate education must be made by the Legislature since the provision states that 'adequate provision shall be made by law.'"  *Sch. Bd. of Miami-Dade Cnty. v. King*, 940 So. 2d 593, 603 (Fla. 1st DCA 2006) (quoting *Simon*, 883 So. 2d at 831).  Thus, "private claims pursuant to this Florida constitutional provision alone, without regard to adequate legislative provisions, are unrecognized[.]"  *M.C.G. ex rel. Gonzalez v. Sch. Bd. of Hillsborough Cnty., Fla.*, No. 8:06-cv-124-T17-MAP, 2006 WL 1528872, at *4 (M.D. Fla. June 1, 2006) (granting motion to dismiss count brought under article IX, section 1(a)) (citing *Simon*, 833 So. 2d at 831); *see also Kunz v. Sch. Bd. of Palm Beach Cnty.*, 237 So. 3d 1026, 1027 (Fla. 4th DCA 2018) ("Because the amendment compelled appropriation to achieve a goal, and not a method of enforcement, it does not provide a private right of action to enforce any specific procedure.").

Unlike the plaintiffs in *Holmes*, on which Plaintiff relies, Plaintiff here does not challenge the constitutionality of any act by the Florida legislature.  Rather his Second Amended Verified Complaint is directed entirely to the actions of Defendant, the School Board of Hillsborough County, in setting the boundaries of various school attendance zones.  (Dkt. 38, Compl.)  For example, Plaintiff asserts in Count VIII that Defendant has failed to provide a "high quality system of free public schools" because its "manipulation of housing property values results in an additional fee that parents must pay to attend certain public schools in the form of higher rents or higher home sales prices."  (*Id.* ¶¶ 229–31.)   In Count IX, Plaintiff alleges that through its "[g]errymander[ing] of school attendance zones," Defendant is failing to provide a "uniform [and] efficient" system of free public schools.  (*Id.* ¶¶ 232–37.)  Plaintiff seeks declaratory relief that Defendant's "actions, omissions, policies , and procedures" violate article IX, section 1 of the Florida Constitution, among other statutes, as well as injunctive relief, damages, attorney fees and costs related to Defendant's actions in drawing school district maps and electing its members.  (Compl. at 51–53.)

Without adequately challenging the constitutionality of a legislative provision, Plaintiff cannot maintain a private cause of action against Defendant to enforce article IX, section 1(a) of the Florida Constitution.  *See, e.g.*, *M.C.G. ex rel. Gonzalez*, 2006 WL 1528872, at *4; *Simon*, 883 So. 2d at 831 (affirming that no private cause of action exists for the enforcement of Article IX, section 1(a) against individual school boards).

Accordingly, the court recommends that Counts VIII and IX be dismissed with prejudice.

## MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff moved for a preliminary injunction against Defendant. (Dkt. 40.) The Honorable District Judge Steven D. Merryday referred Plaintiff's Motion for Preliminary Injunctive Relief pursuant to Federal Rule of Civil Procedure 65 (Dkt. 55) to the undersigned. Plaintiff filed his Motion for Preliminary Injunctive Relief to "force Defendant to place a single student (Plaintiff's child J.W. ) at Carrollwood K-8 for the 2023-2024 sixth grade school year" or alternatively to "enjoin Defendant from implementing the recently promulgated Carrollwood K-8 format change" and maintain the status quo. (Dkt. 40 at 4.) Plaintiff maintains he is likely to prevail on the merits of his claim in Count III for a violation of the EEOA, 20 U.S.C. § 1703. (Dkt. 40 at 4-5.) Defendant objects to Plaintiff's Motion and maintains that Plaintiff lacks standing to pursue this claim on behalf of his minor child. (Dkt. 41 at 3-4.)

The decision to grant or deny a preliminary injunction is within the discretion of the district court. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). To obtain a preliminary injunction, the movant must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the

injunction, if issued, would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal citation and quotation omitted). The sole function of an action for injunction is to forestall future violations. *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952). As such, an injunction serves to "preserve the relative positions of the parties until a trial on the merits can be held," *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983), and therefore cannot serve as a sanction for past conduct that may be addressed by adequate remedies at law, *Alabama v. U.S. Army Corps of Eng'rs.*, 424 F.3d 1117, 1133 (11th Cir. 2005). Because a preliminary injunction "is an extraordinary and drastic remedy," the movant must "clearly" establish the burden of persuasion as to each of the four criteria. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal citations and quotations omitted).

To obtain preliminary injunctive relief, the movant must demonstrate a substantial likelihood of prevailing on the cause of action at issue. *U.S. Army Corps of Eng'rs.*, 424 F.3d at 1134. Stated otherwise, the movant must show that it has a substantial likelihood of success on the merits of the underlying case when the case is ultimately tried. *Id.* at 1128. A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success. *Schiavo ex rel.*

*Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla.), *aff'd*, 403 F.3d 1223 (11th Cir. 2005).

Considering Plaintiff's EEOA claim in Count III of the Second Amended Verified Complaint and the undersigned's recommendations concerning Defendant's Motion to Dismiss, Plaintiff has not established the requirements for preliminary injunctive relief.  Specifically, as the undersigned recommends granting Defendant's Motion to Dismiss, Plaintiff has not established a likelihood of prevailing on Count III of the Second Amended Verified Complaint.

As previously stated, the plain language of 20 U.S.C. § 1703(c) does not encompass a cause of action for parents to sue for the denial of an equal educational opportunity of their child.  *See Coggin Auto. Corp.*, 292 F.3d at 1332 ("The general rule is that unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language.").  Rather, the statute defines prohibited activities and provides a private right of action to the "individual denied an equal educational opportunity." 20 U.S.C. § 1706.  The individual referenced in the statute is the student.  *See Collins*, 156 F. Supp. 3d at 456–57; *Neil Through Cyprian,* 2017 WL 2911578, at *7.  Thus, Plaintiff does not have a cause of action as an individual under the plain language of the EEOA.  *See Bradford*, 2019 WL 572981, at *5 (recommending dismissal of complaint asserting EEOA violations where plaintiff sought to bring action on behalf of his grandchildren).  Plaintiff, as a parent of J.W., may not state a claim under the EEOA to vindicate the denial of an equal educational opportunity to

J.W.   As a result, Plaintiff has not established a likelihood of prevailing on this claim. Accordingly, the undersigned recommends denying Plaintiff's Motion for Preliminary Injunctive Relief (Dkt. 40) without prejudice.

**CONCLUSION**

Accordingly, it is **RECOMMENDED** that:

1. The Defendant's Motion to Dismiss (Dkt. 45) be **GRANTED in part** and **DENIED in part**.

2. Plaintiff's Second Amended Verified Complaint be dismissed with prejudice as to Counts I, II, V, VI, VIII, and IX.

3. Plaintiff's Second Amended Verified Complaint be dismissed without prejudice as to Counts III and IV.

4. Defendant's Motion to Dismiss (Dkt. 45) be denied as to Count VII.

5. Plaintiff's Motion for Preliminary Injunctive Relief (Dkt. 40) be **DENIED without prejudice**.

**IT IS SO REPORTED** in Tampa, Florida, on February 29, 2024.

JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has 14 days after being served with this Report and Recommendation to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Steven D. Merryday
Counsel of Record
Unrepresented Party

# TAB 76

# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM

# Plainitff's Objections to Magistrate Report and Recommendation on Defendant's Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction

Mr. Warner objects to certain parts of the Report and Recommendation (Doc. 72), and respectfully asks the court to issue final judgment as to the due process claim pursuant Rule 54(b), if the court dismisses the count. As the court may recall, one of the reasons Mr. Warner gave for initially filing two separate actions was because the claims related directly to his child's school placement were time sensitive. If the court does not issue final judgment on the due process claim, then Mr. Warner will

not likely be able to seek review on that count while his child is still in middle school[1].
It is Mr. Warner's hope that the court does not experience a total eclipse of the heart
by denying him meaningful review of his school placement due process claims.

# Count I - FHA: Making Housing Unavailable

The report erred in recommending that Count I be dismissed "Given the absence of
authority to affect the availability of housing, Defendant's actions do not fall within
the scope of § 3604(a) of the Fair Housing Act." and because "Defendant does not
allegedly control the availability of housing, nor can Defendant make housing more
or less available" because "The conduct Plaintiff challenges is too remote to support
§ 3604(a) liability".

This is in effect challenging the implied element of causal proximity. But the standard here is not "authority" or "control", but forseeability [2] and/or the "first step"
analytical framework borrowed from antitrust case law[3].

The report erred by failing to engage in any forseeability or first step analysis. All

---

[1]Mr. Warner can already immediately appeal the other school placement count (EEOA claim).

[2]*see* City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1282 (11th Cir. 2015) ("As we've noted, damages claims arising under the FHA have long been analogized to tort claims. Thus, we look to the law of torts to guide our proximate cause analysis in this context. We agree with the City that the proper standard, drawing on the law of tort, is based on foreseeability. See Dobbs, Hayden & Bublick, supra, § 199, at 686 ('Professional usage almost always reduces proximate cause issues to the question of foreseeability. The defendant must have been reasonably able to foresee the kind of harm that was actually suffered by the plaintiff ...'); see also Pac. Shores Props., 730 F.3d at 1168 & n. 32 (noting in the FHA context that 'the doctrine of proximate cause serves merely to protect defendants from unforeseeable results' of their unlawful conduct, and that defendants are 'liable for foreseeable ... effects of discrimination.').")

[3]*see* Bank of Am. Corp. v. City of Miami, 137 S. Ct. 1296, 1306 (2017) ('What falls within that 'first step' depends in part on the 'nature of the statutory cause of action,' Lexmark, supra, at ––––, 134 S.Ct., at 1390, and an assessment " 'of what is administratively possible and convenient,'")

of the cases the report cites to support were either not on point or it's position were disturbed—if they applied at all—by the various Miami opinions.

The manipulation of property values was forseeable because it is common knowledge that 1) higher quality schools assigned to a home increase it's property value, and lower quality schools assigned decrease, 2) that African-Americans and minorities have significantly less household income that white households, and 3) that gerrymandering the school assignment boundaries to exclude minorities from certain schools would cause a shift in racial housing patterns by pricing minorities out of certain white neighborhoods and pricing them in to concentrated minority neighborhoods.

It is well established in the antitrust context that the "first step" are the direct buyers. *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Plaintiff is indisputably the direct home buyer as he purchased a home in October 2022, and he alleges that he was priced out of *south tampa* regarding that home purchase. SAC ¶ 113, 114.

Even if this court finds that the causal chain goes beyond the first step, the Eleventh Circuit on remand from *Miami* none-the-less went beyond the first step again in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) (opinion was vacated as moot after the parties settled) and found causal proximity based on forseeability, as the court should do here.

Mr. Warner requests that the court issue specific findings on forseeability and the

*Miami* "first step", to perfect the record.

# COUNT II - FHA: DISCRIMINATION IN SERVICES

The report erred in finding "that Defendant's provision of education services, including determining school attendance zones in Hillsborough County, is not a 'housing-related service that is directly connected to the sale or rental of a dwelling' under § 3604(b)".

*State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627 (11th Cir. 2019) held that § 3604(b) is not limited in application only to housing providers, but extends to third-party providers of services *connected to housing*.

La Grange imparted a two part test to determine if services are actionable under the FHA: 1) the services must be "closely tied" to the sale or rental of a dwelling and 2) those services are essential to the habitability of the dwelling.

The report did not correctly apply the "closely tied" analysis, but instead erroneously relied on a more stringent "direct control" analysis. The school board directly ties educational opportunity to housing through residential assignment policies that assign homes to schools via school attendance zones. Families with young children are heavily steered into and away from specific neighborhoods based on the school board's discretionary assignment of schools to those neighborhoods, which

makes that conduct "closely related" to the sale or rental of dwellings. At it's heart, the SAC is alleging a discriminatory governmental zoning practice which existing binding case law supports *see* Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2520 (2015) ("Indeed, Congress rejected a proposed amendment that would have eliminated disparate-impact liability for certain zoning decisions. See H.R. Rep., at 89–93."); Jackson v. Okaloosa County, 21 F.3d 1531 (11th Cir. 1994); Huntington Branch, Naacp v. Town of Huntington, 689 F.2d 391 (2d Cir. 1982); and Schwarz v. Treasure Island, 544 F.3d 1201 (11th Cir. 2008).

While the report did not issue any findings with regards to the second prong, water is just as essential to the habitability of a dwelling as schools are to families with school aged children. After all, you do not actually *need* running water when you can just shit in a bucket, anymore than underserved minorities actually *need* to be taught how to read when you can just assign them to Just Elementary or Adams Middle School.

The school board would likely violate the FHA if they totally denied an education to children located in specific neighborhoods, yet that is exactly what they do when the disparity is so great—as alleged in the SAC—that functionally results in the total exclusion from that process of children located in residential real estate that the school board has gerrymandered into failing schools through exclusionary assignment boundaries.

# COUNT III - EEOA

The relevant EEOA provisions read together (emphasis mine):

> "An *individual* denied an equal educational opportunity, as defined by this subchapter may institute a civil action" § 1706

> "No State shall deny equal educational opportunity to an *individual* on account of his or her race ... by—" § 1703

> "the assignment ... of a *student* to a school, other than the one closest to his or her place of residence ..." § 1703(c)

Under plain English construction, the use of the indefinite article "a" when referring to the "student" in relation to the "individual" means that they are not necessarily the same person. If the legislature meant for the "individual" and the "student" to be the same person, they would have used a definite article such as "the".

The eleventh circuit has interpreted the article "a" to be synonymous for "any"[4].

Applying this principle, the phrase becomes:

> "No State shall deny equal educational opportunity to an individual on account of his or her race ... by the assignment ... of *any* student to *any* school, other than the one closest to his or her place of residence ..."

The plain reading of this clearly indicates that the individual and the student do not have to be the same individual. To the extent that the court finds they are the same, then Mr. Warner objects to the report's finding that the statute is not ambiguous,

---

[4]"In common terms, when 'a' or 'an' is followed by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either 'any' or 'one.'" United States v. Alabama, 778 F.3d 926, 932 (11th Cir. 2015)

and maintains that any ambiguity be resolved in his favor to effect the purpose of the statute: to root out racial discrimination in housing.

Pretexual address discrimination is discrimination against both the parent and the child, because it is the parent who decides where the family lives, not the child.

For example, is it discrimination if black parents living in a predominantly black neighborhood adopt a white child, and the school board assigns that white child to a further away majority-minority school? Conversely, is it discrimination for a black child who is adopted by wealthy white parents living in a wealthy white suburb to be assigned to a further away majority-minority school by their address? To ask the question is to answer it.

When someone kidnaps the child of wealthy parents, then demands a large ransom, no one makes the nonsensical argument that only the child was harmed: the child was targeted because of the parent. In the instant case, the school board targeted Mr. Warner, and due to a plain reading of the EEOA statute's expansive language— or alternatively any ambiguity resolves in his favor—Mr. Warner can indepdenently state an EEOA claim on his own behalf.

Coupled with the fact that Mr. Warner's child has no right or ability to enroll himself in school—that right is exclusively Mr. Warner's—makes clear that Mr. Warner was denied an educational opportunity: the ability to apply to enroll his child in a

public school. Especially when those educational opportunities are inexorably intertwined with where Mr. Warner decides to live.

Mr. Warner was denied an equal educational opportunity on account of his race by assigning his child to a further away failing minority-majority school in violation of the EEOA.

## Preliminary Injunction - EEOA

Mr. Warner objects to the report's finding that he has not shown a substantial likelihood of success because he failed to state the EEOA claim that the injunction was based on. Mr. Warner maintains that he has stated a valid claim, and reincorporates the previous argument made in the "Count III - EEOA" section.

## Count VI - Due Process

The report erred in concluding that Mr. Warner did not have a liberty interest in applying to enroll his child through the school choice program, and failing to address *at all* whether Florida Law created a constitutionally protected property interest. Mr. Warner did not sue the school board because they violated state law, he sued them because they denied him a property interest that is protected by the fourteenth amendment (applying to enroll his child in school through the state school choice law, and putting him on a wait list).

## 1. LIBERTY INTEREST

There is a protected liberty interest "of parents and guardians to direct the up-
bringing and education of children under their control." *Pierce v. Society of Sisters*,
268 U.S. 510, 534-35 (1925).

> "Corresponding to the right of control, it is the natural duty of the parent
> to give his children education suitable to their station in life ..." *Meyer v.
> Nebraska*, 262 U.S. 390, 400 (1923)

> "in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the
> 'liberty' protected by the Due Process Clause includes the right of parents
> to 'establish a home and bring up children' and 'to control the education of
> their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510,
> 534-535 (1925), we again held that the 'liberty of parents and guardians' in-
> cludes the right 'to direct the upbringing and education of children under
> their control.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000)

Consistent with the fundamental rights of parents to be actively involved in the
education of their children, the Florida legislature created public school choice
and the parental bill of rights to provide parents and children a right to shape their
education through inter-district transfer.

In *Pierce v. Society of Sisters*, 268 U.S. 510, a unanimous U.S. Supreme Court
invalidated an Oregon law that required parents to send their children to public
schools. The Court ruled that parents have the constitutional right, under the
due process clause of the fourteenth Amendment, to direct their children's edu-
cational as well as moral development, which includes sending their children to a
school of their choice – even a private religious one.

9

Additionally, the fourteenth amendment guarantees "the right of the individual to … acquire useful knowledge …"[5]. The complaint alleges that the school Mr. Warner's child was assigned to was a failing majority-minority school with poor educational outcomes and poor literacy rates, and that the school Mr. Warner attempted to choice his child into was a highly rated majority-white school with excellent educational outcomes and literacy rates. The disparity in educational outcomes and literacy rates between the schools *on their own* trigger due process protections under the fourteenth amendment because they deprive students assigned to those failing schools of acquiring "useful knowledge"[6].

## 2.  PROPERTY INTEREST

Mr. Warner has a protected property interest in enrolling his child in public school because the state has created a legitimate interest in participating in the open enrollment process, and denying participating to a student who is attempting to flee an assigned failing minority-majority school is not de-minimus[7] [8].

The Goss court adopted the Roth two-step analysis for determining whether a

---

[5] *see Meyer v. Nebraska*, 262 U.S. at 399

[6] *see* Buchanan v. City of Bolivar, 99 F.3d 1352, 1359 (6th Cir. 1996) ("Perkins may not have procedural due process rights to notice and an opportunity to be heard when the sanction imposed is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school. See, e.g., C.B. v. Driscoll, 82 F.3d 383, 389 n. 5 (11th Cir. 1996); Doe v. Bagan, 41 F.3d 571, 576 (10th Cir. 1994); *Zamora v. Pomeroy*, 639 F.2d 662, 669-70 (10th Cir. 1981).")

[7] "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause" *Goss v. Lopez*, 419 U.S. 565, 574 (1975)

[8] "The Court's view has been that as long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause" *Id.* at 576

property interest in protectable under the due process clause in the educational

context[9].

Under Roth, the first step turns on whether Mr. Warner has legitimate claim:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577 (1972)

State law—such as the laws at issue—create legitimate claims of entitlement[10]

Florida's Parental Bill of Rights explicitly gives Mr. Warner the right to apply

to *any* public school:

"The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll his or her minor child in a public school or, as an alternative to public education, a private school, including a religious school, a home education program, or other available options, as authorized by law." Fla. Stat. § 1014.04(1)(c)

The Florida open enrollment law reinforces that right, and grants the following

rights that were denied to Mr. Warner:

"each district school board or charter school shall allow a parent from any school district in the state whose child is not subject to a current expulsion or suspension to enroll his or her child in and transport his or her child to any public school, including charter schools, that has not reached capacity in the district, subject to the maximum class size pursuant to s. 1003.03 and s. 1, Art. IX of the State Constitution. The school district or charter school shall accept the student, pursuant to that school district's or charter school's controlled open enrollment process, and report the student for purposes of the school district's or charter school's funding pursuant to the Florida Education Finance Program." Fla. Stat. § 1002.31(2)(a)

---

[9]"whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Id.* 575-76 (quoting *Board of Regents v. Roth*, supra, at 570-571.)

[10]"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law" *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)

"Allow parents to declare school preferences, including placement of siblings within the same school." Fla. Stat. § 1002.31(2)(b)

"Provide a lottery procedure to determine student assignment and establish an appeals process for hardship cases." Fla. Stat. § 1002.31(2)(c)

"Require school districts to maintain a wait list of students who are denied access due to capacity and notify parents when space becomes available." Fla. Stat. § 1002.31(2)(j)

"Maintain socioeconomic, demographic, and racial balance." Fla. Stat. § 1002.31(2)(e)

"Require schools to accept students throughout the school year as capacity becomes available." Fla. Stat. § 1002.31(2)(k)

While the report is correct that there is no on-point binding precedent on this issue, the eighth circuit came in on-point by all but finding that non-discretionary school choice laws create a protected property interest under the due process clause in *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015). The Plaintiffs in that case only lost because the court found the Arkansas school choice law at issue was discretionary, so there was no legitimate expectation or right to it. The Florida laws at issue suffer from no such infirmary.

The *Florida* law at issue is a *non-discretionary* open enrollment statute and the "Parental Bill of rights", both of which create enforceable rights.

The school board failed to give Mr. Warner *any* process regarding the denial of any of these property interests, let alone adequate process.

## 3.   Amendment is not futile

Mr. Warner objects to the reports recommendation that the due process claim be dismissed with prejudice. Even if the court finds that Mr. Warner does not have a protected liberty interest or property interest, the claim should not be dismissed *with prejudice* because he could bring a mandamus action in state court[11].

4-8-2024

_____

Date

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

_____

Signature

_____

[11]This court has already ruled that Mr. Warner cannot bring a mandamus action against state actors in federal court

13

# TAB 78

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


BLAKE ANDREW WARNER,

     Plaintiff,

v.                              CASE NO. 8:23-cv-181-SDM-UAM

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY,
FLORIDA,

     Defendant.

_____/


**ORDER**

     In his second amended complaint (Doc. 38), Blake Warner, appearing *pro se*, asserts nine claims against the Hillsborough County School Board, and Warner moves (Doc. 40) for a preliminary injunction that either "force[s]" the School Board to enroll Warner's child at Carrollwood K-8 or enjoins the School Board from "implementing the recently promulgated Carrollwood K-8 format change . . . ."  In a thorough report, the magistrate judge recommends (Doc. 72) dismissing each claim other than Warner's equal protection claim (Count VII) and denying the motion for a preliminary injunction.  Warner objects (Doc. 76) to the dismissal of Warner's Fair Housing Act claims (Counts I and II), of Warner's Equal Educational Opportunities Act claim (Count III), and of Warner's due process claim (Count VI).  Also, Warner objects to the denial of his motion for a preliminary injunction.

A careful, *de novo* review of the report reveals no error.  As the report explains, the conduct that Warner challenges is "too remote" to support any of Warner's Fair Housing Act claims.  Warner contends that the report omitted a "foreseeability" analysis, but *Bank of America Corp. v. City of Miami, Florida*, 581 U.S. 189, 202 (2017), holds that "foreseeability alone" is not sufficient to support a Fair Housing Act claim.  Instead, "the [Fair Housing Act] requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Bank of America*, 581 U.S. at 202–03.  The report correctly determines (1) that the School Board lacks direct control over the availability of housing and (2) that Warner offers no "causal link evidencing racial discrimination in connection with the provision of any services related to housing or the denial of housing rights[.]"

Also, a *de novo* review confirms the other challenged portions of the report. Warner contends that, as the parent of a child in the public-school system, he may assert an Equal Educational Opportunities Act claim on his own behalf.  The analysis on pages twenty-one through twenty-three of the report explains (in accord with several persuasive decisions) that "the plain language of [the Equal Educational Opportunities Act] does not encompass a cause of action for parents to sue for the loss of an equal educational opportunity of a child."

Similarly, Warner contends that the School Board's not permitting him to submit a "school choice application" to enroll his child in Carrollwood K-8 violates Warner's right to due process.  The report on pages twenty-nine through thirty-one determines that Warner presents no basis establishing that "school choice and

- 2 -

hardship policies provide rights protected by the United States Constitution." Citing *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015), Warner responds that he enjoys a property interest in enrolling his child in a preferred school through a "school choice" application. But *Stevenson* holds that parents, who asserted a due process claim based on a "broad school choice transfer option," established neither a liberty nor property interest in "public school choice." *See Adkisson v. Blytheville Sch. Dist. No. 5*, 2014 WL 6819729, at *15 (E.D. Ark. 2014) (Baker, J.) (finding no authority establishing that a parent has a "fundamental right or liberty" to "choose where his or her child is educated within the public school system").

A review of the remaining portions of the report reveals no error. For these reasons and others stated by the magistrate judge, the report and recommendation (Doc. 72) is **ADOPTED**. The motion (Doc. 45) to dismiss is **GRANTED-IN-PART**. Counts I, II, V, VI, VIII, and IX are **DISMISSED WITH PREJUDICE**. Counts III and IV are **DISMISSED WITHOUT PREJUDICE** as to Warner's asserting through counsel these claims on behalf of his child. The motion (Doc. 40) for a preliminary injunction is **DENIED WITHOUT PREJUDICE**. This action proceeds as to Warner's equal protection claim (Count VII). No later than **JULY 1, 2024**, Warner may amend the complaint in accord with the report and this order. The School Board must respond in accord with Rule 15(a)(3), Federal Rules of Civil Procedure.

In the objection, Warner requests a final judgment as to Warner's due process claim if an order adopts the report and recommendation. Warner wants to appeal

- 3 -

the dismissal of the claim "while his child is still in middle school."  Rule 54(b), Federal Rules of Civil Procedure, permits the entry of judgment as to fewer than all claims "only if the court expressly determines that there is no just reason for delay." *Lloyd Noland Foundation, Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 778 (11th Cir. 2007), explains that "[t]he district court must act as a 'dispatcher' and exercise its discretion in certifying partial judgments in consideration of 'judicial administrative interests' — including 'the historic federal policy against piecemeal appeals' — and 'the equities involved.'"  Despite the potential for some delay, several reasons, such as "the relationship between the adjudicated and unadjudicated claims" and the increased cost for both parties, counsel against certifying a partial judgment for immediate appeal.  *See In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 275 (6th Cir. 2019) (commending for review a "non-exhaustive list of factors" that a district court might use to determine whether to certify a partial judgment).  Warner's request, construed as a request for a partial judgment under Rule 54(b), is **DENIED**.

ORDERED in Tampa, Florida, on June 7, 2024.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

- 4 -

**CERTIFICATE OF SERVICE**

    I filed this appendix with the Court via ECF, which will email everyone requiring notice.

August 13, 2025
_____
Date

/s/blake warner
_____
Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM