# United States Court of Appeals
# for the Eleventh Circuit

No. 25-11376

---

Blake Warner

*Plaintiffs-Appellants,*

*v.*

The School Board of
Hillsborough County, Florida

*Defendants-Appelleees.*

Appeal from the United States District Court
for the Middle District of Florida
USDC No. 8:23-CV-181

---

**APPENDIX VOLUME 5**

# APPENDIX INDEX

## VOLUME 1

**U.S. District Court Middle District of Florida (Tampa)**
    **Civil Docket for Case No. 8:23-cv-181-SDM-LSG** . . . . . . . . . . . . . . . . . . . .DKT

**Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **1**

**Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **29**

**Answer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **30**

**Second Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **38**

Exhibit A south tampa race map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-A

Exhibit B white map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-B

Exhibit C hispanic map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-C

Exhibit D black map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-D

Exhibit E south tampa elementary map . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-E

Exhibit F wfla addison davis property values . . . . . . . . . . . . . . . . . . . . . . .Vol 3-F

Exhibit G HOLC ads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-G

Exhibit H HOLC map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-H

Exhibit J carrollwood proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-J

Exhibit K wtsp property value concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-K

Exhibit R district map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-R

Exhibit X gerrymander graphs elementary . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-X

Exhibit Y gerrymander graphs middle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-Y

Exhibit Z gerrymander graphs high . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-Z

**Motion To Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **45**

**Response To Motion To Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **49**

**Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **72**

**Objection To Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . .    **76**

**Order Adopting Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . .    **78**

VOLUME 2

**Third Amended Complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **79**

Exhibit A south tampa race map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-A

Exhibit B white map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-B

Exhibit C hispanic map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Vol 3-C

Exhibit D black map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-D

Exhibit E south tampa elementary map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-E

Exhibit F wfla addison davis property values . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-F

Exhibit G HOLC ads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-G

Exhibit H HOLC map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-H

Exhibit J carrollwood proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-J

Exhibit K wtsp property value concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-K

Exhibit R district map . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-R

Exhibit X gerrymander graphs elementary . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-X

Exhibit Y gerrymander graphs middle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Y

Exhibit Z gerrymander graphs high . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .Vol 3-Z

**Answer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     **82**

Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82-1

**Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     **85**

**Motion For Judgment On The Pleadings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     **86**

**Opposition Motion For Judgment On The Pleadings** . . . . . . . . . . . . . . . . . . . .     **87**

**Response Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **91**

## VOLUME 3

**Motion To Stay Discovery** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **96**

**Reply Motion To Strike** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **97**

**Response In Opposition To Stay Discovery** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **99**

**Order Staying Discovery and 12(c) Conversion to Summary Judgment** . . .    **103**

**Joint Statement Of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **105**

  Draft Settlement Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-1

  Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-2

  Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-3

  Email Discussions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105-4

**Motion To Stay Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **106**

  Blake Warner Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106-1

**Notice Submitting Evidence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **107**

  Blake Warner Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-1

  Agreement Redline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107-2

**Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **112**

**Objection To Report And Recommendation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **117**

**Response To Objections** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **118**

**Order Adopting Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **120**

**Notice of Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **126**

## VOLUME 4

**Exhibit A south tampa race map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **A**

**Exhibit B white map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **B**

**Exhibit C hispanic map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **C**

**Exhibit D black map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **D**

**Exhibit E south tampa elementary map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **E**

**Exhibit F wfla addison davis property values** . . . . . . . . . . . . . . . . . . . . . . . . . .  **F**

**Exhibit G HOLC ads** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **G**

**Exhibit H HOLC map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **H**

**Exhibit J carrollwood proposal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **J**

**Exhibit K wtsp property value concerns** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **K**

**Exhibit R district map** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **R**

**Exhibit X gerrymander graphs elementary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **X**

**Exhibit Y gerrymander graphs middle** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Y**

**Exhibit Z gerrymander graphs high** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Z**

## VOLUME 5

**114 Cong. Rec. at 2530 (1968)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-1**

**114 Cong. Rec. at 24418** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-2**

**134 Cong. Rec. (1988) at 19711** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-3**

**90th Cong., 1st sess., Congressional Record 113, August 16, 1967 at 22841 -**
    **22848** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-4**

**90th Cong., 2nd sess., Congressional Record 114, February 15, 1968 at 3133**
    **- 3134** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-5**

**DOJ Remarks June 15, 1965** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**CR-6**

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TAB CR-1

**2530**                          CONGRESSIONAL RECORD — SENATE                          *February 7, 1968*

I wanted the Senator from Maryland to know that I will vote against such a tabling motion, should one be made.

I have not concluded how I shall vote on the pending amendment. It is so far reaching that further study is necessary. However, I am listening with rapt attention to the speech by the able Senator from Maryland.

Mr. TYDINGS. Mr. President, I thank the distinguished Senator from Tennessee who has a great record in the Senate as a defender of those who are less fortunate than others and those who need help.

Mr. President, I believe that our efforts to relieve unemployment seem destined to failure under current conditions of housing discrimination. Housing discrimination deprives hundreds of thousands of nonwhites of employment opportunities in suburban communities which are generally unavailable to them as places for them to reside themselves. And within our large, sprawling cities, a similar deprivation occurs within the city limits when nonwhites are excluded from many residential areas. The fact is that most new jobs are springing up in the suburbs. Between 1960 and 1965 from one-half to two-thirds of all new factories, stores, and other mercantile buildings in all sections of the country, except the South, were located outside the central cities of metropolitan areas.

Since 80 percent of the nonwhite population of the nonwhite population in metropolitan areas in 1967 lived in central cities, the handicaps of nonwhite jobseekers are apparent. Unless nonwhites are able to move into suburban communities by the elimination of housing discrimination, and the provision of low- and moderate-cost housing in these areas, they are going to continue to be deprived of jobs, no matter how extensive our efforts to employ them.

As the President has noted in his 1968 civil rights message to the Congress, we have not achieved the goal of "a decent home and a suitable living environment for every American family."

As the President noted:

Construction of new homes is not enough unless every family is free to purchase and rent them. Every American who wishes to buy a home, and can afford it, should be free to do so.

Segregation in housing compounds the Nation's social and economic problems. When those who have the means to move out of the central city are denied the chance to do so, the result is a compression of population in the center. In that crowded ghetto, human tragedies—and crime—increase and multiply. Unemployment and educational problems are compounded—because isolation in the central city prevents minority groups from reaching schools and available jobs in other areas.

A fair housing law is not a cure-all for the Nation's urban problems. But ending discrimination in the sale of land or housing is essential for social justice and social progress.

Despite the fact that the deliberate exclusion from residential neighborhoods on grounds of race—and all the problems that go with it—are still with us today as they were in 1967, in 1960 and long before, there is encouraging evidence that action will be taken and leadership exerted to end these practices.

Montgomery County, in my State of Maryland, has enacted a local fair housing ordinance and Prince Georges County, also in Maryland, is seriously considering similar legislation.

Across the Nation, as of September 1967, 23 States, including my own State of Maryland, and the District of Columbia, the Virgin Islands, and Puerto Rico, have recognized the need for legislation for fair housing and have passed it.

Some 40 other jurisdictions—city and county governments—have established fair housing ordinances.

Mr. President, at this time I ask unanimous consent to have printed in the RECORD a summary of the laws of the 23 States.

There being no objection, the summary was ordered to be printed in the RECORD, as follows:

SUMMARY OF COVERAGE OF STATE FAIR HOUSING LAWS, AS OF SEPTEMBER 1, 1967—23 STATES, DISTRICT OF COLUMBIA, VIRGIN ISLANDS, AND PUERTO RICO

MARYLAND

Owners and managers of five or more units are prohibited from discriminating in sales or rentals, with four exceptions:

(1) Buildings fully constructed prior to June 1, 1967;

(2) Buildings for which a permit was issued pursuant to plans filed prior to June 1, 1967, and which will be completed by June 1, 1968;

(3) Owner-occupied buildings containing less than twelve units;

(4) Buildings qualified under state law as condominiums or cooperative apartments.

Owners and managers are also forbidden to advertise discriminatory preferences except for property descriptions for bona fide appraisal purposes. Religious institutions and fraternal organizations are expressly allowed to give preference to persons of the same religion or to those whom the fraternal organization decides would further its principles. Financial institutions may not discriminate in loans or conditions.

Enforcement is the responsibility of the Commission on Interracial Problems and Relations, which has power to conduct investigations, after a complaint has been filed. After notice and hearings, the Commission may issue cease and desist orders and require affirmative action by the respondent. The Commission's orders must be judicially enforced.

ALASKA

Alaska prohibits discrimination in all categories of housing through its public accommodations laws. A State Commission for Human Rights is charged with administering the law. Either an aggrieved person or the Executive Director may file a complaint with the Commission, which then investigates the alleged discriminatory conduct. If substantial evidence is found which supports the complaint, the Commission attempts to eliminate the discrimination by conciliation. If this fails, a hearing is conducted. In the event that a violation is found, the Commission issues a cease and desist order and may require other affirmative action. Compliance with such an order is a bar to criminal prosecution for the particular instance of discriminatory conduct found by the Commission. Violation of this law is a misdemeanor punishable by imprisonment for not more than 30 days and/or a fine of not more than $500.

CALIFORNIA

California prohibits discrimination in private housing except for houses with four or fewer units. Real estate brokers and financial institutions are covered by the provisions of the law. Enforcement is by the Fair Employment Practice Commission. An aggrieved

person may file a complaint with the Commission, but the Commission itself may not initiate complaints. If the Commission determines by investigation that probable cause exists for believing the allegations of the complaint, it may attempt to eliminate the violation by conciliation. Also, a temporary restraining order may be obtained (for not more than 20 days) enjoining the owner of the housing from selling or leasing it until the Commission has made a final determination. If attempts at conciliation fail, a hearing is held before a hearing officer sitting alone or with the Commission. In the event a case is heard by the hearing officer alone, he prepares a proposed decision, copies of which are served on the parties. The Commission may adopt the decision as drafted, or adopt the decision and reduce the penalty. Alternatively, the Commission may decide the case on the record, with or without taking additional evidence, but in such a case the parties must be provided with an opportunity for oral or written argument. If the Commission finds that an unlawful practice has been engaged in, it issues a cease and desist order and requires the transfer of the housing accommodation in question, the transfer of a like accommodation, or the payment to the complainant of damages not to exceed $500, if the remedy of transfer is not available. Willful violation of such orders is punishable by a fine not to exceed $500, imprisonment not to exceed 6 months, or both. Judicial review of Commission orders is available. If the Commission believes that its orders are being violated it may obtain an injunction against further violations.

California also has a statute which provides that all persons regardless of their race, color, religion, or national origin are entitled to the full and equal accommodations, facilities, and services of all business establishments. This law has been construed by the courts to apply to real estate brokers and developers. Persons aggrieved by violations may bring civil suits for the actual damages suffered plus $250.

COLORADO

The Colorado fair housing act of 1959, as amended, prohibits discrimination in all types of housing except the rental of rooms in an owner-occupied one-family dwelling. The law applies to owners, real estate agents, and lenders. Enforcement is vested in the Colorado Civil Rights Commission. Complaints may be filed by aggrieved persons, the Commission, or the Attorney General. The Commission then investigates the allegation of illegal discriminatory action. If cause for the complaint is found to exist, the Commission tries to eliminate the discrimination by conciliation. The Commission may seek temporary restraining orders to prevent transfer of property prior to disposition of the complaint. If conciliation efforts are unsuccessful, the Commission may conduct a hearing. If, at hearing, the violation is verified, the Commission issues a cease and desist order and may require affirmative action.

CONNECTICUT

Connecticut prohibits discrimination in the sale or rental of all categories of housing except the rental of one unit in an owner-occupied two-family house, and the rental of rooms in a house by the occupant thereof. Violators may be punished by a fine of $25–$100, 30 days imprisonment, or both. In addition, the Connecticut Commission for Human Rights and Opportunities may receive or issue complaints. The Commission investigates, and if reasonable cause exists for concluding that a violation has occurred, attempts are made to settle the matter by conciliation. If conciliation fails, a hearing is held before the Commissioners or a panel of hearing examiners. In the event the Commission finds that an unfair practice has been engaged in, a cease and desist order may be issued or other affirmative action required. The Commission also has power to seek

# TAB CR-2

mechanisms designed to relate research findings and basic data to the processes of decisionmaking and to provide for effective interaction between decisionmakers and faculty members.

To realize these objectives the program of the center, emphasizes:

The provision of research professorships—as described more fully below—and research scholarships, fellowships, and assistantships.

The provision of a physical location where scholars—both faculty and students—concerned with urban life may meet together to work, to discuss, to interact with one another and with members of the community.

The provision of a specialized urban library and data collection, staffed by librarians, statistical clerks, and assistants with special interests in urban subjects and located so that the research professors have easy and continued access to these resources.

The provision of a small administrative staff to plan and administer center activities.

In addition, as part of the university's centennial celebration next year $70,000 has been allocated for seven symposia. The symposia will seek to "bring the virtues of intelligence and good will to the resolution of questions and problems regarding the nature of our cities."

Third, Wayne several years ago—in cooperation with the University of Michigan—established the Institute of Labor and Industrial Relations. A basic function of this institute is research activity.

Work has ranged from studies of discriminatory practices in employment, to pilot research on community mobilization and Federal programs designed to aid the disadvantaged, to study of the hardcore unemployable, to study of manpower adjustment to technological change, to preretirement education.

In addition, the institute has initiated an impressive new journal, Poverty and Human Resources Abstracts. Issued bimonthly, it contains 50 abstracts of material, published and unpublished, in the critical problem areas of poverty, human resources, manpower development, and social legislation.

Fourth, Wayne State University has an extremely active division of urban extension. Its activities have included training for Headstart teachers, establishing a degree program in police administration, and administering the Applied Management and Technology Center. Another activity was "Detroit adventure," a project to bring cultural activities to students in the intercity.

Fifth, discussions are now under way for an exchange of personnel and ideas between the Center for Urban Studies of the City University of New York, and Wayne.

Mr. President, as I said, Detroit preriot was a fascinating laboratory for students of urban affairs. Since the riot this fascination has magnified. Wayne already has been contacted by a number of persons seeking use of facilities—or financing—for valuable studies.

Some research to determine the whys of the Detroit riots already is underway.

A $130,000 grant from the National Institute of Mental Health put researchers on the streets of the wrecked area while snipers were still at work. The goal is to determine what causes riots and what sociological, physical, and welfare changes are needed to avert future uprisings.

A grant request from the Department of Labor for a study of the selectivity of the rioting and looting is in process of submission.

Mr. President, there is no question that much more could be done—and must be done. Other centers are at work. All labor under the shortage of funds. All could profit from a central informational clearinghouse.

We need information, much more information, if we are to lick the problem of our cities as we have licked other problems. It seems to me that President Johnson was entirely right in proposing that an independent institute could aid in this job.

The financing for such an institute could, I believe, be shared by Government and private sources. Indeed, this would be the ideal way, for then the research could go on with a beholdence to no one. That way the facts can be unearthed and the chips can fall where they may.

Mr. President, for decades this country has been able to achieve amazing defense and aerospace goals by pulling together impressively well coordinated and effective research and technological complexes.

When we wanted to create an atomic bomb, we teamed intellectuals with engineers, theorists with technicians, academicians with industrialists.

When we wanted to whip the problems of space, we again assembled an impressive research and technological complex drawn from Government, universities, and industry.

These complexes have been created by public funds to attack massive problems.

Well, the problems of our cities are certainly massive. Would not these problems respond to the same sort of attack? Should we not be willing to make the same sort of commitment?

An Institute of Urban Development would be a useful first step toward such a commitment.

We have already wasted 5 months when we could have been learning how such a commitment would be most effective. Again, I join in the President's request that we establish this Institute—and quickly.

## OPEN HOUSING

Mr. MONDALE. Mr. President, open housing is at the heart of the major problems of our big cities. Obviously, its lack means, for instance, the continuance of segregated schools and a lack of equal opportunity in those schools.

At the same time, open housing has been all too often misrepresented. George Meany, president of the AFL-CIO, contributed substantially to the removal of current misunderstandings in his testimony before the Senate Subcommittee on Housing and Urban Affairs. I ask unanimous consent that his statement be printed in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

STATEMENT ON S. 1358, THE FAIR HOUSING ACT OF 1967, AND RELATED BILLS

(Statement by George Meany, President, American Federation of Labor and Congress of Industrial Organizations, before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, Aug. 23, 1967)

Mr. Chairman, my name is George Meany. I am president of the AFL-CIO. I am glad to have this opportunity to present our views on S. 1358, which you introduced by Senator Mondale and 21 other Senators of both parties.

I would also like to comment briefly, during the course of my testimony, on S. 2114 and S. 2280, offered by Senator Hartke.

We are pleased that S. 1358 is a bipartisan bill from its inception. Surely the long-delayed achievement of equal rights and equal justice for all Americans is not a proper matter for political dispute.

Let me emphasize our profound conviction that the bill before you is extremely important. It is not just a piece of house-cleaning, aimed at picking up a few loose ends left over from the Civil Rights Act of 1964. On the contrary, its ramifications extend into many areas of civil rights already dealt with by that and other measures.

It is not an exaggeration to say that open housing is absolutely essential to the realistic achievement of such accepted goals as desegregated schools and equal opportunity. Indeed, until open housing becomes an operating fact, much of the statutory civil rights progress of recent years—great as it has been—will be no more than inoperative theory.

Schools are the most obvious example. The typical public grammar school is a neighborhood operation. The composition of the student-body, therefore, is determined by that of the residents. The result can, in effect, be de facto segregation.

To some degree this has always been true. In the long history of this country there have been neighborhoods which were in effect segregated by nationality. Some of them are with us yet. Those neighborhoods have had, in their own way, segregated schools.

But the problem of the Negroes is different. The Irish, the Italians and the other nationality groups had one ultimate weapon—mobility. They could and they did move out of their ghettos as their means permitted. Yes, they met some resistance, but it was seldom more than social ostracism of short duration.

Negroes simply do not have that kind of mobility. They may spend their working hours as part of a thoroughly-integrated work-force, but they come home at night to a segregated neighborhood, with its segregated school for their children.

Local school officials, under pressure from the federal courts, have contrived a variety of devices to overcome de facto segregation. These devices may well be necessary as stopgaps to meet the immediate need; but in the long run, the soundest way to attack the segregated neighborhood school is to attack the segregated neighborhood.

This has long been an objective of the labor movement. The 21 fair housing laws that have been passed by state legislatures, and the 43 enacted by cities and counties, were warmly supported and often initiated by organized labor. In the words of the Sixth Constitutional Convention of the AFL-CIO, in December 1965:

"A key feature of labor's housing program is its drive for equal housing opportunity for all Americans. There is no place in Amer-

ica for racial ghettos. Equal access, without regard to race, creed, color or national origin, to every residential neighborhood in every American community should be assured for every family in America."

Moreover, we have fitted our actions to our words. More than 150 housing projects have been sponsored by trade unions and others are on the way. One of the earliest, built by the Amalgamated Clothing Workers in New York City, is now 40 years old. All these projects, large and small, are available to tenants or buyers without regard to race, creed, color or national origin.

The experience of the labor movement amply proves that integrated housing works; that people of different races can live in harmony as neighbors. It should also help put to rest the only other argument against open housing that deserves any consideration at all—the notion that neighborhood standards decline when Negro families move in.

This is an ancient superstition, perpetuated by far too many unscrupulous real estate agents. But the fear it arouses in the hearts of some home-owners cannot be ignored. In the generally affluent society of recent years, vast numbers of young families have bought homes of their own. These homes represent, in most cases, the biggest investment they will ever make, not only absorbing their accumulated savings, but also involving a long-term mortgage obligation of substantial size. The loss of this investment would be a disaster.

Therefore the fears—though baseless—should not be denounced with righteous indignation, but dissipated by exposure to the truth.

Actually, it is our belief that the fears are not as widely held as some assert, especially if they are not drummed up by reactionaries, racists and real estate profiteers. A very heart-ening example was the gubernatorial election in Maryland in 1966, which I am sure the members of the committee remember. One candidate based his entire campaign on the slogan, "Your home is your castle"—which in this case meant total opposition to open housing. He went down to a resounding defeat at the hands of an electorate in which a great majority were registered members of his own party.

Most encouraging of all were the heavy votes against him in the "bedroom" communities in Montgomery and Prince Georges counties, where the immense population growth of recent years has been largely comprised of the young families I mentioned earlier. In the face of a campaign designed to capitalize on their fears, these voters ignored their party affiliation in order to repudiate a racist appeal.

They were right, not just morally but in terms of dollars and cents. For the old superstition about neighborhood standards and property values is simply not true.

It has its foundation, of course, in the unhappy fact that a great many Negroes live in slums. But the Negroes did not create the slums; they inherited them from other ethnic groups that were lucky enough to escape. And what they inherited was bad housing made worse by time and by lack of maintenance by its absentee owners.

There is no need to go beyond the limits of the District of Columbia to learn that neighborhood standards are not a matter of race. Let any skeptic take a tour—not a traditional tourist's round of national monuments, but a tour of the places where the city's Negroes live. He will find shameful slums; he will also find block after block of spic-and-span houses, bright with flower beds and well-kept lawns.

The simple exercise of observation should be even more persuasive than statistics, but statistics are also available.

Many studies have shown that Negro home-owners are just as concerned with neighborhood standards and just as diligent in maintaining them as any other group. One such

study that came to this conclusion should, in this context, be above suspicion; it was conducted more than 20 years ago by the National Association of Real Estate Boards.

The matter of property values has also come under scrutiny. I am sure the members of the committee are familiar with the study by Dr. Luigi Laurenti, undertaken for the Commission on Race and Housing and published in 1960. It covered 20 neighborhoods in San Francisco, Oakland and Philadelphia where Negroes had moved in over a 12-year period. In brief, the results showed that in 85% of the cases, property values either rose or remained stable. In the other 15%, there were moderate declines. But most significantly, there was no pattern attributable to the entrance of non-whites; other influences, taking effect simultaneously, had more effect. Similar studies in Chicago, Kansas City, Detroit and Portland, Oregon, conducted independently by others, came up with the same findings.

Therefore the ancient superstition is no more than an evil falsehood, and the bill you are considering should go far toward wiping it out. And it should also go far toward retraining those who perpetuate it.

In this connection I am referring particularly to Section 4(c), which as I read it would forbid discriminatory references in real estate advertising.

In addition to the intrinsic merit of this provision, I have a special interest in it. And I question whether it goes far enough to meet the subtle discriminatory appeals of much real estate advertising.

Let us consider the peculiar posture of the daily press on this matter.

A considerable number of newspapers, to their great credit, have warmly supported the cause of open housing. One of them is a paper which I suppose all of us read every morning—the *Washington Post.*

Most of these same papers—perhaps all of them—have real estate sections at least once a week, crammed with advertising, much of it from real estate developers and real estate agents who are dedicated to the preservation of racial discrimination. One of these papers is the *Washington Post.*

On July 24 the *Washington Post* published an editorial, one of many on the general issue, offering commendations to the Montgomery County, Maryland commissioners for enacting a fair housing ordinance. As a citizen and a homeowner in that county I was moved to write to the *Washington Post,* as follows:

"Dear Sir:

"As a resident of Montgomery County, I join with the Washington Post (July 24) in hailing the new fair housing ordinance. It is, as you say, 'a standard of single importance' dealing with 'the most urgent domestic issue of this decade.'

"It is, I am proud to report, a decision that is four-square with the policy of the AFL-CIO.

"My purpose in writing, however, is to suggest that the Washington Post is in a unique position to aid the cause of fair housing by simply instructing its advertising department to abide by the principles that its editors espouse.

"I propose a simple declaration that the Washington Post will accept real estate advertising only from advertisers that guarantee the property, either for rent, or for sale, is available without regard to race, creed, color or national origin.

"Such a decision to put principle before profit could set 'a standard of national importance' for newspapers throughout the nation and I urge that the Washington Post establish this standard."

As we all know, Mr. Chairman, the *Washington Post* publishes many letters from readers, even critical ones. Sometimes, if it feels aggrieved, it follows a critical letter with a defense, in italic type. A newspaper or magazine can take criticism in stride, if

it has any sort of case, because it always has the last word.

However, the *Washington Post* did not follow this course. It did not publish my letter at all.

Instead, I received a letter dated August 10 and signed by James J. Daly, vice president and general manager of the *Washington Post,* which reads as follows:

"Dear Mr. Meany:

"The Editor of *The Washington Post* has referred to me your letter of July 24, commenting on the Montgomery County fair housing ordinance and proposing that *The Washington Post* adopt a policy that it will 'accept real estate advertising only from advertisers that guarantee the property, either for rent or for sale, is available without regard to race, creed, color or national origin.' I appreciate this opportunity to comment on your proposal.

"I feel that you must be familiar with what I consider to be the extremely fine historical record that has been made in the field of real estate advertising by *The Washington Post* over the past several years. Long before there was any legislative action by any governmental body in this field, *The Washington Post* adopted standards of advertising acceptability which were designed to discourage, if not prevent, the advertising of property on a discriminatory basis of race, creed or color. Our policy, our views, and our objectives have certainly not changed, and we welcome the progress that has been made in the public field to facilitate the implementation of these wholesome and non-discriminatory objectives.

"However, upon reflection, I am confident that you will realize the dangers of adopting a policy of affidavits of guarantee or any other form of prior restraints upon advertisers of any kind respecting their intention to comply with the law. We would regard this as an abuse of both the authority and responsibility that a free press possesses in the fields of news and advertising.

"On the other hand, you can be sure that in applying our standards of advertising acceptability we will continue to refuse to accept copy which we believe is detrimental to the objective of non-discriminatory practices. Thank you again for your thoughtful letter."

Mr. Chairman, it would be an exaggeration to say that I was shocked by Mr. Daly's letter, but I was certainly saddened by it.

I freely acknowledge that the *Washington Post* long ago began rejecting real estate advertising labelled "whites only" or—conversely—"colored". By the moral standards of the publishing industry it took an advanced position.

But the display advertisements in the *Washington Post's* real estate sections drip with discrimination. What is meant by a phrase like "a private community"? Or "conventional mortgages only"? Or by "with club membership you become eligible to buy"? Any sophisticated reader can understand all this, and we think Mr. Daly and his colleagues are sophisticated. They know the people whose money they are taking.

In attempting to hide all this under a specious paragraph about "freedom of the press", Mr. Daly is insulting my intelligence. I did not appreciate this when I received his letter and my feelings have not mellowed in the two weeks since.

It is indeed ironical that the news column in Section A of the *Washington Post* can report in honest detail a demonstration or a court action against a discriminatory developer, while the real estate section will not only carry the same developer's advertising, but a puff story on the special merits of his enterprise.

One example is the Levitt organization, which discriminates nowhere, any more, except in the Washington area. Mr. Levitt has quite candidly said that he is following "local customs" in his three developments

# TAB CR-3



UNITED STATES        OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 100th CONGRESS

SECOND SESSION

## VOLUME 134—PART 14

JULY 28, 1988 TO AUGUST 5, 1988

(PAGES 19263 TO 20755)




UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1988

## CONCLUSION OF MORNING BUSINESS

The PRESIDING OFFICER. The time for morning business has now expired.

## FAIR HOUSING AMENDMENTS ACT

The PRESIDING OFFICER. Under the previous order, the Senate will now proceed to the consideration of H.R. 1158 which the clerk will report.

The assistant legislative clerk read as follows:

A bill (H.R. 1158) to amend title VIII of the Act commonly called the Civil Rights Act of 1968, to revise the procedures for the enforcement of fair housing, and for other purposes.

The Senate proceeded to consider the bill.

Mr. THURMOND. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. KENNEDY. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 2777

Mr. KENNEDY. Mr. President, I send an amendment to the desk and ask for its immediate consideration.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

The Senator from Massachusetts [Mr. KENNEDY] for himself, Mr. SPECTER, and Mr. HATCH, proposes an amendment numbered 2777.

Mr. KENNEDY. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The text of the amendment is printed in today's RECORD under Amendments Submitted.)

Mr. KENNEDY. Mr. President, I want to commend the majority leader for bringing before the Senate today this landmark civil rights legislation.

Twenty years ago, in the wake of the assassination of Dr. Martin Luther King, Congress enacted into law the promise of fair housing for all Americans. But the Fair Housing Act we passed in 1968 has proved to be an empty promise because the legislation lacked an effective enforcement mechanism. For two decades, fair housing in America has been a right without a remedy.

Housing discrimination exists in America today, and it exists in epidemic proportions. The Department of Housing and Urban Development estimates that nearly 2 million incidents of racial discrimination alone occur each year. One HUD survey found that a black American can expect to encounter discrimination 72 percent of the time in seeking rental housing and 48 percent of the time when seeking to buy a home.

Other studies confirm that residential segregation continues to exist throughout the United States.

In some respects, housing discrimination is the most invidious form of bigotry. It isolates racial and ethnic minorities and perpetuates the ignorance that is the core of bigotry. And discrimination in housing hampers progress to achieve equality in other vital areas as well.

Residential segregation is the primary obstacle to meaningful school integration. And as businesses move away from the urban core, housing discrimination prevents its victims from following jobs to the suburbs, impeding efforts to reduce minority unemployment.

The existing fair housing law is a toothless tiger. It recognizes a fundamental right; but it fails to provide a meaningful remedy.

Under existing law, HUD may respond to complaints of housing discrimination only by "conference, conciliation and persuasion." But because HUD lacks real power to enforce the law, would-be violators have little incentive to obey it.

The Fair Housing Amendments Act of 1988 will put real teeth into the fair housing laws by giving HUD real enforcement authority.

HUD would be empowered to investigate complaints of housing discrimination, and to attempt to effect voluntary conciliation of the parties. Where a complaint is found to have merit, HUD is required to initiate proceedings to obtain full redress for the victims.

In the key compromise in this legislation, the complainant and the parties to an enforcement proceeding could elect to have it heard in Federal Court. If no election is made, the case will be heard by an administrative law judge in the Department of Housing and Urban Development, who can award actual damages, injunctive and equitable relief, attorneys' fees, and civil penalties of up to $50,000 for repeat offenders.

HUD's decision in such a case would be subject to review by the Federal court of appeals. Similar remedies, as well as punitive damages, are available if the Government's enforcement proceeding is heard in Federal Court.

The provisions in existing law relating to private fair housing enforcement actions are also strengthened.

The statute of limitations for housing discrimination cases is lengthened to 2 years, and the limit on punitive damages is removed.

The bill continues the feature of existing law that places reliance on State and local fair housing agencies which provide rights and remedies substantially equivalent to those provided under Federal law.

When HUD receives a complaint within the jurisdiction of such an agency, it is required to refer it to the State or local agency. The bill provides a 40-month transition period, which may be lengthened by the Secretary for an additional 8 months in exceptional circumstances, for agencies to bring their laws and procedures into line with the strengthened measures in the bill.

Housing discrimination also harms two other groups in our society whose interests were not recognized by the 1968 law: persons with handicaps and families with children.

More than 30 million Americans have disabilities of some kind. They face prejudice in housing, both because of the unenlightened attitude of some toward those with disabilities, and because of unwillingness to permit handicapped persons to make reasonable modifications in dwellings to meet their special needs. As a result, they are often prevented from being fully integrated into our society.

The Fair Housing Amendments Act of 1988 will ban housing discrimination against the handicapped. It recognizes that discrimination can take many forms, including a failure to permit handicapped persons to make modifications to housing to enable them to have full enjoyment of the premises, and a failure to make reasonable accommodations to meet the needs of the handicapped.

Similarly, because it is often far less expensive to provide for accessible and adaptable housing before the housing is built, the bill creates minimal requirements for the construction of new dwellings.

Families with children also face serious discrimination in housing. A HUD-funded study found that one-fourth of the rental units in the country barred families with children.

By reducing the availability of housing for families, this discrimination drives up its cost and imposes a heavy burden on those least able to afford it.

The bill would ban this form of discrimination, while protecting the legitimate interest of older Americans to live in retirement-type communities.

A broad coalition of groups, including the American Association of Retired Persons, the Children's Defense Fund, and the United States Catholic Conference have endorsed this bill, and have been particularly helpful in formulating these provisions.

On behalf of myself, and Senator SPECTER, and Senator HATCH I have just sent up an amendment in the nature of a substitute, which makes a few modest changes in H.R. 1158.

I ask unanimous consent that a memorandum describing the Kennedy-

# TAB CR-4

The Act would also prohibit "blockbusting," discrimination in the financing of housing, discrimination in the provision of services or admission to membership by real estate organizations, and interference with or threats against persons enjoying or attempting to enjoy any of the rights which the Act grants or protects.

Responsibility for administration and enforcement would rest with the Secretary of Housing and Urban Development. He would use the time during which the enforcement provisions gradually went into effect to consult with housing industry leaders and state and local officials and otherwise carry on educational and consultation activities.

The Secretary would be required to seek a voluntary solution in every case. If his attempt was unsuccessful, he would be authorized to issue a complaint, hold hearings and, if the evidence disclosed that discriminatory acts had occurred, issue orders granting appropriate relief. All orders of the Secretary would be subject to judicial review.

A person who believed that he had been injured by a discriminatory housing practice could file a charge with the Secretary. The Secretary would not be required to conciliate or to issue a complaint on the basis of every charge so filed, but if he did not, the person filing the charge could commence an action himself in any court of competent jurisdiction.

The Attorney General would be empowered to initiate suits in United States district courts to eliminate patterns or practices of housing discrimination. The Secretary could cede his jurisdiction to state or local fair housing agencies in appropriate cases or cooperate with them without ceding his jurisdiction.

Mr. MONDALE. We face today what may be the most grave social crisis confronting the United States in all its history. We face a serious prospect of guerrilla warfare and civil rioting in our cities and ghettos.

It seems to me the American people are faced with two fundamental choices. They can either choose to suppress the violence and ghettos with whatever force may be necessary, and convert those ghettos into concentration camps—or they can choose to insist upon law and order and also take immediate action to isolate the underlying causes for rioting and obliterate them.

The former will lead to practical State apartheid, and turn the United States into a course of repression and enslavement which will always plague us. The latter will at least keep faith with the ideas and dreams of this Nation.

In the last few weeks, there has been talk of causes, cures, and civil rights. The proposed remedies are many. Their efficacy is uncertain. The truth is, it seems to me, that there is no one solution, but there are many solutions. Our cities are beset by a multitude of ills, which can be cured only by a multitude of remedies.

But every solution and every plan for the multiple evils in our cities and their ghettos is drastically and seriously affected by racial segregation in housing. With high concentrations of low-income, poorly educated, and unemployed persons in our cities—and without dispersal or balance throughout our communities—our cities will never be able to solve the problems of de facto school segregation, slum housing, crime and violence, disease, blight, and pollution.

As the white flight to the suburbs continues, the cities are robbed of stable tax bases and in turn have less money to provide essential services. As industry continues its movement out of central cities, this decline in revenues and tax base can only continue.

Even the programs we now have in existence are distorted and warped by housing discrimination.

We are planning urban renewal programs, but industry is moving to the suburbs.

We are spending millions for elementary and secondary education, but de facto school segregation continues and intensifies.

We provide millions for manpower training and rehabilitation programs, but jobs are fleeing the cities.

We are seeking to increase the income levels of ghetto residents through employment and adequate education, but deny to them the ability to find decent housing near employment centers and near decent schools.

We can predict with absolute certainty that our best laid plans for building and rebuilding our cities will merely create bigger and worse slums, as long as housing for Negroes is confined to certain areas and no others.

I do not say that having integrated housing or open occupancy and free choice for homebuyers will solve all our problems and the problems of the ghettos. But we are somewhat in the position of trying to cure a patient suffering from several fatal diseases. A cure applied to one of the diseases will not do the whole job, but certainly without a cure for each one of the diseases he will die.

Fair housing alone is not a solution for riots and ghettos. But it is an absolutely indispensable part of any overall solution to our growing urban crisis.

As a matter of fact, the chief difficulty with fair housing legislation, in my judgment, is that it will largely only set a legal climate and a guarantee for Negroes purchasing housing.

The key problem after all—to which is tied unemployment and educational deprivation—remains low Negro family income. Until that is remedied, by other social programs on a very massive scale, we will have, in passing a fair housing law, only guaranteed a fundamental right now denied even to those who do have the income and resources to afford high cost suburban housing.

Dispersal and racial balance is not the primary goal and motivation of this legislation. If this were our goal, we would have to concede ahead of time that it is doomed to failure. It will simply not achieve dispersal and racial balance. The laws of economics will determine that fact.

Most Negroes do not earnestly desire dispersal and racial balance as a desirable goal. What they do want, and what this legislation seeks to do, is to enable every American to buy a decent home wherever he wishes in a neighborhood of his choice in accordance with his income level and personal desires and needs.

This is so elementary and so modest a proposal that I am frankly amazed that the cobwebs of bigotry and ignorance have made it a much more unpopular proposal than massive social programs for education, poverty, retraining, urban renewal, and slum rehabilitation. Even more amazing, in this context, is the recent Harris Poll showing that almost 65 percent of the people of the United States favor abolition of ghettos.

I am certain that what is needed is a massive public education program to destroy some of the strawman arguments against open occupancy which are apparently the only reason the Congress has not been able to act on this problem. The legislation certainly will not cost huge sums of money.

One of the most common and most abused arguments against fair housing is that integrated neighborhoods suffer rapid declines and property values. Dr. Luigi Laurenti, in a study in 1960, entitled "Property Values and Race," surveyed some 10,000 transactions involving Negroes and whites, and Negro entry into all-white neighborhoods. He found that in six of seven cases, property values in a neighborhood either remained stable or increased when a Negro bought into an all-white neighborhood. To be exact, prices rose in 44 percent of the cases, remained stable in 41 percent, and declined only in 15 percent of the cases. These were long-term trends, and measured relative to trends in carefully matched neighborhoods which remained all white.

In some cases, the myth of the decline in property values is actually brought into being either by panic selling or the unscrupulous practice of blockbusting. White householders are told by real estate speculators that their property will decline because of the recent Negro entrant into the neighborhood. They are encouraged to sell at ridiculously low prices, and later Negroes wishing to buy are forced to pay exorbitant prices for homes in that neighborhood. Thus, property values did in that neighborhood for a short time decline, but only because of the panic selling attributable to blockbusting, and later returned to high or higher levels.

It seems to me, therefore, that we must use every effort and resource at our command to push for speedy enactment of legislation to end discrimination in housing. I believe there is an urgency to this effort transcending most other domestic concerns. We are in a time of major social disaster.

I think we need legislation at the national level and need it desperately. The Executive order on equal opportunity in housing issued by President Kennedy in 1962 affects only a fraction of the total housing market. Mortgage lending institutions are affected only to the extent that they engage in FHA and VA loans. Commercial banks, mutual savings banks, and savings and loan associations are not covered and such institutions represent the major sources of the conventional mortgage market.

National legislation is needed because State and local fair housing laws either provide inadequate coverage or inadequate enforcement. They have been enacted in 23 States, and in addition, in more than 40 other jurisdictions including city and county governmental units through ordinance.

Although 19 States have laws covering

some private housing, and provide for some sort of penalty in case of violation, only nine of them provide for temporary injunctions or similar relief designed to prevent sale or rental of the property in question to someone else, pending resolution of the claim of discrimination. Many States exempt owner-occupied homes from coverage. Only two States, along with Puerto Rico and the Virgin Islands, have laws which do not admit of exemptions of one kind or another. Almost everywhere, fair housing legislation on the State or local level is to some degree inadequate to meet the needs of our people, to solve the problems of the ghetto and to fulfill the promise embodied in our system of government.

A large part of the answer lies as well in inadequate enforcement machinery, painfully slow administrative processing of complaints, and a too-heavy reliance on individual complaints without a corresponding effort to make the public aware that such laws exist.

A recent survey of local and State laws in 15 jurisdictions indicates that fair housing laws have been an important factor in the slow but steady movement of Negro families of middle-class status into the general community. But the survey also indicates that only 12 percent of persons filing complaints actually secure the housing they sought, or comparable housing. The rest of the complaints are "unsatisfactorily closed," or the complainant finds that he cannot wait out the period required for investigation and settlement.

Administrative problems will, no doubt, still be with us under the Federal law. But there can be no doubt that this Government, unlike many State and local governments has the resources to solve most of these problems. And as recent experience with the Equal Employment Opportunity Act indicates, unlike many State laws, Federal legislation has high visibility and leads to a much greater number of complaints than comparable State laws.

In addition, fair housing laws on the State and local level simply did not come early enough to fight a trend in operation for years before they were enacted. During the decade from 1950 to 1960, dramatic increases in the Negro populations of every major American city were recorded, ranging from 41 to 187 percent—Philadelphia, Milwaukee. In almost every one of our major cities, Negroes constitute a much larger percentage than is their nationwide average. The city of Washington, D.C., is a good example. Of the total metropolitan population in this area, Negroes have since 1920 up to today remained roughly 25 percent of the population. But in the city of Washington, Negroes have increased from about 25 percent to nearly 67 percent—and in the metropolitan area suburbs have declined from 25 percent to 6 percent or less.

Statements have been made by some Members of the Congress that several cities that have experienced major riots are located in jurisdictions with State or local fair housing laws. The implication—and the sometimes explicit asser-

tion—that follows this observation is that fair housing laws do not stop riots.

There are many answers to this, perhaps the most important of which is that, as I have said before, fair housing legislation is only one of the cures needed for the solution of our urban sickness. While it is the cornerstone and bedrock of all efforts to solve urban ghetto problems, and while it is absolutely indispensable, it is by no means the total cure to the problem.

This bill is not, and has not been, a response to this summer's or last summer's riots in our cities. Nor will it do more than take the first step toward a correct resolution of our urban difficulties. And while it is only a step that step must be taken for without it no other effort will bear fruit. The reasons for this legislation may be summed up by quoting former Attorney General Katzenbach's testimony before the House Judiciary Subcommittee last year:

> By now it should be plain that a patchwork of State and local laws is not enough. The work of private volunteer groups is not enough. Court decisions are not enough. The limited authority of the Executive Branch is not enough. . . . Durable remedies for sole endemic and deep seated a condition as housing segregation should be based on the prescription and sanction of Congress. This is all the more so as the issue is national in scope and as it penetrates into so many other sectors of public policy such as the rebuilding and physical improvement of our cities.

This legislation alone will not bring an end to the ghetto—but it will provide the opportunity for those persons economically able to escape the ghetto to do so, and to take their families with them. It will assure them free choice in the selection of their housing.

For those still condemned by poverty to remain in the ghetto, there will be at least the knowledge that it is poverty—and not their fellow citizens or their Government—that forces them to live in the slums. There will be at least the knowledge that their children will have an opportunity to escape the restrictions and confines of the ghetto pressure cooker.

Mr. CLARK. Mr. President, will the Senator from Minnesota yield?

Mr. MONDALE. I am happy to yield to the Senator from Pennsylvania.

Mr. CLARK. I want to commend my good friend from Minnesota for the splendid address he has made in connection with the problem of open housing. I should like to point out that the position he has taken has required a certain amount of courage because there is strong objection in many parts of the country to open housing legislation—because of what has been described by the opposition as the white backlash. That backlash has been exacerbated, in my opinion, by the recent riots. Therefore, it takes a great deal of courage to stand up and advocate measures which are so clearly right and just but which have aroused so much bigotry.

I was interested to hear the Senator's comment on the fact that he sees a little light at the end of the tunnel with respect to the real estate lobby. I wondered on what he bases his rather encouraging

statement, Frankly, I have not seen much of it myself.

Mr. MONDALE. I thank the Senator from Pennsylvania for his most complimentary statement, which means a great deal to me, particularly in light of the fact that the Senator from Pennsylvania has been one of the great leaders in Congress since his career in the Senate began in this whole field of trying to square American actions with American ideals.

The Senator from Pennsylvania will be pleased to know that we have already received requests from six realtors from across the country who wish to testify in behalf of fair housing legislation.

In my own State of Minnesota, where we have one of the finest fair housing laws in the country, I have observed a marked change in Minnesota realtors from one of rather strong opposition prior to adoption of our fair housing legislation to substantial support, or at least an understanding at this point, from many of its leaders. There is greater need for an understanding of this problem, and its great importance.

Mr. CLARK. I am delighted to hear that. I see the able Senator from Virginia [Mr. SPONG] occupying the chair at this moment. I wonder whether the Senator would agree with me that the recent action of Secretary McNamara in declaring segregated housing off limits for military personnel of Andrews Air Force Base has not made a real contribution to open housing.

I have no doubt that the implications of what happened in Maryland spread, to some extent, across the Potomac River.

Mr. MONDALE. Indeed, I do. As a matter of fact, when the Secretary announced this policy, I wrote him a letter commending him for his courage. I believe, in addition to adopting the kind of open housing law we are talking about, that the Federal Government is not only within its right, but it also has a moral responsibility to use its resources to see that wherever its actions can affect progress in this field of human rights, that it do so.

I think the Secretary of Defense is to be highly commended for his vision and his courage in the action he took in this field.

Mr. CLARK. I was glad to hear the Senator say that his State of Minnesota has one of the best fair housing acts in the country.

In Pennsylvania, we have made some progress in this regard. But, hitherto, it has been at the local level.

When I was mayor of Philadelphia, I was able to push forward the whole concept of open housing, through the cooperation of the Human Rights Commission which I had the honor to appoint at that time.

In Pittsburgh, also, there has been a notable movement towards fair housing ordinances. I am happy to report now that the legislature of Pennsylvania, under the leadership of Governor Shafer—whom I am very happy to commend, and he is a Republican Governor, because he has been very courageous in

this regard—appears to be on its way to adopting a fair housing law.

Mr. President, I hold in my hand an article dated August 8, published in the Philadelphia Enquirer, entitled "Pennsylvania House Bars Bias in All Property Rentals and Sales," an article which I ask unanimous consent to have printed in the RECORD at the conclusion of my remarks.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. CLARK. The article points out that the fair housing law is one of six civil rights bills which were passed by the House of Representatives on August 9. The law would extend the Fair Housing Act to private dwellings and make illegal discrimination in the sale or rental of housing. It has exemptions for the rental of rooms by a property owner living in the same dwelling, or rental of an apartment or room which utilizes the same entrance as that of the owner. I think this is what is known as the "Mrs. Murphy" amendment, so coined by the Senator from Vermont [Mr. AIKEN].

Is there a similar exemption in the State law of Minnesota?

Mr. MONDALE. Yes, I believe there is a similar exemption. However Minnesota has recently strengthened its law and I am not sure what it now provides in this regard.

Mr. CLARK. This action is particularly significant because the two parties at Harrisburg are almost evenly divided. The Republicans have a majority of two or three; but, as is often the case, the opposite party tends to have more age than does the party of youth and progress to which the Senator from Minnesota and I belong, and it is not always able to get its members to the floor. So it took considerable cooperation from the Democrats to pass the law in the house.

I want to congratulate Governor Shafer for the leadership he has taken, which has been considerable.

The only opposition in the house came from a Republican member who is also a real estate broker in Montgomery County. To some extent, Montgomery County in southeast Pennsylvania has the same attitude toward open housing as exists in the suburbs of Maryland and Virginia. I am glad to say he got only 10 votes, and the bill was passed by a vote of 182 to 10.

The bill now goes to the State senate, where the Republicans have a somewhat larger majority, but still not a "safe" majority. I am hopeful that action there will result in Pennsylvania's having almost as good, if not as good, a fair housing law as Minnesota has, and I am sure the Senator from Minnesota played his part, before he came to the Senate, in having the law enacted there.

Now I should like to ask the Senator a question. Does the Senator have any real hope of getting a fair housing measure on the floor in the 90th Congress, and does he think there is any chance of getting the law passed? The Senator serves on that committee, and that is the reason why I ask him the question.

Mr. MONDALE. My hopes of getting

the bill to the floor are stronger than my hopes of getting the bill passed, because of the cloture problem. We have not had a fair housing measure similar to this one before the current Senate, so we do not know what the current attitude of the Senate will be.

I note that some of the polls, in particular one by Louis Harris, indicate a substantial consensus of American society that we must have a massive program, a total massive commitment to do something to undo the enormous injustices under which so many of our citizens live in American cities. I hope this public attitude will reflect itself in the urgency with which we bring forth and adopt fair housing legislation.

Mr. CLARK. I would hope so. But, as the Senator knows, most of the public speaking on the Senate floor has been devoted to means of vengeance and criminal enforcement, the attitude of, "Let's put them all in jail," more than it has been in the direction of taking positive social steps, which, in my opinion, are necessary, whether it be the poverty program, or an Equal Employment Opportunity Act, which I have the honor to sponsor, or the Fair Housing Act, which the Senator from Minnesota has proposed, or rent supplements, or model cities, or the Teacher Corps. All these efforts are part of a package which is absolutely necessary if we are to deal with a frightening problem at home.

I commend the Senator from Minnesota for his fine speech, and pledge him my support, and congratulate him for the leadership he has taken in this regard.

Mr. MONDALE. I thank the Senator for his encouraging remarks. I hope we will be successful.

The Supreme Court has given to Congress almost unlimited power to legislate in areas affecting interstate commerce, no matter how slight the particular isolated instance might be or no matter what the reasons or motivation for legislating might be. To choose to exercise this power is not then a matter of determining the constitutionality of any particular bill, but determining the wisdom, the justice, and the advisability of doing so. It is at the root of things a matter of public choice and policy.

While the position of the established real estate industry is apparently the same as it has been in the past, in opposition to the legislation, there are winds of change blowing through that industry. More real estate brokers, salesmen, and builders are supporting open housing. Opposition to this measure is a policy which prevents them from having a wider market, and costs them sales and commissions. It is a policy which costs individual sellers and brokers the burden and conscience of discriminating against qualified applicants, and in many cases they must take back agreements to sell or assurances to applicants when they later learn that they are Negro. Many real estate men today seek the answer and the excuse of an all-inclusive Federal law, which will allow them to say, "We have no choice in the matter, and we must comply with the Federal law."

I believe there is another fundamental

reason why this Nation should formally and legally declare its commitment to the principle of free choice in the selection of housing by all Americans regardless of color. I believe there are still Americans who harbor the belief that we must require Negro-America to live by itself, whether in the rotting core of America's major cities or in the poverty-stricken sharecropping areas of the rural south. Others in American society, while possibly with the finest intentions, have avoided the issue of fairness in housing altogether. Happily, millions of Americans in some States and communities have long since decided that segregated living is un-American and immoral. The necessity for all Americans to face this issue squarely and for this country to declare unequivocally that ours is a Nation where color is irrelevant and where we will live with each other and not separately is a choice that must be made for the health of our country. It cannot be delayed. For far too many, the thought of a Negro family living in their community is surrounded by vague fears of property value deterioration, the quick development of a black ghetto, and other ill-defined anxieties. A responsible debate of this issue will help to cause Americans to understand better that where integrated living exists—and it does in many communities throughout the country—it has been a pleasant and rewarding experience.

### EXHIBIT 1

#### PENNSYLVANIA HOUSE BARS BIAS IN ALL PROPERTY RENTALS AND SALES

(By Saul Kohler)

HARRISBURG, August 9.—A bill barring discrimination in the sale or rental of all properties, including private homes, was passed Wednesday by the House of Representatives. The bill, one of six civil rights measures approved by the House, extends the Fair Housing Act to private dwellings and makes illegal discrimination in sale or rental.

Exemptions provided are for rental of rooms by a property owner living in the same dwelling, or rental of an apartment or room which utilizes the same entrance as that of the owner.

##### CREATES STIR

The bill was the only one of the six which created any stir before it was passed, 139–53.

An amendment which would have exempted existing housing and made the law applicable only to dwellings constructed after passage of the bill was defeated by 182–8.

Sponsor of the amendment was Rep. Charles H. Dager (R., Montgomery), a real estate broker and appraiser, who was joined by seven other Republicans in supporting it.

##### RIGHTS PACKAGE SPEEDED

In final passage of the controversial bill, 11 Democrats joined 41 Republicans in voting against it.

However, only an hour was occupied in passing the package of civil rights bills which now go to the Senate. They were designed to fulfill election pledges and ease big city racial tension.

##### HAILED BY SHAFER

Shortly after the House acted, Gov. Raymond P. Shafer issued a statement in which he hailed the passage as "heartening indeed."

"Although it is impossible to change men's minds through legislation, this action proves conclusively that Pennsylvania is determined

to give equal rights to all—including both housing and employment," Shafer said.

"I am hopeful that this entire package of bills will receive immediate approval in the Senate and can become law at the earliest possible moment."

### OTHER BILLS APPROVED

There was only a sprinkling of opposition—mostly from Republicans—to the rest of the bills, which were approved without debate. These measures would:

—Extend the coverage of the Fair Employment Act to employers of one or more persons and to agricultural employes, except to workers who live in the personal residence of their employers. Exempt would be domestic employes. Presently, the act applies only to employers of four or more. (The vote was 175–16).

### SPEEDY COURT RELIEF

—Provide for speedy court relief in cases of housing discrimination by requiring the issuance of an injunction within 30 days against disposing of a property which is the subject of a complaint. (The vote was 188–3).

—Authorize the State Human Relations Commission to initiate investigations without formal complaints, of situations which could result in racial tension or rioting, providing the majority of the commissioners agree, and providing that an enforceable order can be written only if there is a formal complaint. (The vote was 176–16).

### PENALTIES FOR BIAS

Provide strict penalties for discrimination by real estate brokers or real estate agents. (The vote was 176–15).

—Provide a procedure for reporting cases of discrimination in professions licensed by the Commonwealth to the appropriate licensing board or commission. (The vote was 182–10).

Prior to the voting on the bills, Rep. Freeman Hankins (D., Phila.) called upon the House to pass the measures without hesitation.

### MUST MEET CHALLENGE

"The course of this summer's events have driven this House to center stage—we must rise to a clear and urgent challenge," Hankins said.

Hankins drew a stinging reply from Rep. Jules Filo (D., Allegheny)—who then proceeded to vote for all the civil rights bills anyway.

"The main issue is not legislation, but jobs for those who want to work," Filo said. "Not one of our Negro colleagues has risen to condemn Stokely Carmichael or H. Rap Brown or Dick Gregory.

"The colored people have got to lift themselves up—we cannot do it in the halls of this House."

### ON PAR WITH MARYLAND

Dager told the House that his amendment to the open housing bill would put Pennsylvania on a par with Maryland's new law, and that "the reservoir" of housing available to minority groups would grow as new homes are built.

The Democratic whip, Rep. K. Leroy Irvis, of Allegheny, said Dager was saying in effect, "permit us our discrimination now and by the year 2000 or 2500, all will be fair and just."

"Well, I don't want to wait until the year 2000 for the promised land," Irvis said.

### JOINS IN OPPOSITION

Irvis was joined by majority leader Lee A. Donaldson (R., Allegheny), who also asked the House to reject Dager's amendment.

"Certainly, it would put us on a par with Maryland," Donaldson said. "But we are, and will remain, ahead of Maryland."

After the votes were taken, Donaldson rose to compliment the House on the "momentous" action.

"I concur with the majority leader," Irvis,

the ranking Negro in the General Assembly, replied.

"You have strengthened the hands of those of us who stand for law and order. I congratulate those who voted against the bills, for they were showing the courage of convictions."

---

### HOUSE SPEEDS RIGHTS PACKAGE TO PASSAGE TODAY

HARRISBURG, August 8.—The House gave second reading Tuesday to six civil rights bills—including the highly controversial open housing legislation—and put them in position for final passage on Wednesday.

Majority Leader Lee A. Donaldson (R., Allegheny) said the Republicans would caucus on the bills once again after the House convenes at 10 A.M. The bulk of the votes is expected to come from the Democratic side of the aisle, however.

Minority Whip K. Leroy Irvis, a Negro Democrat from Pittsburgh who has served as floor manager for the measures even though three of them are Administration-inspired, said he was optimistic "if they run the bills on Wednesday."

On three of the bills, there were technical amendments Tuesday—none of which was contested or debated. The others were given their second reading.

Besides the open housing legislation, which extends antidiscrimination coverage to all individual residences, the measures would:

Extend antidiscrimination provisions to employers of one or more persons and to agricultural employes, except when the employe lives in the personal residence of the employer.

Require the issuing, within 30 days, of an injunction against disposing of a property which is the subject of a discrimination complaint.

Give the human relations commission the power to initiate investigations of racially tense situations on its own motion. Irvis considers this one of the key measures in the package.

Require the human relations commission to notify state licensing authorities of actions by licensees which are found to be in violation of the law.

Impose penalties on real estate dealers who offer to maintain discriminatory conditions of sale.

Meanwhile, two State-wide organizations with different aims got together and issued a statement calling the civil rights package "totally worthless to the people of Pennsylvania in present form."

The Pennsylvania Equal Rights Council, through Mrs. Marguerite I. Hofer, of Pittsburgh, its president, contended most of the measures "have been reduced to an empty gesture."

And Herbert M. Packer, Jr., executive vice president of the Pennsylvania Home Builders Association, insisted the same treatment should be given those dealing in new homes as those renting used ones.

## Mr. CASE. Mr. President, will the Senator yield?

Mr. MONDALE. I yield.

Mr. CASE. Mr. President, I commend my colleague from Minnesota on his statement. I am glad to join with him and other colleagues to urge enactment of meaningful legislation to insure both fair and open housing for all Americans.

There can be no doubt that unequal housing, resulting from discriminatory and closed housing policies, contributes to the intolerable conditions of life in many of this Nation's greatest urban areas. The impacted racial ghetto, with its segregated overcrowded living conditions, inherently unequal schools, unemployment and underemployment, ap-

palling mortality and health statistics, inevitably gives rise to hopelessness, bitterness, and, yes, even open rebellion of those imprisoned within its confines. Surrounded by affluent suburbia, is it any wonder the ghettos of our cities seethe with explosive discontent, racial alienation, and tension?

It is an ironic and bitter fact that the Federal Government has helped to build our urban ghettos, both directly and indirectly.

In some cases, Federal financing of public housing, coupled with nonenforcement of Executive Order No. 11063, has brought increased segregation in so-called vertical slums.

In other cases, urban renewal projects have displaced hundreds and thousands of persons and left them no choice but to crowd into already overcrowded slums.

It is not lack of money alone that prevents the ghetto resident from moving out. Time and time again, it has been demonstrated that he is likely to pay a disproportionate rent for a squalid dwelling place. Rather, it is a bar based on color alone that, regardless of other factors, makes it so difficult for the Negro to secure decent housing.

Some of the States already have open housing legislation. In my own State of New Jersey our statutes trace back to 1950. But progress is still agonizingly slow. It proceeds on a case-by-case basis and puts upon the member of the minority group a heavy burden of proof.

For example, if I may at this point, I ask unanimous consent to insert in the RECORD an article from the New York Times of August 16 which relates the story of two Negro sisters who have been thwarted 3 years in efforts to buy a house. This is in a State which has what is regarded as a more modern fair housing law.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

### TWO NEGRO SISTERS THWARTED 3 YEARS IN EFFORTS TO BUY HOUSE

(By Edith Evans Asbury)

Two Negro sisters—a welfare supervisor and a registered nurse—are still "camping out" among packing boxes and crates after trying for nearly three years to buy a house in an all-white neighborhood in Brooklyn.

"We have tried every legal means; we have been thwarted at every turn; we simply cannot believe this is happening—but it is," Mrs. John Braithewaite declared yesterday in an interview in their crowded apartment.

Mrs. Braithewaite, who is employed by the city's Department of Social Services, is the wife of a merchant mariner and the mother of two boys. And, she said, she is "sick and tired of being cramped in this small place in Bedford-Stuyvesant."

Her sisted, Mrs. Ellen Creasey, is a registered nurse who was formerly assistant supervisor of nurses at Coney Island Hospital. Together they undertook to buy a new house in 1964.

They found a two-family new house in the Canarsie section of Brooklyn in November, 1964, priced at $38,490, and they offered to buy it.

"It suited all our requirements," Mrs. Braithewaite recalled yesterday, in her apartment at 209 Hancock Street. "A large apartment for my family, a small one for my sister; a garage for her; near good schools for

my children; near the subway so I could continue my church and civic activities, and no worries about repair bills or alterations that you get with an old house."

However, first the owner told the sisters the house had been sold, then he offered to let them have it for $42,500, according to later court testimony.

"This belated offer was viewed as excessive and discriminatory," commented Supreme Court Justice Abraham N. Geller, in a decision ordering the city's Commission on Human Rights to "promptly proceed" with efforts to effect the sale.

That order was issued April 2, 1966, 17 months after the sisters had first tried to buy the house.

"Today 'we are no nearer to realizing our hopes of having a nice home than we were almost three years ago," Mrs. Braithewaite protested in a letter to Mayor Lindsay recently.

The "outrageous situation" results in frustration which is "magnified by the knowledge that no official agency of the government or any government official to whom we have gone in an effort to have some action taken to right this act of discrimination, has shown any real interest in helping us," Mrs. Braithewaite wrote the Mayor.

### LACK OF HELP CITED

She listed officials of the Human Rights Commission and Corporation Counsel's office on whom she had called personally, and "Senators, United States and New York State," to whom she had written for help.

"What is happening to me in my efforts to secure a home will be held up to others of my race as an example of what trusting in and abiding by our laws can or cannot do," she declared in the letter.

Mrs. Braithewaite commented yesterday that Mayor Lindsay's new search for "causes of unrest" as recently appointed vice chairman of the President's Advisory Commission on Civil Disorders "need take him no further than my case—which is a classic one."

"My sister and I are articulate," she said, "the kind of people who halfway know where to go to get things done, and look how far we've gotten out of the ghetto in three years."

"How, then can the man in the street, who doesn't know where to turn, and cannot afford legal advice, be expected to think Government is in his corner?" Mrs. Braithewaite asked.

Since Justice Geller's April, 1966, order, there have been hearings, negotiations, briefs "inordinate delays" arguments about what to do about tenants installed in the house by the owner, and about what the fair price is now for the three-year-old house, Mrs. Braithewaite reported to the Mayor.

"This last straw, that prompted me to write the Mayor, was the discovery that the referee who is supposed to make a recommendation of the price has gone off on vacation," Mrs. Braithewaite said.

"I suppose when he gets back, the judge who will have to pass on his recommendation will go on vacation," she said, bitterly.

David Love, an assistant to Mayor Lindsay, said that he was concerned about Mrs. Braithewaite's case, and had done what he could to expedite it, but was unable to interfere in the courts.

Mr. CASE. Mr. President, the time has come for effective action which will apply equally to all those engaged in the rental or sale of real property.

I am delighted that hearings are now scheduled on S. 1358, for I believe that together with equal opportunity for education and jobs, equal opportunity for decent housing is at the top of the problems confronting the Nation.

Mr. MONDALE. Mr. President, I thank the Senator for his discussion and his leadership in the field of human rights. His discussion underlines an issue of fairness and, at bottom, an issue of morality, and one that ought to cut across party lines and one which deserves the support of every person who believes in fairness and equal treatment for all Americans. The statement made by the Senator from New Jersey is indicative of the inspiring and creative leadership which he has contributed to this cause.

Those opponents who like to call the fair housing bill the "forced housing" bill are guilty of a cruel and cynical distortion of the facts. The only "forced housing" in this country today is that which forces millions of Americans to live on top of one another in abject poverty in the ghettos and slums of our major cities.

Once Americans decide that we are going to live together and not separately, once we thoroughly understand and accept the fact that Negro Americans contribute to the health and the vitality of their communities just as anyone else, many of the vague, penumbral fears which now haunt some Americans will disappear. Just as important, many of the developing black racists who charge that all whites hate Negroes will begin to understand the unfairness of their accusations and the substantial possibilities that exist for an America in which we understand each other.

I am hopeful that out of the hearings before the Subcommittee on Housing and Urban Affairs of the Committee on Banking and Currency, which will begin on Monday, will be forthcoming the information and advice we need on this subject if Congress is to pass fair housing legislation.

Mr. HART. Mr. President, will the Senator from Minnesota yield?

Mr. MONDALE. I am delighted to yield to the Senator from Michigan, who, more than any other Senator, has helped to lead the fight in the Senate for a balanced program of human rights.

Mr. HART. I thank the Senator from Minnesota for his kind words, but I wish to salute him for the thoughtful and effective course of action he has taken in support of the open housing bill. We are on the eve of really historic hearings on the subject of open housing. We have reached this day in principal part because of the efforts of the junior Senator from Minnesota.

We who over the years have attempted to persuade Congress to legislate in the area of civil rights have some fair understanding of the difficulties that have confronted us and which will continue to confront us.

I came to the Chamber this morning, first and most important of all, to thank the Senator from Minnesota for the efforts that have brought us to this day.

Of course, Mr. President, I also support the bill itself; and I wish to voice my own deep conviction that the clock of history cautions us not to go slowly in this area now, but rather to move faster.

The first civil rights bill passed by Congress was the Civil Rights Act of 1866. That bill guaranteed all Americans, regardless of race, the same right to inherit, purchase, lease, sell, hold, and convey real and personal property as is enjoyed by white persons.

We said that on April 9, 1866. That was 101 years ago. It sounded great. But you do not have to be a Ph. D. in history to know that that promise has not yet been fully delivered upon. Indeed, only in the decades since World War II has the Negro been aided by legislation in his effort to overcome the separate but equal barriers in education, unfair employment practices, and the segregated use of public accommodations.

Now, Mr. President, it is critically important that the Negro also gain equal access to housing. This Nation, as is true of all nations and peoples, has a great many maxims or rules of thumb in the nature of sound moral guides. In our Horatio Alger tradition, important among such guides is the counsel that a parent is supposed to give his child— you know how it goes—he lectures the child, "Work hard, save your money, resist extravagances."

One of the most important responsibilities the fulfillment of which that maxim is supposed to insure is that the child, as an adult, will be able to buy a home. He is told to save for the day when he will have a family and will want to shelter that family in decency, and wherever his means permit.

That is a dream that lyricists have proclaimed. I do not know how many songs have been written about it. It is the dream that when, having worked hard and saved, I can buy any home I want and can afford.

Let us make that dream a dream that can be dreamed by all Americans, not just white Aryan Americans; make it possible for every parent to counsel his child to work and to save for that home, and not, in his inner heart, fear that that child is going to run into a closed door.

I have often thought that in the earlier hearings in support of open housing legislation, we did not obtain the best witness of all. We have had the economists, we have had the social science experts, we have had politicians, we have had spokesmen for minority groups. I think the most persuasive witness in support of our open housing would be a Negro father who had worked and saved his money, had gone out to buy a home where he could give his children opportunities that he might not have had, had been refused because of his color, and then had had to explain the refusal to his children. I would like to hear from that man. I suspect that he might be able to turn some votes around here.

Time runs fast on everything today, but it runs with incredible speed and at enormous hazard on the business of whether we, as Congress, can demonstrate an awareness of what protest is attempting to bring to our attention.

This is not to defend rioting. Nothing can be said in defense of it. But all that we say in criticism of it will not stop it, unless we perform consistently with what for 100 years have been preaching we stand for.

One of the things we have always said is that we judge a man on his merits. Then let us stop judging him while he is

50 feet away, as he is getting out of his car to come in and seek to buy a home. I would resent it, and so does he.

I hope very much, Mr. President, that the efforts of the Senator from Minnesota will be capped with enactment by this Congress of fair housing legislation. I think he has already indicated that if bookmaking were permitted in the Senate, the odds would probably have increased against the likelihood of enactment of any civil rights legislation, by reason of the violence that has recently marred our land. We do not pass laws to avoid violence, nor do we pass laws because of violence. We should not judge this proposal in the light of the flames from our burning cities, nor because of pressure, nor in the response to backlash, white or black. We should look at it line by line, and ask ourselves the questions, Does this make good sense? Is this what is morally right?

On those bases, Mr. President, Congress will eventually pass open housing legislation, whether it is in 1967—as I hope it will be—or later. The later it is, the greater the danger, and the sharper will be history's criticism of us.

This Nation may hesitate from time to time but it winds up doing the moral thing. And this bill is not an effort to upgrade only the Negro in the United States. It is an effort to upgrade the United States and all of its citizens.

None of us pretend that this legislation has much direct appeal for many of the dwellers in our city ghettos. Their reaction may be pretty academic. It is similar to the reaction of a ghetto dweller when he looks at the European travel ads in glossy magazines—nice to think about but too remote a possibility to relate to seriously. However, a legislative commitment to fair housing does have symbolism even for him; and it has very direct meaning for the hard-working Negro in our country.

It should have appeal to all of us. If we want to reduce crime, fair housing is an important key step. If we want to upgrade the Nation's educational level, fair housing is a most important step. And if we want to reduce the welfare rolls, fair housing is a key step.

We should remind ourselves of the entrapment that a Negro feels, as voiced by Secretary Weaver in his book, "The Negro Ghetto," in which he said:

The most striking difference between the experience of white and colored immigrants is that while a white immigrant improves himself economically and culturally and has a chance to move out into another section of the city and generally be accepted as an individual, the Negro has no such escape.

I think that is true. And it is tragic that we have to acknowledge it. To correct this requires a commitment to fair housing as a principle which Government shall acknowledge and support. I repeat, Congress will take the action sooner or later. Let it be now.

Mr. SCOTT. Mr. President, will the Senator yield?

Mr. MONDALE. I yield.

Mr. SCOTT. Mr. President, I commend the Senators from Minnesota and Michigan for what they have said.

I think it is good for the voice of con-

science to be heard in the Senate. I have spoken in favor of doing those things which ought to be done and of the tragedies which result from leaving undone the things which ought to be done.

I spoke on the subject when the bill was before us before and again recently on the rent supplement program.

I was quoted in an editorial published in the Philadelphia Bulletin on August 14, 1967.

The editorial reads in part:

As Sen. Scott said, "this is the kind of free enterprise thing Republicans ought to be interested in." It is indeed. It is not "socialism," as some fast conclusion-jumpers have theorized; it is a viable alternative to public housing. It will not by itself solve the housing needs of the poor. But if given a chance it will help, and do it by the relatively easy route of matching available housing with those who need it.

Mr. President, let us suppose for a minute that we were to eliminate all consideration of compassion. Let us suppose that we were to eliminate all consideration of the individual who lacks shelter, who lacks the security of having a storm-tight roof over his head, who is unable to pay rent or buy a home or find a home to rent.

Let us suppose that compassion did not enter into it at all, even though to my mind compassion ought to be the underlying reason for legislation. However, even if it were not, let us consider the interest of the rest of the community.

I think—and I am sure that the Senator agrees with me—that if we permit these conditions to exist, we not only have the riots or civil disorders about which so much has been said in so many places, but we also have the loss of property values which erode the property which so many people rise so strongly to protect. The rich, the well-favored, the middle-income group, all of those people who would like to see their property maintain or increase its value will have to stand by unless something constructive is done at the National, State, and local levels. It is said that people find their property values are decreasing.

It seems to me that the argument of compassion is a good one when it can be legislatively justified, but the argument of omitting compassion still leaves the argument for these measures unimpaired because the protection of the material values of the community is still at stake if we do not move, belated though it may be, to do our very level best to solve the problem.

Reverting to compassion, I think that the invocation in the fourth chapter of Genesis still has bearing. I think we are, whether some of us like it or not, our brother's keeper.

I think we are compelled to consider compassionately the matters involved here.

Some Senators are moved by compassion; some by material benefits; and some by fear and sympathy and compassion.

I would say that all of these arguments could be marshaled in support of what we have been saying on the floor today.

I thank the Senator from Minnesota very much for yielding.

Mr. MONDALE. Mr. President, I thank

the Senator from Pennsylvania for cosponsoring the measure and lending his support and assistance to the measure.

It is characteristic of the Senator. This measure is a most necessary step in the field of human rights.

Mr. JAVITS. Mr. President, will the Senator yield?

Mr. MONDALE. I yield.

Mr. JAVITS. Mr. President, I, too, am a cosponsor of this measure.

I feel very deeply about it and always have. I have fought for this for many years. Rather than address myself to the arguments which have been made so very eloquently by the other Senators, I would just like to add one very practical point.

We have found by experience in New York, and it has also been found to be true in other cities, that the pragmatic aspect of the open housing stands up, that the fears that the neighborhood will be destroyed and property values will be lessened are found to be baseless, and that, if anything, property values go up because there is a broader market.

The economic capability of individuals very largely determines the type of people who live in a community. The people are found to be congenial, whatever the color of their skin may be.

That is history and factually demonstrable and has been convincing to many of those who have been in such terrible fear that their neighborhood will become a ghetto because a Negro buys a house there.

The so-called blockbusters—the conscienceless real estate agents who spread fear and rumor in order to buy sacrificed property—are doing so with a very good understanding of that fact. They are not buying it to take a loss. The very fact that they are buying the property indicates that they know that the very rumor they are spreading—that property values will be destroyed—is not true. They buy the property and they take a profit.

I hope that this represents a word of warning to all who may be susceptible to this kind of alarm which has been demonstrated to be so baseless.

One of the most outstanding examples of that is the so-called Levittown structures in the United States, where for a very long time, it was thought that it would be impossible to have open housing without a destruction of the character of the development and property values until it was actually tried, pursuant to a uniform rule where everybody was bound the same way. That assurance is what was insisted on there; and as soon as it was given, open housing was found to have no harmful economic effect at all. The Levittowns are as beautiful and as attractive as ever, and the company is about to be sold to the I.T. & T. for $90 million.

The second point which is very important is, what does an open housing law mean to the dweller in the ghetto who cannot even think about affording a house in the ghettos? It means to him dignity. If you search deep down for the reasons for the riots—and we will do so in the Committee on Government Operations, in due course—you will find in-

evitably buried in all of it is the issue of personal dignity. That is the real thing in Detroit. There were many jobs in Detroit, with a fairly high standard of living and income in the ghettos. But it was the affront, the oppression to dignity—the Senator from Michigan [Mr. HART] will correct me if I am wrong—that incited even them to riot, or at least the small portion that did riot in that area, and the community climate which makes it possible.

The big thing about dignity is encompassed in housing—the fact that you are told that you may not live here, expressly or impliedly, and therefore you are some kind of a debased human being, some kind of monster that people cannot tolerate having around.

I am glad that the Senator from Minnesota has stirred up this discussion today. It is a very pertinent time to do so, as we search out our own consciences. Forget about the basic causes of riots. I am not for yielding to any cause that is unjust, but when a cause is just, it is the duty of government to take account of it and try to do something about it, and not to act out of resentment. To refrain from acting because there has been a riot is as great an act of injustice as to perpetuate the injustice which was one of the basic causes in bringing it about.

I hope that what the Senator has done—which is very constructive and useful—will sound this note to the country at this critical time, that we may follow through with courage, that notwithstanding the pitfalls and the difficulties, we will be able to get a bill out of the Committee on Banking and Currency and pass it.

Mr. MONDALE. I thank the Senator from New York for his most useful observations. He has been a leader in the field of human rights from the day he entered the Senate, and he continues to do so.

I am particularly pleased that he made note of one of the most odious characters in American society—the blockbuster. As the Senator knows, this measure includes a special provision to make those acts by a blockbuster illegal.

As the Senator has stated, the very nature of that technique puts the lie to the argument that a Negro who moves into a neighborhood reduces the value of property, because the blockbuster's whole strategy is based on a theory that is exactly the opposite, and he profits from it.

Second, I believe that the Senator's emphasis on the importance of dignity and the recognition of human worth of every person is fundamental to the argument justifying the need for fair housing. I am sure the Senator has heard the argument I have heard, that we should be steering shy of this particular approach, that we should deal solely with the economic needs of the ghetto dweller—his housing, employment, education, parks, recreation, and the rest. Of course, there is no question that we must deal with these matters. The Senator from New York has done just that. But the big debate going on in the ghetto today concerns an appraisal of the white man and his attitude toward the Negro. Are those black racists who are arguing

that "Whitey" hates them, will never relent, will never give up, and intends in no way to give them dignity or opportunity, correct? Or, are the moderate civil rights leaders, who claim that there is a basic decency in the rest of America, correct? I believe that debate is raging in ghetto America today.

I believe one of the things that rankles the Negro more than anything else—and properly so—is the deeply embedded and growing practice by which we crowd Negro America into the rotting core of our cities and into the vestiges of the sharecroppers' areas of the South.

Americans must stand up and face this issue squarely, and declare that we intend to have a country in which every American, regardless of race, can live in the housing of his choice if he can afford it.

Mr. JAVITS. I thank the Senator.

Mr. MUSKIE. Mr. President, will the Senator yield?

Mr. MONDALE. I yield.

Mr. MUSKIE. Mr. President, the Senator from Minnesota is to be commended for opening up a subject that is at the very heart of the distressing national crisis in our cities. To ignore the subject is to ignore one of the key elements of the solutions which must be found to restore stability, justice, peace, and order to our cities.

Housing is a fundamental human requirement, and it goes to the fundamentals of human aspirations in our country.

The Senator from New York has very properly equated housing aspirations of the individual human being with his desire for dignity. It is also related to his desire for opportunity and security; and because it is related to a search for security in this country—economic security, physical security—the subject is wrapped up in conflicting emotions—the emotions of those who seek dignity and opportunity, the emotions of those who think that drive somehow endangers their own opportunities, their own dignity, their own security.

We will not resolve these conflicting emotions by brushing the subject under the table, by hiding from it, by trying to escape from it. The only way we are going to deal with it is to put the subject on the table, discuss it frankly, and discuss it as objectively as we can, and somehow develop public policies which will stimulate Americans of all races and colors to learn to live together. This is really the heart of the matter. Housing is one of the ways we can learn to live together; and unless we can learn to live together, we will not overcome our fears of each other, and all the other emotions which tend to tempt Americans to become anti-American, in the sense that they are not willing to grant to other Americans the same freedom, the same opportunity, and the same dignity which each of us seeks for himself.

So I commend the distinguished Senator from Minnesota for placing this subject on the table of discussion in the Senate, in this crucial summer of 1967.

Mr. MONDALE. I thank the distinguished Senator from Maine for his important contribution to this colloquy and

for his continuing leadership in the field of human rights. I believe the Senator underscores an exceedingly important point when he refers to fears, prejudices, and superstitions that are reflected in the minds of so many Americans when they think of fair housing, when they think of the opportunity of free choice for every American, regardless of color, in the selection of housing; because that is what it is.

When white and black America are separated and live by themselves, they tend to develop fears and caricatures about the others. They tend to lump all white men together, or conversely, all black men together, and develop theories, fears, and anxieties that are totally unrealistic.

The truth of the matter is that in the United States some States have strong housing laws, and in hundreds of communities the races live together, and it is working out very well. The fears are unfounded, but since so many have nothing to judge these fears by, they hold them, nevertheless.

This is one of the big things to gain here—to look at the problem squarely, to clear away the anxieties, the prejudices, and the fears that are unfounded, and just look at the problem for what it is. I believe that once we have done that, America will make the choice that I am sure a decent American can be expected to make, and that is that we intend to live together.

Mr. MUSKIE. I thank the Senator and compliment him again.

Mr. MONDALE. I thank the Senator from Maine.

Mr. President, I yield the floor.

Mr. FONG. Mr. President, since Congress passed the historic Civil Rights Act of 1964, we have seen tremendous strides toward full citizenship for the Negro American. That landmark legislation set in motion forces of democracy aimed at the ultimate goal of according equal rights to all our citizens.

Substantial progress has been made in such areas as schools, voting, public accommodation and public facilities, transportation, employment, and expenditure of public funds.

However, we have made hardly a start in dealing with one pervasive problem which is found in all sections of our Nation, North and South, East and West—the problem of discrimination in housing.

Illustrative of the problem's scope is a recent survey conducted by the Department of Defense of 235 military installations across the country. This survey showed that Negro servicemen faced severe discrimination in obtaining housing near 102 of the installations.

Reported in the survey were case after case of Americans, in the service of their country, being denied houses or apartments, or being charged outrageous prices for housing—simply because of their skin color.

Because of widespread discriminatory practices in the area of housing, vast numbers of our Negro citizens are denied the right to live where they choose; they are forced to live in what amounts to segregated areas, and this is particularly true of our urban centers. This fact

USCA11 Case: 25-11376    Document: 20-5    Date Filed: 08/13/2025    Page: 25 of 38

has been made very plain by the recent civic disturbances sweeping across so many of our Nation's cities.

The housing conditions in which many of our Negro citizens are forced to live are generally of inferior quality, and overcrowding is intense, particularly in our urban centers.

For example, in New York City's Harlem section, 237,792 people live in a three-and-a-half square mile area, or 100 people per acre, according to a recent study. Ninety percent of the housing in that area is more than 30 years old, and nearly half was built before 1900.

Segregated housing isolates our racial minorities from the public life of the communities. Invariably, it also results in inferior public education, recreation, health, sanitation, and transportation services and facilities. It restricts access to training and employment and business opportunities.

The Negro American has not been able to benefit from the post-World War II housing boom on a par with his fellow Americans. His choice of a place to live is limited not only by his inability to pay, but also by his color.

As the U.S. Commission on Civil Rights has concluded, today—

Housing seems to be the one commodity in the American market that is not freely available on equal terms to everyone who can afford to pay.

Mr. President, the system of segregated housing disables our society. It often has led to the creation of deplorable slum conditions in which many of our citizens are too poorly educated, inadequately trained, and ill equipped to become productive members of a society which is increasingly technical and automated.

The resulting economic loss to the Nation, according to one study conducted on the subject by the Council of Economic Advisers, is quite staggering. According to the Council's figures, in 1966 the economic cost of racial discrimination was estimated to be about $27 billion—equal to 4 percent of our gross national product.

Of this $27 billion, the Council estimates that some $22 billion is traced directly to the lack of education and training among Negroes.

State and local governments have made some headway in attacking this problem. Fair housing laws have been enacted by 17 States and by a large number of municipalities.

On the Federal level, in 1948 the Supreme Court held racially restrictive covenants unenforceable in both State and Federal courts. President Kennedy's Executive order of November 20, 1962, established the President's Committee on Equal Housing Opportunity and forbade racial discrimination in new FHA and VA-insured housing. And only a few weeks ago, Secretary McNamara issued an order forbidding housing discrimination around military installations.

While very laudatory, these scattered efforts have not been sufficient to eliminate discriminatory practices in housing.

Mr. President, it is time for Congress to take decisive action in this area of civil rights legislation.

I strongly believe that Congress should enact legislation such as the bill S. 1358, the Fair Housing Act of 1967, of which I am a cosponsor. This proposal, a modest but essential first step, would prohibit discrimination on account of race, color, religion, or national origin in the sale, lease, and financing of housing.

Mr. President, to me, the senseless lawlessness erupting in so many of our cities points up the urgent need for this legislation. I do not, for one moment, condone the urban riots, which I do not believe to have the slightest relation to the Negro quest for equal justice. However, as I pointed out last year when I announced sponsorship of the fair housing proposal, the passage of S. 1358 is a matter of some urgency. This was true in 1966, and it is true today.

The Housing Subcommittee of the Banking and Currency Committee has scheduled the first hearings on the bill for August 21, 22, and 23. It is my hope that the subcommittee and the full committee will act with all dispatch, and that the Senate will speedily approve the bill.

Mr. TYDINGS. Mr. President, I am happy to join with my colleagues this morning on the eve of hearings in the Senate Banking and Currency Committee on S. 1358, the Fair Housing Act of 1967. I commend my colleagues for the insights they have given us regarding the pressing need for this legislation, and I congratulate the Senator from Minnesota [Mr. MONDALE] for his leadership in this matter. The presence of residential ghettos—in effect, restricted areas in which all members of a minority group are forced to reside no matter where they desire or can afford to live—brings gravely damaging social consequences to our country, particularly in our urban areas.

I strongly believe that a man's religion, national origin, or race has no bearing on his worth as a human being or his desirability as a neighbor. Yet purposeful exclusion from residential neighborhoods particularly on grounds of race, is the rule rather than the exception in many parts of our country. Such exclusion unjustly denies many Americans the freedom to gain access on equal terms with other Americans to good housing and good schools for their children, and proximity to good jobs. Such exclusion unjustly denies many Americans of an equal opportunity to better their lives.

Some people assert that, as a matter of principle, some Americans should be free to treat other Americans unjustly. I do not believe this. I am not in favor of giving any person or group preferential treatment in seeking housing. I believe that landlords and property owners should be free to demand proper qualifications of prospective tenants or home buyers, such as adequate income, good credit record, proper family size to insure against overcrowding, and so forth. But I firmly believe that sellers and landlords must deal with everyone fairly and equally, by not excluding anyone from residences solely because of race, religion or national creed.

I believe that this principle of equal

treatment is fundamental to the American way of life.

Mr. KENNEDY of New York. Mr. President, I commend the Senator from Minnesota for his incisive and timely speech.

This week, we in the Senate have been occupied with issues of foreign policy; the Vietnam war, the scope of our assistance to other nations, the nature of our defense policies, all require careful consideration.

But we cannot—we must not—forget the urgent issues facing us at home. And of these issues, none is more important, none is more pressing, than the continued fight for equality of opportunity throughout our society. In this effort to achieve racial justice, the right of all Americans—regardless of race—to live in whatever housing they choose is primary.

It is of course true that we must also commit our resources fully to the needs of the inner cities. Whatever legislation we pass, the ghettos will be with us for a long time to come. And we must act to improve the lives of their residents so that we do not lose another generation to the degradation of poverty and unemployment and welfare.

But it is also true that we must provide vigorous protection for those who have the resources to live elsewhere. It is no more just to deprive an American of housing because of his race than it is to deprive him of access to education, or a job, or the right to vote.

I agree with those who say that State and local efforts are important—but they are not enough.

First, the pressure of interests who falsely believe that such legislation has a detrimental effect on property values too often prevents legislative action at the State and local level. And the same interests may cause whatever laws are passed to be too narrow in their coverage, and may bring about inadequate enforcement as well.

More important, State laws cannot deal with this issue, because housing has now become a national problem. The increasing mobility of the American household and the development of metropolitan areas which cross State lines illustrate the need for Federal action.

As Senator MONDALE notes, this legislation will not solve the problem of the ghetto—it will not provide the funds needed to fulfill the promise of decent housing for all Americans. But it is a step further toward the goal of a just society. And it is a step we must take now.

I want to express again my agreement with the Senator from Minnesota, and to commend him for his excellent speech this morning.

## COMMITTEE ON THE JUDICIARY—SENATE RESOLUTION 156

Mr. EASTLAND. Mr. President, from the Committee on the Judiciary, I send a resolution No. 156, to the desk and ask unanimous consent for its immediate consideration.

The PRESIDING OFFICER. The resolution will be stated.

The assistant legislative clerk proceeded to read the resolution.

# TAB CR-5

UNITED STATES

OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
SECOND SESSION

## VOLUME 114—PART 3

FEBRUARY 8, 1968, TO FEBRUARY 22, 1968

(PAGES 2603 TO 3952)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1968

Case 1:25-1137 Document 11 Filed 06/13/2025 Page: 28 of 38

chairman of the District of Columbia Council would be authorized to designate members of the (D.C.) Council to maintain contact with each NFC.

The Agency for Planning and Development would be required to provide the NPC's and any other interested citizens' groups with full information on proposals that it was developing which affected specific neighborhoods. The Agency would also be required to consult with the NFC's and to hold public hearings prior to any action being taken upon any proposal. At these hearings the NPC's and anyone else could present their views and alternatives.

There would also be established an Office of Neighborhood Planning to service the Neighborhood Planning Councils. The director of this Office would be chosen by a majority of the chairmen of the NPC's and he would serve a one year term. His appointment would be subject to the approval of the Mayor.

The federal agency planning functions now exercised by the National Capital Planning Commission would be transferred to a new unit, the Office of Federal Development in the National Capital Region, in the Executive Office of the President. This Office would review all agency proposals for building sites and other federal facilities in the Washington region. A commission composed of five distinguished planners and architects appointed by the President would advise the Office on the proposals it was considering.

The Office would be required to refer all agency proposals submitted to it to the local jurisdictions and the Metropolitan Washington Council of Governments (COG) for comment. The Office would also be responsible for the development in cooperation with COG and the local jurisdictions (including the District) of federal site plans for the region which complemented other regional and local planning objectives. It would then review the agency proposals on the basis of their conformity to the federal plan and on the basis of the comments of the local jurisdictions and COG.

The agencies would be required to develop their own five year (or longer) capital improvement programs for their facilities needs in the region and to submit these to the office for review.

## INTERFERENCE WITH CIVIL RIGHTS

The Senate resumed the consideration of the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

Mr. MONDALE. Mr. President, I wish to speak in support of the fair housing amendment.

In this session of Congress we have talked about and will continue to talk about manpower training programs to remedy hard-core unemployment and about the deplorable state of ghetto area schools. One of the means the Senate and this Congress can begin to remedy these situations is through the passage of a fair housing law.

The pattern of racial segregation in housing affects employment opportunities and the racial composition and quality of schools. Any city planner planning the ideal city will tell you that journey-to-work considerations are crucial in the location of housing and employment. Low-income people cannot afford the expenses of private transportation to work. In the first half of this century, industry and most employment in American cities was located in the cities' central sector, and housing for the low-income groups was also located in the central sector.

Among the many reasons for industry's move to the suburbs in the past 15 years are the requirements of mechanized assembly lines which need space all on one level and the requirements for increased parking areas. In addition, the increase of interstate truck transportation required that industries locate on the outskirts of large cities. Industries found no barriers to moving out where more land was available, but discrimination in housing prevented the nonwhite workers from following them. Those who could not afford the transportation to work were left without employment.

The Secretary of Housing and Urban Development, Robert Weaver, testified before the Committee on Banking and Currency's Subcommittee on Housing and Urban Affairs that in the first 5 years of this decade, one-half to two-thirds of all new factories, stores, and other mercantile buildings in all areas of the country except the South were located outside the central cities and metropolitan areas. If this trend continues, and it is expected to, expanding job opportunities will be in or near the suburbs rather than in core cities.

Eighty percent of the nonwhite population of metropolitan areas in 1967 lived in central cities. Under present conditions, these persons are unable to move to suburbia because of housing discrimination practices and because of the lack of low- and moderate-cost housing. They are the least able to afford the high cost of transportation, and unable to live in the central city and work in the suburbs, they will be deprived of many jobs.

Recently U.S. Department of Labor reports show that unemployment is so much worse in the slum ghettos than in the country as a whole. National unemployment rates do not begin to show the problems of minority workers. Unemployment figures of 3.7 or 4 percent do not indicate the rate of unemployment in the slums. In the slums, few persons have decent jobs, up to one-half are unable to earn better than a poverty-level income, and between 10 to 20 percent of those who should be working are not working at all.

I give a few specific examples presented by the National Committee Against Discrimination in Housing showing the movement of jobs from the central city to the suburbs. New York City lost more than 180,000 manufacturing jobs in the years 1951 to 1965 when its nonwhite and Puerto Rican population was increasing by almost one-quarter of a million. New employment gain of approximately 30,000 jobs occurred especially in manufacturing industries in the suburbs of the cities.

Between 1962 and 1965, when St. Louis city's employment increased less than 3,000, St. Louis County gained almost 53,000 jobs, mostly manufacturing and service type jobs.

In Baltimore between 1951 and 1965, total employment increased only 1,450. Baltimore lost almost 20,000 jobs in manufacturing and urban Baltimore gained 86,272 in those years.

The city of Philadelphia lost nearly 50,000 jobs from 1952 to 1965, but the ring around Philadelphia gained 215,000 jobs.

What is the transportation situation for the inhabitant of the Negro ghetto out to these jobs? In New York, the monthly commuting total on the Long Island Railroad equals $30. In St. Louis there is no public transportation to many of the areas to which jobs moved. Where there is transportation, the trip costs about $6.50 a week and takes from 1½ hours to 2 hours each way.

In Baltimore, the trip ranges from $4 a week and a 40-minute ride each way to $15 and an hour's ride each way. In Philadelphia, a person working in Montgomery County would have to change buses at least three times and pay about $6.60 a week in commuter tickets.

The Watts riots in Los Angeles indicated that the problem is even of greater magnitude in California. I commend to the reading of the Senate the remarkable book entitled "Rivers of Blood, Years of Darkness," by Robert Conot. This book spells out many of the aspects that contributed to the tragic rioting in the Watts area and the fact that one of the key factors was this pool of unskilled employment, penned in the ghettos and sealed off from employment, unable to afford cars or public transportation. There is in addition the inconvenience of spending time to find jobs, if jobs can be found. These factors were such as to discourage completely efforts to find employment. I think the best example of that is the recent Aerojet-General plant located in the center of the Watts area. That company produces military tents under Federal contract. The initial employment was to be 75 employees. In response to help wanted ads, more than 5,500 residents of the Watts area applied. That showed the absolutely pathetic need for unskilled jobs in that one area alone.

The same situation exists in San Francisco. To commute from any one of the several Negro ghettos in San Francisco or the East Bay to job openings in South San Francisco, Martinez, Livermore, or Point Richmond, a person would find it almost impossible if he had to rely on public transportation. To commute from Hunters Point in San Francisco to a job in Contra Costa County in the East Bay would require from three to four transfers, a cost of about $15 a week, and a 4- to 5-hour commute time each day. A more reasonable commute, via Alameda or West Oakland, to jobs in Contra Costa County costs about $11.50 a week, takes at least 2 hours each way, and is restricted primarily to travel during peak rush hours, which makes any off-hour job of this kind virtually impossible.

Unless the county is willing to invest billions of dollars in a cheap, fast, and multidestination transportation system, ghetto residents will not be able to reach most jobs. A much simpler solution to one facet of the employment problem would be to open housing to everyone.

The pattern of racial segregation in housing also affects the racial composition and quality of schools. The neighborhood school concept, until recently,

coupled with patterns of racial housing, operated despite a Supreme Court decision in Brown against the Board of Education to keep Negroes in de facto segregated schools. And the condition of these schools is a question of considerable concern for many. The schools in Washington, D.C., in New York City, and in other large city ghetto areas have been the subject of intense criticism. Jonathan Kozol's book, "Death at an Early Age," depicts the conditions of schools in Boston. The book describes the efforts of a young teacher in the Boston school system to deal with the deplorable conditions which literally destroy the young students attending those schools.

The stopgap solution for this result of lack of fair housing measures has been, as for unemployment, to provide transportation. For education this has come in the form of busing. Neither de facto segregation nor busing would be the case if we could do away with discrimination in housing.

The U.S. Commission on Civil Rights has recently published a study entitled "Racial Isolation in the Public Schools." This report demonstrated that there is a relationship between the confinement of Negroes to central city ghettos and inferior educational opportunities. For this reason, since housing discrimination produces inequality of educational opportunity, the Commission recommended in that report a Federal fair housing law in order to minimize the impact of housing segregation on education.

Open housing is absolutely essential to the realistic achievement of such accepted goals as desegregated schools and equal opportunity. Much of the statutory civil rights progress of recent years will be little more than theoretical until open housing becomes a reality. Because the composition of the student body is determined by the composition of the residents of the area in which this school is located, the soundest way to attack segregated education and the quality of the schools resulting from it is to attack the segregated neighborhood. Testimony at the hearings on the Fair Housing Act brought out that it is virtually impossible to provide high quality education to disadvantaged minorities as long as they are restricted to living in older congested sections of cities. The opportunity to go to school with members of other racial and ethnic and economic groups tends to improve the educational achievement of disadvantaged children, according to findings of educational research including the Coleman report.

De facto segregation in schools and education is directly traceable to the existing patterns of racially segregated housing. We cannot afford to allow our efforts to provide the best education possible to all Americans to be thwarted by actions of private persons, actions which are antisocial, immoral, and which ultimately amount to contravention of our public policy in favor of equal educational opportunity. Fair housing is therefore more than merely housing. It is part of an educational bill of rights for all citizens.

Without it, the dream of full and fair social opportunities for all Americans is an illusion.

(At this point, Mr. WILLIAMS of New Jersey assumed the chair.)

Mr. ELLENDER. Mr. President, the open housing amendment to the pending bill declares that it is the policy of the United States to prevent discrimination in the purchase, rental and occupancy of all housing. Title II of the amendment provides that the bill will take effect in three stages, that is, its provisions shall apply to the Federal Government and its agencies immediately. After December 31, 1968, the provisions of the amendment would also then apply to all dwellings in which the owner is not a resident at the time of the sale, and dwellings intended for occupancy by five or more families. The final stage of the bill is December 31, 1969, when it would apply to all dwellings. However, there are exempted dwellings which are occupied by no more than four families, if the owner actually occupies one of the living quarters as his residence.

The amendment further provides that discrimination in the sale and rental of houses is not only unlawful, but also the printing or publication or any statement or notice indicating a preference based on race, religion, or national origin. Apparently, under this provision any newspaper publisher who accepted an advertisement indicating a preference for the owner of a certain race or religion would be in violation of the law. Apparently, freedom of speech and press guaranteed in the Bill of Rights is to be abolished with the inauguration of this open housing amendment.

The amendment also provides that any person involved in the financing of housing who in any way discriminates against a person applying for a loan would be made criminally liable.

Any person operating a multiple listing service or real estate brokers' service, who indicated a preference for one race or another, would be in violation of the law. In the hearings held in 1966 and 1967, most of the real estate organizations testified against the whole open housing bill, and not just this section alone. The amendment further provides that it is unlawful to interfere, coerce, intimidate, or do anything which would interfere with the so-called right of open occupancy. There is exempted from these provisions the right of a religious organization to show preference in any institution controlled by it for its own members.

There would be created an additional Assistant Secretary to the Department of Housing and Urban Development to implement the provisions of the amendment. The Secretary of Housing and Urban Development, or his agents, are given unlimited power to implement and enforce the so-called right of open occupancy. He is given the power to entertain complaints, engage in factfinding in particular disputes, render judgments on the charges of discrimination, issue restraining orders and subpenas, and assess penalties for failure to comply with his judgments. Never in the history of the United States or of the civilized world has a political appointee been

granted such far-reaching and sweeping executive and judicial powers. He may even institute proceedings against an alleged violator without having even received a complaint.

The intent of the proposed amendment gives authority to the Secretary to conduct what is termed "educational activities." He is authorized to pay out sums of money to bring groups of people together to be educated in this new social order. It is indeed a sad day for the United States when Congress would even consider permitting a political appointee to engage in this type of propaganda and brainwashing of our own citizens. I do not believe that it is unfair of me to say that the Department of Housing and Urban Development is the poorest run department of any of our Federal agencies, even taking into account that it is a relatively new department. The officials charged with the administration of the programs have indicated an ignorance of congressional acts and congressional intent to an unbelievable extent. The bureaucratic bungling in the Department of Housing and Urban Development is unparalleled in any of our executive departments.

As Senators know, I have supported every housing act which has become law in the last 31 years. In my earlier years in the Senate, I was a member of the committee which considered all housing legislation. I toured the country to ascertain the housing needs of the American people. I have done everything in my power to see that all people in this country, regardless of race, have had decent housing. In very recent years, I have even supported rent supplement programs at considerable political cost, I might add. Each and every time I have attempted to secure any information of value from the Department of Housing and Urban Development regarding new proposals or the operation of existing programs, I have been met with nothing but delays, misinformation, lack of information—no information.

In granting power and authority to the Secretary of Housing and Urban Development and his agents, we must proceed on the assumption that the least qualified people will occupy those positions of power because there is no assurance that the best people will ever hold these jobs. As has been said by one of my colleagues, "no good Secretary would want such power as this amendment invests in him, and no bad Secretary should have it."

This open housing amendment holds out the traditional bait to the Northern States by providing that their local open housing laws may take precedence over the Federal law and the Secretary is authorized to refrain from enforcing the Federal law in such States.

I may say, Mr. President, that quite a few States have such laws. We have heard a discussion this afternoon of such a law in the State of Oregon.

As I suggested to my good friend the Senator from Oregon, with the State having only 1 percent of its population Negro, and most of the 1 percent located in the city of Portland, they have no problem.

I was surprised when the Senator from

Oregon stated that there was a ghetto in Portland, when only 20,000 Negroes live throughout the State, and more than 18,000 of them are in the city of Portland.

The Secretary or his agents are authorized to hold hearings and investigate, and to have access to premises, records, documents, and individuals and any other evidence to determine if there are any violations of the provisions of this act. Here, again, is another constitutional safeguard to the right of privacy, a citizen's right to be secure in his home, trampled underfoot by this amendment. As I said before, it is unbelievable that the Senate would consider for a moment enacting the provisions of this amendment into law, taking away all of the rights which were fought for so long and so hard.

This bill is so obnoxious because it weights the controversy so heavily in favor of the person who claims to have been discriminated against. There is no attempt to maintain evenhanded justice. A person can file a complaint against the owner of a dwelling or the Secretary of Housing and Urban Development can file the complaint, or the Attorney General can bring an action in the U.S. District Court against an alleged violator, all independently of each other, or all working together, depending upon their own discretionary choice. Anyone who violates the Secretary's orders can be fined $50 a day for disobeying such an order. In the past, Congress has created special commissions such as the Interstate Commerce Commission, and has endowed it with quasi-judicial functions. It has made certain by the enactment of the Administrative Procedure Act—APA—and other rights of redress against arbitrary acts of the Commission to insure that a respondent or violator would be protected in his constitutional rights.

However, in this case, an ordinary political appointee of the President and his agents who hold office at the pleasure of the President, are invested with these overwhelming executive and judicial powers, without any safeguards for the rights of an accused person. To my knowledge, this is the first time a partisan political official in this Government would be granted such powers.

The pending amendment on open housing represents the ultimate in social extravagance in the United States. Every cherished liberty purchased at a high cost in Anglo-American history over the centuries is cast aside. All personal rights and liberties of the individual are ripped away for the alleged purpose of preventing discrimination. All the personal liberties wrung from the sovereigns from the Magna Carta to the Bill of Rights are trampled under foot. If this amendment becomes law, those guaranteed rights will be nothing but lies and dead concepts. The curators of our archives have placed the Declaration of Independence and the Constitution in a steel and concrete vault. How stupid and foolish. Do they not know that the protection of the Constitution is here on this very floor and in the minds and actions of all Americans? The vault contains but empty promises on faded parchment. The fulfillment of the promises has not been kept.

Under this amendment the Secretary of Housing and Urban Development would become a virtual commissar of housing—violating every right of life, liberty, and property. Sweeping judicial powers, I repeat, are given the Secretary and his agents to investigate the facts of alleged discrimination, render judgments against an accused and assess penalties. No right to file a complaint in court is granted an accused until 6 months after the Secretary or his agents

have rendered their judgments that a violation has occurred. However, if the Secretary should decide against one of the so-called aggrieved persons he can go into Federal court in 30 days. In other words, if a so-called aggrieved person does not get a favorable decision from the Secretary within 30 days he can get the Attorney General to go into Federal court with his complaint. However, the poor fellow accused of discrimination cannot get a fair trial in a duly constituted court for 6 months.

Nothing so monstrous has been perpetrated on civilized people since the French and Russian Revolutions. The howling mobs are always the same—whether it is Paris in 1793, Petrograd in 1917 or Detroit in 1967. It is always in the name of democracy and equality. Equality is the last refuge of the trifling, the shiftless and the incompetent. This amendment runs into many of the same constitutional objections as the pending bill does, only it violates more provisions of the Bill of Rights.

The amendment is more or less the same bill that was considered in 1966 and 1967. On May 27, 1966, the Attorney General of Louisiana filed an opinion in the form of a memorandum with the Judiciary Committee on the constitutional questions raised. At some future time I shall quote from his very thoughtful and learned opinion.

---

## ADJOURNMENT

Mr. BYRD of West Virginia. Mr. President, if there be no further business to come before the Senate, I move, in accordance with the previous order, that the Senate stand in adjournment until 12 o'clock meridian tomorrow.

The motion was agreed to; and (at 4 o'clock and 16 minutes p.m.) the Senate adjourned until tomorrow, Friday, February 16, at 12 o'clock meridian.

# EXTENSIONS OF REMARKS

## The 16th Annual Presidential Prayer Breakfast

### HON. FRANK CARLSON
#### OF KANSAS

IN THE SENATE OF THE UNITED STATES

*Thursday, February 15, 1968*

Mr. CARLSON. Mr. President, on Thursday morning, February 1, the 16th consecutive annual Presidential prayer breakfast was held. The breakfast was attended by the President of the United States, the Vice President of the United States, the Speaker of the House, members of the Cabinet, members of the Supreme Court, members of the diplomatic corps, Governors of various States, and members of the executive and legislative branches of the Government.

Also present were presidents of national and international labor unions, outstanding leaders in the field of industry and business, chancellors and presidents from a select number of universities and colleges, and men of distinction from the courts, from communications, and

from every other phase of our economic life.

We have found this event to be very meaningful, not only to those of us who gather at the breakfast, but also to millions of citizens across this Nation.

I ask unanimous consent to have printed in the Extensions of Remarks the text of the program and the proceedings.

There being no objection, the program was ordered to be printed in the RECORD, as follows:

PROGRAM OF PRESIDENTIAL PRAYER BREAKFAST

Invocation: The Hon. John A. Volpe, Governor, State of Massachusetts.

Introduction of Head Table and Statement: Sen. Frank Carlson, Kans.

Greetings from House Breakfast Group: Rep. Ben Reifel, S. Dak.

Old Testament Reading: Rep. John W. McCormack, Mass.; Deuteronomy 6:4–17, Read by Sen. Joseph Tydings, Md.

Greetings from Senate Breakfast Group: Sen. John Stennis, Miss.

New Testament Reading: John 15:1–17, The Vice President of the United States.

Prayer for National Leaders: Hon. Robert C. Weaver, Secretary Housing and Urban Development.

Message: General Harold K. Johnson, Chief of Staff, U.S. Army.

Address by Lyndon B. Johnson, President of the United States.

Closing Prayer: Hon. Price Daniel, Office of Emergency Planning.

Closing Song: The Singing Sergeants.

INVOCATION, GOV. JOHN A. VOLPE

We raise our voices in prayer to the God of men and nations acknowledging our dependence on Him and our earnest intention to do His will. On this earth we only see dimly the sound of His voice. May His grace make us each day more sensitive to our duty, more conscious of how helpless we are without Him. As we ask His blessing on ourselves, we ask Him also to guide this nation and all others into the paths of peace and justice. Too often in our bewildered world, His sons are enemies separated by conflict and violence seeking to resolve by power what must be earned in peace. Those who call Him Father must by this fact be brothers, but how easily oppression, persecution and discrimination divide them one from the other and make a mockery of brotherhood and justice. The world God made for man, man has remade according to his own weakness. Help us, oh Lord, to know your ways and give us strength to follow them. Make us humble

# TAB CR-6

PS
668
. K25

# Department of Justice

REMARKS BY

ATTORNEY GENERAL NICHOLAS deB. KATZENBACH

ST. LOUIS CONFERENCE ON EQUAL

OPPORTUNITY IN HOUSING

Chase Park Plaza Hotel
St. Louis, Missouri

Tuesday, June 15, 1965, 7:00 P.M. CDT

We meet this evening on the anniversary of an event of momentous and seminal significance in the development of Anglo-Saxon law and government. On June 15, 1215 -- 750 years ago today -- "in the meadow which is called Runnymede between Windsor and Staines" King John affixed his seal to the Magna Carta.

The rebellious barons who forced the King to grant the charter were not much concerned with its effect in the distant future. They were practical and selfish men who demanded redress for specific grievances. Nor did the tyrannous John probably know or care that in granting redress he was setting precedent for the limitations of governmental power. Until that time, the power of the King, so far as anyone knew, was absolute.

The language of the charter is still remarkably acute. It set down a guarantee of freedom under law:

"No free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him except by the lawful judgment of his peers and by the law of the land."

And it guaranteed impartial administration of justice.

"To no one will We sell, to none will We deny or delay, right or justice."

These are words which have filtered down the centuries with enormous impact. The principles of the Great Charter were carried by the colonists to the New World. The Constitution and the Bill of Rights are its direct descendants.

This link was dramatically, if poignantly, underscored at the recent ceremonies in which an acre of ground at Runnymede was deeded in perpetuity to America by the British people in honor of President Kennedy.

We are, in the United States, today, still working to guarantee the impartial administration of justice written into the Magna Carta. We are still fighting to assure that "to none will We deny or delay, right or justice."

Equal justice before the law is, after centuries of denial, finally being won for Negro citizens.

This has been a decade of struggle and a decade of great achievement. The courts have made it clear that separate but equal has no meaning in any area of the law. The 1957 and 1964 Civil Rights Act gave the government tools to eliminate publicly sanctioned segregation. The Voting Rights Bill of 1965, which I am confident will be passed by Congress with dispatch, will further hasten the end of official discrimination.

The work is not complete. There will continue to be difficulties in enforcing legal guarantees. Loopholes may develop in the laws and mopping-up action will be required. But the legal principle is now established;

the system of officially sanctioned segregation is in its death throes in
the United States. The legal rights guaranteed to the American Negro have
existed for a century. Now they are being put into effect.

We have thus, as President Johnson noted at Howard University ten days
ago, reached the end of the beginning. For as the President said, " it is
not enough just to open the gates of opportunity" unless everyone can walk
through the gates.

We seek, in the President's words "not just equality as a right and a
theory but equality as a fact and equality as a result."

Moving from the area of theory and law to the area of fact means that
we must now confront all the mean realities of inequality, of deprivation,
and poverty right at home in our own communities.

These problems will be even more difficult to dissolve because they
represent the sum total of our neglect and failure as a whole society.

Unemployment, poverty, bad health, inferior schools, rat-infested
slums -- these are not just Negro problems -- they are American problems.
This conference is concerned with what is probably the most crucial and
the most important problem of all. Segregated housing is the cause -- di-
rect and indirect -- of many other kinds of segregation.

Almost three out of four Negroes in America live in a city, and most
Negro city dwellers are forced by discrimination into slums. Segregated
housing creates segregation in schools and hospitals and most other areas
of everyday life. It creates a separate community that might as well be
walled in like a medieval ghetto, so effective is the division.

These walls will not be made to tumble by law alone, but by persuasion
and action on the community, neighborhood and individual level.

Conferences like this already have proved their value. Last November
I spoke at a similar meeting in Baltimore. Following that Conference the
local board of realtors revised its listing contract to contain a clause
saying: "The Seller agrees to offer his property to all qualified purchasers
regardless of race or color."

Not stopping with a simple statement of nondiscriminatory policy, the
Baltimore board has developed an educational program to acquaint salesmen
with ways to overcome seller resistance to prospective Negro buyers.

Promising steps of a similar nature have been taken in other cities.
In Cincinnati, for instance, the housing industry has joined civil rights
groups in setting up a city-wide fair housing council. Such action has
not been restricted to cities, but has been growing rapidly, even in white,
middle-class suburbs.

In the past five years, fair housing committees affiliated with the
National Committee Against Discrimination in Housing have increased from
18 to about 1,000.

- 3 -

The fact that three levels of government -- city, county, and state -- are co-sponsoring this conference with the President's Committee on Equal Opportunity in Housing, says much about the interest in finding solutions here in St. Louis.

I have no need to stress to this group, however, that despite all these positive beginnings, the great bulk of the work lies ahead. We have barely scratched the surface of accomplishment in truly integrated housing.

The first job is to clear away the fables and fears that block progress in this field. The causes of discrimination rest, at bottom, in the human mind. It is there where discriminatory attitudes must first be undermined. It is there where the fantasies about what will happen if a Negro moves into the neighborhood must first be broken.

These myths do not come as sharply into play when their falsity is theoretical -- when they are to be tested in someone else's backyard. But they may be the dominant cause of resistance when the question is not theoretical equality, but Negroes moving to one's own street.

You know what these myths are -- they are as much a part of American folklore as Paul Bunyan:

"If we let one in they will all come in"

"They will take over"

"All the whites will move out"

"The neighborhood will deteriorate"

"Property values will go down"

Statements of this kind are so common and so mesmerizing that it is easy to forget that they are just myths. But that is what they are -- myths -- untrue assumptions.

"I cannot comprehend how any man can want anything but the truth" wrote Roman Emperor Marcus Aurelius. "It is our false opinions of things which ruin us."

The only way to counter the mythology of race relations is with facts and knowledge. And facts and knowledge are becoming increasingly available as starts toward integrated housing are made in many cities. Evidence is now piled high that the parade of horrors evoked by the prospect of a Negro family moving into a white neighborhood is a mirage.

Hundreds of white communities, both urban and suburban, throughout the country, have been quietly and successfully integrated. Apartment developments in dozens of major cities have adopted equal opportunity policies. And they have done so without financial calamity, disorder, or disruption of any sort.

- 4 -

The towns, cities, and developments where integration occurred are not freaks. The white families who accepted Negro neighbors were not all "do-gooders" or "firebrand liberals." The builders and owners were not possessed or suicidal. They were serious businessmen, not afraid to make a change which was both sound business and the right thing.

Little progress will be made in opening equal opportunities in housing until more real estate dealers and housing industry executives emulate them. One of the most dismaying things about the myths I have mentioned is that so many real estate people -- men and women who should be better informed -- either subscribe to them or are convinced that every prospective white customer believes them.

In either case, by preserving the misconceptions and misapprehensions of a passing age, they are damaging the nation's interests in general, and their own in particular. All prospective customers are not bigots. Impartiality toward Negroes does not mean financial ruin or social ostracism.

Lending institutions, home builders, and real estate dealers who insist on believing the opposite are fighting what is essentially a rearguard action, and in so doing, are endangering their own long-range business prospects.

For, above all, segregation is really not practical. It is not practical because trying to preserve it in the face of the overwhelming trend of history, of opinion and of moral influence, will be costly and ultimately self-defeating.

With the Voting Rights bill nearing passage civil rights leaders have already indicated that housing is their next major goal for advancement.

I hope that leaders in the housing industry will work with them to bring about progress. Early and constructive action can obviate the kind of hostility and conflict that which help none and hurt all.

This conference and others like it can help to smooth the path. It can facilitate communication between the groups. And it can spread the understanding that in North as well as South, in St. Louis as well as Selma, national interest is self-interest.

The confirmed existence of ghettoes, whether they be of Negro poor, or Puerto Rican poor, or Irish poor, endangers and deprives and deprecates not only those in it, but the entire community.

If our central city areas increasingly become empty cores in fat doughnuts of suburban prosperity, we do damage not only to our democratic vision, but also to the prosperity of downtown businessmen. If welfare costs mount ever higher, the price is paid by all citizens. If crime continues to increase in slum areas, its effects reverberate through all levels of society.

- 5 -

In stressing the impracticality of continuing segregated practices in housing, I have not meant to ignore the even more fundamental considera- tion. For aside from the fact that it is economically unsound, and aside from the fact that it is opposed to public policy, segregation is basically immoral.

I am happy to note that St. Louis religious leadership has been active in the fight on segregation and is participating in this conference. The significant role the clergy has played in recent civil rights developments underlines the fact that this revolution is as much moral as it is social, and as much spiritual as it is secular.

There is a rising tide which recognizes that our prosperity is not complete and our promise as a nation not fulfilled until all can partake of it, and all can contribute to it.

This is a hope and an idea as old as man, and we are today working to attain it.

"Your abundance," says the New Testament, "may be a supply for their want, that their abundance also may be a supply for your want; that there may be equality."

## CERTIFICATE OF SERVICE

I filed this appendix with the Court via ECF, which will email everyone requiring notice.


August 13, 2025
_____
Date

/s/blake warner
_____
Signature
Blake Warner, *pro se*
2211 S Village Ave
Tampa, FL 33612
E-Service: BLAKE@NULL3D.COM