IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

USCA Case No. 25-11376-J
United States District Court, Middle District of Florida
Case No.: 8:23-CV-181

BLAKE WARNER, *on behalf of his minor child J.W.*

Plaintiffs/Appellants

v.

THE SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA

Defendant/Appellee.

## ANSWER BRIEF OF APPELLEE

KRISTEN M. FIORE, B.C.S. (25766)
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

JASON L. MARGOLIN (69881)
**AKERMAN LLP**
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone:  (813) 209-5009
Facsimile:   (813) 223-2837
Jason.margolin@akerman.com

ATTORNEYS FOR APPELLEE

USCA Case No. 25-11376-J

*Blake Warner v. The School Board of Hillsborough County, Florida*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE PURSUANT TO FRAP 26.1 AND 11TH CIR. R. 26.1-1

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, Appellee, THE SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA, by and through its undersigned counsel, hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Akerman LLP (Attorneys for Appellee)

2. Fiore, Kristen M. (Attorney for Appellee)

3. Griffin, Lindsay S., U.S. Magistrate Judge (M.D. Fla.)

4. Margolin, Jason L. (Attorney for Appellee)

5. Merryday, Steven D., U.S. Dist. Judge (M.D. Fla.)

6. Sneed, Julie S., U.S. Dist. Judge (M.D. Fla.)

7. The School Board of Hillsborough County, Florida (Appellee)

8. Warner, Blake (Pro Se)

C-1

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary because this appeal involves straightforward issues on which the law is clear and that are fully briefed by the parties.

83254363;4

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .................................................. C1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

    *Statement Of The Facts* ..................................................................... 3

    *Standard Of Review* ........................................................................ 7

SUMMARY OF THE ARGUMENT ................................................................ 10

ARGUMENT ......................................................................................... 12

    I.   **THE FAIR HOUSING ACT DOES NOT REGULATE
    SCHOOL BOARD DISTRICTING ACTIVITY, AND
    WARNER FAILS TO DEMONSTRATE ANY
    PROXIMATE HARM** ........................................................................ 12

        A. Title 42 U.S.C. § 3604(a) extends to activity directly
        affecting housing that proximately causes the alleged
        harm. Warner demonstrates neither .................................................. 12

        B.  This Court's precedent prevents recovery under 42 U.S.C.
        § 3604(b). .............................................................................. 19

    II.  **THE SCHOOL CHOICE APPLICATION PROCESS
    DID NOT VIOLATE WARNER'S DUE PROCESS
    RIGHTS** .................................................................................... 22

III. **THE PARTIES' PREVIOUS SETTLEMENT AGREEMENT PRECLUDES ASSERTION OF HIS CLAIMS AGAINST THE SCHOOL ASSIGNMENT BOUNDARIES AND THE SCHOOL VOTING MAPS** ...............28

A. Warner received sufficient consideration to support the settlement agreement ......................................................29

B. The settlement agreement bars the two Equal Protection claims that were dismissed on summary judgment .........................31

   1. The school assignment boundaries relate specifically to J.W.'s schooling, and otherwise fall within paragraph six. ....................................................................33

   2. The school voting district map claim is specifically related to J.W.'s schooling and is therefore precluded by the settlement agreement. It is also prohibited by paragraph six ...................................................37

C. The settlement agreement survives Warner's remaining attacks. ...........................................................38

   1. Warner knowingly and voluntarily entered the agreement. ...............................................................38

   2. The agreement does not violate public policy. ...........................41

IV. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS PROCEDURAL DETERMINATIONS** ..................................................44

A. The District Court did not abuse its discretion by denying Warner's motion to stay for discovery ............................44

B. Warner received sufficient notice of the motion's conversion. ...........................................................46

iii

C.  The District Court did not violate the party presentation
    rule. ...................................................................................48

CONCLUSION .......................................................................................51

CERTIFICATE OF COMPLIANCE.......................................................52

CERTIFICATE OF SERVICE ...............................................................52

83254363;4

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

## <u>CASES</u>

*Amey, Inc. v. Gulf Abstract & Title, Inc.,*
  758 F.2d 1486 (11th Cir. 1985) ........................................................44

*Anderson v. Hillsborough Cnty. Sch. Bd.,*
  390 F. App'x 902 (11th Cir. 2010) ...................................................24

*Anthony v. Anthony,*
  949 So. 2d 226 (Fla. 3rd DCA 2007)..........................................39, 45

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)............................................................................7

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983)....................................................................17, 19

*AT&T Wireless Servs. of Fla., Inc. v. WCI Cmtys., Inc.,*
  932 So. 2d 251 (Fla. 4th DCA 2005)................................................45

*Aviation Specialties, Inc. v. United Techs. Corp.,*
  568 F.2d 1186 (5th Cir. 1978) .........................................................44

*\*Bank of America Corp. v. City of Miami,*
  581 U.S. 189 (2017)..............................................................16, 17, 18

*Bd. of Regents v. Roth,*
  408 U.S. 564 (1972)..........................................................................25

*Beadle v. City of Tampa,*
  42 F.3d 633 (11th Cir. 1995) ...........................................................39

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................7

*Bituminous Cas. Corp. v. Williams,*
  17 So. 2d 98 (Fla. 1944)...................................................................42

*Bush v. Holmes*,
  919 So. 2d 392 (Fla. 2006)....................................................................21

*City of Largo v. AHF-Bay Fund, LLC*,
  215 So. 3d 10 (Fla. 2017)....................................................................42

*\*City of Miami v. Wells Fargo & Co.*,
  923 F.3d 1260 (11th Cir. 2019) .......................................16, 17, 18

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)............................................................................24

*Clifton Terrace Assocs., Ltd. v. United Tech. Corp.*,
  929 F.2d 714 (D.C. Cir. 1991) ...........................................................20

*Coal. for Adequacy and Fairness in Sch. Funding, Inc. v. Chiles*,
  680 So. 2d 400 (Fla. 1996)................................................................21

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
  583 F.3d 690 (9th Cir. 2009) .............................................................20

*Delgado v. Gov't Emps. Ins. Co.*,
  528 So. 2d 23 (Fla. 3rd DCA 1988)...................................................31

*Dorman v. Publix-Saenger-Sparks Theatres*,
  184 So. 886 (Fla. 1938)......................................................................29

*Evers v. Gen. Motors Corp.*,
  770 F.2d 984 (11th Cir. 1985) ...........................................................39

*Fla. Power Corp. v. Pub. Serv. Comm'n*,
  487 So. 2d 1061 (Fla. 1986)..............................................................29

*Fuentes v. Shevin*,
  407 U.S. 67 (1972)..............................................................................41

*Fuhr v. Credit Suisse AG*,
  687 F. App'x 810 (11th Cir. 2017).....................................................39

vi

*Gables Ins. Recovery, Inc. v. Cits. Prop. Ins. Corp.*,
  261 So. 3d 613 (Fla. 3rd DCA 2018)...................................................................42

*\*Georgia State Conference of the NAACP v. City of LaGrange*,
  940 F.3d 627 (11th Cir. 2019) ...................................................................19, 21

*Gill v. Whitford*,
  585 U.S. 48 (2018)...................................................................37

*Ginsburg v. United States*,
  17 F.4th 78 (11th Cir. 2021) ...................................................................7

*Glob. Marine Expl., Inc. v. Republic of France*, No. 24-10148,
  2025 WL 2394694 (11th Cir. Aug. 19, 2025) ...................................................................48

*Gray ex rel. Alexander v. Bostic*,
  613 F.3d 1035 (11th Cir. 2010) ...................................................................9

*Grayden v. Rhodes*,
  345 F.3d 1225 (11th Cir. 2003) ...................................................................22

*Goss v. Lopez*,
  419 U.S. 565 (1975)...................................................................23

*Halet v. Wend Inv. Co.*,
  672 F.2d 1305 (9th Cir. 1982) ...................................................................13

*Harris v. Evans*,
  20 F.3d 1118 (11th Cir. 1994) ...................................................................50

*Henderson v. McMurray*,
  987 F.3d 997 (11th Cir. 2021) ...................................................................7

*Hold v. Manzini*,
  736 So. 2d 138 (Fla. 3rd DCA 1999)...................................................................31

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992)...................................................................16, 17

vii

*In re Home Depot Inc.*,
   931 F.3d 1065 (11th Cir. 2019) ..........................................................................24

*\*Jackson v. Okaloosa County*,
   21 F.3d 1531 (11th Cir. 1994) ...................................................................13, 14

*Jones v. Auto. Ins. Co. of Hartford*,
   917 F.2d 1528 (11th Cir. 1990) ...........................................................................8

*Key West Harbour Dev. Corp. v. City of Key West*,
   987 F.2d 723 (11th Cir. 1993) ...........................................................................25

*Lawrence v. Courtyards at Deerwood Ass'n, Inc.*,
   318 F. Supp. 2d 1133 (S.D. Fla. 2004) .............................................................15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ...........................................................................................17

*Marshall v. City of Cape Coral*,
   797 F.2d 1555 (11th Cir. 1986) .........................................................................27

*Med. Ctr. Health Plan v. Brick*,
   572 So. 2d 548 (Fla. 1st DCA 1990) .................................................................36

*Memphis Light, Gas & Water Div. v. Craft*,
   436 U.S. 1 (1978) ...............................................................................................25

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ...........................................................................................22

*Moore v. E. Cleveland*,
   431 U.S. 494 (1977) ...........................................................................................24

*N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*,
   978 F.2d 287 (7th Cir. 1992) .............................................................................13

*Norfolk S. Corp. v. Chevron, U.S.A., Inc.*,
   371 F.3d 1285 (11th Cir. 2004) .........................................................................31

viii

*Oceanic Villas, Inc. v. Godson*,
  4 So. 2d 689 (Fla. 1941) .................................................................. 39

*Paladyne Corp. v. Weindruch*,
  867 So. 2d 630 (Fla. 5th DCA 2004) ............................................... 33

*Pardes v. Pardes*,
  335 So. 3d 1241 (Fla. 3rd DCA 2021) ....................................... 39, 45

*Patterson v. U.S. Postal Serv.*,
  901 F.2d 927 (11th Cir. 1990). ............................................. 8, 44, 46

*Pierce v. Soc'y of the Sisters of the Holy Names Jesus & Mary*,
  268 U.S. 510 (1925) ................................................................... 22, 23

*Polelle v. Fla. Sec'y of State*,
  131 F.4th 1201 (11th Cir. 2025) ...................................................... 50

*Powers v. United States*,
  996 F.2d 1121 (11th Cir. 1993) ........................................................ 8

*Santana v. Miller*,
  314 So. 3d 346 (Fla. 3rd DCA 2020) ............................................... 31

*Schneir v. State*,
  43 So. 3d 135 (Fla. 3rd DCA 2010) ................................................. 30

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ........................................................ 13

*State of Alabama v. U.S. E.P.A.*,
  871 F.2d 1548 (11th Cir. 1989) ...................................................... 50

*Stevenson v. Blytheville Sch. Dist. #5*,
  800 F.3d 955 (8th Cir. 2015) .......................................................... 25

*Torjagbo v. United States*,
  285 F. App'x 615 (11th Cir. 2008) .................................................. 36

ix

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005).................................................................25

*Truesdale v. Venice Arms, Inc.,*
    713 F. Supp. 3d 1350 (S.D. Fla. 2024) .................................15

*Trustmark Ins. Co. v. ESLU, Inc.,*
    299 F.3d 1265 (11th Cir. 2002) ............................................46

*United States v. Campbell,*
    26 F.4th 860 (11th Cir. 2022) ...............................................48

*United States v. City of Black Jack,*
    508 F.2d 1179 (8th Cir. 1974) ..............................................13

*United States v. City of Jackson,*
    359 F.3d 727 (5th Cir. 2004) ................................................13

*United States v. City of Parma,*
    661 F.2d 562 (6th Cir. 1981) ................................................13

*United States v. Mitchell,*
    580 F.2d 789 (5th Cir. 1978) ................................................13

*Warner v. Sch. Bd. of Hillsborough Cnty.,* No. 23-12408,
    2024 WL 2053698 (11th Cir. May 8, 2024) ............................6

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)...............................................................24

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler,*
    537 U.S. 371 (2003)...............................................................14

*Whitesell Corp. v. Electrolux Home Prods., Inc.,* No. 23-10935,
    2025 WL 2538638 (11th Cir. Sept. 4, 2025) ........................7, 8

*Yates v. United States,*
    574 U.S. 528 (2015)...............................................................14

x

*Yee v. City of Escondido*,
    503 U.S. 519 (1992)................................................................24

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
    846 F.3d 1159 (11th Cir. 2017) ...........................................8

*Young Apartments, Inc. v. Town of Jupiter*,
    529 F.3d 1027 (11th Cir. 2008) .........................................50

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002)............................................................23

## STATUTES, CODE PROVISIONS AND CONSTITUTIONS

§ 1002.31(1), Fla. Stat...............................................................26

§ 1002.31(2)(a), Fla. Stat. .........................................................4

§ 1002.31(2)(b), Fla. Stat..................................................26, 27

§ 1002.31(2)(c), Fla. Stat. ......................................................4, 26

§ 1002.31(3), Fla. Stat...............................................................4

§ 1002.31(3)(c), Fla. Stat. .......................................................27

24 C.F.R. § 100.60 ...................................................................14

24 C.F.R. § 100.70 ...................................................................14

20 U.S.C. § 1703 ......................................................................34

42 U.S.C. § 1983 ....................................................................5, 6

42 U.S.C. § 3604 ........................................................................1

42 U.S.C. § 3604(a) ..............................................12, 14, 15, 19, 21

42 U.S.C. § 3604(b) ...............................................12, 19, 20, 21

Art. IX, § 1(a), Fla. Const. ...............................................................................20

## **<u>RULES AND REGULATIONS</u>**

11th Cir. R. 26.1-1 ........................................................................................C-1

11th Cir. R. 36-2 ............................................................................................24

Fed. R. App. P. 26.1 .....................................................................................C-1

Fed. R. App. P. 32(a)(5)................................................................................52

Fed. R. App. P. 32(a)(6)................................................................................52

Fed. R. App. P. 32(a)(7)(B) ..........................................................................52

Fed. R. App. P. 32(a)(7)(B)(iii) ....................................................................52

Fed. R. Civ. P. 12(d) .....................................................................................46

Fed. R. Civ. P. 12(h)(2)..................................................................................49

Fed. R. Civ. P. 56(a).........................................................................................8

Fed. R. Civ. P. 56(d) .....................................................................................45

83254363;4

## <u>STATEMENT OF THE ISSUES</u>

I.      Whether the Fair Housing Act, 42 U.S.C. § 3604, prescribes a cause of action against school boards for school assignment boundaries.

II.     Whether the Board's public school choice application process violates due process.

III.    Whether the Board's and Warner's settlement agreement from a previous administrative matter, which includes a broad release and covenant not to sue, bars his Equal Protection Clause claims.

IV.     Whether the District Court abused its discretion by converting the Board's Rule 12(c) Motion for Judgment on the Pleadings to a Rule 56 Motion for Summary Judgment and considering the motion without further discovery.

## STATEMENT OF THE CASE[1]

This dispute stems from a series of legal actions concerning Warner's minor child, J.W.'s, public school assignment. In 2021, Warner brought an administrative action against the Board on behalf of himself and J.W., challenging the Board's administration of its public school assig nment system. The parties entered a settlement agreement, under which Warner sweepingly released the Board from causes of action related to J.W.'s education. He also agreed not to file any legal proceeding related to any facts, acts, or events predating the settlement agreement. Warner, however, violated the agreement and filed the instant suit. He now claims— on his own behalf—that the Board's school districts violate the Fair Housing Act ("FHA"), that the Board's administration of the school choice program violates the Due Process Clause, and that the District Court wrongly applied the settlement agreement to the remainder of his suit because it does not reach his current causes of action and, in the alternative, is void.

But the settlement agreement was far-reaching, and Warner had the opportunity to confer with counsel. Moreover, his claims that he was priced out of

---

[1] This brief cites to district court docket entries by docket entry number and page number (*i.e.*, [Doc. 1 at 1]), and Warner's Initial Brief by the page number in the ECF header (*i.e.*, [IB 1]). This brief refers to Appellant Blake Warner as "Warner" and Appellee the School Board of Hillsborough County, Florida, as "the Board."

south Tampa due to school districting are unfounded. Each of his claims fails as a

matter of law:

1.  Warner's FHA challenges are meritless. The FHA does not govern the
    Board's alleged activity, which is wholly unrelated to the procurement or
    provision of housing.

2.  Warner has no liberty or property interest in selecting the public school in
    which to enroll his child, nor was he ever denied process to apply under the
    school choice program.

3.  Warner agreed in a settlement agreement to release the Board from related
    legal claims and waived his right to bring any related cause of action. His
    new constitutional claims relating to the Board's school assignment and
    voting maps fall within that release and waiver.

4.  The District Court did not abuse its discretion in its case management and
    declination to continue discovery in a suit governed by purely legal issues.

    Accordingly, the Court should affirm in all respects.

### Statement of the Facts

Warner is a resident of Hillsborough County. [Doc. 79 ¶ 2] His minor son,

J.W., is currently enrolled in the Hillsborough County public school system, which

is operated by the Board. [Doc. 1 ¶ 1] The Board assigned J.W. to a school based on

the location of his residence, in accordance with school assignment maps at the time

of his enrollment.  Then, in 2021, Warner filed an administrative action against the

Board regarding J.W.'s schooling. [Doc. 112 at 1] On March 15, 2022, the parties

settled the two related matters, identified in the settlement agreement as "*J.W. v.*

*Hillsborough County School District*, pending before the Division of Administrative

Hearings under Case Numbers 21-002537 and 21-002910." [Doc. 82-1 ¶ 1; Doc. 112 at 1–2] Under the agreement, Warner agreed to broad releases and waivers of his rights to bring causes of action against the Board. In particular, he released the Board "from any and all claims, demands, causes of action, complaints or charges, known or unknown specifically related [to] J.W.'s education, services, and educational program" that accrued any time before the execution's effective date. [Doc. 82-1 ¶ 5] In another provision, Warner agreed not to file any cause of action "connected in any way . . . to any other facts, acts, or events" that occurred prior to the agreement's effective date. [Doc. 82-1 ¶ 6] In return, the Board permitted J.W. to enroll in schools outside of his assigned boundaries. [Doc. 82-1 ¶ 4]

Several months later, Warner moved. [Doc. 79 ¶ 88] Although he retained the right to send J.W. to the schools guaranteed in the settlement agreement, Warner applied under Florida's school choice program to enroll J.W. in one of two schools, neither of which was in the settlement agreement or J.W.'s assigned school. [*See* Doc. 38 ¶¶ 203-04] However, he was unable to apply for Carrollwood K-8 because its utilization rates were too high. [Doc. 38 ¶¶ 202–18; Doc. 38-9][2]

---

[2] Under Florida's school choice program, a parent may "enroll his or her child in and transport his or her child to any public school . . . that has not reached capacity in the district," so long as the child is not subject to expulsion or suspension. FLA. STAT. § 1002.31(2)(a) (2024). The selection process provides preferential treatment to children under certain circumstances, *see* FLA. STAT. § 1002.31(2)(c), and "[e]ach district school board shall adopt by rule and post on its website the process required to participate" in this process. FLA. STAT. § 1002.31(3). In maintaining a school

4

Accordingly, in January 2023, Warner filed a verified complaint in this matter (the "181 suit") alleging violations of the Equal Educational Opportunities Act ("EEOA"), the FHA, and 42 U.S.C. § 1983, "for intentionally operating a segregated school system." [Doc. 1 at 1] His complaint broadly asserted that the Board's school assignment boundaries priced him out of south Tampa, thus violating the FHA, and that J.W.'s public school assignment constituted discriminatory action because, rather than be assigned to a closer school, he was assigned to a more distant minority-majority school. [*See, e.g.*, Doc. 1 ¶¶ 10, 32–33, 114] The Board moved to dismiss or, in the alternative, for a more definite statement, [Doc. 14] which the District Court denied. [Doc. 25]

Warner then consolidated the 181 suit with another suit he filed against the Board in 2023, which alleged substantially similar causes of action (the "1029 suit"), by amending his complaint after the Court identified that he had impermissibly split claims between the two suits. [Docs. 29, 37] The Court also found that Warner could not appear *pro se* in a representative capacity on behalf of his minor child. [Doc. 37 at 3–4][3] Meanwhile, the Board moved to dismiss the Second Amended Complaint

_____

choice program, the District must allow parents to declare their preferences; provide a lottery procedure for student assignment and establish an appellate process to determine hardship; maintain socioeconomic, demographic, and racial balance; identify those schools that have not reached capacity; maintain a waitlist; and must not segregate, among other requirements. *Id.*

[3] Warner filed an interlocutory appeal challenging his ability to institute this action *pro se* on J.W.'s behalf. This Court affirmed the District Court's decision. *See*

under Rule 12(b)(6). As it pertains to this appeal, the Magistrate Judge recommended granting the motion as to Warner's FHA and Due Process Clause claims, but denying it as to his Equal Protection Clause claims because the settlement agreement upon which the Board relied was not essential to the causes of action. [Doc. 72] The District Court adopted the Report and Recommendations. [Doc. 78]

Warner subsequently amended his complaint again, alleging two Equal Protection Clause violations under 42 U.S.C. § 1983. [Doc. 79] The Board answered and asserted several affirmative defenses, including that the claims were barred by the settlement agreement, [Doc. 82] and moved for judgment on the pleadings on that basis. [Doc. 86] Because the settlement agreement was not central to the causes of action, the Magistrate Judge recommended converting the motion to a motion for summary judgment, and granted Warner fourteen days to provide additional evidence in support of his opposition. [Doc. 103 at 3–4] Warner made various additional filings, and the Magistrate Judge issued a report recommending that the District Court grant summary judgment to the Board on the basis that Warner released the Board from the Equal Protection Clause causes of action and had waived his right to sue and, in the alternative, that he lacked standing to assert such claims. [Doc. 112] The District Court adopted the Report and Recommendations over

---

*Warner v. Sch. Bd. of Hillsborough Cnty.*, No. 23-12408, 2024 WL 2053698 (11th Cir. May 8, 2024).

Warner's objections, granted summary judgment, and dismissed Warner's causes of action. [Doc. 120] This appeal followed.

### Standard of Review

This Court reviews the dismissal of a complaint for failure to state a claim *de novo*, "accept[ing] the allegations in the complaint as true and constru[ing] them in the light most favorable to the plaintiff." *Henderson v. McMurray*, 987 F.3d 997, 1001 (11th Cir. 2021). That tenet, however, "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Moreover, the facts must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this "standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Complaints pleading facts that make their legal conclusions merely conceivable are insufficient to state a claim. *Id.* at 680.

Similarly, this Court reviews a district court's grant of summary judgment *de novo*, "viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party." *Whitesell Corp. v. Electrolux Home Prods., Inc.*, No. 23-10935, 2025 WL 2538638, at *1 (11th Cir. Sept. 4, 2025) (quoting *Ginsburg v. U.S.*, 17 F.4th 78, 83 (11th Cir. 2021)). Summary judgment is warranted when

"the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This Court "may affirm the district court's judgment on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below." *Whitesell*, 2025 WL 2538638, at *1 (quoting *Powers v. U.S.*, 996 F.2d 1121, 1123–24 (11th Cir. 1993)). A district court's interpretation of a contract is also reviewed *de novo*. *Id.*

Finally, with respect to Warner's challenges to the District Court's management of the Board's Rule 12(c) motion, this Court reviews those determinations for abuse of discretion. *See Jones v. Auto. Ins. Co. of Hartford*, 917 F.2d 1528, 1531–32 (11th Cir. 1990) (referring to "the judge's discretion to decide whether to consider matters outside of the pleadings that are presented to the court"). The same is true of "[m]atters pertaining to discovery," which "are committed to the sound discretion of the district court and, therefore, [are] review[ed] under an abuse of discretion standard." *Patterson v. U.S. Postal Serv.*, 901 F.2d 927, 929 (11th Cir. 1990). "An abuse of discretion occurs when a district court commits a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017). "This standard necessarily implies a range of choices," so this Court "will affirm even if '[it] would

8

have decided the other way if it had been [its] choice.'" *Id.* (quoting *Gray ex rel. Alexander v. Bostic*, 613 F.3d 1035, 1039 (11th Cir. 2010)).

## SUMMARY OF THE ARGUMENT

The District Court's Order adopting the Magistrate Judge's Report & Recommendations properly dismissed Warner's FHA causes of action because the FHA does not regulate school board districting activity. While the FHA regulates public entities to the extent that they discriminate in the procurement or provision of housing, its reach is not limitless. The Board's activity is not related to housing and therefore does not fall within the FHA's scope. Further, to state a claim under the FHA, a plaintiff must show that the alleged injury was proximately caused by the alleged action. Warner failed to show that the statute reaches the Board's activity, nor did he plead causation with the requisite specificity, and the District Court therefore properly dismissed his action.

Warner's due process challenge to the Board's school choice application process is similarly meritless. To challenge state action on due process grounds, a plaintiff must demonstrate that they were deprived of a constitutionally protected liberty or property interest, and that such deprivation was made without sufficient process. But Warner cannot show that he was deprived of any constitutionally protected right. While a parent has a constitutional right to direct their child's upbringing, they have neither a liberty nor property interest in selecting the public school in which to enroll their child. The Board has never prevented Warner or his child from exercising their protected rights. Nor can Warner demonstrate that he was

denied process even if he can show a constitutional violation. Rather than appeal for hardship as set forth in the statutory scheme, Warner enrolled J.W. in another school and filed this suit. That act precludes him from asserting a violation of due process.

Next, the District Court properly identified that the parties' settlement agreement from a previous administrative matter released the Board from any causes of action relating to J.W.'s education. Warner also agreed not bring any action connected in *any* way to the facts, acts, or events preceding the effective date of the agreement. Both of Warner's Equal Protection Clause causes of action are specifically related to J.W.'s schooling, complaining of the school assignment program and the dilution of his vote in Board elections. Further, each of the claims is related in some way to acts, facts, or events occurring prior to the agreement's enforcement date, and they therefore fall within the wide-sweeping covenant not to sue. Finally, although Warner attacks the validity of the settlement agreement on various formation grounds, each fails because the agreement had sufficient consideration and does not violate public policy.

Finally, the District Court did not abuse its discretion in its management of the Board's Rule 12(c) Motion for Judgment on the Pleadings. After determining that the motion incorporated evidence not central to the cause of action, the Court converted the motion to a Rule 56 motion and provided Warner fourteen days to submit evidence in support of his position. Although Warner requested additional

time for discovery, the District Court denied relief, largely because the requested discovery was not essential to the determination of the issues of pure law. Finally, the Court did not violate the party presentation rule. The Board raised both arguments about which Warner complains, including standing, which the District Court had an obligation to scrutinize regardless of whether it was raised.

This Court should therefore affirm the District Court's judgment in all respects.

## **ARGUMENT**

### I.   **THE FAIR HOUSING ACT DOES NOT REGULATE SCHOOL BOARD DISTRICTING ACTIVITY, AND WARNER FAILS TO DEMONSTRATE ANY PROXIMATE HARM.**

Warner's complaint failed to identify a specific provision of the FHA that he believes the Board violated. Nevertheless, the District Court dismissed Counts I and II of his Second Amended Complaint under each of 42 U.S.C. § 3604(a) and § 3604(b). It was correct to do so.

### A.   **Title 42 U.S.C. § 3604(a) extends to activity directly affecting housing that proximately causes the alleged harm. Warner demonstrates neither.**

Title 42 U.S.C. § 3604(a) prohibits an individual or entity from refusing to sell or rent, to negotiate for sale or rental, or to "otherwise make unavailable or deny" housing on the basis of race, color, religion, sex, familial status, or national origin. To state a claim, a plaintiff "must allege unequal treatment on the basis of race that

affects the availability of housing." *Jackson v. Okaloosa County*, 21 F.3d 1531, 1542 (11th Cir. 1994). The "otherwise make unavailable or deny" language "encompass[es] actions by individuals or government units that affect[] the availability of housing to minorities." *Id.* at 1542 n.17. Warner highlights this phrase, combined with the FHA's wide-sweeping legislative history and intent, to claim that the statute reaches the Board's alleged actions. [IB 22–28] But his argument turns a blind eye to the very impediments that warranted dismissal by the District Court.

First, while courts have recognized that government units and individuals that limit the availability of housing to minorities may be liable under § 3604(a), they have only done so with respect to activity that is inextricably intertwined with the procurement or provision of housing. *See, e.g.*, *id.* at 1542–43 (bid process for public housing unit); *Halet v. Wend Inv. Co.*, 672 F.2d 1305 (9th Cir. 1982) (discriminatory rental decisions); *U.S. v. City of Parma*, 661 F.2d 562 (6th Cir. 1981) (rejection of public and low-income housing combined with restrictive land use ordinances); *U.S. v. Mitchell*, 580 F.2d 789 (5th Cir. 1978) (racial steering), *superseded on other grounds by statute*, Fair Housing Amendments Act, *as recognized in*, *U.S. v. City of Jackson*, 359 F.3d 727 (5th Cir. 2004); *U.S. v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) (restrictive zoning); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) (withdrawal from housing authority); *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) (insurance redlining). But never has a court

13

extended the FHA to school board line-drawing. And that unwillingness to extend the FHA beyond traditional housing-related activity comports with relevant federal regulations, which contemplate liability only for those actions that are directly related to limiting the availability of housing. *See* 24 C.F.R. § 100.60 (non-exhaustive list prohibiting redlining, discriminatory evictions and conditions, harassment, and imposing different sales prices based on protected characteristics); *id.* § 100.70 (prohibiting discriminatory zoning codes).

As the District Court explained, Warner failed to allege that the Board has any authority over the availability or denial of housing, or that the Board directly manipulated pricing or otherwise denied housing to minorities on any protected basis. [Doc. 72 at 15] Instead, he alleged a tenuous basis by which Board activity affected housing availability: an increase in unit price driven by school districting. Absent a regulatory scheme that *actually* limits the availability of housing, Warner's FHA claims cannot succeed. *See* 42 U.S.C. § 3604(a) (tying liability to selling, renting, or otherwise determining the *availability* of a dwelling);[4] *see also Jackson*,

---

[4] The *ejusdem generis* rule of construction narrows the catch-all provision. That rule says that "[w]here general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. U.S.*, 574 U.S. 528, 545 (2015) (second alteration in original) (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003)). The broader "make unavailable or deny" follows the more precise terms "refuse to sell or rent" and "refuse to negotiate." 42 U.S.C. § 3604(a). Clearly,

14

21 F.3d at 1542 & n.17 (applying 42 U.S.C. § 3604(a) because the suit alleged discrimination affecting the availability of public housing within a regulatory agency's territory by intentionally "exclud[ing] public housing from areas that are predominantly white and [ensuring] that housing will be placed in areas that contain the greatest concentration of African-Americans"); *Truesdale v. Venice Arms, Inc.*, 713 F. Supp. 3d 1350, 1355–56 (S.D. Fla. 2024) (noting that "[f]ederal courts have consistently found 'that section 3604 of the FHA applies only to claims relating to the buying or selling or leasing of housing,'" and collecting cases (quoting *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*, 318 F. Supp. 2d 1133, 1143 (S.D. Fla. 2004))). Nowhere does the statute's language expand liability to entities wholly unrelated to the housing industry. Nor does Warner provide any law suggesting that the countless external pressures upon housing prices fall within the FHA's scope.

Second, and relatedly, Warner cannot show that the Board's actions proximately caused the increase in property values in any measurable way. Although he asserts that the FHA's broad remedial purpose directs this Court to find proximate cause, [IB 32–33] his complaint is entirely devoid of quantifiable changes to housing prices caused by any Board action, save for generalized assertions that individuals

---

Congress did not intend the catch-all provision to be so broad that it encompasses all acts that touch on housing.

are willing to pay premiums for highly-rated schools. [Doc. 38 ¶¶ 92–108][5] Before this Court, he cites broadly to the Supreme Court's opinion in *Bank of America Corp. v. City of Miami*, 581 U.S. 189 (2017), for the proposition that proximate cause determinations must consider the underlying policy goals of the related statute and the attendant cause of action. [IB 32–33] But in that very case, the Supreme Court declined to "draw the precise boundaries of proximate cause under the FHA." *Id.* at 203. Instead, the Court remanded for further consideration of "the contours of proximate cause under the FHA." *Id.* Warner's allegations cannot survive those contours.

On remand, this Court applied the principles set forth in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992). *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1281 (11th Cir. 2019), *vacated as moot*, 140 S. Ct. 1259 (2020) (mem.). Under this framework, courts consider three factors: (1) the directness of the action on the injury; (2) whether the court must apportion possible respective recoveries among plaintiffs at different levels of injury from the violative acts; and (3) whether the directly injured individuals could be counted on to vindicate the violation of law on behalf of those injured down the line of causation. *Id.* at 1282, 1287–88.

---

[5] While ¶ 106 introduces a chart demonstrating the elementary school rank against median home values, Warner does not explain which axis drives the other, nor does such a chart prove any more than correlation. [Doc. 38 ¶ 106]

Warner's claims fail at the first step. Of course, inherent in any consideration of proximate cause is a question of how direct the relation is between the alleged action and the injury. *See Bank of Am.*, 581 U.S. at 202 ("As we have explained, proximate cause 'generally bars suits for alleged harm that is "too remote" from the defendant's unlawful conduct.'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)); *see also id.* (explaining foreseeability alone cannot sustain a finding of proximate harm because "[a] violation of the FHA may . . . 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct," but "[n]othing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel" (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983)). This Court's discussion of this issue on remand in *Wells Fargo* applied these principles.

There, the City of Miami alleged predatory loaning practices by national banks reduced the City's tax revenue following mass foreclosures and property value diminution, and the practices also resulted in increased municipal expenses. *Wells Fargo*, 923 F.3d at 1263. This Court, applying the *Holmes* factors, held the former injury could survive a motion to dismiss premised on causation, but the latter could not. *Id.* at 1294. Warner's alleged injuries are akin to the municipal expenses.

The City's municipal expense allegations did not explain how the Court could "ascertain with any level of detail or precision which expenditures [would] be

17

attributable to the Banks . . . because the entire increase in municipal expenditures over any time period cannot possibly be fairly attributed to the Banks' conduct." *Wells Fargo*, 923 F.3d at 1285 (emphasis omitted). The tax revenue claims, however, survived the motion because the complaint detailed a developed hedonic regression model predicting damages. *See id.* at 1284. The Court identified the tax revenue loss as the type of damage that is "entirely practicable and not unduly inconvenient for the courts to handle," unlike the municipal expenses. *Id.* at 1281.

Warner does not and cannot demonstrate the value of any price changes he alleges were caused by the Board's school assignment boundaries. Consider the limitless possible effects on housing prices: general demand, a new park or commercial district built nearby, favorable interest rates, risk of natural disaster, neighborhood crime statistics, and the list goes on. After all, "many independent variables can enter the equation" with respect to housing value. *See id.* at 1290. And even if Warner has correctly attributed *some* increase in housing prices through school assignment maps, that connection is remote, unquantified, and qualifies as one of the many ripples affecting the housing market. Entertaining suit for such an injury—which is perhaps foreseeable but certainly not proximate—"would risk 'massive and complex damages litigation'" for swaths of activity given the housing market's interconnection "with economic and social life." *Bank of Am.*, 581 U.S. at

18

202 (quoting *Cal. State Council of Carpenters*, 459 U.S. at 545). That expands § 3604(a) beyond its scope.

**B.    This Court's precedent prevents recovery under 42 U.S.C. § 3604(b).**

Title 42 U.S.C. § 3604(b) prohibits discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Warner contends that the Board violated § 3604(b) by discriminating through its school assignment boundaries. [IB 41; Doc. 38 ¶¶ 180–83] He broadly draws connections between housing and the public school system, and contends that this Court's decision in *Georgia State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th Cir. 2019), confirms liability by holding that utility services fall within § 3604(b)'s scope. [IB 37–41] But his reading of *LaGrange* is tenuous at best.

In *LaGrange*, this Court held that § 3604(b) "reaches certain post-acquisition conduct, including post-acquisition conduct related to the provision of services." *Id.* at 632. Crucially, however, those services must be "connected to the sale or rental of a dwelling." *Id.* at 632–33. And since basic utility services—water, gas, and electricity—are (1) "closely tied to the sale or rental of a dwelling" and (2) "essential to the habitability of a dwelling," this Court held that § 3604(b) applied. *Id.* at 634. But while services that satisfy the criteria above are covered by § 3604(b), "not *all*

19

housing-related services necessarily fall within" the statute's scope. *Id.* at 633 (emphasis added). Rather, "to extend the [FHA] to any and every municipal policy or service that touches the lives of residents 'would be to expand that Act into a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities.'" *Id.* (quoting *Clifton Terrace Assocs., Ltd. v. United Tech. Corp.*, 929 F.2d 714, 720 (D.C. Cir. 1991)).

For instance, this Court discussed the Ninth Circuit's expansive reading of the FHA. The Ninth Circuit has incorporated within § 3604(b)'s purview "the 'timely provision of law-enforcement personnel.'" *Id.* (quoting *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 714–15 (9th Cir. 2009)). The Court rejected that view because "[l]aw enforcement services are not provided in connection with the 'sale or rental of a dwelling.'" *Id.* Instead, "those services are provided regardless of whether an individual has housing and are not required in order to obtain housing." *Id.* So too with public schooling, which is not attached to the sale or rental of a dwelling. Florida's constitution recognizes the value of public education, so long as the child resides within the state's boundaries. *See* FLA. CONST. art. 9 § 1(a) ("The education of children is a fundamental value of the people of the State of Florida. It is, therefore, a paramount duty of the state to make adequate

20

provision for the education of all children residing within its borders.").[6] But schooling, much like law enforcement, is "provided regardless of whether an individual has housing and [is] not required in order to obtain housing." *LaGrange*, 940 F.3d at 633.[7] Just as law enforcement entities are jurisdictionally bound to specific areas, schooling is dependent upon an individual's location.

Under this Court's precedent and the plain language of § 3604(b), Warner did not state a claim, and the Court should affirm the District Court's dismissal of his FHA claims.

---

[6] The "fundamental value" language was codified to avoid liability "for every individual's dissatisfaction with the education system." *Bush v. Holmes*, 919 So. 2d 392, 403–04 (Fla. 2006) (citing *Coal. for Adequacy and Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400 (Fla. 1996)).

[7] While this Court did not extend its reasoning in *LaGrange* to suits under § 3604(a), its reasoning permeates into such suits. The Court excluded law enforcement from § 3604(b) liability because it is not provided "in connection with the sale or rental of a dwelling." *LaGrange*, 940 F.3d at 633. Stepping beyond the issue of individualized "services," the main thrust behind *LaGrange* is that law enforcement activity is not sufficiently related to housing because it is neither "closely tied to the sale or rental of a dwelling" nor "essential to the habitability of a dwelling." *Id.* at 634. If a service is not sufficiently proximately related under subsection (b), then that action cannot sustain a cause of action under the narrower subsection (a), the language of which attaches causes of action to the provision and procurement of housing. While subsection (a) does contain a catch-all provision upon which Warner relies, that phrase does not unmoor the statutory cause of action from requiring a direct relation to the sale, rental, or general availability of housing. *LaGrange* espouses a logical interpretation of the FHA's limitations.

## II.    THE SCHOOL CHOICE APPLICATION PROCESS DID NOT VIOLATE WARNER'S DUE PROCESS RIGHTS.

Warner's due process rights were not violated by his application process for school choice. Citing his right to direct J.W.'s education, Warner complains that the Board violated his substantive and procedural due process rights in its administration of the school choice application process. [IB 44–46] But Warner has no constitutionally protected right to enroll J.W. in the public school of Warner's choosing.

For his due process claims to survive a motion to dismiss, Warner's complaint must have alleged facts, taken as true, demonstrating three elements: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). Warner clings to Supreme Court precedent describing a parent's general constitutional right to direct their child's education, [IB 44–45] and the importance of school choice, [IB 46] to claim that constitutionally protected rights were at issue. He also asserts that the Florida statutory scheme governing school choice has created vested property interests in all citizens. [*See* IB 47] These allegations fall short of stating a claim.

As an initial matter, while it is true parents have a constitutional right to make educational decisions with respect to their children—a right recognized for upwards of a century, *see Meyer v. Nebraska*, 262 U.S. 390, 401 (1923); *Pierce v. Soc'y of*

*the Sisters of the Holy Names Jesus & Mary*, 268 U.S. 510, 534–35 (1925)—that right protects a parent's choice between public and *private* schooling. *See Pierce*, 268 U.S. at 535 ("The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only."). He similarly cites *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), in support of his argument. But there, the Court considered the permissibility of a pilot program that provided educational choices to families between public schools and *religious* schools under the Establishment Clause. *See id.* at 643–44. None of these cases recognizes the right for parents to choose *among* public schools. And the Board has never prevented Warner from choosing whether to send J.W. to public or private school.[8] Therefore the Board did not violate Warner's liberty interest in managing J.W.'s upbringing.

Nor can he demonstrate the existence of any property interest. While he cites *Goss v. Lopez*, 419 U.S. 565, 574 (1975), for the proposition that a state must "recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause," [IB 47] *Goss* does not extend that protection to the selection among schools. Indeed, since *Goss*, this Court has

---

[8] In fact, through the settlement agreement, the Board granted Warner the ability to select among public schools by guaranteeing J.W. enrollment in each of an elementary, middle, and high school to which he would not be assigned otherwise. [Doc. 82-1 ¶ 4] Warner subsequently withdrew J.W. from that school, thus waiving any purported right to continue to send J.W. to the institution.

23

recognized that individuals do not have a property interest in school selection: "Florida law does not . . . create a right to attend a high school of your choice, and this court has never decided that a Florida student has a property or liberty interest in attending a particular high school." *Anderson v. Hillsborough Cnty. Sch. Bd.*, 390 F. App'x 902, 903 (11th Cir. 2010).[9] Warner points to no case law suggesting otherwise.[10]

Instead, he relies entirely on the fact that Florida's statutorily-created educational benefits are property rights, which in turn are protected by the Due Process Clause. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)

---

[9] Although *Anderson* is unpublished and is therefore not binding precedent, it remains persuasive authority. 11TH CIR. R. 36-2. The Court in *Anderson* expressed doubt "that the transfer of a student to an alternative school deprives a Florida student of an interest that is cognizable under the Fourteenth Amendment," *id.*, but declined to conclusively decide that question.

[10] To the extent Warner asserts a substantive due process violation, that claim must also fail. Substantive due process protects only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). There is no deeply rooted fundamental right or liberty to choose which public school to attend.

While the Board did not raise these arguments before the District Court, it had no opportunity to do so. Warner first raised federal constitutional rights in his response to the Board's Motion to Dismiss, [Doc. 49] and then again in his objections to the Report and Recommendations. [Doc. 76] A party is "not limited to the precise arguments they made below," but to the issues it raised. *In re Home Depot Inc.*, 931 F.3d 1065, 1086 (11th Cir. 2019) (quoting *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)). This issue—a dispute regarding the propriety of Warner's Due Process Clause claims—was raised below, and is thus properly presented.

24

("Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (citation modified) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972))). "[F]ederal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005) (emphasis omitted) (citation modified) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).

"'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Roth*, 308 U.S. at 577). But there is no legitimate claim of entitlement to school choice. "Under Florida law, statutory procedures alone do not create protected property interests." *Key West Harbour Dev. Corp. v. City of Key West*, 987 F.2d 723, 728 (11th Cir. 1993). And where access to the claimed entitlement is not mandatory, it does not rise to the level of a constitutionally protected property interest. *See Gonzales*, 545 U.S. at 756 (no protected entitlement if government officials may grant or deny the claimed entitlement in their discretion); *id.* at 768 (finding no property right where claimed entitlement is not mandatory); *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 968–69 (8th Cir. 2015) (recognizing no entitlement where the right is not

absolute but speculative). The school choice application process provides no mandatory right to public school selection. His claim therefore cannot survive under *Roth* and its progeny.

Regardless, the statutory language upon which Warner relies indicates that there is no guaranteed right to school choice. For instance, FLA. STAT. § 1002.31(1) explains that the system allows the District to make the student school assignments, "using parents' indicated preferential educational choice as a significant factor." The statute also allows the District to determine whether schools are available under the program based on each school's enrollment capacity, which takes into account "the specifications, plans, elements, and commitments contained in the school district educational facilities plan and the long-term work programs." FLA. STAT. § 1002.31(2)(b). And schools must provide preferential treatment in a particular order, suggesting that there is no guarantee that an applicant that merely resides in the school district will be able to enroll in their top selection. *See* FLA. STAT. § 1002.31(2)(c) (ranking residence within the school district as fourth on the preference list). Warner cannot claim that a denied application under this scheme violates constitutional rights.

Finally, even if Warner somehow had a constitutional right nestled among these claims, which he does not, he admits that the general processes have remained open to him. For instance, in a motion for a preliminary injunction that is otherwise

26

irrelevant to this appeal, Warner admitted he submitted a school choice application. [Doc. 40 at 8 n.8] He was not denied process to do so. Warner alternatively claims that, should he desire to send J.W. to a school that has reached capacity, he must submit a "hardship" request. [Doc. 38 ¶¶ 207–09] FLA. STAT. § 1002.31(3)(c). But he complains that the Board requests a parent claiming hardship to write "a 2000 character essay explaining 'a compelling reason for this hardship request,'" which he labels arbitrary and capricious. [Doc. 38 ¶ 209]

As an initial matter, his own exhibit to his complaint shows that Carrollwood's projected growth will cause it to reach capacity over the next three years. [*See* Doc. 38-9 at 3] Again, a school may consider its long-term plans in determining its availability under the school choice program. FLA. STAT. § 1002.31(2)(b). Nevertheless, the Board's hardship appeals process allows it to reconsider a parent's application where they have extenuating circumstances, but Warner, instead of pursuing a hardship application, applied to another school. [Doc. 38 ¶¶ 205–06] His voluntary decision not to utilize the process available to him precludes him from claiming any violation to due process. *See Marshall v. City of Cape Coral*, 797 F.2d 1555, 1560 (11th Cir. 1986) ("A volitional choice to forego available procedures, however unwise, cannot give rise to a subsequent complaint that one has been 'deprived' of procedural protections.").

For the foregoing reasons, the Court should affirm the dismissal of Warner's

Due Process Clause claim.

## III. THE PARTIES' PREVIOUS SETTLEMENT AGREEMENT PRECLUDES ASSERTION OF HIS CLAIMS AGAINST THE SCHOOL ASSIGNMENT BOUNDARIES AND THE SCHOOL VOTING MAPS.

As explained above, Warner previously brought an administrative action

centering on J.W.'s education. The parties ultimately entered a settlement

agreement, which included a broad release. In the release, Warner agreed as follows:

1. Parent hereby knowingly and voluntarily releases and discharges the School Board and District from any and all claims, demands, causes of action, complaints or charges, known or unknown specifically related [to] J.W.'s education, services, and educational program in the District through the date of the execution of this Agreement.

2. This shall include . . . all losses of any kind whatsoever related specifically to J.W.'s education, which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement.

3. [T]his release shall also cover any claims, if any, that may belong independently to J.W. related to his educational services and program.

4. [T]his release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement.

[Doc. 82-1 ¶ 5] These releases preclude Warner from asserting the claims that he

brings in this suit, as described below. Moreover, paragraph six of the settlement

agreement details Warner's agreement not to bring any legal proceedings of any type

"that are connected in any way to or by virtue of or related to any other facts, acts,

28

or events" occurring prior to the effective date of the agreement. [Doc. 82-1, ¶ 6] Because the Equal Protection Clause claims accrued prior to the settlement date, he cannot assert these causes of action. But first, the Court must reject Warner's challenges to the contract's validity.

### A.    Warner received sufficient consideration to support the settlement agreement.

Warner received sufficient consideration to support the contract. Under Florida law, consideration "may consist of either a benefit to the promisor or a detriment to the promisee." *Fla. Power Corp. v. Pub. Serv. Comm'n*, 487 So. 2d 1061, 1063 (Fla. 1986) (quoting *Dorman v. Publix-Saenger-Sparks Theatres*, 184 So. 886, 889 (Fla. 1938)). Paragraph four of the settlement agreement sets forth two promises to Warner and J.W., including a guarantee of particular school assignments, contingent upon Warner's completion of school choice applications. [Doc. 82-1 ¶ 4]

Warner contends that this promise served as consideration *only* for J.W., and that it was not sufficient to support the contract as it pertained to him in his personal capacity. [IB 61–64] There are several issues with this argument. As an initial matter, the administrative action underlying the settlement agreement focused on J.W.'s schooling—an issue that Warner consistently ties to his own alleged injuries. [*See, e.g.*, Doc. 79 ¶ 93 ("Mr. Warner is further injured by being forced to compete in a race-based school enrollment system to enroll his minor child in one of the [Board's]

public schools."); Case No. 8:23-cv-1029 (1029 suit) Doc. 19 ¶¶ 13 (complaining of harm caused by "driving approximately two hours per day to distant schools that J.W. can get admitted into")] Any resolution of J.W.'s schooling issues alleged in the administrative action would have benefitted Warner as well, who was a member of that suit in his individual capacity. Indeed, Warner signed the settlement agreement both in his individual capacity and in a representative capacity on J.W.'s behalf. [Doc. 82-1 at 4]

In response, Warner states: "If the Board was already legally obligated to provide educational services to J.W. due to their agreement with J.W. . . . , then that same promise cannot simultaneously serve as fresh consideration to Mr. Warner in his individual capacity." [IB 62] But neither case Warner cites supports the proposition that one promise may not serve as consideration for more than one individual, so long as that promise is either a benefit to the promisor or a detriment to the promisee.[11] And acceptance of the legal position for which Warner advocates would create absurd results. What of putative class action settlement agreements in which a defendant promises to cease certain activity in exchange for a promise not to sue? Does the promise not to engage in that activity only apply to the named class

---

[11] True enough, "a promise to perform what one is already required to do by an existing contract or otherwise is not valid consideration." *Schneir v. State*, 43 So. 3d 135, 137–38 (Fla. 3rd DCA 2010). But the promise was made to J.W. and Warner simultaneously. J.W.'s consideration did *not* stem from an existing contract, nor did such a duty arise by operation of law.

30

action plaintiff, but no other putative member? Such an agreement is not the "tripartite" contract that Warner labels it. [IB 66] It is instead a bilateral contract, with promises exchanged between Warner (on behalf of J.W.) and the Board, and between Warner (in his individual capacity) and the Board.

Warner therefore received adequate consideration under the settlement agreement.

### B.    The settlement agreement bars the two Equal Protection claims that were dismissed on summary judgment.

Across various issue statements, Warner argues that his two Equal Protection claims, Counts I and II of his Third Amended Complaint, do not fall within the purview of the settlement agreement. They do.

First, Warner wrongly labeled the settlement agreement's release provisions as ambiguous. [Doc. 117 at 8–12] As the District Court properly recognized, settlement agreements are contracts subject to typical contractual interpretation rules. *See Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1290 (11th Cir. 2004). Releases are subject to the same rules. *See Santana v. Miller*, 314 So. 3d 346, 348 (Fla. 3rd DCA 2020). And where a release is clear and unambiguous, as is the case here, "a court 'cannot indulge in construction or interpretation of its plain meaning.'" *Hold v. Manzini*, 736 So. 2d 138, 141 (Fla. 3rd DCA 1999) (citation modified) (quoting *Delgado v. Gov't Emps. Ins. Co.*, 528 So. 2d 23, 24 (Fla. 3rd DCA 1988)). Courts therefore look to the clear language of the release.

31

The release covers all "claims the Parent purports to have against the School Board and District as set forth in paragraph 5," [Doc. 82-1 ¶ 4] including all causes of action "specifically related [to] J.W.'s education, services, and educational program" and "all losses of any kind whatsoever related specifically to J.W.'s education, which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement." [Doc. 82-1 ¶ 5] No part of paragraph five is ambiguous. Each individual release is clearly tied to J.W.'s education, extending to any losses that Warner *may* have by way of facts, acts, or events occurring prior to the agreement. And Warner points to no ambiguous language in the release. It therefore is enforceable as written.

The same can be said of paragraph six. It reads:

> The Parent agrees not to maintain, argue, institute, or file any of the Released Claims in any court, administrative or agency process or other legal forum whatsoever, nor shall any other court actions, agency action/process or other legal proceedings of any type be filed that are connected in any way to or by virtue of or related to any other facts, acts, or events occurring in whole or in part on or before the Effective Date of this Agreement.

[Doc. 82-1 ¶ 6] The language in this covenant clearly was designed to prevent any suit related to the any facts or acts predating the agreement from being filed.[12] Its plain terms must thus be enforced.

---

[12] As sweeping as this covenant may appear, the plain language supports such a reading. The second clause barring any legal proceeding "connected in any way . . . to any other facts, acts, or events" would be superfluous if a nexus with J.W.'s

### 1.  The school assignment boundaries relate specifically to J.W.'s schooling, and otherwise fall within paragraph six.

Count I of Warner's Third Amended Complaint alleges a violation of the Equal Protection Clause, claiming that the Board redistricted school assignment maps based on race. This claim directly relates to J.W.'s education. As an initial matter, Warner moved from south Tampa sometime after October 2022, placing J.W. into a new school district. [*See* Doc. 79 ¶¶ 54, 83; Doc. 86 at 5] Under the settlement agreement, he remained free to send J.W. to Coleman. He elected not to, and J.W. was reassigned to a different school Warner chose.

Now, Warner attacks the school assignment boundary changes made in May and June 2023. [*See* Doc 79, ¶¶ 52, 72; Doc. 79-9] Many of his complained-of changes relate to Carrollwood Elementary School, which expanded to include sixth, seventh, and eighth grades, with attendance boundaries identical to the elementary school boundaries. [Doc. 79-9 at 2–4] Warner's home was not within Carrollwood's

---

schooling or any previous suit was required. The first clause covers that very issue by precluding any released claims, which are necessarily tied to J.W.'s schooling. Florida courts "read provisions of a contract harmoniously in order to give effect to all portions of the contract, and to give effect to every term in the agreement." *Paladyne Corp. v. Weindruch*, 867 So. 2d 630, 631 (Fla. 5th DCA 2004). Paragraph six thus reaches even facts, acts, or events unrelated to J.W.'s schooling or the prior administrative action by precluding *future* filings of such suits, so long as the claim accrued before the effective date.

boundaries, so the school's middle school expansion did not affect Warner.[13] [Doc. 79 ¶¶ 80–82] But he complains that, because J.W. is assigned to Hill Middle School rather than the nearer Carrollwood, [Doc. 79 ¶ 62] Warner is "being forced to compete in a race-based school enrollment system to enroll his minor child in one of the [Board's] public schools." [Doc. 79 ¶ 93] This directly ties Count I to J.W.'s schooling.

Other facts support the finding that this long-morphing cause of action is connected to J.W.'s schooling. Consider the path that this claim has followed. In the 1029 suit, Warner requested that the court "enter an order directing *Defendant* [Board] to redraw the Carrollwood K-8 assignment boundary map to be in compliance with the EEOA." [Case No. 23-cv-1029 Doc. 1 at 4] The EEOA protects children from discrimination. *See* 20 U.S.C. § 1703. That, of course, is directly related to J.W.'s schooling. After the District Court dismissed the 1029 suit for claim-splitting, Warner amended his 181 suit claims, repackaging that cause of action into an Equal Protection claim. Such gamesmanship does not allow him to circumvent the releases to which he previously agreed.

There is no way for Warner to spin the cause of action: his alleged injury relates *directly* to J.W.'s schooling. Indeed, he would have no alleged injury had he

---

[13] He therefore lacks standing to assert any claim regarding the school assignment maps with respect to Carrollwood. The new maps did not cause him any injury-in-fact.

continued to accept the relief granted in the settlement agreement and enrolled J.W. in Coleman. This claim specifically relates to J.W.'s education.

Moreover, the claim existed as of March 15, 2022. Nowhere in the complaint does Warner explain that the assignment maps were altered after March 2022, nor does he ever express how he was impacted by such a change. [Doc. 79 ¶ 62 (explaining that he lives outside of Carrollwood's boundaries)] Indeed, as the District Court pointed out, these school assignment boundaries have existed in this form for decades. [*See* Doc. 112 at 14–15; *see also* Doc. 79 ¶ 39] And, by Warner's effective admission, Carrollwood's middle school boundaries are identical to its elementary school boundaries. [Doc. 79 ¶ 74 ("Every time the School Board creates a K-8, they always make the 6-8 boundary the exact same as the PK-5 unless 6-8 is school choice enrollment only."); Doc. 79-9 ("In the scenario under consideration, Carrollwood PK-8 would use the same boundary as the current elementary school when it opens.").] It was not until Warner voluntarily moved—and felt that he was personally injured by boundaries that do not affect him—that he filed suit.[14] This claim is specifically related to J.W.'s schooling, and is not a new claim arising after the enforcement date of the settlement agreement because the "expansion" did not

_____

[14] Again, given that the "new" school boundary does not impact Warner, it is difficult to see how he has standing to bring a claim. Because Carrollwood's boundaries do not reach Warner's new home, the alleged line-drawing is not traceable to the enrollment system of which Warner complains, nor does it cause him actual injury.

alter the map. He therefore cannot rely on the release's end date to claim that his cause of action is viable.

Further, paragraph six of the settlement agreement prevents this claim. In paragraph six, Warner sweepingly agreed that he would not bring "any other court actions . . . connected *in any way* to or by virtue of or related to any other facts, acts, or events occurring in whole or in part before the Effective Date of this Agreement." [Doc. 82-1 ¶ 6 (emphasis added)] This covenant not to sue is unambiguous, and "a party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract." *Torjagbo v. U.S.*, 285 F. App'x 615, 620 (11th Cir. 2008) (quoting *Med. Ctr. Health Plan v. Brick*, 572 So. 2d 548, 551 (Fla. 1st DCA 1990)). The breadth of the clause does not invalidate the agreement. *See id.*

The covenant not to sue precludes court actions connected in any way to facts occurring prior to the effective date of the agreement. Warner primarily complains of the addition of a middle school expansion overlaid on an identical, already-existent elementary school map. [*See* Doc. 78-9] Beyond the fact that this alleged change does not impact Warner, any cause of action relating to that map would have existed before Carrollwood's expansion to incorporate a middle school. Warner therefore violates his covenant not to sue by bringing this suit, and the District Court rightly granted summary judgment to the Board as to Count I.

**2.   The school voting district map claim is specifically related to J.W.'s schooling and is therefore precluded by the settlement agreement. It is also prohibited by paragraph six.**

In Count II, Warner attacks the voting maps promulgated on December 16, 2021. [Doc. 79 ¶ 100] The District Court rightly granted the Board summary judgment.

Count II broadly complains of vote dilution in the school's voting districts. First, to the extent Warner complains of voting districts in which he does not reside, he lacks standing to assert those claims. *See Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered."). Whittling Count II down to only Warner's district, then, his suit becomes clear viewed in light of the various other claims he has pressed in both this suit and prior suits: it "is simply another iteration of the same dispute over school assignments for J.W. that began in the administrative 'Lawsuit' with the School Board and that continued" in this lawsuit. [Doc. 112 at 17–18] For instance, Warner alleges that the voting map changes were designed to ensure the very decisions about which he complains in Count I. [*See* Doc. 79 ¶ 96] By tying his injury directly to Count I—which is intertwined with J.W.'s schooling—Warner necessarily connects Count II to the same. It therefore falls within the exceedingly broad language in paragraph five.

Moreover, as explained above, Warner agreed he would not bring "any other court actions . . . connected *in any way* to or by virtue of or related to any other facts, acts, or events occurring in whole or in part before the Effective Date of this Agreement." [Doc. 82-1 ¶ 6 (emphasis added)] This claim stems from an act that occurred before March 15, 2022—the voting district map was promulgated in December 2021—that was directly related to the claims underlying the administrative action relating to J.W.'s schooling. This is a fact, act, or event that took place prior to the agreement's effective date. Therefore, the claim cannot withstand paragraph six, and the judgment must be affirmed.

### C.    The settlement agreement survives Warner's remaining attacks.

Finally, the settlement agreement survives Warner's remaining attacks: (1) that he did not knowingly or voluntarily enter the release; and (2) that the agreement violates public policy. [IB 67–80]

### 1.    Warner knowingly and voluntarily entered the agreement.

Warner first claims that the signed release was not knowing or voluntary, largely because it incorporated the waiver of constitutional claims. [IB 70–74] But his own admissions throughout the settlement agreement vitiate any claim to this effect.

First, Warner acknowledged that he "had the opportunity to obtain the advice of legal counsel of his choice prior to executing [the] Agreement and agree[d] that

83254363;4

he had an opportunity to read and consider the agreement in its entirety." [Doc. 112 at 20] Perhaps even more problematic for Warner, he agreed that he relied "on [his] own judgment and/or on the advice of [his] . . . attorneys," ultimately confirming his "competence to understand and accept the terms and conditions of the Agreement." [Doc. 112 at 20] Among those unambiguous terms were paragraphs five and six, under which Warner released the Board from any claims specifically related to J.W.'s schooling and agreed not to sue the Board for any related acts, facts, or events occurring prior to March 15, 2022. He cannot now release himself from the strictures of this language.[15]

---

[15] Nor can he save himself by claiming that he was fraudulently induced into signing the agreement. He relies solely on his conclusory, self-serving affidavit that he was misinformed of the meaning behind the terms of the agreement. "Conclusory statements made in a plaintiff's affidavit do not, taken alone, constitute substantial evidence." *Fuhr v. Credit Suisse AG*, 687 F. App'x 810, 818 n.11 (11th Cir. 2017); *accord Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value."). Warner's affidavit baldly projects that he was informed that the provisions in the settlement agreement were far narrower than the plain language in paragraphs five and six. Such an affidavit does not demonstrate fraudulent inducement warranting rescission of the settlement agreement. Evidence of the parties' intent is of no use when analyzing an unambiguous contract. *See Pardes v. Pardes*, 335 So. 3d 1241, 1245 (Fla. 3rd DCA 2021) ("When a contract is clear and unambiguous, 'the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls.'" (quoting *Anthony v. Anthony*, 949 So. 2d 226, 227 (Fla. 3rd DCA 2007))).

Finally, the parties incorporated a non-reliance clause that states that Warner did not rely "on any representation, compromise, conduct or action made by any person on behalf of" the Board, besides the agreement's terms. [Doc. 105-4 ¶ 2] Warner looks to *Oceanic Villas, Inc. v. Godson*, 4 So. 2d 689 (Fla. 1941), to claim that such a clause does not prove a lack of fraud. But *Godson* did not say that.

Second, Warner's guarantee not to sue did not waive a fundamental constitutional right. [*See* IB 68] In his opening brief, Warner cites broadly to caselaw governing waiver of remedial rights under Title VII of the Civil Rights Act to claim that the settlement agreement did not meet certain requirements for waiver. [IB 68–74] But Title VII waivers are wholly inapplicable in this context. Under Title VII, individuals have causes of action against their employers for some discriminatory action; it is in this context that the Eleventh Circuit set forth the multi-factored inquiry upon which Warner relies. *See Beadle v. City of Tampa*, 42 F.3d 633, 635–36 (11th Cir. 1995). The factors themselves show that they were created with an eye to Title VII, including inquiries centered on "the employer's encouragement or discouragement of consultation with an attorney" and "the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled." *Id.* at 635.

Regardless of the *Beadle* factors' applicability, Warner cannot legitimately claim that his waiver was unknowing or involuntary under such an inquiry. While he points to his "limited educational background," his briefing demonstrates an ability to grasp basic legal issues, [IB 71] as does his attestation in the agreement itself that he was "competen[t] to understand and accept the terms and conditions of

---

Instead, such a stipulation may "evidence[] an agreement between the parties that no fraud had been committed." *Id.* at 691. The parties stipulated to non-reliance, and Warner's fraudulent inducement claim must fail.

the Agreement." [Doc. 112 at 20] Moreover, the parties engaged in "several months of negotiation," [Doc. 112 at 22] and Warner expressly acknowledged that he had the ability to confer with an attorney about whether to sign the settlement agreement. This is not the type of case where an individual is pressured to sign an agreement in a short period of time with no access to counsel.

Warner thus has no legitimate claim that his waiver was unknowing or involuntary.[16]

### 2.    The agreement does not violate public policy.

Grasping at straws, Warner claims that the settlement agreement violates public policy. [IB 74–80] It does not. The Supreme Court of Florida has spoken on this subject with crystal clarity:

> Courts . . . should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to

---

[16] To be clear, Warner's argument that any waiver must have expressly incorporated language that he waived constitutional rights is a non-starter. In support, he cites *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972). There, the Supreme Court rejected a waiver defense rooted in a contract of adhesion in which "[t]here was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power." *Id.* "The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale," and there was no showing "that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights." *Id.* The facts at hand are wholly inapposite; not only was the settlement agreement freely negotiated—not a contract of adhesion—but Warner acknowledged his full understanding of the agreement in signing it.

overthrow the fundamental public policy of the right to freedom of contract between parties sui juris.

*Bituminous Cas. Corp. v. Williams*, 17 So. 2d 98, 101–02 (Fla. 1944); *accord Gables Ins. Recovery, Inc. v. Cits. Prop. Ins. Corp.*, 261 So. 3d 613, 636 (Fla. 3rd DCA 2018) (Salter, J., concurring in part and dissenting in part) (canvassing cases discussing contracts against public policy and explaining that "the Florida Supreme Court has reaffirmed a rule of restraint and caution in invalidating private contracts on grounds of public policy, observing that 'there is also a strong public policy favoring freedom of contract'" (quoting *City of Largo v. AHF-Bay Fund, LLC*, 215 So. 3d 10, 16 (Fla. 2017))). If a contract "is not prohibited under [a] constitutional or statutory provision, or prior judicial decision, it should not be struck down on the ground that it is contrary to public policy, except it be clearly injurious to the public good or contravene some established interest of society." *Williams*, 17 So. 2d at 101.

As explained at length above, the settlement agreement in no way violates constitutional or statutory provisions. Nor can Warner demonstrate that it does. Rather, he claims that the agreement coercively conditions J.W.'s special education on Warner's waiver of constitutional rights, the release undermines civil rights enforcement, and civil rights cannot be prospectively waived. [IB 74–80] These are mischaracterizations of the settlement agreement's effects.

As to the first, Warner asserts that the Board "[f]orc[ed] [him] to choose between vindicating [his] child's educational rights and preserving [his] own

42

constitutional rights." [IB 75] But for the reasons described above, at no point were Warner's constitutional rights or J.W.'s educational rights in danger. In fact, J.W. was *always* welcome to attend the public school to which he was assigned, and under the settlement agreement was able to attend other schools of Warner's choice. Warner's second argument is a repackaged version of the first, stating that he was "require[d] . . . to waive constitutional challenges to discriminatory policies as a condition for receiving IDEA services." [IB 75–76] Again, he voluntarily entered an agreement releasing the Board from related claims and promising not to sue the Board for any acts, facts, or events preceding the agreement. This does not violate any law, nor is it clearly injurious to the public good. Finally, he argues that the District Court "effectively rul[ed] that Warner can never sue the school board, for anything ever again." [IB 76–77] This is patently false. Paragraph six only waives the right to sue for acts, facts, and events *predating* the agreement's effective date. The District Court properly enforced paragraph six. All of Warner's claims stem from alleged facts, acts, or events that occurred prior to the effective date. This is not a prospective waiver of civil rights and does not violate public policy.

For the various reasons detailed above, Warner cannot demonstrate that the agreement violated public policy. This Court should therefore affirm the District Court's grant of summary judgment to the Board on Counts I and II of the Third Amended Complaint.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ITS PROCEDURAL DETERMINATIONS.

In a last-ditch effort, Warner claims that the District Court abused its discretion by (1) "refusing to allow discovery before ruling on summary judgment," [IB 80]; (2) "den[ying] [him] an opportunity to fully oppose summary judgment after converting [the Board's] Rule 12(c) motion into a Rule 56 motion," [IB 82]; and (3) "violat[ing] the party presentation rule by granting summary judgment on grounds not raised by the School Board in its motion or pleadings." [IB 84] Each is baseless.

### A. The District Court did not abuse its discretion by denying Warner's motion to stay for discovery.

Warner first wrongly claims that the District Court should have permitted him to engage in further discovery following the conversion of the Board's Rule 12(c) Motion for Judgment on the Pleadings into a Rule 56 motion. But the Eleventh Circuit has held that parties do "not have an unlimited right to discovery prior to a hearing on a motion for summary judgment." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1506 (11th Cir. 1985). "When the record becomes clear enough to disclose that further discovery is not needed to develop significant aspects of the case and that such discovery is not likely to produce a genuine issue of material fact, discovery should be ended." *Id.* (quoting *Aviation Specialties, Inc. v. United Techs. Corp.*, 568 F.2d 1186, 1190 (5th Cir. 1978)); *see also Patterson*, 901 F.2d at 929

(refusing to find abuse of discretion where further discovery would not produce a genuine dispute of material fact). This understanding fits squarely within Rule 56(d), which requires Warner to show that he "cannot present facts essential to justify [his] opposition." FED. R. CIV. P. 56(d).

A brief review of the issues before this Court (and those before the District Court) shows the Motion for Summary Judgment raised only issues of law. Warner's remaining causes of action were dismissed due to waiver and, in the alternative, for lack of standing. Additionally, none of the various discovery-related issues Warner raised had any bearing on the ultimate disposition of the matter. [*See* Doc. 112 at 8 (explaining Warner previously had not sought discovery on these topics despite the agreement being raised over a year prior and explaining "Warner's declaration fail[ed] to show that extrinsic evidence of the parties' intent [was] 'essential' to his opposition")] By his own admission, his discovery was entirely related to the intent and understanding of other signatories to a contract, the language of which is explicitly clear. "When a contract is clear and unambiguous, 'the actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls.'" *Pardes v. Pardes*, 335 So. 3d 1241, 1245 (Fla. 3rd DCA 2021) (quoting *Anthony v. Anthony*, 949 So. 2d 226, 227 (Fla. 3rd DCA 2007)); *accord AT&T Wireless Servs. of Fla., Inc. v. WCI Cmtys., Inc.*, 932 So. 2d 251, 255 (Fla. 4th DCA 2005).

"Matters pertaining to discovery are committed to the sound discretion of the district court . . . ." *Patterson*, 901 F.2d at 929. The District Court had sufficient information with which to rule on summary judgment, and it therefore did not abuse its discretion in denying Warner's motion to stay for further discovery.

### B.    Warner received sufficient notice of the motion's conversion.

Next, Warner, with no legal basis, contends that he did not receive sufficient notice or ability to brief his opposition to the Board's motion after it was converted. [IB 82–84] "The district court is required to notify the parties that the motion has been converted [to a motion for summary judgment], and give the parties 10 days in which to supplement the record." *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002). This comports with Rule 12(d)'s requirement that the court provide the parties "a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d). After the conversion occurs, "the district court must comply with the requirements of Rule 56." *Trustmark*, 299 F.3d at 1267.

As an initial matter, nowhere in the Federal Rules of Civil Procedure is a new briefing schedule required following the conversion of a Rule 12 motion into a Rule 56 motion. Additionally, on November 18, 2024, when the District Court converted the Board's motion, it acknowledged the need for the parties to "receive the opportunity to provide all material pertinent to the motion." [Doc. 103 at 4] To that

46

end, the Order provided the parties until December 2, 2024—fourteen days—to "provide the Court all material pertinent to the motion for judgment on the pleadings." [Doc. 103 at 4] Warner then filed a declaration and various documents in support of his position, and the parties submitted a notice of stipulated facts. [Docs. 104–05, 107] Warner never moved for leave to file supplemental briefing in opposition to the now-converted summary judgment motion.[17]

Finally, in two separate orders, the District Court extended the filing deadline for Warner to object to the Magistrate Judge's Report and Recommendations, and extended his page limit for objections from ten pages to twenty-five pages. [Docs. 114 & 116] Warner then unsuccessfully raised these very objections. As the District Court explained, "[t]he ability to object to the report afford[ed] Warner an opportunity to present full briefing and argument in response to the converted motion." [Doc. 120 at 3 (citation modified)] The failure of his arguments before the

---

[17] As an aside, it is unclear exactly what else Warner would have raised in opposition to the converted motion. One day after the Board filed its Rule 12(c) motion, Warner filed his opposition, raising the following issues: estoppel; unenforceability of the settlement agreement release; lack of consideration; post-release date accrual of claims; ambiguity of release language; waiver was unknowing and involuntary; and the release violates public policy. [Doc. 87] In other words, he raised in opposition to the original motion the very arguments he ultimately raised in his objections to the Report and Recommendation, and those that he raises here. He suffered no prejudice by the lack of an additional, unrequired briefing schedule that he failed to request.

District Court Judge does not turn the proper procedural process into an abuse of discretion.

### C.    The District Court did not violate the party presentation rule.

Lastly, Warner's claim that the District Court abused its discretion by violating the party presentation rule should be denied. He contends that the Board failed to raise (1) paragraph six of the settlement agreement or (2) standing, and therefore forfeited the right to challenge Warner's claims on those bases. Each argument fails.

The party presentation rule prevents a court from raising previously unraised arguments. "Under that principle, [courts] rely on parties to litigation 'to frame the issues for decision' and retain 'the role of neutral arbiter of matters the parties present.'" *Glob. Marine Expl., Inc. v. Republic of France*, No. 24-10148, 2025 WL 2394694, at *10 (11th Cir. Aug. 19, 2025) (quoting *U.S. v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc)). Therefore, absent exceptional circumstances, when a party fails to raise an argument, a court may not consider that argument. But the Board *did* raise paragraph six.

First, the Board pleaded the settlement agreement as an affirmative defense in its answer to the Third Amended Complaint, attaching a redacted copy of the entire settlement agreement. [Docs. 82, 82-1] The Board's third defense read: "Plaintiff's claims are barred by release, discharge, and waiver. Plaintiff previously executed a

48

Settlement Agreement with the School Board." [Doc. 82 at 33] Even if the answer did not expressly reproduce paragraph six, the affirmative defense mentions waiver. That falls within paragraph six: waiver of the right to sue the Board for any facts, acts, or events predating the effective date of the agreement. This alone is sufficient to raise the issue. *See* FED. R. CIV. P. 12(h)(2) (allowing a party to "state a legal defense to a claim . . . in any pleading allowed or ordered under Rule 7(a)," as well as "by a motion under Rule 12(c)").

Additionally, while the Board's Rule 12(c) motion did not expressly mention paragraph six, it incorporated arguments regarding waiver of claims accruing prior to the effective date. For instance, as to Count II, the motion argued that the "map was obviously enacted before the date Warner executed the March 15, 2022 Settlement Agreement." [Doc. 86 at 7] The same can be said for Count I. The motion explained that "there was no change to the voting maps after the date of the release. Thus, Warner cannot allege or demonstrate any impact to him (or his child) following the execution of the broad release." [Doc. 86 at 8] These arguments clearly can be attributed to paragraph six's prohibition of suit for activity dating prior to the settlement agreement. The Board sufficiently presented this matter.

Second, the Board raised the issue of standing by identifying that Warner did not suffer any injury. It explained that no action taken by the Board "affect[ed] Warner or his child following the release," [Doc. 86 at 1] that the alleged changes

"did not affect Warner nor his minor child[] and [that] Warner does not allege any direct impact," [Doc. 86 at 6 (emphasis omitted)] and that no school boundary assignment changes altered the options available to J.W. for the school year at issue. [Doc. 86 at 8] Where a plaintiff does not sufficiently allege an injury-in-fact, they lack standing.

Regardless, while the Board does not concede that it did not raise standing, it matters not whether any party raises that issue. "Standing is a jurisdictional prerequisite to suit in federal court." *State of Alabama v. U.S. E.P.A.*, 871 F.2d 1548, 1554 (11th Cir. 1989); *accord Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1038 (11th Cir. 2008) ("The constitutional requirements [for standing] derive from Article III's limitation of federal jurisdiction to situations where a justiciable 'case or controversy' exists between the litigants." (quoting *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994) (en banc))). "And because standing involves [a federal court's] jurisdiction, [the court] must raise *sua sponte* any issues related to standing that [it] spot[s]." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1207 (11th Cir. 2025). Therefore, the District Court had an obligation to scrutinize Warner's standing. Doing so is clearly not an abuse of discretion.

Accordingly, the Court should affirm the District Court's procedural determinations with respect to the conversion of the Board's Rule 12(c) motion to a Rule 56 motion.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should affirm the District Court's judgment in all respects.

Respectfully submitted,

<u>/s/ Kristen M. Fiore</u>
KRISTEN M. FIORE, B.C.S. (25766)
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Facsimile: (850) 222-0103
kristen.fiore@akerman.com

JASON L. MARGOLIN (69881)
**AKERMAN LLP**
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Telephone:   (813) 209-5009
Facsimile:   (813) 223-2837
Jason.Margolin@akerman.com

**ATTORNEYS FOR APPELLEE**

83254363;4

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 12,786 words, excluding the parts of the brief exempted by FRAP 32(a)(7)(B)(iii). This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

<u>/s/ Kristen M. Fiore</u>
KRISTEN M. FIORE, B.C.S.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 6, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will automatically send a copy to all counsel of record in this case registered on the CM/ECF system.

<u>/s/ Kristen M. Fiore</u>
KRISTEN M. FIORE, B.C.S.

83254363;4