# United States Court of Appeals for the Eleventh Circuit

No. 25-11376

---

Blake Warner

*Plaintiffs-Appellants,*

*v.*

The School Board of
Hillsborough County, Florida

*Defendants-Appelleees.*

Appeal from the United States District Court
for the Middle District of Florida
USDC No. 8:23-CV-181

---

**REPLY BRIEF OF APPELLANT**

(i)

**Table of Contents**

I    Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . .   iv

II   Certificate of Interested Persons  . . . . . . . . . . . . . . . . . .   1

III  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

IV   The Board's Mischaracterization of Facts and Procedural History  . . . . . .   3

1.   The Board Mischaracterizes the Nature of the Underlying Dispute  . . . . .   3

2.   The Board Conceals Critical Timing and Context  . . . . . . . . . . . .   4

V    The Board's Restrictive Reading of § 3604(a) Contradicts Supreme Court and Circuit Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

1.   The Board's "Inextricably Intertwined" Test Is a Legal Fiction . . . . . . . .   5

     A.   Jackson v. Okaloosa County and LaGrange Defeats the Board's Position   6

     B.   The Board's Own Cases Refute Its "Direct Authority" Requirement  .   8

2.   The Board's Ejusdem Generis Argument Fails Under Supreme Court Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

     A.   The Supreme Court Has Rejected Narrow Construction of FHA Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

     B.   School Boundaries Are Similar in Effect to Direct Housing Denials . .   11

VI   Warner Satisfies All Proximate Cause Requirements Under Bank of America 11

1.   Warner Is a Direct Victim Within the Zone of Interests . . . . . . . . . . .   12

2.   Warner's Claims Mirror the Tax Revenue Claims That Survived in Wells Fargo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

3.   The Board Cannot Disclaim Causation It Publicly Acknowledges  . . . . . .   15

4.   The Board's "Limitless Effects" Argument Proves Too Much . . . . . . . .   15

VII  The Board Misapplies LaGrange to Exclude School Assignments from § 3604(b) 17

1.   School Assignments Satisfy Both Prongs of LaGrange . . . . . . . . . . . .   17

     A.   The Unique Legal Nexus Between Schools and Housing  . . . . . . . .   17

     B.   Education Is Essential to Habitability Under Florida Law . . . . . . . .   19

2.    Failing Schools Deny the Constitutional Liberty Interest in Education  . . .  20

3.    The Board's Position Creates Educational Ghettos  . . . . . . . . . . . . . .  21

4.    LaGrange's Logic Compels This Result  . . . . . . . . . . . . . . . . . . .  22

VIII  The Settlement Agreement Cannot Bar Warner's Constitutional Claims  . .  23

1.    The Board Overstates the Agreement's Scope  . . . . . . . . . . . . . . . .  23

2.    The Release Is Limited to Claims "Specifically Related to J.W.'s Education" 27

3.    The Agreement Lacks Consideration for Warner's Individual Releases  . . .  28

4.    The Agreement Was Not Knowingly and Voluntarily Entered . . . . . . . .  30

IX   The Board's Fraudulent Inducement Requires Trial  . . . . . . . . . . . . .  34

1.    The Board Misrepresented the Agreement's Scope  . . . . . . . . . . . . .  34

X    The Due Process Claim—The Board Misconstrues Both Fact and Law  . . .  35

1.    The Fundamental Mischaracterization  . . . . . . . . . . . . . . . . . . . .  35

2.    Florida Law Creates More Than Mere Procedures—It Establishes Enforce-
      able Rights  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

3.    The Board's Case Citations Fail on Their Facts  . . . . . . . . . . . . . . .  38

      A.    *Marshall* Addresses Process Avoidance, Not Process Denial  . . . . . .  38

      B.    *Anderson* Is Distinguishable and Non-Binding  . . . . . . . . . . . . .  39

XI   The District Court's Procedural Errors Require Reversal  . . . . . . . . . . .  41

1.    The Denial of Discovery Was an Abuse of Discretion  . . . . . . . . . . .  41

2.    The Board Waived Defenses Not Raised Below  . . . . . . . . . . . . . . .  42

XII  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

XIII Certificate of Compliance  . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

# I   Table of Authorities

Cases                                                                                    Page

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)  . . . . . . . . . . . . . . . . . . . . . . . 26, 31, 32, 33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  . . . . . . . . . . 27, 39

*Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)  . . . . . . . 16

*Board of Regents v. Roth*, 408 U.S. 564 (1972)  . . . . . . . . . . . . . 35, 37, 38

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995)  . . . . . . . . . 10

*City of Miami v. Wells Fargo & Co.*,
  923 F.3d 1260 (11th Cir. 2019)  . . . . . . . . . . . . . . . . 12, 13, 14, 16

*Dorman v. Publix-Saenger-Sparks Theatres*,
  184 So. 886 (Fla. 1938)  . . . . . . . . . . . . . . . . . . . . . . . 28

*Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*,
  262 F. Supp. 2d 1334 (S.D. Fla. 2003)  . . . . . . . . . . . . . . . . . 34

*Georgia State Conference of the NAACP v. City of LaGrange*,
  940 F.3d 627 (11th Cir. 2019)  . . . . . . . . . . . . . . . . . . . . *passim*

*Goss v. Lopez*, 419 U.S. 565 (1975)  . . . . . . . . . . . . . . . . . . . . 40

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)  . . . . . . . . . . . . . . 12

*Jackson v. Okaloosa County, Fla.*,
  21 F.3d 1531 (11th Cir. 1994)  . . . . . . . . . . . . . . . . . . . . *passim*

*Jones v. McConnon & Co., 100 Fla. 1158*, 130 So. 760 (1930)  . . . . . . . . 29

*Key West Harbour Dev. Corp. v. City of Key West*,
  987 F.2d 723 (11th Cir. 1993)  . . . . . . . . . . . . . . . . . . . . . 36

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)  . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Marshall v. City of Cape Coral*, 797 F.2d 1555 (11th Cir. 1986)  . . . . . . . 38

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011)  . . . . . . . . . . . . 14

*Meyer v. Nebraska*, 262 U.S. 390 (1923)  . . . . . . . . . . . . . . . . . . 20

*N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*,
  978 F.2d 287 (7th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . . 9

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)  . . . . . . . . . 26

Cases—Continued                                                                Page

*Oubre v. Entergy Operations, Inc.,*
  522 U.S. 422 (1998)  . . . . . . . . . . . . . . . . . . . . 31, 32, 33, 34

*Plyler v. Doe*, 457 U.S. 202 (1982)  . . . . . . . . . . . . . . . . . . . . . 20

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982)  . . . . . . . . . . . 8

*Texas Department of Housing & Community Affairs v. Inclusive
  Communities Project, Inc.*, 135 S. Ct. 2507 (2015)  . . . . . . . . . . . . 11

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)  . . . . . . . . . . . . 37

*Town of Newton v. Rumery*, 480 U.S. 386 (1987)  . . . . . . . . . . . . . . *passim*

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972)  . . . . . . . . 10

*United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974)  . . . . . . . 8

*United States v. City of Parma*, 661 F.2d 562 (6th Cir. 1981)  . . . . . . . . . 8

*Yates v. U.S.*, 574 U.S. 528 (2015)  . . . . . . . . . . . . . . . . . . . . . . 10


Constitutional Provisions, Statutes and Rules


Other Authorities

**II   Certificate of Interested Persons**

1. Blake Warner (Appellant)

2. Akerman LLP (Attorneys for Appellee)

3. Fiore, Kristen M. (Attorney for Appellee)

4. Margolin, Jason L. (Attorney for Appellee)

5. Merryday, Steven D., U.S. Dist. Judge (M.D. Fla.)

6. Sneed, Julie S., U.S. Dist. Judge (M.D. Fla.)

7. Griffin, Lindsay S., U.S. Magistrate Judge (M.D. Fla.)

8. The School Board of Hillsborough County, Florida (Appellee)

## III   Introduction

The School Board's Answer Brief reveals both a fundamental misunderstanding of the Fair Housing Act's scope and a systematic misrepresentation of a narrow IDEA settlement to manufacture immunity from unrelated civil rights claims. Through dual strategies of legal revisionism and factual distortion, the Board seeks three wild outcomes: first, that school districts can perpetuate residential segregation through discriminatory boundaries without FHA liability; second, that parents settling special education disputes thereby waive all future constitutional rights remotely touching education; and third, the Board insists that courts evaluating whether such civil rights waivers were knowing and voluntary must ignore the actual circumstances of the settlement and consider only the agreement's text—effectively barring the very factual inquiry the Eleventh Circuit requires under the "Totality of the Circumstances" test.

As this Court recently emphasized in *Georgia State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627 (11th Cir. 2019), "the language of the FHA is broad and inclusive," "prohibits a wide range of conduct," "has a broad remedial purpose," and "is written in decidedly far-reaching terms." *Id.* at 632. The Board's invented "inextricably intertwined" standard contradicts this Court's holdings. Its proximate cause arguments ignore the Board's own admissions that school assignments drive

2

property values. And its extraordinary overreach in transforming a special education Individuals with Disabilities Act ("IDEA"") settlement into perpetual immunity from all federal civil rights claims finds no support in law, logic, or the actual agreement at issue.

Crucially, the Board did not dispute that Congress intended the Fair Housing Act to address school segregation as demonstrated through the congressional record in Appellant's brief.

## IV   The Board's Mischaracterization of Facts and Procedural History

Before addressing the legal arguments, this Court must understand how the Board has distorted the factual record to manufacture defenses never contemplated by the parties.

### 1.   The Board Mischaracterizes the Nature of the Underlying Dispute

The Board claims: "This dispute stems from a series of legal actions concerning Warner's minor child, J.W.'s, public school assignment" (Appellee Br. at 2). This is demonstrably false. The administrative proceedings were IDEA due process hearings concerning the denial of a Free Appropriate Public Education (FAPE)

during COVID-19 remote learning and the effects of mask mandates on J.W.'s Individualized Education Plan ("IEP")—not school assignments. The Board provides no record citation for this assertion because none exists. Every document in the record confirms these were special education disputes under IDEA, 20 U.S.C. § 1415, which has no jurisdiction over general school assignment challenges.

The Board further misrepresents: "In 2021, Warner brought an administrative action against the Board on behalf of himself and J.W., challenging the Board's administration of its public school assignment system" (Appellee Br. at 3). This is legally impossible. IDEA due process hearings can only be brought in the child's name. 20 U.S.C. § 1415(b)(6). Warner was not and could not be a party to that litigation. The Board's own settlement agreement identifies the cases as "J.W. v. Hillsborough County School District"—not "Warner and J.W. v. School Board." [Doc. 82-1 ¶ 1]. This misrepresentation attempts to create a false connection between J.W.'s special education claims and Warner's individual civil rights claims.

## 2.    The Board Conceals Critical Timing and Context

The Board states: "In return, the Board permitted J.W. to enroll in schools outside of his assigned boundaries" (Appellee Br. at 4). This misleading statement omits

4

crucial context:

1. At the time of the settlement (March 2022), J.W. was zoned for the best schools in Hillsborough County—he literally lived across the street from an A-rated school.

2. J.W.'s school assignment did not become problematic until October 2022—six months after the settlement—when the family moved to North Tampa and was assigned to poor-performing schools.

3. The bulk of the consideration given to J.W. was remedial special education services to remedy the denial of FAPE, not school choice guarantees.

Why would J.W. challenge assignment to the county's best schools? The answer is obvious: he wouldn't and didn't. The administrative proceedings concerned special education services, not school boundaries.

## V   The Board's Restrictive Reading of § 3604(a) Contradicts Supreme Court and Circuit Precedent

### 1.   The Board's "Inextricably Intertwined" Test Is a Legal Fiction

The Board argues that "courts have only [found liability under § 3604(a)] with respect to activity that is inextricably intertwined with the procurement or provision of

housing" (Appellee Br. at 13). This assertion is demonstrably false and finds no support in any controlling precedent. Ironically, this Court in *Id* used the phrase "inextricably intertwined" not as a limitation but to describe why basic utilities fall within § 3604(b)'s scope: "these basic utility services are inextricably intertwined with the dwelling itself." *Id.* at 634. The Board has misappropriated this language to create a restrictive test that contradicts the FHA's broad remedial purpose. In any event, it's a moot point since public school's are "inextricably intertwined" with the dwelling because the Board themselves assigns those schools directly to the dwelling.

### A.   Jackson v. Okaloosa County and LaGrange Defeats the Board's Position

The Board's argument cannot survive this Court's holdings in *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531 (11th Cir. 1994) and *LaGrange*, 940 F.3d 627. In Jackson, this Court explicitly held that § 3604(a) "encompass[es] actions by individuals or government units that affect[] the availability of housing to minorities." *Jackson v. Okaloosa County*, 21 F.3d at 1542 n.17. LaGrange reinforced this broad interpretation, emphasizing that "the language of the FHA is broad and inclusive" and "prohibits a wide range of conduct." *LaGrange*, 940 F.3d at 632.

Nowhere did Jackson require that defendants possess direct authority over housing or that their actions be "inextricably intertwined" with housing transactions.

6

Instead, Jackson established a straightforward test: does the governmental action have "a direct impact on the ability of potential homebuyers or renters to locate in a particular area"? *Jackson v. Okaloosa County*, 21 F.3d at 1542.

> "The complaint in this case adequately states a cause of action under § 3604(a), since this suit alleges race-based discrimination affecting the "availability" of public housing within the Authority's territory. The Fair Housing Act is concerned with both the furtherance of equal housing opportunity and the elimination of segregated housing. Therefore, in order to state a claim under § 3604(a), the plaintiffs must allege unequal treatment on the basis of race that affects the availability of housing." *Id.* 1542–43.

> "Given the broad application of § 3604(a) to practices that affect the housing market for minorities, we do not hesitate to apply the provision to the instant case, even though the facility will eventually be "available" at some location." *Id.* at 1542.

School assignment boundaries unquestionably meet this standard. The Board's own policies demonstrate that school assignments drive property values and housing availability. (TAC ¶¶ 86-87). This is not speculation—nationwide empirical research documents that school assignment boundaries routinely create 20% or greater price premiums for otherwise comparable homes. When the Board draws boundaries that systematically assign minority neighborhoods to lower-rated schools while preserving high-rated schools for white neighborhoods, it creates powerful economic forces that make housing in those white neighborhoods unavailable to minority families. (TAC ¶¶ 85-86).

**B.  The Board's Own Cases Refute Its "Direct Authority" Requirement**

The Board claims that FHA liability requires "authority over the availability or denial of housing" (Appellee Br. at 15), yet every case it cites involved defendants who lacked such direct authority:

**U.S. v.  City of Parma, 661 F.2d 562 (6th Cir.  1981)**:  The Board cites this as supporting its position, yet Parma involved zoning ordinances and rejection of housing proposals—actions that only *indirectly* affected housing through land use regulation.  The city had no authority to sell or rent housing.  *United States v. City of Parma*, 661 F.2d 562, 562 (6th Cir. 1981).

**U.S. v. City of Black Jack, 508 F.2d 1179 (8th Cir. 1974)**:  Again, the defendant city possessed no direct authority over housing sales or rentals.  It merely changed zoning laws that *indirectly* prevented multifamily housing construction.  *United States v. City of Black Jack*, 508 F.2d 1179, 1179 (8th Cir. 1974).

**Smith v.  Town of Clarkton, 682 F.2d 1055 (4th Cir.  1982)**:  The town's withdrawal from a housing authority did not involve any direct regulation of housing transactions—it simply removed government participation, *indirectly* affecting housing availability.  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1055 (4th Cir. 1982).

**N.A.A.C.P. v. Am. Fam. Mut. Ins. Co., 978 F.2d 287 (7th Cir. 1992)**: Most tellingly, this insurance redlining case found FHA liability despite insurance companies having zero authority to sell or rent housing. Their practices only *indirectly* made housing unavailable by affecting insurance availability. *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 287 (7th Cir. 1992).

If the Board's "direct authority" test were correct, none of these defendants could have violated § 3604(a). The Board has thus inadvertently proven Warner's point: § 3604(a) reaches beyond direct housing transactions to encompass governmental zoning actions—which school assignment boundaries are. *see* 24 C.F.R. §100.70. Actions that make housing unavailable through economic and market mechanisms. *Jackson v. Okaloosa County*, 21 F.3d at 1542–43.

## 2.  The Board's Ejusdem Generis Argument Fails Under Supreme Court Precedent

The Board invokes *ejusdem generis* to argue that "otherwise make unavailable" must be narrowly construed (Appellee Br. at 15 n.4). This argument fails on multiple levels.

## A.   The Supreme Court Has Rejected Narrow Construction of FHA Provisions

The Board ignores that the Supreme Court has repeatedly rejected attempts to narrowly construe the FHA's broad remedial provisions. In *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972), the Court held that the Act's "aggrieved person" language must be construed broadly to effectuate Congress's remedial intent, despite following specific categories of potential plaintiffs. *Id.* 209–12. Similarly, in *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995), the Court rejected narrow construction arguments nearly identical to the Board's. *Id.* at 731.

This Court in *LaGrange*, 940 F.3d 627 recently reaffirmed this principle: "We do not look at one word or term in isolation, but instead look to the entire statutory context." *Id.* at 631. The entire statutory context of the FHA demonstrates its "broad remedial purpose." *Id.* at 632.

The Board's reliance on *Yates v. U.S.*, 574 U.S. 528, 545 (2015) is misplaced. Yates involved a criminal statute requiring strict construction, not a remedial civil rights statute that courts must interpret broadly. The Supreme Court has consistently distinguished between these contexts, applying broad construction to civil rights statutes while requiring narrow construction only for criminal provisions.

10

**B.   School Boundaries Are Similar in Effect to Direct Housing Denials**

Even accepting the Board's framework, school assignment boundaries are similar in nature to refusals to sell or rent—both operate as gatekeeping mechanisms determining whether families can access housing in particular neighborhoods.  The similarity lies not in form but in effect:  both make housing unavailable to protected groups.  This effects-based analysis is confirmed by the FHA's acceptance of disparate impact liability.  *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2525 (2015).

**VI   Warner Satisfies All Proximate Cause Requirements Under Bank of America**

The Board's proximate cause arguments fundamentally mischaracterize both Warner's allegations and the applicable legal standards.  The Board claims Warner "cannot show that the Board's actions proximately caused the increase in property values in any measurable way" (Appellee Br. at 17).  This argument fails for three independent reasons.

### 1.  Warner Is a Direct Victim Within the Zone of Interests

The Board attempts to analogize Warner's claims to the diffuse municipal expense claims that failed in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019).  This comparison is inapt.  Warner is not a downstream municipal entity claiming generalized budget impacts—he is a direct victim who was priced out of South Tampa by the Board's discriminatory boundaries and forced to purchase in North Tampa where his home was assigned to lower-performing schools. (TAC ¶¶ 87-88).

As a direct purchaser affected by discriminatory housing practices, Warner falls within what the Supreme Court calls the "first step" of causation, which creates a presumption of proximate cause. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 720 (1977).  And consistent with the FHA's liberal standing regime, 'Congress has made standing as broad as the Constitution permits" in actions brought under § 3612. *Jackson v. Okaloosa County*, 21 F.3d at 1537.  The Board's argument that Warner must prove "quantifiable changes to housing prices" at the pleading stage (Appellee Br. at 17) inverts the proper analysis.  Warner need only allege facts plausibly suggesting causation, which he has done through detailed allegations about:

• The Board's discriminatory school boundary practices that systematically ex-

clude minorities from higher-performing schools (TAC ¶¶ 84-85)

- The direct effect of these boundaries on property values in minority versus white neighborhoods (TAC ¶¶ 86-87)

- Warner's personal injury of being priced out of South Tampa due to inflated property values (TAC ¶ 88)

- The foreseeability that discriminatory boundaries would create economic barriers to integrated housing (TAC ¶¶ 85-90)

## 2.   Warner's Claims Mirror the Tax Revenue Claims That Survived in Wells Fargo

The Board mischaracterizes *Wells Fargo*, 923 F.3d 1260 by focusing only on the municipal expense claims that failed while ignoring that the tax revenue claims survived. The critical distinction was between: (1) diffuse, unquantifiable increases in municipal expenses with multiple possible causes, and (2) tax revenue losses that could be isolated through a developed hedonic regression model predicting damages. *Id.* 1284–85.

Warner's property value claims align with the surviving tax revenue claims, not the failed expense claims:

13

**First**, property values can be isolated and quantified through the same hedonic regression models this Court approved in *Id.* Real estate economics routinely employs such models to isolate school assignment effects while controlling for other variables. Courts regularly handle these analyses. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). And as this Court explained in *Jackson v. Okaloosa County*, 21 F.3d 1531 1541, the requirement of redressability for standing is not a demand for complete certainty in results.

**Second**, Warner's injuries are direct and concrete. Unlike Miami's generalized expense increases, Warner suffered a specific, quantifiable injury: being priced out of a white South Tampa neighborhood and forced to purchase in a minority neighborhood where his family received inferior school assignments. (TAC ¶¶ 87-88). This is not a "ripple" effect—it is the direct, intended consequence of boundaries that disproportionately affect racial minorities by isolating them into under-performing schools while isolated white students excel in A-rated schools. (TAC ¶ 85).

**Third**, the causal chain is shorter than in Wells Fargo. Warner's injury involves only three steps: (1) discriminatory boundary drawing, (2) resulting property value changes, (3) pricing out minority homebuyers. This Court found a five-step chain sufficient in *Wells Fargo*, 923 F.3d at 1267.

14

### 3.    The Board Cannot Disclaim Causation It Publicly Acknowledges

The Board's causation argument is particularly disingenuous given its superintendent's explicit acknowledgment that school assignments drive property values. When a defendant publicly touts that its decisions increase property values (SAC ¶ 94):

> "We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values. The more we continue to address our high quality education within within everyone of our schools." -Hillsborough County School Superintendent Addison Davis

It cannot then argue with a straight face in litigation that any connection between its policies and housing prices is too "tenuous" or "remote" to satisfy proximate cause.

### 4.    The Board's "Limitless Effects" Argument Proves Too Much

The Board warns that recognizing Warner's claim would open floodgates to litigation over "general demand, a new park or commercial district built nearby, favorable interest rates, risk of natural disaster, neighborhood crime statistics" (Appellee Br. at 19). This parade of horribles fails for three reasons:

15

**First**, the FHA contains built-in limitations: plaintiffs must prove the defendant's actions were based on race, made housing unavailable to protected groups, and the implied element of causal connection. These requirements eliminate the Board's hypothetical concerns.

**Second**, this Court rejected identical "floodgates" arguments in *Id.* There, banks made virtually the same arguments about "limitless" causation chains. This Court responded that the FHA's "broad remedial purpose" can accommodate "aggregative causal connection[s]" when injuries are foreseeable and quantifiable. *Id.* 1267, 1281.

**Third**, the Supreme Court in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) acknowledged that the FHA must reach beyond "the first step" when necessary to effectuate the statute's purpose. *Id.* at 203. The Court declined to adopt a rigid "first-step only" rule precisely because doing so would undermine the FHA's broad remedial scope.

## VII   The Board Misapplies LaGrange to Exclude School Assignments from § 3604(b)

The Board argues that § 3604(b) excludes school assignments because they are not "inextricably intertwined" with housing (Appellee Br. at 22-25).  This misreads *LaGrange*, 940 F.3d 627 and ignores the unique relationship between school assignments and housing.  Their argument also ignores HUD regulations that forbid government discriminatory zoning practices that restrict or deny housing opportunities. *see* 24 C.F.R. § 100.70(d)(5).

### 1.   School Assignments Satisfy Both Prongs of LaGrange

*id* established a two-part test:  services must be (1) "closely tied to the sale or rental of a dwelling" and (2) "essential to the habitability of a dwelling." *Id.* at 634. Importantly, LaGrange also held that services must be "housing-related service[s] that [are] directly connected to the sale or rental of a dwelling." *Id.*  School assignments unequivocally meet both requirements.

### A.   The Unique Legal Nexus Between Schools and Housing

The Board's reliance on *Id*'s exclusion of law enforcement misses the critical distinction.  Law enforcement is provided "regardless of whether an individual has

17

housing." *Id.* at 633. Police protect the homeless, visitors, and residents alike.

School assignments are fundamentally different. Under the Board's policies, school assignment is determined *exclusively* by residential address. A family literally cannot access their assigned school without first obtaining housing within the attendance zone[1]. This creates a legal prerequisite that exists for no other municipal service—housing becomes the gateway to education.

LaGrange emphasized that basic utilities are "inextricably intertwined with the dwelling itself" because "it is practically impossible when considering housing to separate the 'sale or rental of a dwelling' from the concept of obtaining basic utility services." *Id.* at 634. The same is true for school assignments. As the Board's own superintendent confirms by admitting school quality "increases property values" (SAC ¶ 94):

Families cannot separate housing decisions from school assignments. When school assignments routinely account for 20-30% of home values (TAC ¶¶ 104–108), they are not merely "connected" to housing transactions—they often determine them.

---

[1]Under the McKinney–Vento Homeless Assistance Act, homeless children and youths may enroll in the public school that serves the attendance area where they are currently living, without securing permanent housing. However the same discrimination mechanism operates in the same way, as homeless rarely reside in white neighborhoods with good schools.

The Board's own superintendent confirms this reality by admitting school qual-
ity "increases property values" (SAC ¶ 94). When school assignments routinely
account for 20-30% of home values (TAC ¶¶ 104–108), they are not merely "con-
nected" to housing transactions—they often determine them.

**B.   Education Is Essential to Habitability Under Florida Law**

Florida's Constitution declares education "a fundamental value" and makes ade-
quate educational provision "a paramount duty of the state." FLA. CONST. art.
IX, § 1(a). Compulsory education laws impose criminal penalties on parents who
fail to ensure their children attend school. FLA. STAT. § 1003.27.

A dwelling that prevents compliance with compulsory education laws cannot
be habitable for families with children. The Board's position—that families can
have "habitable" housing without school access—would force parents to choose
between criminal prosecution, unaffordable private schooling, or abandoning their
homes. This is not habitability; it is coercion.

As LaGrange recognized, services are "fundamental to the ability to inhabit a
dwelling" when their absence makes the premises uninhabitable. *Id.* Just as La-
Grange found that "even if the plaintiffs are able to purchase or rent a dwelling,
they are unable to live in it due to being unable to obtain or maintain basic utility

services," *Id*, families cannot truly inhabit homes where their children lack access to constitutionally adequate education.

## 2.  Failing Schools Deny the Constitutional Liberty Interest in Education

The Supreme Court has long recognized that the Due Process Clause protects a liberty interest in education—specifically, the right to "acquire useful knowledge." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (education provides "the basic tools by which individuals might lead economically productive lives").

When the Board assigns minority neighborhoods to schools so deficient they cannot teach basic literacy or numeracy, it denies this fundamental liberty interest.  A school that fails to teach children to read is not providing education—it is warehousing children while denying them "useful knowledge."  For constitutional purposes, assignment to such a school is equivalent to no school assignment at all.

A dwelling assigned to a school that cannot fulfill the basic educational mission is therefore uninhabitable for families with children.  Just as *LaGrange*, 940 F.3d 627 recognized that a house without water is "not fit for human habitation," a house without access to actual education—as opposed to mere enrollment in a

20

failing institution—cannot serve the basic needs of families.

### 3. The Board's Position Creates Educational Ghettos

When the Board systematically assigns minority neighborhoods to failing schools while preserving quality schools for white neighborhoods, it creates "educational ghettos." (TAC ¶¶ 38-42). These are zones where the educational deprivation is so severe that it amounts to constructive denial of both education and housing.

Consider the practical impact documented in the complaint: A minority family seeking housing faces a cruel choice. They can purchase in their assigned neighborhood, condemning their children to schools that the Board has systematically underfunded and neglected (TAC ¶¶ 40-42), or they can attempt to purchase in white neighborhoods with better schools, where the Board's own policies have driven prices beyond their reach (TAC ¶¶ 86-88). This is precisely the discriminatory "provision of services in connection with" housing that § 3604(b) prohibits. And consistent with *Jackson v. Okaloosa County*, 21 F.3d 1531, this Court recognized 'neighborhood' standing when a resident alleged the site selection 'will exacerbate segregation in her neighborhood" and held 'she does have standing to pursue her Fair Housing Act claim." *Id.* at 1538.

#### 4.   LaGrange's Logic Compels This Result

*LaGrange*, 940 F.3d 627 held utilities fall within § 3604(b) because they are "essential to the habitability of a dwelling." *Id.* at 634.  The Court distinguished law enforcement because it operates "regardless of whether an individual has housing." *Id.* at 633.

Moreover, *Id* rejected the Ninth Circuit's inclusion of law enforcement precisely because police services "are provided regardless of whether an individual has housing." *Id.* at 633.  This reasoning supports coverage of school assignments, which—unlike law enforcement—are provided *only* to those with housing in designated attendance zones.

School assignments fit squarely within LaGrange's protected category:

• Unlike police services, schools require housing for access

• Unlike parks or libraries, school assignment is legally tied to residential residence[2]

• Like utilities, education is essential for families with children

• Like utilities, inadequate service renders dwellings uninhabitable

---

[2]parks and libraries are often tied to county residences, due to funding coming from the county.  Schools are not funded from individual neighborhoods in Hillsborough County, Florida.

- Like utilities, school assignments are "inextricably intertwined with the dwelling itself" *Id.* at 634

## VIII    The Settlement Agreement Cannot Bar Warner's Constitutional Claims

The Board seeks to transform a narrow IDEA settlement about special education services during COVID-19 into perpetual immunity from federal civil rights claims. This extraordinary overreach violates basic principles of contract law, constitutional doctrine, and public policy.

### 1.    The Board Overstates the Agreement's Scope

The Board argues the settlement agreement contains a "sweeping release" that bars all of Warner's current claims (Appellee Br. at 28–31). This mischaracterizes both the agreement's language and applicable law.

### The Board Selectively Quotes the Agreement While Omitting Exculpatory Language

The Board quotes paragraph 5's release language but deliberately omits the critical limitation immediately following: "The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education or any new claim

that may arise by reason of an act or omission occurring after the Effective Date of this Agreement." [Doc. 82-1 ¶ 5].

This omission is not accidental. The Board knows Warner challenges boundaries enacted in 2023—after the March 2022 agreement. By selectively quoting, the Board conceals that its own agreement expressly preserves these claims.

**The Board Cannot Explain the Agreement's Internal Contradictions**

If paragraph 6 bars all claims "connected in any way" to pre-2022 facts, why does paragraph 5 limit releases to claims "specifically related to J.W.'s education" and "The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement."? Why preserve post-agreement claims if pre-agreement facts create perpetual immunity? Why acknowledge continuing FAPE obligations if the Board has immunity?

These aren't claims about pre-2022 facts but about post-2022 acts violating current rights. The agreement preserves "any new claim that may arise by reason of an act or omission occurring after the Effective Date." The 2023 boundaries are precisely such post-agreement acts.

24

The Board offers no coherent interpretation reconciling these provisions.  This failure confirms the agreement's ambiguity.

**The Board's Temporal Manipulation Cannot Transform Future Acts into Past "Facts"**

The Board's most audacious contention—that **2023** discriminatory boundary changes constitute "facts, acts, or events occurring...**before** the Effective Date" [Doc.  82-1 ¶ 6]—commits temporal alchemy, turning future violations into retroactively released "past facts."  This defies logic, contract interpretation, and federal law.  **Paragraph 5 expressly preserves** "**any new claim that may arise by reason of an act or omission occurring **after** the Effective Date**." [Doc. 82-1 ¶ 5 (emphasis added).]  Warner's claims arise precisely from such **post-March 2022 acts**:

- **March 2022**:  Warner purportedly signs a release that purportedly releases claims through March 2022.

- **May 9, 2023**:  Carrollwood Elementary expanded to K-8, **creating** the middle school program J.W. sought (TAC ¶ 56; SAC ¶ 205).  This **new act** blocked his choice application—impossible to release in 2022.

25

- **June 20, 2023**: Board adopted **revised boundaries** isolating minorities into failing schools (TAC ¶ 72).

- **Ongoing 2023–2025**: Continued enforcement dilutes votes and segregates housing (TAC ¶¶ 94–95, 180–83).

These are **fresh "acts or omissions"** generating "**new claim[s]**" under ¶ 5's plain text. The Board conflates **pre-2022 boundary existence** with **specific 2023 discriminatory changes**—like claiming a 2022 traffic **law** releases **future tickets**. Absurd. Claims accrue upon **each application** of unlawful policy. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (each discrete act restarts limitations).

The Board's reading **nullifies ¶ 5's carve-out**, rendering it surplusage—a canon violation. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("every word and clause has effect"). Construed against the drafter (Board), ¶ 5 **preserves** Warner's timely challenges.

Worse, it creates an **impermissible prospective waiver**, immunizing **perpetual discrimination**. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("no prospective waiver" of civil rights); *Town of Newton v. Rumery*, 480 U.S. 386, 394 (1987) (releases cannot "tempt[]...to perpetuate" violations). Granting **carte**

26

blanche** for future gerrymandering defeats federal policy.

Compounding this, the Board's **factual distortions** confirm summary judgment's impropriety:  Warner challenges **Adams Middle** assignment (TAC ¶¶ 157–58), **not** "Hill Middle" as claimed (Appellee Br.  at 35).  Material errors demand trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## 2.    The Release Is Limited to Claims "Specifically Related to J.W.'s Education"

The agreement releases only claims "specifically related [to] J.W.'s education, services, and educational program" (Doc. 82-1 ¶ 5).  The Board argues this encompasses Warner's Fair Housing Act claims because they involve school boundaries. But Warner's FHA claims are not about J.W.'s education—they are about Warner's inability to purchase housing in South Tampa due to discriminatory practices that affect the entire housing market.

The distinction is critical.  A claim is "specifically related to J.W.'s education" if it seeks educational remedies for J.W.  Warner's FHA claims seek housing remedies for discriminatory practices affecting all minority home buyers.  The fact that school boundaries are the mechanism of discrimination does not transform housing claims into education claims.

27

### 3.   The Agreement Lacks Consideration for Warner's Individual Releases

The Board cannot escape the fundamental defect identified in Appellant's opening brief: Warner individually received no consideration for his personal releases. The Board's response conflates parent and child, ignoring basic contract principles requiring each party to receive separate consideration.

The Board concedes this is two "bilateral contract[s], with promises exchanged between Warner (on behalf of J.W.) and the Board, and between Warner (in his individual capacity) and the Board" (Appellee Br. at 26).

The Board identifies only benefits to J.W.—remedial special education services and guaranteed school choice admission. It points to nothing Warner received individually. Under Florida law, "consideration must be bargained for and given in exchange for the promise." *Dorman v. Publix-Saenger-Sparks Theatres*, 184 So. 886, 889 (Fla. 1938). Benefits to a child cannot constitute consideration for a parent's individual releases, when those benefits were already promised to the child directly. The Board acknowledges that "a promise to perform what one is already required to do by an existing contract or otherwise is not valid consideration." (Appellee Br. at 30), but argues–without citation–that this principal of Florida law does not apply because the two bilateral contracts were executed simultaneously.

28

The Board's central argument—that the same consideration can satisfy obligations from two different parties—violates established Florida Supreme Court precedent. The Florida Supreme Court recognizes only one narrow exception to the general rule requiring separate consideration for separate obligations: guarantor agreements. In *Jones v. McConnon & Co., 100 Fla. 1158*, 130 So. 760, 762 (1930), the Court held that "where the guaranty or promise is made at the same time with the principal contract, and becomes an essential ground of the credit given to the principal debtor, the whole is one original and entire transaction, and the consideration extends to and sustains the promise of the principal debtor, and also the guarantor." This exception—and the Court emphasized it applies only "[w]hile ordinarily a contract of guaranty is separable from the debt"—exists solely because guarantors receive an indirect benefit when the principal's performance is secured, thereby reducing the guarantor's exposure. *Id.*

Warner is not J.W.'s guarantor. He is a separate party with independent claims, not someone who "becomes an essential ground of the credit given to the principal debtor." Jones, 100 Fla. at 1163, 130 So. at 762. The Board cites no Florida case—because none exists—extending Jones's narrow guarantor exception beyond the specific context of simultaneous guaranty agreements that form "one original and entire transaction" with the principal obligation. Id. If the Board's theory were

29

valid, it would eviscerate the general rule that Jones itself acknowledges: "ordinarily a contract of guaranty is separable from the debt." Id. Such an interpretation would permit any multi-party agreement to use single consideration for multiple obligors, transforming Jones's carefully limited exception into a rule that swallows the principle itself.

**4.   The Agreement Was Not Knowingly and Voluntarily Entered**

The Board claims Warner "had the opportunity to confer with counsel" (Appellee Br. at 2). This mischaracterizes the record. Warner alleges:

1. He was unrepresented during negotiations

2. The Board never mentioned constitutional claims

3. He understood the agreement resolved only IDEA issues

4. The Board actively concealed broader interpretations

The Board argues these facts are irrelevant because the contract is "unambiguous." But knowing waiver is a separate inquiry from civil rights release contract interpretation. And whether the agreement was unambiguous is at issue in this appeal. *Rumery*, 480 U.S. at r equires a specific showing that enforcement serves the

public interest and that the waiver was voluntary, deliberate, and informed, which did not happen here. *Alexander*, 415 U.S. at ( "[W]e think it clear that there can be no prospective waiver of an employee's rights under Title VII.") and *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998) likewise reject enforcing general releases to waive federal civil rights absent clear, knowing, and lawful waiver standards.

### Federal Public Policy Controls—and It Bars Enforcement Here

**Threshold error.** The Board analyzes enforceability solely through state contract principles.  That is a category mistake.  The agreement purports to waive rights created by federal civil-rights statutes and the Constitution.  As the Supreme Court has made explicit, "the question whether the policies underlying [a federal statute] may in some circumstances render [a] waiver unenforceable is a question of *federal law*." *Rumery*, 480 U.S. at 392. The Board's failure to apply the federal standard is dispositive.

**The federal standard.** Under *Id*, government-drafted releases of federal civil-rights claims are not enforced merely because they are written clearly; they are enforced, if at all, only when the government *proves* the waiver was voluntary, deliberate, and informed, and that enforcing it would *serve the public interest* in the

specific circumstances.  See *Id.* at 399 (O'Connor, J., conc.)  (cautioning against broad waivers and approving, at most, a tailored release of "specific claims arising from [the] arrest").  That is a fact-intensive, totality-of-the-circumstances inquiry that the Board never undertook and the district court never made.

**Prospective civil-rights waivers are disfavored.**  The Supreme Court has repeatedly refused to give effect to releases that prospectively trade away federal civil-rights protections or evade federal waiver safeguards.  *Alexander*, 415 U.S. at 51 (no prospective waiver of Title VII rights); *Oubre*, 522 U.S. at 427 (civil-rights waivers must satisfy stringent, statute-specific requirements).  The release the Board urges here is the exact opposite of what those cases contemplate:  it is broad, forward-looking, and untethered to a discrete, resolved controversy.  The Board cites no decision upholding a *prospective* waiver of *unknown* future federal civil-rights claims; that silence is telling.

**Inherent coercion and public policy.**  Even if the text were clear, federal public policy forbids conditioning a child's IDEA services on the parent's surrender of the parent's own separate federal rights.  That structure is inherently coercive:  it leverages a child's statutory entitlements—services the child is owed by federal law—to extract a parent's release of unrelated federal claims (e.g., future Fair Housing Act

or constitutional claims). Such bargaining pressure undermines voluntariness under *Rumery*, 480 U.S. 386 and disserves the public interest by chilling private enforcement of federal civil-rights laws. If school districts can routinely "bundle" a child's IDEA remedies with a parent's waiver of future federal claims, the predictable result is fewer meritorious suits, less accountability for discriminatory practices, and the very erosion of federal rights that *Alexander*, 415 U.S. 36 and *Oubre*, 522 U.S. 422 guard against. That is not a close case under *Rumery*, 480 U.S. 386 's public-interest prong.

**Narrow tailoring is absent.** Where the Court has been willing to consider enforcement, the release was narrowly cabined to the specific, known dispute before the parties. *Id.* at 399 (O'Connor, J., conc.). By contrast, the Board asks this Court to enforce a sweeping, time-uncabined waiver that reaches far beyond the resolved IDEA controversy and into future controversies the parties could not have anticipated. That breadth alone defeats enforcement under the federal standard.

**Bottom line.** Because the Board relied exclusively on state law and never carried its federal burden to show (1) a voluntary, informed waiver and (2) that enforcement would *advance*—rather than frustrate—federal civil-rights policy, the release is unenforceable as a matter of federal law. *Id.* 392, 399; *Alexander*, 415 U.S. at 51;

33

*Oubre*, 522 U.S. at 427.  At minimum, *Rumery*, 480 U.S. 386 requires a developed factual record on voluntariness and public interest—one the summary judgment posture here does not supply.

## IX   The Board's Fraudulent Inducement Requires Trial

### 1.   The Board Misrepresented the Agreement's Scope

The Board dismisses fraudulent inducement in a footnote, claiming "evidence of the parties' intent is of no use when analyzing an unambiguous contract" (Appellee Br. at 31 n.8).

This misstates Florida law.  Fraudulent inducement claims are exempt from the parol evidence rule. *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1342 (S.D. Fla. 2003).  Warner alleges the Board:

• Assured him the agreement covered only IDEA claims

• Never mentioned constitutional or housing claims

• Actively concealed their broad interpretation

• Induced his signature through misrepresentations

34

These allegations, taken as true on summary judgment, require trial. The Board offers no contrary evidence.

## X   The Due Process Claim—The Board Misconstrues Both Fact and Law

### 1.   The Fundamental Mischaracterization

The Board erects a straw man. It argues Warner claims an entitlement to attend a particular school (Appellee Br. at 24–26), then knocks it down by observing no such substantive right exists. But Warner makes no such claim. His challenge targets something far more basic: the *process* itself—specifically, the Board's arbitrary refusal to allow him even to *apply* to Carrollwood K-8 and its capricious administration of the hardship appeal system.

This distinction is dispositive. Warner need not establish a property interest in attending Carrollwood K-8. He need only show that once the Board creates an application process, the Constitution forbids administering that process in an arbitrary and discriminatory manner. As the Supreme Court made clear in *Board of Regents v. Roth*, even wholly discretionary benefits require fair procedures in their distribution. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The question is not whether Warner has a right to a favorable outcome, but whether he has a right to a

fair process.

The Board compounds its error by misreading the record. It claims Warner "admits that the general processes have remained open to him" because he applied to an unrelated school (Appellee Br. at 26). This cherry-picks the facts. Warner specifically alleges he was *unable* to submit a school choice application for Carrollwood K-8 (SAC ¶¶ 203–205), was *denied* the opportunity to file a hardship application for that school (SAC ¶ 207), and faced an arbitrary hardship review process devoid of meaningful standards (SAC ¶ 209). That he could apply elsewhere proves nothing.

## 2.    Florida Law Creates More Than Mere Procedures—It Establishes Enforceable Rights

Florida Statute § 1002.31 does far more than suggest best practices. Its mandatory language creates binding obligations and, consequently, protected interests. The statute commands that districts "*shall* adopt by rule" school choice processes and "*shall*" provide specified procedures. FLA. STAT. § 1002.31. When a legislature uses such imperative language and prescribes specific processes that government actors must follow, it creates enforceable rights. *See Key West Harbour Dev. Corp. v. City of Key West*, 987 F.2d 723, 728 (11th Cir. 1993) (holding that mandatory statu-

36

tory non-descretionary procedures create protected interests, rejecting the argument that "procedures alone" cannot suffice).

Moreover, Florida law does not grant unbounded discretion. It establishes concrete criteria for school choice determinations, requiring enrollment capacity calculations "based on specifications, plans, elements, and commitments contained in the school district educational facilities plan." FLA. STAT. § 1002.31(2)(b). This statutory framework constrains administrative discretion in precisely the manner that creates a protected liberty interest. *See Roth*, 408 U.S. at 577 ("[P]roperty interests …are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law").

The Board's reliance on *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), misses the mark. *Gonzales* involved a restraining order enforcement statute riddled with discretionary language ("shall use every reasonable means to enforce") and no specific enforcement criteria. *Id.* at 760–61. The Court emphasized that police retained "discretion to assess the situation" and determine appropriate action. *Id.* Here, by contrast, Florida law provides definite standards—enrollment calculations tied to facility plans and mandatory application processes and procedures. Where *Gonzales* found only "well-established tradition of police discretion,"

Florida's school choice statute creates a "legitimate claim of entitlement" through its precise mandates and constraining criteria. *Compare id.* at 760 *with Roth*, 408 U.S. at 577.

### 3.   The Board's Case Citations Fail on Their Facts

#### A.   *Marshall* Addresses Process Avoidance, Not Process Denial

The Board invokes *Marshall v. City of Cape Coral*, 797 F.2d 1555 (11th Cir. 1986), for the proposition that Warner's "voluntary decision not to utilize the process available to him precludes him from claiming any violation [of] due process" (Appellee Br. at 27). This both misstates the facts and misapplies the law.

Factually, Warner did not voluntarily forgo the process—he was barred from accessing it. He could not submit a school choice application for Carrollwood K-8 because the Board closed that option to him entirely. *Marshall* involved a plaintiff who had available administrative procedures but chose to bypass them. That scenario bears no resemblance to this case, where Warner attempted to use the process but was denied entry to it. One cannot "voluntarily" decline something never offered. The Board's argument proves too much: under its logic, any denial of access to administrative procedures would be unreviewable because the denied applicant

"chose" not to use them.

## B.   *Anderson* Is Distinguishable and Non-Binding

The Board's citation to *Anderson v. School Board*, *Anderson*, 477 U.S. 242, for the proposition that Florida law creates no right to attend a chosen school (Appellee Br. at 24) suffers from multiple defects.

First, *Anderson* addressed student discipline and involuntary alternative school placement—not discriminatory denial of access to application processes. The procedural posture and legal questions differ fundamentally.

Second, *Anderson* is an unpublished district court opinion that explicitly declined to resolve the issue, noting only "doubt" about protected interests. Unpublished opinions carry no precedential weight and tentative dicta even less so.

Third, *Anderson* predated Florida's current comprehensive school choice framework. The statutory landscape it examined no longer exists. Florida has since enacted detailed school choice provisions with mandatory procedures and specific criteria—precisely the elements that transform discretionary benefits into protected interests.

Most critically, the Board conflates substantive and procedural rights. *Ander-*

*son*'s observation that no substantive right to attend a particular school exists says nothing about the procedural right to fair administration of application processes. As *Goss v. Lopez* teaches, while students have no constitutional right to public education itself, "having chosen to extend the right," the state cannot withdraw it "on grounds of misconduct absent fundamentally fair procedures." *Goss v. Lopez*, 419 U.S. 565, 574 (1975). The same principle applies here: having created an application system, the Board cannot administer it arbitrarily.

Warner's due process claim rests on bedrock principles: government cannot create processes for distributing benefits and then administer those processes arbitrarily or discriminatorily. Florida law reinforces this constitutional floor by mandating specific procedures and establishing constraining criteria. The Board's attempt to reframe Warner's procedural claim as a substantive entitlement claim fails, as does its reliance on inapposite cases addressing different legal questions. Warner seeks only what due process guarantees—a fair opportunity to apply according to stated criteria, free from arbitrary denial and discriminatory treatment.

40

## XI   The District Court's Procedural Errors Require Reversal

### 1.   The Denial of Discovery Was an Abuse of Discretion

The Board claims discovery was unnecessary because the case involved "purely legal issues" (Appellee Br.  at 44–46).  This is demonstrably false.  The District Court's opinion relied heavily on factual determinations about:

• The scope and meaning of the settlement agreement

• The parties' intent of the contract

• whether the agreement was otherwise knowingly and voluntarily made

These are quintessentially factual issues requiring discovery.  The Board cannot claim issues are "purely legal" when its own brief spends pages disputing facts about causation, housing markets, school administration, and settlement negotiations.

The court denied discovery under Rule 56(d) because it refused to properly engage in the fact intensive inquiry on whether the agreement was knowingly and voluntarily made or procured through fraud, relying instead on the plain-text of the agreement without considering extrinsic facts.

41

## 2.  The Board Waived Defenses Not Raised Below

The Board now relies heavily on paragraph 6's "agreement not to sue," but failed to raise this as an affirmative defense in its answer.  Federal Rule of Civil Procedure 8(c) requires affirmative defenses be pleaded or they are waived.  The Board cannot resurrect waived defenses on appeal.

## XII  Conclusion

For the reasons set out above and in the opening brief, the judgment should be reversed.  The Board's theories are incompatible with the Fair Housing Act's text and this Court's precedents:  school-boundary and assignment decisions fall within §§ 3604(a) and (b), and Warner plausibly alleged proximate cause.  The due-process claim challenges the Board's arbitrary refusal to allow even an application or hardship review—not a right to any particular school—and Florida's statutory scheme supplies the governing constraints.  The settlement cannot bar these claims:  it is textually limited to J.W.'s education, expressly preserves claims arising from post-effective-date acts, lacks separate consideration for Warner's individual release, and, in any event, cannot operate as a prospective waiver of federal civil-rights claims.  At minimum, disputed facts about scope, voluntariness, and inducement preclude summary judgment and require discovery.

42

Accordingly, Appellant respectfully requests that this Court (1) reverse the dismissal of the FHA; (2) reverse summary judgment on the constitutional claims; (3) vacate any reliance on the settlement as a bar; and (4) remand for further proceedings on the merits. In the alternative, the Court should vacate and remand for discovery and factual findings.

## XIII    Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Eleventh Circuit Rule 32-4 because, excluding the parts of the brief exempted by Rule 32(f), this brief contains 6,451 words as counted by https://charactercounter.com/pdf-word-counter

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using LaTeX in 14-point Times New Roman font.

October 27, 2025
_____

Date

/s/blake warner
_____

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM