**NOT FOR PUBLICATION**

# In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 25-11376
Non-Argument Calendar

————————————

BLAKE WARNER,

*Plaintiff-Appellant,*

*versus*

SCHOOL BOARD OF HILLSBOROUGH
COUNTY, FLORIDA,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:23-cv-00181-SDM-LSG

————————————

Before LAGOA, ABUDU, and ANDERSON, Circuit Judges.

PER CURIAM:

Blake Warner appeals the dismissal of his claims against the School Board of Hillsborough County ("School Board") alleging violations of the Fair Housing Act, 42 U.S.C. § 3601, and Due Process and Equal Protection clauses of the Fourteenth Amendment of the U.S. Constitution.  This appeal asks us to determine whether a release clause and agreement not to sue clause in a settlement agreement from a prior action ("Settlement Agreement" or the "Agreement") were enforceable, whether those clauses barred Warner's claims, and whether Warner's fundamental right to direct his child's education was violated when he could not enroll his child in a public school that was below capacity.

After careful consideration of the record, we conclude that the Settlement Agreement's terms barred Warner from raising his Equal Protection and Fair Housing Act claims, we conclude that Warner's Due Process claim fails as a matter of the law, and we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Warner is an African-American resident of Hillsborough County and a registered voter in the county since 2016.  Hillsborough County is broken up into five districts.  Warner lived in District 1 until late 2022 but moved to District 3 because of rising housing costs.  Warner currently lives with his minor child, J.W., in District 3 and at the time Warner's operative complaint was filed, J.W. was a fifth-grade student.

In Hillsborough County, the School Board draws school assignment maps for its residents.  The school that children attend is

based on where they live, even if the assigned school is not the closest. For example, J.W. is assigned to Hill Middle School[1] but Carrollwood public school is geographically closer to him. The reverse is also true: some students assigned to Carrollwood public school geographically live closer to Hill Middle School. In addition, the performance ratings and enrollment at schools are not uniform across Hillsborough County. For example, Carrollwood public school is an A-rated school with a lower minority enrollment than Hill Middle School, which is a lower-rated school with a majority-minority student body.

On January 26, 2023, Warner, proceeding pro se, sued the School Board to challenge Hillsborough County's school assignment maps and alleged that the School Board intentionally segregated students by race. As the case progressed, Warner amended his complaint a total of three times.[2] In between the first and second amended complaints, additional events occurred.

---

[1] The operative complaint states that J.W. was assigned to Adams Middle School and Hill Middle School. Because the operative complaint predominantly references Hill Middle School as J.W.'s assigned school, that is where J.W. is presumed to be assigned for the purposes of this appeal.

[2] Warner's initial complaint was filed on behalf of himself and J.W. Following this Court's opinion in *Warner v. Sch. Bd. Of Hillsborough Cnty., Fla.*, No. 23-12408, 2024 WL 2053698, at *1 (11th Cir. May 8, 2024), which held that Warner, as a nonlawyer, could not represent his son pro se, Warner amended his complaint to remove any claims asserted on behalf of J.W. and none of his following amended complaints asserted such claims.

On May 9, 2023, the School Board changed Carrollwood from a kindergarten through fifth grade school to a kindergarten through eighth grade school ("Carrollwood K-8"). Because of this change, if J.W. were assigned the school that he was geographically closest to, he would have attended Carrollwood K-8 when he started sixth grade in Fall 2023.

On July 10, 2023, the School Board opened the school choice application website to allow parents the opportunity to enroll their children in out-of-zone schools that were below capacity. Warner participated in the school choice application process with the goal of enrolling J.W. in Carrollwood K-8, but it was not listed on the website. Assuming Carrollwood K-8 was at capacity, Warner applied to the schools that were listed and attempted to apply to Carrollwood K-8 by submitting a hardship application.[3] But because he applied to other schools, he was prevented from submitting a hardship application without first withdrawing his other applications. Warner was neither told that Carrollwood K-8 was over capacity nor placed on a wait list to be notified if space became available throughout the school year. Warner ultimately did not apply to Carrollwood K-8.

Also on July 10, 2023, Warner amended his complaint a second time pursuant to a court order requiring him to merge the action below and another that was pending in the same jurisdiction

---

[3] According to Warner's second amended complaint, applying to a school through a hardship application requires submission of a 2000-character essay explaining a compelling reason for the hardship request.

for similar claims. His second amended complaint added a claim challenging Hillsborough County's school choice application process and asserted a total of nine counts against the School Board.

Three counts from the second amended complaint are relevant for the present appeal. Counts I and II alleged that the School Board violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, when it made housing and education unavailable through its school assignment boundary maps by pricing minorities out of certain neighborhoods and the schools assigned to those neighborhoods. Warner claimed that school assignments raised property values for residences zoned for high-rated schools. This increase in property values, Warner alleged, disproportionally priced out minorities from certain neighborhoods. Specific to Warner, the school assignment maps increased housing costs in District 1 such that he was forced to relocate to District 3, where J.W. was assigned to a low-rated school. Count VI alleged that the School Board violated his Due Process rights when it deprived Warner of the ability to enroll J.W. in Carrollwood K-8.

On July 24, 2023, the School Board moved to dismiss Warner's second amended complaint and appended the Settlement Agreement between Warner, individually and on behalf of J.W., and the School Board from yet another lawsuit about J.W.'s education (the "Settled Lawsuit"). The Settlement Agreement states, in relevant part:

> 5. **Release of the School Board and District:**
> For and in consideration of the required acts and

promises set forth in this Agreement, [Warner] hereby knowingly and voluntarily releases and discharges the [School Board] from any and all claims, demands, causes of action, complaints or charges, known or unknown specifically related J.W.'s education, services, and educational program in the District through the date of the execution of this Agreement. This shall include, but not be limited to, all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorney's fees, and all losses of any kind whatsoever related specifically to J.W.'s education . . . .

6. **Agreement Not to Sue:** [Warner] agrees not to maintain, argue, institute, or file any of the Released Claims in any court, administrative or agency process or other legal forum whatsoever, nor shall any other court actions, agency action/process or other legal proceedings of any type be filed that are connected in any way to or by virtue of or related to any other facts, acts, or events occurring in whole or in part on or before the Effective Date of this Agreement.

As part of the Agreement, Warner and J.W. were guaranteed enrollment at specific schools in exchange for dismissal of the action with prejudice, release of claims, and an agreement not to sue. The

Settlement Agreement also memorialized Warner's opportunity to obtain the advice of legal counsel prior to executing the agreement and his opportunity to read and consider the agreement in its entirety before signing. In executing the Agreement, Warner acknowledged that he did not rely on any representation, compromise, conduct, or action made by the School Board and its attorneys except for what was contained in the Agreement.

Because the magistrate judge was considering a motion to dismiss, she did not recommend dismissing Warner's second amended complaint on the basis of the Settlement Agreement. Instead, the magistrate judge proffered other reasons for why Warner's claims should be dismissed as a matter of law. Relevant here, the magistrate judge recommended that Warner's FHA claims be dismissed because the connection between the School Board's school assignment map and housing availability was too attenuated to support FHA liability. With regards to Warner's Due Process claim, the school choice and hardship application procedures did not implicate a constitutionally-protected fundamental right sufficient for a § 1983 action. In adopting the magistrate judge's report and recommendation, the district court dismissed Warner's claims with leave to amend.

On June 10, 2024, Warner filed a third amended complaint, the operative complaint, asserting two counts under the Equal Protection Clause against the School Board.

Count I alleged that the school assignment maps promulgated by the School Board were racially motivated. According to

Warner, the boundary lines for public schools were drawn to separate children from affluent white families and children of color attending nearby majority-minority schools. In a thorough complaint, Warner included numerous examples of school boundary lines for public schools in Hillsborough County to support his allegation.

Count II raised a new claim challenging the voting district maps for school board member elections and alleged that race was a predominant factor when the School Board drew those districts.[4] For example, the School Board intentionally drew the lines for District 1 to include a majority Hispanic population; District 5 to include a majority African-American population; and Districts 2, 3, and 4 to include majority-white populations. In support of his allegations, Warner cited statements from a December 10, 2021, redistricting hearing. For example, board member Stacy Hahn stated her intention "to create an Hispanic seat on the school board to represent our Hispanic community." And board member Henry Washington stated that he wanted to "increase[] the largest Black population" in his District 5. This racially-motivated redistricting, Warner alleged, diminished the influence of African-American and Hispanic voters on school board decisions, such as the school assignment maps for Hillsborough County public schools.

---

[4] Five of the seven members of the school board are elected by constituents in their respective districts (Districts 1–5) and the remaining two are elected in at-large countywide elections.

The School Board moved for judgment on the pleadings and again appended the Settlement Agreement to its motion. Because the Settlement Agreement was outside the pleadings, the magistrate judge considered the School Board's motion as a motion for summary judgment and directed the Parties to provide the court with all materials pertinent to the motion.

In support of his opposition, Warner filed a declaration recounting his conversations with LaKisha Kinsey-Sallis, the attorney who represented the School Board in the Settled Lawsuit. Based on his conversation with Kinsey-Sallis, Warner stated that he understood the broad release language to only cover special education claims specifically related to J.W. and that he himself was only included because he possessed rights as a parent that needed to be released to fully end the litigation.

On January 14, 2025, the magistrate judge recommended that summary judgment be granted in favor of the School Board because the Settlement Agreement barred Warner from pursuing his claims. The magistrate judge concluded that Warner's school assignment map claim was barred by the release in the Settlement Agreement because the claim was specifically connected with J.W.'s education and the school J.W. was assigned. The magistrate judge also recognized that though Warner's voting map claim was not specifically connected to J.W.'s education, the claim was barred by the broader language in the Settlement Agreement's agreement not to sue. The district court adopted the magistrate judge's report and recommendation in full.

Warner filed the present appeal.

## II.    STANDARD OF REVIEW

This Court "review[s] de novo a district court's grant of a motion to dismiss for failure to state a claim under FRCP 12(b)(6), accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Ga. State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 631 (11th Cir. 2019).

This Court "review[s] a grant of summary judgment de novo, viewing all facts in the record in the light most favorable to the nonmovant and drawing all inferences in h[is] favor." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1316–17 (11th Cir. 2024).

## III.    ANALYSIS

On appeal, Warner argues that the district court erred in dismissing his FHA and Due Process clause claims in his second amended complaint as a matter of law. Warner also argues that the district court erred in holding that the Settlement Agreement was enforceable and that his two Equal Protection clause claims were barred by the Agreement. Because many of Warner's claims on appeal can be precluded by the Settlement Agreement, we first address whether the Settlement Agreement was enforceable.

### A. Enforceability of the Settlement Agreement

Warner argues that the Settlement Agreement was not enforceable because it was fraudulently induced, lacked consideration, and was not executed knowingly or voluntarily. Warner also

argues that the district court erred in enforcing the Settlement Agreement because it violated public policy.

A settlement agreement is essentially a contract, subject to the traditional rules of contract interpretation. *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1290 (11th Cir. 2004). "Where the plain meaning of an agreement is clear, we may not go beyond the four corners of the document to look for additional evidence of the drafters' intentions." *Id.* When the parties to a contract do not dispute a choice-of-law clause, this Court enforces the clause. *See AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1290 (11th Cir. 2022) (applying Maryland law to interpret an agreement when the parties did not dispute the applicability of the clause). Here, we interpret the Settlement Agreement under Florida law because the Agreement designates Florida law in its choice-of-law provision and the provision is not disputed.

With regards to Warner's fraudulent inducement argument, the Settlement Agreement expressly provides that Warner "has not relied on any representation, compromise, conduct or action made by any person on behalf of the School Board or the School Board's attorneys except what is otherwise contained in this Agreement." This language directly forecloses the statements made in Warner's declaration that his conversations with the School Board's attorneys restricted the scope of the release despite the broad language in the release clause. *See Pardes v. Pardes*, 335 So.3d 1241, 1245 (Fla. 3d DCA 2007) ("When a contract is clear and unambiguous, the

actual language used in the contract is the best evidence of the intent of the parties and the meaning of that language controls.") (citation modified).  Because Warner did not "rel[y] on any representation … made by … the School Board's attorneys," we reject Warner's contentions that LaKisha Kinsey-Sallis's representations fraudulently induced him to sign the Agreement.

With regards to Warner's lack of consideration argument, the Settlement Agreement's clause titled "Consideration" lists the benefits J.W. received in exchange for dismissal of the lawsuit and release of claims.  These benefits include guaranteed school assignments for J.W. and though school assignments are not monetary compensation, such benefits are consideration under Florida law, particularly when J.W.'s education was the subject of the Settled Lawsuit.  *See Florida Power Cor. v. Pub. Serv. Comm'n*, 487 So.2d 1061, 1063 (Fla. 1986) ("[C]onsideration need not be money or anything having monetary value, but may consist of either a benefit to the promisor or a detriment to the promise.") (citation modified).  Per the terms of the Settlement Agreement, valid consideration was offered to Warner "individually, and on behalf of his minor child."

With regards to Warner's knowing and voluntary argument, the Agreement states that Warner "acknowledge[d] that he has had the opportunity to obtain the advice of legal counsel of his choice prior to executing this Agreement and agree[d] that he had an opportunity to read and consider the Agreement in its entirety."  The Settlement Agreement also confirmed Warner's "opportunity to have the Agreement explained to [him] by an attorney and that

[he was] relying on [his] own judgment and/or on the advice of [his] attorney" and confirmed Warner's "competence to understand and accept the terms and conditions of the Agreement." Additionally, the Settlement Agreement notes that Warner "knowingly and voluntarily releas[ed]" the claims against the School Board. This is clear and unambiguous language that Warner executed the Settlement Agreement knowingly and voluntarily. *See Freeman v. Motor Convoy, Inc.*, 700 F.2d 1339, 1352 (11th Cir. 1983).

In a last-ditch effort, Warner also claims that the Settlement Agreement violates public policy because contracting away rights to sue under § 1983 undermines civil rights enforcement. But the Florida Supreme Court has advised courts to proceed with "extreme caution when called upon to declare transactions void as contrary to public policy." *Bituminous Cas. Corp. v. Williams*, 17 So.2d 98, 101 (Fla. 1944). Enforcing the release to bar Warner's claims, thus, does not violate public policy.

### B. Claims Barred by the Settlement Agreement

Having determined that the Settlement Agreement was enforceable, we turn next to whether Warner's claims were barred by the Settlement Agreement's terms. On a plain reading of the Settlement Agreement, *see Norfolk S. Corp.*, 371 F.3d at 1290, we conclude that Warner's school assignment map claim was barred by the Agreement's release clause and that his school voting district

map and FHA claims were barred by the Agreement's agreement not to sue clause.[5]

### 1. School Assignment Map Claim

The release clause of the Settlement Agreement provides that Warner "releases and discharges the School Board … from any and all claims … known or unknown specifically related to J.W.'s education, services, and educational program … through [March 21, 2022]." Thus, for a claim to be barred under the release clause, (1) the alleged misconduct must have occurred prior to March 21, 2022, and (2) the claim must be "specifically related to J.W.'s education, services, and educational program."

First, Warner argues that the school assignment maps he challenges were implemented in 2023, which is after the March 2022 date enumerated in the Agreement. In his third amended complaint, Warner alleges that on May 9, 2023, the School Board changed Carrollwood public school from a K-5 school to a K-8 school and that J.W. should be attending that school because it is closer to their home.

---

[5] Warner challenges school assignment maps and school voting district maps to which he does not belong, but he lacks standing to challenge the School Board's conduct for those maps. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (recognizing that courts "refuse[] to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power"); *Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("[A] plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his district has been so gerrymandered.").

But Warner fails to show that the school assignment map that allegedly harmed him was promulgated after March 2022. Instead, all Warner has shown is that the School Board changed the grades that Carrollwood services from K-5 to K-8. Indeed, Warner alleged that the school assignment boundaries correspond with maps created in 1933 and he has not shown any changes to the map after March 2022. Moreover, Warner did not plead that any change to the Carrollwood K-8 assignment map affected him in anyway because throughout Warner's residence in District 3, Warner was never assigned to Carrollwood K-8 in the first place. The facts alleged in the operative complaint, thus, show that Warner's claim about the discriminatory nature of the school assignment maps existed prior to the execution of the Settlement Agreement.

Second, Warner argues that his school assignment map claim is not "specifically related to J.W.'s education, services, and educational program."

But Warner's allegations in his third amended complaint belie his position. There, Warner specifically noted that J.W. will start sixth grade the year the Carrollwood change takes effect and that had the school assignment map been drawn differently, J.W. would be attending Carrollwood. Warner's own allegations tied his school assignment map claim to J.W.'s education and the School Board, thus, was released of liability for this claim.

### 2. School Voting District Map Claim

The agreement not to sue clause of the Settlement Agreement provides that Warner "shall" not file "any other court actions

… that are connected in any way to or by virtue of or related to any other facts, acts, or events occurring in whole or in part before [March 21, 2022]." Warner argues that his school voting district map claim was not barred by the agreement not to sue because the School Board waived the defense when it failed to invoke this clause as an affirmative defense.

Ordinarily, a defendant's "failure to specifically plead the [affirmative] defense in its answer or amended answer bars a challenge on appeal." *Isaac Indust., Inc. v. Petroquimica De Venezuela, S.A.*, 127 F.4th 289, 301 (11th Cir. 2025). Courts generally lack the ability to raise an unpleaded affirmative defense sua sponte. *Id.* The purpose of this rule is to afford plaintiffs with "adequate notice of unanticipated defenses." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1240 (11th Cir. 2010). A district court may consider certain defenses sua sponte in the interest of "promot[ing] judicial efficiency, even where the defendants fail to raise those claims themselves." *Id.* Moreover, a court may grant summary judgment on grounds not raised by a party after giving "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f).

The district court did not err in considering the agreement not to sue in its disposition of this case for three reasons. First, the School Board invoked the Settlement Agreement in its answer and Warner was on notice that an agreement not to sue was a possible defense theory. Second, the magistrate judge afforded the Parties a reasonable time to provide the court with all materials pertinent to the School Board's motion. This brief extension of discovery

gave Warner time to prepare a defense to the Settlement Agreement. Third, assuming, *arguendo*, that the affirmative defense was not raised in the School Board's operative answer, judicial efficiency weighs in favor of raising the defense sua sponte because the entire Settlement Agreement was before the district court for consideration. *See Latimer*, 601 F.3d at 1240. Indeed, the facts, materials, and arguments that support barring Warner's claims with the release clause and agreement not to sue clause significantly overlap; both ask what and when something happened.

Because Warner does not dispute the district court's conclusion that the school voting district map claim would fall under the language of the agreement not to sue, his claim was barred by that provision.

### 3. Fair Housing Act Claim

The terms of the agreement not to sue clause also barred Warner from raising his FHA claim.[6] Through the agreement not to sue, Warner agreed not to assert any rights against the School Board for any violations covered by the clause. *See Rosen v. Fla. Ins. Guar. Ass'n*, 802 So.2d 291, 295 (Fla. 2001). In other words, Warner waived his right to bring an action against the School Board for "any facts, acts, or events occurring in whole or in part" before March 21, 2022.

---

[6] Though the district court did not consider this in the first instance, we may affirm on grounds supported by the record. *See Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017).

Here, Warner alleged that the School Board denied housing and educational services to minority residents by inflating property values. By assigning specific residences to a high-rated school, the School Board increased property values for those residences and thereby excluded minorities who could not afford those residences from the benefit of an education at those schools. Instead, parents such as Warner could only afford the residences zoned for lower-rated majority-minority schools. The School Board's conduct, Warner alleges, further entrenched school and residential segregation.

But the facts giving rise to Warner's FHA claim occurred, at least in part, before March 21, 2022, the date the Settlement Agreement was executed. Like Warner's school assignment map claim, Warner fails to show any changes to the school assignment map after March 2022. Without any changes to the map, the challenged conduct occurred before the Settlement Agreement was executed. Though Warner moved after March 2022 due to rising costs, he has not sufficiently pleaded specific conduct that occurred after March 2022 that led to those rising costs. Warner's FHA claim, thus, was barred by the agreement not to sue.

## C. Due Process Claim

Unlike Warner's other claims, his Due Process claim was not barred by the Settlement Agreement because the conduct alleged occurred entirely after the Agreement was executed. For this claim, Warner argues that his fundamental right to direct his child's education was violated when he was deprived of the statutorily-

created right, under Florida law, to enroll in any public school that is below capacity. Specifically, Warner contends that he was denied the right to enroll J.W. in Carrollwood K-8.

"To establish a violation of procedural due process under 42 U.S.C. § 1983, a plaintiff must prove (1) that some person deprived him of a federal right, and (2) that the person who deprived him of that right acted under color of state law. *Key West Harbour Dev. Corp. v. City of Key West*, 987 F.2d 723, 727 (11th Cir. 1993). A right is a "federal right" protected under the Fourteenth Amendment if it is guaranteed as a property interest under state law. *See id*. Under Florida Law, a property interest may be created under a statute that "support[s] claims of entitlement." *Id*.

But "statutory procedures alone do not create protected property interests," and thus, do not create a "federal right." *Id*. at 728. The distinction between a statutory procedure and a property interest was described in *Key West*. There, a development company (the "Company") sued the City of Key West (the "City") for violation of the Due Process clause when the City rescinded a redevelopment plan, thereby causing the company to lose the predevelopment project it was contracted to perform. *Id*. at 725. The Company relied on the Community Redevelopment Act of 1969 (the "Act") to establish that it had a property interest in performing the predevelopment services. *Id*. at 727. The Act required the City to create a community redevelopment agency that prepared a redevelopment plan and chose contractors to fulfill the plan. *Id*. at 728. The Act also entitled the City the "power of final approval of the []

redevelopment plan and modifications thereof." *Id.* We rejected the Company's position that the Act vested in it a property interest in completing the predevelopment project because the terms of the Act did not "create an entitlement to a contract," which was in contrast to an act "requir[ing] … the overseeing state agency to award contracts to the lowest responsible bidder" that this Court held did. *See id.* (citing *Pataula Elec. Memb. Corp., v. Whitworth*, 951 F.2d 1238 (11th Cir. 1992)). Instead, the Act merely created a statutory procedure for awarding redevelopment contracts and did not entitle the Company to any property interest because it afforded the City "broad discretion to choose the [] redevelopment plan." *Id.* at 728–29.

Here, the statute Warner relies on only establishes statutory procedures for school selection. Florida law requires that "each school district board … shall allow a parent from any school district in the state … to enroll his or her child in … any public school … that has not reached capacity in the district[.]" Fla. Stat. § 1002.31(2)(a). To determine maximum class size, each school board is required to determine its own capacity based on its specifications, plans, elements, and commitments in the statutorily-mandated facilities plan and long-term work programs. *Id.* § 1002.31(2)(b).[7] Moreover, the statute establishes a preferential

---

[7] To the extent Warner argues that he had a property interest in the enrollment procedures mandated by Fla. Stat. § 1002.31(3)—*e.g.*, allowing parents to declare school preferences, maintaining a wait list of students who are denied access, and accepting students as capacity becomes available—Fla Stat. §

treatment procedure for differently situated children, with "[d]ependent children of active duty military personnel" preferred over "[s]tudents residing in the school district." *Id.* § 1002.31(2)(c).

Indeed, nothing in Fla. Stat. § 1002.31(2)(a) guarantees attendance at Warner's preferred school, Carrollwood K-8. Like the City in *Key West*, the School Board is afforded broad discretion to determine whether a child is enrolled at the preferred school. For example, under Fla. Stat. § 1002.31(2)(a), the School Board may determine that Carrollwood K-8 is at capacity and reject enrolling the student there. Additionally, even after an application is submitted to a school below capacity, the School Board must follow the preferential treatment procedures for student acceptance enumerated by Fla. Stat. § 1002.31(2)(c). Without any vested property right in attending Warner's preferred school, the statute merely creates statutory procedures that do not grant a "federal right." *Key West*, 987 F.2d at 728. Thus, we conclude that the district court did not err in dismissing Warner's Due Process claim for failure to state a claim as a matter of law.

---

1002.31(2)(b) permits the School Board to consider its long-term plan in determining capacity and enrollment availability. This means that even if Carrollwood K-8 was not physically at capacity, it may be determined to be at capacity for the purposes of the School Board's long-term plans. Additionally, Warner's allegations in his second amended complaint show that he could have applied to Carrollwood K-8 but chose not to. We do not decide whether the enrollment procedures under Fla. Stat. § 1002.31(3) vested in Warner a property interest.

## IV. CONCLUSION

For all these reasons, we conclude that the district court did not err in dismissing Warner's claims.  We thus affirm the district court's decision.

**AFFIRMED**.